**No. 24-1201**

IN THE
United States Court of Appeals for the Tenth Circuit

—————————

JACQUELINE ARMENDARIZ and CHINOOK CENTER,

Plaintiffs-Appellants,

v.

CITY OF COLORADO SPRINGS; DANIEL SUMMEY, a detective with the
Colorado Springs Police Department, in his individual capacity; B.K. STECKLER, a
detective with the Colorado Springs Police Department, in his individual capacity;
JASON S. OTERO, a sergeant with the Colorado Springs Police Department, in his
individual capacity; ROY A. DITZLER, a police officer with the Colorado Springs
Police Department, in his individual capacity; FEDERAL BUREAU OF
INVESTIGATION; and THE UNITED STATES OF AMERICA,

Defendants-Appellees.

—————————

On Appeal from the
United States District Court for the District of Colorado
Civil Action No. 23-cv-01951-SKC-MDB
(Hon. S. Kato Crews)

—————————

**ANSWER BRIEF OF CITY DEFENDANTS-APPELLEES**

—————————

ANNE H. TURNER
OFFICE OF THE CITY ATTORNEY OF THE
CITY OF COLORADO SPRINGS
30 South Nevada Avenue, Suite 501
Colorado Springs, Colorado 80903
(719) 385-5909

Attorney for Defendants-Appellees City of Colorado Springs,
Bradley K. Steckler, Jason S. Otero, and Roy A. Ditzler

**ORAL ARGUMENT IS NOT REQUESTED**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

PRIOR OR RELATED APPEALS ......................................................... vii

STATEMENT OF THE CASE ................................................................1

    Facts .....................................................................................2

        Pulpit Rock Protest ....................................................2

        March for Housing.....................................................4

        Search Warrant 1: Armendariz Apartment Warrant.....................6

        Search Warrant 2: Armendariz Devices Warrant.......................8

        Search Warrant 3: Chinook Facebook Warrant .........................11

        Criminal Prosecutions.................................................13

    Procedural History ...................................................................14

        Complaint ..............................................................14

        Motions to Dismiss....................................................15

        Order for Additional Briefing.........................................16

        Order on Motions to Dismiss .........................................16

SUMMARY OF THE ARGUMENT ......................................................23

ARGUMENT

I.    The District Court correctly dismissed Chinook's Fourth
    Amendment claim against Steckler and Otero ...................................26

    A.  The Chinook Facebook Warrant satisfied the Fourth Amendment ............26

        1.  The warrant affidavit identified the crimes and persons
            under investigation. .................................................28

2.    The warrant affidavit provided the factual basis for
deeming the protestors' conduct illegal ..................................................30

3.    The warrant affidavit established a nexus between the
crimes under investigation and the Chinook Facebook page...............32

4.    The warrant's scope was limited to searching for and
seizing evidence for which the Officers had probable cause...............36

B.  Qualified immunity shields Steckler and Otero from liability
for the Chinook Facebook Warrant because there is no clearly
established law governing Facebook warrants.............................................44

II.  The District Court correctly dismissed Plaintiffs' constitutional
claims against the City...........................................................................46

A. Plaintiffs fail to state a constitutional violation claim against
any City employee.............................................................................47

B. Plaintiffs fail to allege the existence of an unconstitutional
custom of seeking overbroad search warrants against protestors ...............47

III. Because the Opening Brief fails to adequately argue that
Armendariz asserts her injunctive relief claim against the City,
that the Chinook Facebook Warrant violates the Stored
Communications Act, or that the District Court should have
retained jurisdiction over Plaintiffs' state law claims, Plaintiffs
have forfeited any argument that City Defendants are not entitled
to the dismissal of such claims ...........................................................53

IV. Ditzler joins Summey's Fourth Amendment arguments. ...................................54

V.  Ditzler, Steckler and Otero join Summey's First Amendment
arguments...........................................................................................55

CONCLUSION..........................................................................................56

CERTIFICATE OF COMPLIANCE........................................................58

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY
REDACTIONS ........................................................................................59

CERTIFICATE OF SERVICE ..................................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Adler v. Wal-Mart Stores*,
  144 F.3d 664 (10th Cir. 1998) .................................................................. 54

*Baca v. Menyhert*,
  1994 WL 75877 (10th Cir. Mar. 11, 1994) ........................................ 26, 46, 53, 55

*Bronson v. Swensen*,
  500 F.3d 1099 (10th Cir. 2007) ................................................................ 54

*Cassady v. Goering*,
  567 F.3d 628 (10th Cir. 2009) ................................................................ 44

*Davis v. Gracey*,
  111 F.3d 1472 (10th Cir. 1997) ............................................................... 21

*Eckert v. Dougherty*,
  658 F. App'x 401 (10th Cir. 2016) ........................................................ 27, 29, 40

*Franks v. Delaware*,
  438 U.S. 154 (1978) .......................................................................... 18

*Hartman v. Moore*,
  547 U.S. 250 (2006) .......................................................................... 20

*Illinois v. Gates*,
  462 U.S. 213 (1983) .............................................................. 23, 28, 35, 38, 52

*Messerschmidt v. Millender*,
  565 U.S. 535 (2012) .............................................................. 18, 25, 45, 52

*Mink v. Knox*,
  613 F.3d 995 (10th Cir. 2010) ............................................................ 31, 44

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ......................................................................... 23, 32

*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019) ....................................................................... 20

*Poolaw v. Marcantel*,
565 F.3d 721 (10th Cir. 2009)................................................................ 44

*Saucier v. Katz*,
533 U.S. 194 (2001) .............................................................................. 44

*Stanford v. Texas*,
379 U.S. 476 (1965) ........................................................................ 24, 41

*Stonecipher v. Valles*,
759 F.3d 1134 (10th Cir. 2014)............................................................. 18

*United States v. Allen*,
2018 WL 1726349 (D. Kan. Apr. 10, 2018) ........................................ 38

*United States v. Arnold*,
2017 WL 4036312 (E.D. Mich. Sept. 13, 2017)................................... 33

*United States v. Augustine*,
742 F.3d 1258 (10th Cir. 2014) ............................................................ 45

*United States v. Chavez*,
423 F. Supp. 3d 194 (W.D.N.C. 2019) ................................................. 46

*United States v. Christie*,
717 F.3d 1156 (10th Cir. 2013)............................................................. 45

*United States v. Cotto*,
995 F.3d 786 (10th Cir. 2021)................................................... 27, 28, 32

*United States v. Gonzales*,
399 F.3d 1225 (10th Cir. 2005)............................................................. 44

*United States v. Hardman*,
297 F.3d 1116 (10th Cir. 2002)............................................................. 54

*United States v. Harris*,
2021 WL 4847832 (D. Minn. July 16, 2021) ................................. 43, 46

*United States v. Liburd*,
2018 WL 2709199 (E.D.N.Y. June 5, 2018) ......................... 36, 37, 38

*United States v. Lowry*,
   2015 WL 4399627 (S.D. Ohio July 17, 2015) ...................................................... 38

*United States v. Ortiz-Salazar*,
   2015 WL 2089366 (E.D. Tex. May 4, 2015) ...................................................... 33

*United States v. Palms*,
   21 F.4th 689 (10th Cir. 2021) ...................................................... 29, 44

*United States v. Pugh*,
   2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) ...................................................... 36

*United States v. Pulliam*,
   748 F.3d 967 (10th Cir. 2014) ...................................................... 28, 36, 45

*United States v. Purcell*,
   967 F.3d 159 (2d Cir. 2020) ...................................................... 37, 42, 43, 44, 52

*United States v. Sadlowski*,
   948 F.3d 1200 (10th Cir. 2020) ...................................................... 44

*United States v. Shelton*,
   817 F. App'x 629 (10th Cir. 2020) ...................................................... 23, 28, 34, 42

*United States v. Suggs*,
   998 F.3d 1125 (10th Cir. 2021) ...................................................... 30, 42

*United States v. Turner*,
   2022 WL 195083 (D. Nev. Jan. 21, 2022) ...................................................... 36, 37, 38

*United States v. Turner*,
   2023 WL 5696053 (9th Cir. Sept. 5, 2023) ...................................................... 38

*United States v. Walker*,
   918 F.3d 1134 (10th Cir. 2019) ...................................................... 54

*United States v. Westley*,
   2018 WL 3448161 (D. Conn. July 17, 2018) ...................................................... 46

*United States v. Yelizarov*,
   2017 WL 3022927 (D. Md. July 17, 2017) ...................................................... 33

*Voss v. Bergsgaard,*
  774 F.2d 402 (10th Cir. 1985)................................................................. 24, 41, 44

*Waller v. City & Cty. of Denver,*
  932 F.3d 1277 (10th Cir. 2020)............................................................ 48

**Statutes**

5 U.S.C. § 702 ........................................................................................ 15

18 U.S.C. § 2703 .................................................................................... 13

18 U.S.C. § 2705(b) ............................................................................... 13

28 U.S.C. § 2675(a) ............................................................................... 22

42 U.S.C. § 1983 .................................................................................... 14, 47

Colo. Const. art. II §§ 7, 10, 24............................................................. 14

Colo. Rev. Stat. § 13-21-131 ................................................................. 14, 22

Colo. Rev. Stat. §18-9-101 .................................................................... 50

Colo. Rev. Stat. § 18-2-101 ................................................................... 6

**Rules**

10th Cir. R. 10.4(B) .............................................................................. 26, 46, 53, 55

10th Cir. R. 10.4(D)(2)......................................................................... 26, 46, 53, 54, 55

10th Cir. R. 28(A) ................................................................................ 26, 46, 53, 54, 55

Fed. R. Crim. P. 41(g).......................................................................... 22

Fed. R. App. P. 28(i)............................................................................ 55, 56

## **PRIOR OR RELATED APPEALS**

None.

## **STATEMENT OF THE CASE**

Plaintiffs are not merely "activists" who exercised their First Amendment rights through protest on July 31, 2021. They engaged in <u>criminal conduct</u>: second-degree assault, obstructing traffic, and resisting arrest. Approximately one year earlier, Plaintiff Chinook Center also promoted a "protest" at which Chinook leaders explicitly authorized participants to bring "long guns." Those firearms were then used to terrorize citizens driving to and from their homes, spawning police investigations into "Attempted Robbery, Menacing, and Riot related charges." (Supp. App. 361)

The First Amendment does not protect such criminal conduct from investigation. The search warrants Plaintiffs challenge sought evidence of criminal conduct material to pending and anticipated criminal prosecutions. Neutral judges issued all the warrants Plaintiffs challenge, concluding they were amply supported by probable cause—both to reasonably suspect Plaintiffs and others of committing crimes and to believe that there is a fair probability that evidence of the crimes will be found in the places to be searched. Moreover, Plaintiffs do not contend the search warrant affidavits contain material misstatements or omissions. The District Court correctly found that Plaintiffs failed to state a plausible claim against Defendants. This Court should affirm.

1

## Facts

### Pulpit Rock Protest

Plaintiff Chinook Center ("Chinook") showed Colorado Springs who they are on August 3, 2020, nearly a year before the incident at issue in this case. On that date, Chinook participated in a "riot" in front of the home of a police officer who had shot and killed De'von Bailey on August 3, 2019. (A24 ¶31, 51 ¶138) Armed and masked "protestors" surrounded citizens' vehicles, terrifying the drivers and blocking their passage (Supp. App. 344-346):






(Supp. App. 348, 354, 369)

Detective Daniel Summey averred in search warrant affidavits:

Your Affiant is aware that the Chinook Center, and Chinook Center member groups, have promoted other protests that turned violent in the past, namely the Pulpit Rock protest where numerous activist groups and their members unlawfully protested outside of CSPD Officer Van't Land's residence on the anniversary of Van't Land shooting and killing De'Von Bailey. During that protest, numerous protesters showed up armed, and several were arrested after pointing their weapons at people who were driving through the neighborhood, attempting to get to their respective homes.

(A112) Plaintiffs acknowledge the criminal conduct at the Pulpit Rock protest in the

First Amended Complaint ("FAC"). (A50-51 ¶¶136-137)

Following the Pulpit Rock protest, Colorado Springs Police Department

("CSPD") officers sought to identify the masked individuals in their investigation

into "Attempted Robbery, Menacing, and Riot related charges." (Supp. App. 361)

They drafted, and neutral judges issued, search warrants for (1) a cell phone of a

woman whose vehicle was parked at the protest and whose longtime partner was

believed to be one of the armed intimidators (Supp. App. 342-356), (2) the Facebook

page of the Empowerment Solidarity Network ("ESN"), a promoter of the "protest"

(Supp. App. 357-364), and (3) a notebook found at the home of one of the armed

suspects (Supp. App. 365-377).

Detective Summey discovered a video posted to YouTube on August 16,

2020, showing Chinook leaders Shaun Walls and Jon Christiansen discussing the

3

Pulpit Rock protest, evidencing their participation in its planning, including their decision to approve firearms:

> [A]t the 5:16 mark of the video, Walls states, "We were very well organized", and went on to state, "We got our message across." At the 5:35 mark, Jon Christiansen states, "We had decided it was ok for people to bring long guns, um, because we knew that there were some threats out there."

(A113) Together, their statements showed Summey "that Jon Christiansen played a role in okaying protesters bringing firearms to the protest, and therefore had a hand in the planning of the protest. Those firearms … were later used to menace citizens driving through the neighborhood, and several arrests were made. This shows a pattern of protest activity that has turned illegal associated with the Chinook Center and Chinook Center member organizations." (A113)

## **March for Housing**

The City of Colorado Springs ("City") planned to celebrate the 150th anniversary of its founding on July 31, 2021, with a parade through the downtown commercial district followed by a festival. (A71, 118) "In the leadup to the event, the Chinook Center … posted on social media that a march was planned regarding housing in Colorado Springs." (A71) The housing march likewise was to take place in the downtown commercial center of Colorado Springs on July 31, 2021. (A72)

Having experienced Chinook's form of "protest" before, at Pulpit Rock, CSPD prepared for Chinook's march. A police commander "was 'concerned

protesters would engage in <u>unlawful</u> activity designed to disrupt the public celebration.'" (A24 ¶32 (emphasis added; citation omitted)) The commander's concern proved to be well-founded.

"During the ensuing march, protesters immediately and intentionally walked in the roadway and obstructed traffic." (A72) "[A] group of approximately 60 protestors illegally march[ed] northbound up South Tejon Street, blocking vehicle traffic in the process. Officers arrived and formed a line in the road to block the path of the protestors. The protestors turned eastbound on East Mill Street in an apparent attempt to move around the police line. Officers repositioned their police line to block the protestors from moving northbound up South Nevada Avenue." (A118)

A CSPD lieutenant "gave numerous verbal warnings to the group to inform them it was illegal to march in the roadway and they needed to immediately exit the roadway to the sidewalk or face arrest. The announcements were made with a bullhorn megaphone and could be heard clearly. The protestors continued to block both northbound and southbound lanes of South Nevada Avenue." (A118) A bald, black male leading the march "extended his middle finger toward the police line," communicating that he was not about to comply. (A118)

On the lieutenant's command, police officers moved in to arrest the march leader, later identified as Shaun Walls. (A118) "Walls was actively resisting officers who were attempting to take him into custody." (A72) As uniformed CSPD Officer

Anthony Spicuglia "ran to assist other police officers who were attempting to take Shaun Walls into custody," "a female … attempted to strike [Officer Spicuglia] with a bicycle." (A72) "As Officer Spicuglia approached the female, she got off the bicycle and threw it at Officer Spicuglia with the clear intent to strike him with it, as he was sprinting at and by her. Officer Spicuglia was very nearly struck by the bicycle and had to slow his sprint towards other officers and jump to avoid the bicycle as it hit the ground in front of him. Had the bicycle made contact with Officer Spicuglia as he was running by at a sprint, it almost certainly would have caused bodily injury to him, possibly even serious bodily injury, as he was sprinting on a paved roadway while wearing bulky, heavy police gear." (A72-73)

The female's "intent to strike Officer Spicuglia with the bicycle" was clear to Summey. (A73) "There were no other protesters around the female, and therefore no one she could have been attempting to throw or roll the bicycle to." (*Id.*) She "was far away from all other protesters and had no logical reason to exit the bicycle and throw it directly at Officer Spicuglia as he sprinted past." (*Id.*)

### <u>Search Warrant 1: Armendariz Apartment Warrant</u>

Utilizing drone and body worn camera video footage and "open source social media," Summey determined that the female who threw her bicycle at Officer Spicuglia was Plaintiff Jacqueline Armendariz. (A78-85) Suspecting Armendariz of violating "Colorado Revised Statutes: § 18-2-101 Criminal Attempt – Second

6

Degree Assault – Class 5 Felony (F5)," Summey drafted a search warrant affidavit seeking authority to search Armendariz's apartment for evidence confirming her identity as the female who threw her bicycle at Officer Spicuglia: *e.g.*, the bicycle, the clothing she was seen wearing at the march, etc. (A85-86) Summey also asked to search for and seize "[d]igital media storage devices, to include phones, computers, tablets, thumb drives, and external hard drives found to be associated with Jacqueline Armendariz." (A86)

Summey sought the digital devices based on Armendariz's evident use of social media (Facebook, Twitter, and LinkedIn), including in the days preceding the march (A80-84), and on his "training and experience." (A85) Summey had been a CSPD Officer "for over 6 years," a "CSPD Intelligence Detective from 2018 to 2020," and at the time, was "assigned to the FBI Joint Terrorism Task Force." (A71) He possessed specialized knowledge in "Bias-Motivated Crimes" and had "collected information regarding Bias-Motivated Crimes and Groups in the Colorado Springs metro area." (A71) His job duties familiarized him with "illegal protest activity and people who protest as part of a group," including Chinook, specifically. (A71, 85)

Through his "training and experience," Summey knew that Armendariz's digital devices were likely to contain "material evidence in the subsequent prosecution of Armendariz for attempting to assault Officer Spicuglia." (A85)

> Your Affiant knows people who engage in illegal protest activity
> frequently carry their phones with them to take photos of their activity

and message others who are also participating in illegal protest activity. Your Affiant also knows that phones regularly track the location of their user and can show where a person is at a given date and time. Your Affiant is also aware that people regularly attach their phones to their computers, and use their computers to back up their phones, or transfer photos from their phones to save space on their phones. Your Affiant knows that people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives.

(A85)

After drafting the search warrant affidavit, Summey had his CSPD supervisor, Sgt. Roy A. Ditzler, review and approve it. (A57 ¶160) On August 6, 2021, Summey presented the 15-page search warrant affidavit to El Paso County Court Judge Douglas J. Miles, who reviewed and signed it (the "Armendariz Apartment Warrant" or "Warrant 1").[1] (A69-70, 85)

### Search Warrant 2: Armendariz Devices Warrant

Summey continued his investigation. He discovered information suggesting that Armendariz "appears to be very active politically," based on the substance of her Facebook postings and her public profiles on Twitter and LinkedIn. (A84)

He also concluded that "there appears to be a close relationship that exists between Walls and Armendariz, wherein they are friends on social media, Armendariz attended an event that Walls promoted on social media, and she attempted to assault an officer who was attempting to take Walls into custody."

---

[1] Judge Miles also reviewed and signed an arrest warrant for Armendariz for attempted second degree assault. (A105)

(A111) Armendariz also appeared in the same YouTube video in which Walls and Christiansen discussed organizing the Pulpit Rock protest. (A113)

Armendariz's relationship with Walls and Chinook was noteworthy because Summey regards Chinook to be "an anarchist or anti-government organization …, and a leader of the Chinook Center, namely Shaun Walls, has called for violence against police officers and their families in the past, and has discussed revolution and uprisings against the government." (A106) Summey found "social media snips from Shaun Walls" evidencing as much and included them in his subsequent search warrant affidavit. (A106-111)

During the execution of the Armendariz Apartment Warrant on August 18, 2021, officers seized six digital devices. (A105) According to Summey's training and experience, there was a fair probability that Armendariz generated electronic data about her attempted assault on Officer Spicuglia on those digital devices, which data "would be material evidence in the subsequent prosecution of Armendariz" for attempted assault (A114):

> In Your Affiant's training and experience, people who commit illegal activity in furtherance of the ideology or goals of anarchist or anti-government groups share this information with others though messaging applications, emails, or texts in order to take credit for their actions and gain standing or notoriety in such groups. In Your Affiant's training and experience, people who engage in illegal activity in furtherance of the ideology or goals of anarchist or anti-government groups take videos or photos of themselves or others engaged in illegal activity, or engaged in group activities leading up to the illegal activity. Your Affiant is aware the cell phones regularly track location

information of the user and can oftentimes place a person at a location if given a date and time.[2]

(A106)

Given that (1) Walls advocates violence against law enforcement, (2) Armendariz has a "close relationship" with Walls, (3) Chinook (including Walls and Christiansen) organized the housing march, (4) Armendariz attempted violence on a police officer who was attempting to assist in Walls' arrest at the Chinook march, and (5) idealogues (like Armendariz appeared to be) tend to create and store digital evidence of their acts in furtherance of the group's goals, Summey prepared a search warrant affidavit to search the digital devices seized from Armendariz's apartment:

> Your Affiant is seeking permission to search the digital devices recovered from Armendariz's person and residence … to seize any photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer.

> Your Affiant is aware that Shaun Walls began posting about "Housing is a Human Right" on 6/5/2021 and has provided a snip of that post below. Your Affiant believes this is likely the time that planning for the unlawful protest began….

---

[2] Although one of the devices was a laptop issued by Armendariz's employer, Summey averred that it also likely contained evidence material to Armendariz's prosecution. Armendariz's supervisor told Summey that "Armendariz had sent her digital media of the protest." (A105) Additionally, in Summey's experience, "people often engage in personal communications with their work devices even though it is oftentimes not allowed by company policy." (*Id.*)

> Your Affiant is also requesting permission to perform a key word search of the devices for the following words:
>
>> Police, officer, cop, pig, bike, bicycle, attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Shaun, Wails, as these terms would be relevant to the investigation regardless of the time period in which they occurred.
>
> The above mentioned items would be material evidence in the subsequent prosecution of Armendariz for attempting to assault Officer Spicuglia.

(A113-114)

Summey set forth the foregoing information in a 24-page search warrant affidavit that he presented, first, to Ditzler for review and approval, and then to El Paso County Court Judge Ann Rotolo on August 20, 2021. (A57 ¶¶160-63) Judge Rotolo reviewed and signed the search warrant (the "Armendariz Device Warrant" or "Warrant 2"). (A88, 90, 114)

"The police department enlisted the help of the FBI to search, seize, and copy Armendariz's electronic devices." (A125) "The FBI continues to retain copies of the data." (*Id.*)

### Search Warrant 3: Chinook Facebook Warrant

On August 2, 2021, CSPD Officer Bradley Steckler was assigned to "research a tip regarding a Facebook post that was posted after arrest[s] were made for Obstructing Passage or Assembly, and Resisting, Interference with a Public Official" at the July 31, 2021 march. (A118) Steckler was a seventeen-year veteran of the

CSPD, then working as an investigator. (A118) He recited in his search warrant affidavit the conduct of the protestors at the July 31, 2021 march that supported charges for "Obstructing Passage or Assembly, and Resisting, Interference with a Public Official." (A118)

After the march, CSPD had received an "anonymous tip" regarding a Facebook post by Shaun Walls from July 31, 2021 at 10:39 PM. (A118) The post related to the housing march from earlier that day, stating:

> "Now it's fun ... it was work before.. I could whoop all them pigs and they felt it too. I laid down so we could keep fighting with purpose. You can watch or help idgaf. I'm going to #Fuck12."

(A118-119, quoting https ://www.facebook.com/profile. php ?id= 1 00008489040279) Steckler recited that he already had applied for and obtained a search warrant for Walls' Facebook profile. (A119)

On August 3, 2021, Steckler "became aware of two more Facebook profiles that had bearing on this case." (A119) First, a Facebook "profile under the name of Nicholas Crutcher … had pictures and videos from the protest and included some photographs of Mr. Walls being taken into custody." (A119)

Second, a CSPD detective notified Steckler of a Facebook profile "under the name of Chinook Center … in which the protest was organized under the events tab." (A119) Steckler "went to the site and was able to see details regarding a 'March for Housing' set for 07/31/21 …." Steckler believed information from the Chinook

12

Facebook account would "be material evidence in this case." (A119) In his experience, "people involved in illegal demonstrations use social media to organize planned events." (A119) Thus, Steckler sought authority to search for and seize:

> All subscriber information tied to Facebook profile:
> https:www.facebook.com/chinookcenter to include names, phone numbers, and addresses.
>
> All Facebook posts for profile:
> https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Messenger chats tied to Facebook profile:
> https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Events for profile:
> https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.

(A120) Steckler sought the warrant "pursuant to provisions of the United States Electronics Communications Privacy Act, 18 U.S.C. § 2703." (A119)

Steckler had his CSPD supervisor, Sgt. Jason S. Otero, review and approve the "Chinook Facebook Warrant" (or "Warrant 3"). (A29 ¶55) He then presented it to El Paso County Court Judge Dennis McGuire, who issued it "[p]ursuant to 18 U.S.C. § 2705(b)." (A120)

### **Criminal Prosecutions**

For their conduct at the July 31, 2021 housing march, Chinook leaders Shaun Walls and Jonathan Christiansen were prosecuted for Obstructing Passage and Assembly and for Resisting arrest. (Supp. App. 108-155 (Walls), 156-193 (Christiansen)) "Armendariz ultimately reached a plea agreement for obstructing a

peace officer, received a deferred judgment, and successfully served six months of

unsupervised probation." (A125)

## Procedural History

### Complaint

Plaintiffs filed suit on August 1, 2023 (A4), and subsequently filed the FAC

on August 18, 2023 (A17-68), asserting six claims as follows:

| PLAINTIFF | CLAIM | DEFENDANTS |
|---|---|---|
| Armendariz | First Claim for Relief:<br>unlawful search and seizure in violation of First and Fourth Amendments; 42 U.S.C. § 1983 | Summey<br>Ditzler<br>City |
| Chinook Center | Second Claim for Relief:<br>unlawful search and seizure in violation of First and Fourth Amendments; 42 U.S.C. § 1983 | Steckler<br>Otero<br>City |
| Chinook Center | Third Claim for Relief:<br>unlawful search in violation of Stored Communications Act | Steckler<br>Otero<br>City |
| Armendariz | Fourth Claim for Relief:<br>Deprivation of Rights in violation of Colo. Const. Art. II §§ 7, 10, 24: Colo. Rev. Stat. § 13-21-131 | United States[3]<br>Ditzler |
| Chinook Center | Fifth Claim for Relief:<br>Deprivation of Rights in violation of Colo. Const. Art. II §§ 7, 10, 24: Colo. Rev. Stat. § 13-21-131 | Steckler<br>Otero |

---

[3] "In a prior order …, the [magistrate judge] granted the United States' Motion to substitute itself as a party for Summey as to Claim 4." (A126 n.2)

| PLAINTIFF | CLAIM | DEFENDANTS |
|---|---|---|
| Armendariz | Sixth Claim for Relief: Injunctive relief under First[4] and Fourth Amendments; 5 U.S.C. § 702 | FBI[5] |

(A126-127)

## **Motions to Dismiss**

All Defendants moved to dismiss all claims asserted against them, which motions were fully briefed. (*See generally* Supp. App.) Ditzler, Steckler, and Otero argued that Plaintiffs failed to state plausible claims for the violation of their First and Fourth Amendment rights and that they were entitled to qualified immunity due to the lack of clearly established law and good faith reliance on the judge-issued warrants. Steckler, Otero, and the City argued that Chinook failed to allege that they violated the Stored Communications Act, because the Officers proceeded in good faith pursuant to a warrant. The City argued that Plaintiffs failed to state First and Fourth Amendment claims against it because, *inter alia*, the FAC fails to allege a City custom of seeking unconstitutionally overbroad search warrants in retaliation for protestors' exercise of their First Amendment rights.

---

[4] "While the heading for the Sixth Claim for Relief titles the claim as seeking injunctive relief under the First and Fourth Amendments, the claim expressly alleges only a violation of the Fourth Amendment." (A154 n.9, citing App. 66 ¶215)

[5] Plaintiffs argued below that Armendariz asserted Claim 6 against the City as well as the FBI. (Supp. App. 287-88) The District Court rejected the argument as "insincere," considering the FAC's allegations. (A152-153 n.8, citing App. 66)

**<u>Order for Additional Briefing</u>**

After the Defendants' motions to dismiss were fully briefed, the District Court ordered the parties to submit additional briefing on whether "a subjective component or analysis applies to the qualified immunity question on Plaintiff's First Amendment claims." (Supp. App. 380-81) City Defendants argued the individual Defendants are entitled to qualified immunity on Plaintiffs' First Amendment retaliation claims because (1) Plaintiffs cannot prove the absence of probable cause for the search warrants, and (2) they cannot show that the right to be free from retaliatory search that is otherwise supported by probable cause was clearly established in August 2021. (Supp. App. 383-392) The Federal Defendants and Plaintiffs also filed additional briefing. (Supp. App. 394-403, 406-416)

**<u>Order on Motions to Dismiss</u>**

The District Court granted all Defendants' motions to dismiss. (A121-161)

<u>Armendariz's Fourth Amendment Claim</u>

To begin, the District Court found that Warrant 1 established probable cause to search for and seize Armendariz's digital devices "based on the evidence of her use of social media, her social media connection to Walls, the selfie she took and posted to Facebook days before the protest while out on her bike, and her other various posts referencing her social activism." (A134)

16

The District Court also found that Warrant 2 "was supported by arguable probable cause for the search of the specified electronic devices and using the proposed search terms." (A137) The court reasoned that Summey made "factual averments" in the warrant affidavit that "he either knows from, or has encountered based on, his training and experience, which is an appropriate consideration bearing on probable cause." (*Id.*) For example, the Armendariz Device Warrant:

> contains averments about Summey's claimed awareness of the "Chinook Center [as] an anarchist or anti-government organization" whose members have promoted protests that turned violent in the past; purported ties between Armendariz and the Chinook Center and its founders, including Walls; numerous descriptions of Walls' social activism including his calling for "violence against police officers and their families;" and a "pattern of protest activity that has turned illegal associated with the Chinook Center and Chinook Center member organizations."

(A135-136, quoting A111) Summey further averred facts connecting Armendariz to Chinook and Walls: " 'they are friends on social media, Armendariz attended an event that Walls promoted on social media, and she attempted to assault an officer who was attempting to take Walls into custody.' " (A136, quoting A111) "And notably, both warrants experienced two levels of approval, first by Summey's supervisor and then by a neutral judicial officer who found probable cause and signed the warrants." (*Id.*)

The District Court also found both Armendariz Warrants to be "sufficiently particular." (A138) Regarding Warrant 2, the District Court found it "is limited to a

three-month period (6/5/3032 to 8/7/2021) for the seizure of certain tangible items and uses specified key words to limit the forensic search of the seized electronic devices." (A139)

The District Court also determined Plaintiffs "failed to discern any clearly established law" to defeat the Officers' assertions of qualified immunity. (A141) The right to be clearly established was not the far too general " 'right to be free from unreasonable searches and seizures,' " as urged by Plaintiffs. (A142) Rather, Plaintiffs were required to adduce precedent clearly establishing:

> that an officer violates the Fourth Amendment when they specify a criminal statute under investigation in a search and seizure warrant, include limiting principles in the warrant around the criminal statute or criminal conduct under investigation, and have that warrant approved first by a supervisor and second by a neutral judicial officer who found probable cause.

(A141) The need to define a "more particularized right," the District Court explained, "is particularly apt" in this case considering that (1) Plaintiffs challenge judge-issued warrants, and (2) Plaintiffs fail sufficiently to allege "that the officer who sought the warrant misrepresented or omitted material facts to the judge rising to the level of a deliberate falsehood or reckless disregard for the truth, or that the warrant was so obviously lacking in probable cause that no reasonably competent officer would have concluded a warrant should issue." (A142-143, citing *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012); *Stonecipher v. Valles*, 759 F.3d 1134 1142-43 (10th Cir. 2014)*; Franks v. Delaware*, 438 U.S. 154, 171 (1978))

18

For these reasons, the District Court granted Summey's and Ditzler's motions to dismiss Armendariz's Fourth Amendment claims. (A140-144)

### Chinook's Fourth Amendment Claim

The District Court similarly analyzed Warrant 3, finding it was supported by probable cause:

> After Walls and others were arrested during the protest on July 31, 2021, Steckler was investigating "Obstructing Passage or Assembly, and Resisting, Interference with a Public Official" related to those arrests. He had evidence of Walls' and others' use of Facebook to post information about the July 31 protest that resulted in multiple arrests, including evidence that Chinook organized and had details about the protest on the events tab on its Facebook account. On these facts alone, it was objectively reasonable for Steckler to believe there was probable cause that material evidence for use in a subsequent prosecution(s) involving those arrested would be found within the subscriber information, posts, messenger chats, and events tab of the Chinook Facebook profile.

(A146) The District Court likewise found Warrant 3 to be "sufficiently particular. It is limited to evidence involving specific arrests for specific infractions all occurring on July 31, 2021, and Attachment B further limits the information sought to a seven-day period of July 27 to August 2, 2021." (A147) "And like the Armendariz Warrants …, Steckler presented the Facebook warrant first to a supervisor for approval and second to a judge who reviewed and approved the warrant, finding probable cause." (*Id.*)

The District Court also determined that Steckler and Otero were entitled to qualified immunity due to Chinook's failure "to adduce clearly established law for the reasons discussed above regarding the Armendariz Warrants." (A147)

### Plaintiffs' First Amendment Claims

The District Court held that Plaintiffs must plead the lack of probable cause as an element of their retaliatory search claim, "especially where, as here, the searches were conducted based on warrants approved by neutral judicial officers." (A149, citing *Hartman v. Moore*, 547 U.S. 250, 261-62 (2006), and *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019)) Based on the District Court's conclusion that "the FAC fails to plausibly plead the absence of probable cause regarding the Armendariz and Facebook Warrants," its "numerous allegations that the warrants lacked probable cause are conclusory" and need not be accepted as true, "particularly after this Court's review of the warrants." (A150) The District Court also found that the FAC fails to "allege any similarly situated individuals were treated differently than either or both Plaintiffs…. Indeed, it in fact appears to allege the opposite." (A151)

Furthermore, this was not a case where "the warrants must describe the things to be seized with 'scrupulous exactitude,'" as Plaintiffs argued, because "the basis of the warrants in this case" was not "in and of itself the ideas, speech, or associations of either Plaintiff;" "the alleged criminal statutes or criminal conduct under

investigation" supplied the probable cause for the warrants. (A149 n.5) In sum, the District Court held that "the FAC fails to allege a plausible violation of the First Amendment by the [individual Defendants], further entitling them to qualified immunity …." (A151)

### Plaintiffs' Constitutional Claims Against the City

"Because the Court has found the FAC fails to plausibly allege a constitutional violation by the [individual Defendants], it necessarily means the FAC fails to state plausible First and Fourth Amendment claims against the City." (A151)

### Chinook's Stored Communications Act Claim

The District Court dismissed Chinook's Stored Communications Act claims due to "the FAC's failure to plausibly plead a constitutional violation regarding the Facebook Warrant." (A122, citing *Davis v. Gracey*, 111 F.3d 1472, 1484 (10th Cir. 1997)) "The Plaintiffs cite no authority to suggest the [Stored Communications Act] imposes requirements more demanding than the Fourth Amendment." (*Id.*)

### Armendariz's Injunctive Relief Claim

Armendariz "seeks the return or destruction of the digital <u>copies</u>" the FBI made and retains of her digital devices. (A153 (emphasis in original)) The District Court "agree[d] with the FBI that the Fourth Amendment does not provide a remedy for its ongoing retention of these digital copies." (A154) Because Armendariz "simply seeks the return or destruction of copies of property seized in connection

21

with a completed criminal case," "[t]he appropriate claim appears to be one for return of property under Fed. R. Crim. P. 41(g)." (A154, 157)

### Plaintiffs' State Law Claims

Claims four and five of the FAC asserted state law claims under section 13-21-131 of the Colorado Revised Statutes against the individual Defendants and the United States (substituted for Summey). (A126) The District Court dismissed Armendariz's state law claim against the United Stated based on her failure to allege the exhaustion of administrative remedies pursuant to 28 U.S.C. § 2675(a). (A158-160) It declined to exercise supplemental jurisdiction over the state law claims against Ditzler, Steckler, and Otero considering its "findings pertaining to, and dismissal of, Plaintiff's federal law claims and state law claim against the United States." (A160)

In sum, the District Court dismissed all Plaintiffs' claims without prejudice. (A161) Final judgment "entered in favor of the defendants and against the plaintiffs" on April 10, 2024. (A162)

## SUMMARY OF THE ARGUMENT

**I.      Chinook's Fourth Amendment claim against Steckler and Otero:** Warrant 3 satisfies the Fourth Amendment. It identifies "Obstructing Passage" and "Resisting, Interference with a Public Official" as the crimes, and Shaun Walls and "approximately 60" other unidentified protestors as the persons under investigation. The protestors' unlawful conduct "may not constitutionally masquerade under the guise of advocacy." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) (cleaned up).

Steckler's warrant affidavit also demonstrated that there was a fair probability that evidence material to Walls' and others' prosecutions would be found in Chinook's Facebook account. Chinook organized the march through its Facebook page; in Steckler's experience, "people involved in illegal demonstrations use social media to organize" such events; and march participants, including Walls, in fact used Facebook to communicate about and share photos and videos of the march. The issuing judge was entitled to "draw reasonable inferences" from this information to conclude that there was probable cause to believe that evidence of the crimes would be found in the Chinook Facebook account, which determination is accorded "great deference." *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *United States v. Shelton*, 817 F. App'x 629, 633-34 (10th Cir. 2020). Indeed, Chinook does not contend that evidence was not, in fact, likely to be found in its Facebook page.

The scope of the Chinook Facebook Warrant also was narrowly crafted to search for and seize the evidence for which the Officers had probable cause. It incorporated Steckler's warrant affidavit, which described the crimes under investigation and provided examples of items to seize. It authorized the seizure of just four categories of Facebook data, for a limited seven-day period. The protestors' unlawful conduct at the march—not their advocacy for affordable housing or association with Chinook—justified the investigation and, thus, " 'scrupulous exactitude' " was not required. *Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir. 1985), quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965).

The dismissal of Chinook's Fourth Amendment claim should be affirmed for two additional reasons. First, Chinook fails to cite a single case from the Supreme Court or this Court, or the weight of authority from other circuits, clearly establishing that Warrant 3 was overbroad. Second, the Officers' reliance on Warrant 3 was objectively reasonable. The warrant went through two levels of review, and Chinook does not assert that it contains material misrepresentations or omissions. Steckler and Otero are entitled to qualified immunity.

**II.     Plaintiffs' constitutional claims against the City:** Plaintiffs fail to state a constitutional claim against the City because they fail to plausibly allege that a City employee violated their constitutional rights or that the City has a custom of seeking unconstitutionally overbroad search warrants. Neutral judges issued all the search

warrants on which Plaintiffs rely, and none of the warrants were so obviously lacking in probable cause " 'that no reasonably competent officer would have concluded a warrant should issue.' " *Messerschmidt*, 565 U.S. at 547 (citation omitted).

**III.  Armendariz's injunctive relief claim against the City, Chinook's Stored Communications Act claim, and Plaintiffs' state law claims:** Plaintiffs have forfeited their right to challenge the dismissal of these claims by addressing them only in a perfunctory manner in footnotes.

**IV.  Armendariz's Fourth Amendment claim against Ditzler:** Ditzler joins the parts of the Federal Defendants' Answer Brief arguing on behalf of Summey that the dismissal of Armendariz's Fourth Amendment claims should be affirmed, which arguments apply equally to Ditzler.

**V.  Plaintiffs' First Amendment claims against Ditzler, Steckler, and Otero:** Ditzler, Steckler, and Otero join the part of the Federal Defendants' Answer Brief arguing on behalf of Summey that the dismissal of Plaintiffs' First Amendment claims should be affirmed, which arguments apply equally to Ditzler, Steckler, and Otero.

# ARGUMENT

## I. The District Court correctly dismissed Chinook's Fourth Amendment claim against Steckler and Otero.

*Issue raised and ruled on:* Like the Federal Defendants, City Defendants (Ditzler, Steckler, Otero, and the City) note Chinook's failure to show where this issue was raised and ruled upon and its failure to include the relevant briefing on this issue in Appellants' Appendix, as required by 10th Cir. R. 28(A) and 10.4(D)(2), respectively. The Court may decline to address this issue based on either of these violations. *See* 10th Cir. R. 10.4(B); *Baca v. Menyhert*, No. 92-2206, 1994 WL 75877, at *2 (10th Cir. Mar. 11, 1994) (unpublished).

Steckler and Otero addressed this issue in their motion to dismiss and reply. (Supp. App. 88-94, 318-326) The District Court held that Warrant 3 did not violate the Fourth Amendment, but even if it did, Steckler and Otero were entitled to qualified immunity on that claim. (A 144-47)

### A. The Chinook Facebook Warrant satisfied the Fourth Amendment.

In Claim 2 of the FAC, Plaintiffs assert that Steckler and Otero violated Chinook's Fourth Amendment rights by seeking a search warrant that "any reasonably well-trained officer" allegedly would have known "failed to comply with the Fourth Amendment." (A60 ¶179) More specifically, Chinook challenges the

warrant for "All Facebook Messenger chats tied" to the Chinook Facebook page for the seven days from July 27, 2021 to August 2, 2021. (A28 ¶¶45-46, 120)

A search warrant is valid if it meets three requirements: it must (1) have been "issued by a neutral, disinterested" judge; (2) be based on " 'probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense' "; and (3) "particularly describe the things to be seized, as well as the place to be searched." *Eckert v. Dougherty*, 658 F. App'x 401, 406 (10th Cir. 2016) (citation omitted).

Plaintiffs argue that Warrant 3 is overbroad and, thus, fails to satisfy the second element. (A28-29 ¶¶45-56; Op. Brf. at 45) "[A]n overly broad warrant 'describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause.'" *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021) (citation omitted), *cert. denied*, 142 S. Ct. 820 (2022).

In 2020, this Court described the legal standard for evaluating a search warrant as follows:

> Where a warrant is obtained, a reviewing court determines the sufficiency of the warrant by examining the affidavit supporting it. The court determines the sufficiency of the affidavit "by looking at the totality of the circumstances and simply ensuring that the magistrate had a substantial basis for concluding that probable cause existed." Probable cause exists when "there is a fair probability that the contraband or evidence of a crime will be found in a particular place."

27

The "affidavit supporting the search warrant need not contain direct evidence or personal knowledge that the items sought are located at the place to be searched." Instead, the magistrate judge may draw reasonable inferences from the information in the affidavit supporting the warrant.

*United States v. Shelton*, 817 F. App'x 629, 633-34 (10th Cir. 2020) (internal citations omitted).

As suggested, this Court's job is not to review the search warrants *de novo*. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983). Rather, it must accord the issuing judges' probable cause determinations "great deference." *Id. See also Cotto*, 995 F.3d at 795; *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014). "[S]o long as the magistrate had a 'substantial basis for … concluding' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (citation omitted). "Accordingly, even in a 'doubtful or marginal case,' [this Court is to] defer 'to the [issuing judge's] determination of probable cause.'" *Pulliam*, 748 F.3d at 971 (citation omitted).

### 1. The warrant affidavit identified the crimes and persons under investigation.

Plaintiffs first allege that the "affidavit in support of the [Chinook Facebook] warrant was wholly lacking in probable cause" because it "identified no particular crime or even person under investigation." (A28 ¶50, A59 ¶174; *see also* Op. Brf. at 45-46)

28

Although warrants "do not have to identify specific statutes for the crimes to which they are limited," *United States v. Palms*, 21 F.4th 689, 698-99 (10th Cir. 2021), Steckler's affidavit identified "Obstructing Passage or Assembly" and "Resisting, Interference with a Public Official" as crimes for which the evidence was sought. (A118) Steckler averred, "arrest[s] were made for Obstructing Passage or Assembly, and Resisting, Interference with a Public Official … on 07/31/21 at approximately 1137 hours." (*Id.*) He attested to the conduct of the "approximately 60 protestors" who "illegally march[ed]" up the street, "blocking vehicle traffic in the process." (*Id.*) Steckler further averred that Shaun Walls led the march in the street, despite police commands "to exit the roadway to the sidewalk or face arrest." (*Id.*) The warrant affidavit also described how Walls "actively" resisted arrest "by remaining on his feet and attempting to pull away from officers." (*Id.*)

At the very least, the information sought in the Chinook Facebook Warrant would be material to Walls' prosecution. But it also would aid CSPD in identifying and apprehending the "approximately 60 protestors" who likewise "illegally" marched up the street, blocking traffic, despite verbal commands to move to the sidewalk. (*Id.*) A warrant may lawfully seek information that will aid in " 'a particular apprehension or conviction for a particular offense'." *Eckert*, 658 F. App'x at 406 (citation omitted). Participants in the march (including Armendariz) were masked, perhaps in relation to the COVID-19 pandemic, perhaps to obscure their

identities. (*See, e.g.,* A73-77) Thus, Warrant 3 not only sought information material to Walls' prosecution for obstruction and resisting arrest but also—lawfully—sought information to aid in the apprehension of the other, "approximately 60," unidentified individuals who also obstructed passage. (A118) Such was a reasonable inference from the information in the warrant.

Plaintiffs' contention that Warrant 3 lacks a crime or person under investigation rests on a "hypertechnical" reading of the warrant affidavit, not the "practical and commonsense" construction the Court is to employ. *United States v. Suggs*, 998 F.3d 1125, 1133 (10th Cir. 2021). Plaintiffs essentially argue that to satisfy the Fourth Amendment, a warrant must contain such magic words as, "Your Affiant seeks evidence that would be material in subsequent criminal prosecutions of Shaun Walls and unidentified others for Obstructing Passage or Assembly and Resisting, Interference with a Public Official." No authority that Plaintiffs cite stands for such a proposition, which runs counter to the "practical and commonsense" construction this Court must apply. *Suggs*, 998 F.3d at 1133.

### 2. The warrant affidavit provided the factual basis for deeming the protestors' conduct illegal.

Next, Plaintiffs allege that the Chinook Warrant affidavit "did not specify what was 'illegal' about the constitutionally protected housing march." (A28 ¶52) The allegation is puzzling considering the warrant affidavit's description of the "group of approximately 60 protestors" who "illegally march[ed] up South Tejon

Street, blocking vehicle traffic in the process," despite "numerous verbal warnings" directing the marchers "to immediately exit the roadway to the sidewalk or face arrest." (A118) Steckler's warrant affidavit does not suggest that any of the protestors did <u>not</u> engage in the unlawful conduct of Obstructing Passage. Nor do Plaintiffs.

This case is unlike *Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010), on which Plaintiffs rely. In *Mink*, a state prosecutor approved a search warrant that lacked any reference to a crime under investigation and lacked probable cause to suspect the plaintiff of a crime. The plaintiff had authored an editorial for his internet-based journal, *The Howling Pig*, that satirically criticized a university professor. 613 F.3d at 998. The professor contacted the police, "who started investigating a potential violation of Colorado's criminal libel statute." *Id.* This Court held that "no reasonable prosecutor could believe it was probable that publishing such statements constituted a crime warranting search and seizure of Mr. Mink's property." *Id.* at 1010. Here, by contrast, the Chinook Facebook Warrant provided the factual predicate for suspecting the marchers (including Walls) of Obstructing Passage. Defiantly marching in the middle of a busy street, blocking traffic, despite repeated commands to move to the sidewalk, was unlawful. (Supp. App. 105-107)

Plaintiffs also argue that "[e]ven if individual criminal acts occur during a protest, the protest itself is not rendered illegal—and its participants are not all

automatically rendered criminals." (Op. Brf. at 46) As support, Plaintiffs rely on *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). (Op. Brf. at 46) In *Claiborne*, black citizens banded together to boycott white merchants in their Mississippi county. The boycott "included elements of criminality and elements of majesty." 458 U.S. at 888. The white merchants sued boycott participants and civil rights organizations for damages they incurred because of the boycott. *Id.* at 890. The Supreme Court held that "much of petitioners' conduct was constitutionally protected," and, thus, could not subject them to liability. *Id.* at 916. But those participants who engaged in "acts of violence" during the boycott found " 'no sanctuary in the First Amendment.' " *Id.* (citation omitted). Unlawful conduct "may not constitutionally masquerade under the guise of advocacy." *Id.* (cleaned up). So too, here. The protestors' unlawful conduct of Obstructing Passage "may not constitutionally masquerade under the guise of advocacy." *Id.* (cleaned up).

### 3. The warrant affidavit established a nexus between the crimes under investigation and the Chinook Facebook page.

Plaintiffs next argue that Warrant 3 fails to demonstrate probable cause to believe that evidence of illegal activity would be found in Chinook's Facebook account. (Op. Brf. at 47; App. 28 ¶¶48-49)

"An affidavit provided by the government in support of a warrant establishes probable cause if it evinces a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Cotto*, 995 F.3d at 796 (citation omitted). A

32

Facebook warrant establishes this nexus by averring why the government believes that relevant evidence may reside in the Facebook account. *See, e.g.*, *United States v. Arnold*, No. 15-20652, 2017 WL 4036312, at *2-3 (E.D. Mich. Sept. 13, 2017) (unpublished); *United States v. Yelizarov*, No. CR MJG-16-0309, 2017 WL 3022927, at *2 (D. Md. July 17, 2017) (unpublished); *United States v. Ortiz-Salazar*, No. 4:13CR67, 2015 WL 2089366, at *3 (May 4, 2015), *rpt. & recomm. adopted*, 2015 WL 2194470 (E.D. Tex. May 8, 2015) (unpublished).

In three ways, Steckler's warrant affidavit established probable cause to believe that evidence of Obstructing Passage and Resisting at the July 31, 2021, march would be found in Chinook's Facebook account. First, Chinook organized and promoted the July 31, 2021 "March for Housing" <u>through</u> the Chinook Facebook account. (A119) Second, in Officer Steckler's seventeen-year experience as a police officer and investigator, "people involved in illegal demonstrations [*e.g.*, those where essentially all participants illegally march in the street, blocking traffic] use social media to organize planned events." (*Id.*) Third, participants in the march, including arrestee Walls, <u>in fact</u> utilized Facebook as a medium to communicate about and share photos and videos of the march:

- At 10:39 PM on July 31, 2021, Walls posted to his Facebook page concerning his conduct at the march earlier that day (*id.*); and

- Nicholas Crutcher posted "pictures and videos from the protest," including "photographs of Mr. Walls being taken into custody" to his Facebook page. (*Id.*)

Importantly, Chinook does not contest the accuracy of the information contained in Steckler's warrant affidavit.[6]

Plaintiffs nonetheless argue that while Steckler's affidavit "indicates the Chinook's Facebook profile contains information about the housing march," it fails to "provide any basis to find probable cause to believe Chinook's Facebook account contains evidence of any particular crime." (Op. Brf. at 49) But Plaintiffs overstate the probable cause required of search warrants. As this Court counseled:

> The "affidavit supporting the search warrant need not contain direct evidence or personal knowledge that the items sought are located at the place to be searched." Instead, the magistrate judge may draw reasonable inferences from the information in the affidavit supporting the warrant.

*Shelton*, 817 F. App'x at 633-34 (internal citations omitted). A reasonable inference from the information in Steckler's warrant affidavit is that there was a fair

---

[6] The Federal Defendants' Answer Brief also addresses the law governing the Fourth Amendment's requirement of a "nexus" between the criminal offense and the place to be searched. *See* Fed. Defs.' Answer Brf. at 19-20. The framework of that analysis also demonstrates that the Chinook Facebook Warrant established a nexus between the Obstructing Passage and Resisting crimes to Chinook's Facebook page via (2) Steckler's statement that, in his professional experience, evidence of the crimes is likely to be found in Chinook's Facebook account, and (3) inferences reasonably drawn from the facts that Chinook advertised the march for housing through its Facebook page and march participants (including Walls) used Facebook to communicate and share evidence from the march.

probability that evidence of crime would be found in Chinook's Facebook account. Steckler's affidavit demonstrated as much to Judge McGuire, whose finding is entitled to "great deference," *Gates*, 462 U.S. at 236, as well as to the District Court (App 146).

To be sure, evidence from the Chinook Facebook page would be material to the pending and anticipated criminal prosecutions. Marchers' intent to engage in or taking credit for the unlawful conduct would provide material evidence of guilt. For example, if the unlawful conduct that occurred at the march was planned beforehand—if Chinook authorized or directed it in advance, just as its leaders authorized protestors to bring long guns to the Pulpit Rock protest in advance (A113)—then the Chinook Facebook page, the source of the planned event, likely would contain it. Similarly, if protestors expressed their intent to engage in unlawful conduct at the march or took credit for unlawful conduct during or after the march, then there was a fair probability that such evidence would be found in the Chinook Facebook page posts, chats, and events. Such evidence would help identify and prosecute the wrongdoers.

In sum, Plaintiffs' contention that the Chinook Facebook account is "unrelated" to CSPD's investigation into the crimes (Op. Brf. at 48) fails under the facts of this case and the "practical, common-sense [and] flexible standard" applicable to search warrants. *Gates*, 462 U.S. at 238-39.

### 4. The warrant's scope was limited to searching for and seizing evidence for which the Officers had probable cause.

Finally, Plaintiffs complain of the scope of Warrant 3. (Op. Brf. 49-52; A29 ¶54) But it was " 'as specific as the circumstances and the nature of the activity under investigation permit' " and, thus, constitutional. *Pulliam*, 748 F.3d at 972 (citation omitted).

Plaintiffs fail to reckon with the nature of computer searches, in general, and Facebook warrants, in particular. "[O]verseizing is an accepted reality in electronic searches because there is no way to be sure exactly what an electronic file contains without somehow examining its contents." *United States v. Turner*, No. 2:21-cr-00013-KJD-BNW, 2022 WL 195083, at *6 (D. Nev. Jan. 21, 2022) (unpublished) (citations omitted), *aff'd*, No. 22-10194, 2023 WL 5696053 (9th Cir. Sept. 5, 2023) (unpublished). Indeed, "in the context of Facebook searches, 'courts … repeatedly have recognized that ... avoiding the intrusiveness of a search while maintaining its efficacy is largely infeasible.'" *United States v. Liburd*, No. 17-CR-296 (PKC), 2018 WL 2709199, at *3 (E.D.N.Y. June 5, 2018) (unpublished), quoting *United States v. Pugh*, No. 1:15-CR-00116-NGG, 2015 WL 9450598, at *27 (E.D.N.Y. Dec. 21, 2015) (unpublished) (citing cases).

Accordingly, a Facebook search warrant is not overbroad in scope where it incorporates the affidavit describing the factual basis for the suspected crime(s), gives examples of items to seize, is limited with respect to the categories of Facebook

data to be searched, and contains a temporal limitation. *See, e.g., United States v. Purcell*, 967 F.3d 159, 181 (2d Cir. 2020); *Turner*, 2022 WL 195083, at *2; *Liburd*, 2018 WL 2709199, at *3.

In *Turner*, a warrant authorized officers investigating a forgery scheme to search and seize eight different categories of Facebook account information, including all private chats for a two-month period. *Turner*, 2022 WL 195083, at *2. In a motion to suppress, the defendant argued that the warrant was overbroad. *Id.*

The court held that the Facebook warrant was sufficiently particular, first, because "[t]here was a fair probability that evidence of the forgery scheme would be found in each of the enumerated categories, including Turner's private messages." *Id.* at *4. Next, although the warrant did not explicitly limit the information to be seized to evidence of the forgery scheme, "the warrant and incorporated affidavit set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not" because "the affidavit described the alleged crimes and gave examples of items to seize." *Id.* at 5-6. Third, as mentioned above, electronic searches "necessarily overseize … because there is no way to be sure exactly what an electronic file contains without somehow examining its contents." *Id.* at 6. Fourth, "the Supreme Court has indicated that specific, technical language is not expected in warrants. It found that affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation, and suggested that

warrants be granted a standard less demanding than those used in more formal legal proceedings." *Id.*, quoting *Gates*, 462 U.S. at 235 (cleaned up). The Ninth Circuit affirmed. *United States v. Turner*, No. 22-10194, 2023 WL 5696053, at *1 (9th Cir. Sept. 5, 2023) (unpublished).

Similarly, in a robbery conspiracy investigation, the court upheld a Facebook warrant as sufficiently particular "because of the nature of digital media searches." *Liburd*, 2018 WL 2709199, at *3. Although the warrant authorized the search of "the entire contents of Defendant's Facebook account," "it was " 'limited by reference to an exemplary list of items to be seized' ... related to the existence of ... [the] robbery conspiracy." *Id. See also United States v. Allen*, No. 16-10141-01-EFM, 2018 WL 1726349, at *6 n.25 (D. Kan. Apr. 10, 2018) (unpublished) (denying a motion to suppress a warrant seeking broad categories of Facebook account information because "it did not authorize on its face a search for every record associated with the Facebook accounts"); *United States v. Lowry*, No. 1:15-cr-043, 2015 WL 4399627 at *3 (S.D. Ohio July 17, 2015) (unpublished) (search warrant for "all communications between any user or recipient and the substance of those communications" was not overbroad where a criminal defendant used Facebook Messenger to exchange nude photographs with minors).

In this case, the Chinook Facebook Warrant was not overbroad. Like the warrant in *Turner*, it incorporated Steckler's affidavit (*see* A116), which specified

(1) the crimes for which the information was sought (Obstructing Passage and Resisting) and (2) examples of items to be seized (posts regarding the march, "pictures and videos from the protest," "photographs of Mr. Walls being taken into custody"). (A118-120) In addition, it did not authorize the search and seizure of <u>all</u> data available from Chinook's Facebook page, such as location data or membership lists.[7] Rather, it sought only those four categories of Facebook data where evidence of the crimes most likely was to be found. (A120) It also imposed an extremely narrow date range: from just four days prior to the march to two days after the march. (*Id.*) Plaintiffs fail to cite any caselaw to support the notion that such a confined search of a Facebook account is overbroad.

Plaintiffs nonetheless argue that the warrant's scope is "unjustified" because the warrant affidavit "does not provide probable cause to believe that illegality pervaded every aspect of the housing march, the Chinook Center, or Chinook's Facebook account." (Op. Brf. at 46-47) But Steckler did not seek

---

[7] Plaintiffs suggest in their brief that the Chinook Facebook Warrant's request to seize "[a]ll subscriber information tied" to the Chinook Facebook profile (A120) would "disclos[e] individuals' association with Chinook." (Op. Brf. at 51) Not necessarily so. The "subscriber information" for a Facebook account is believed to be basic information related to the Facebook account creation, not every individual who has "followed," "liked," "commented," or "posted," to the account. (*See, e.g.,* Supp. App. 363-64 (describing for the ESN Facebook account "Basic Subscriber <u>Information</u>" (which does not include, for example, "Shares," "Wall Postings," "Friend Listing, with Friends Facebook ID's," and "Group Listing, with Facebook Group ID's," as opposed to "Expanded Subscriber <u>Content</u>" (which does))).

authority to search and seize every aspect of the Chinook Facebook account. He sought—and received—authority to search and seize the posts, chats, and events of Chinook's Facebook account for seven days and its subscriber information.

Plaintiffs also allege that CSPD should have "known who or what it was looking for in connection with its investigation" before seeking the warrant, so that the warrant's scope could have been even more limited. (A29 ¶53) But Plaintiffs' argument collides with one of the lawful purposes of search warrants, in general, and of the Chinook Facebook Warrant, in particular: seeking information that will <u>aid</u> in a particular apprehension. *See Eckert*, 658 F. App'x at 406. Here, it must be remembered that participants in the march (including Armendariz) were masked. (*See, e.g.,* A73-77) The Chinook Facebook Warrant not only sought information material to Walls' prosecution for Obstruction and Resisting but also—lawfully—sought information to aid in the apprehension of the other, "approximately 60," unidentified individuals who also obstructed passage. (A118)

Plaintiffs also take issue with two of the categories of Chinook Facebook data to be searched and seized because they allegedly implicate First Amendment protected activity: (1) the Messenger chats, which implicate free speech rights, and (2) the subscriber information, which purportedly implicate associational rights.[8]

---

[8] City Defendants disagree that the Facebook subscriber information necessarily

40

(Op. Brf. at 49-52) As a result, Plaintiffs argue, "the Fourth Amendment's warrant requirements must be applied with 'the most scrupulous exactitude.'" (Op. Brf. at 49, quoting *Voss*, 774 F.2d at 405, quoting *Stanford*, 379 U.S. at 485)

But Plaintiffs take the "scrupulous exactitude" language out of context. The full quotation in *Voss* (from *Stanford*) reads:

> "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things are books and the basis for their seizure is the ideas they contain.'"

*Voss*, 774 F.2d at 405, quoting *Stanford*, 379 U.S. at 485. In *Voss*, the search warrant "authorized the seizure of books, literature and tapes advocating nonpayment of federal income taxes; publications of tax protestor organizations; and literature relating to communications between persons conspiring to defraud the IRS, or to conceal such fraud," for example. *Voss*, 774 F.2d at 404. Here, by contrast, Steckler sought Warrant 3 based on the protestors' criminal <u>conduct</u> at the housing march, not their advocacy for affordable housing or their association with Chinook. Indeed, the District Court rejected Plaintiffs' application of the "scrupulous exactitude" standard for this reason, explaining that the FAC "fails to plausibly plead the basis of the warrants in this case was in and of itself the ideas, speech, or associations of either Plaintiff versus alleged criminal statutes or criminal conduct under

_____

implicates associational rights. *See supra* page 39 n. 7.

investigation." (A149 n.5) Plaintiffs fail to demonstrate any error in the District Court's conclusion.

Plaintiffs also complain of the seven-day date range for the warrant: from just four days before the march to two days after the march. (Op. Brf. at 47; App. 120) They argue that "the affidavit provides no facts to suggest that any illegal activity 'was organized prior to 07/31/21'" and that it "provides no justification for why the timeframe of the search extends two days after the march." (*Id.*) But Plaintiffs' argument runs counter to the "practical and commonsense" construction the Court is to employ and the "reasonable inferences" the judge issuing the search warrant may draw from the affidavit's contents. *Suggs*, 998 F.3d at 1133; *Shelton*, 817 F. App'x at 634. To suggest that CSPD could capture the evidence material to the criminal prosecutions from a seizure of just one day of data—July 31, 2021—from the Chinook Facebook page defies common sense and common experience.

Finally, even if, as Plaintiffs contend, the Facebook Warrant failed to specify "any particular crime" as the subject of the search authority it requested, that omission would not violate the Fourth Amendment. (Op. Brf. at 49, 50) "[D]ue to the manner in which Facebook warrants are executed," "there [is] no appreciable practical effect" of an "omission of the specific offense" as a limitation on the Facebook data to be seized. *Purcell*, 967 F.3d at 182. Facebook warrants are a "novel hybrid of a traditional warrant and a subpoena" that render the specification of the

42

suspected offense "functionally unnecessary." *Id.* at 183. In *Purcell*, "the [warrant] called for Facebook, Inc. to turn over specified information without first culling the information itself." *Id.* at 182. As a result, "the scope of Facebook's 'search' and its identification of the items to be seized were not tethered to its cognizance of the suspected criminal conduct." *Id.* But this "omission" did not "give[] rise to a less particularized search and seizure of evidence." *Id.* Facebook would have returned "the same data" to the government as it would have if the warrant <u>had</u> specified the relevant offense. *Id. See also United States v. Harris*, No. 20-CR-98 (SRN/TNL), 2021 WL 4847832, at *9 (D. Minn. July 16, 2021) (unpublished) ("[D]espite the omission of the specific offense for which Defendant was being investigated in the warrant itself, there was no appreciable practical effect on the warrant's sweep due to the manner in which Facebook warrants are executed."), *rpt. & recomm. adopted*, 2021 WL 3929270 (D. Minn. Sept. 2, 2021) (unpublished). Thus, Plaintiffs' chief complaint here—that the Facebook Warrant failed <u>explicitly</u> to limit the search and seizure of Facebook data to evidence of Obstructing Passage or Resisting—would not have changed the data Facebook returned. For all these reasons, Chinook fails to state a Fourth Amendment violation claim against Steckler and Otero.

### B.     Qualified immunity shields Steckler and Otero from liability for the Chinook Facebook Warrant because there is no clearly established law governing Facebook warrants.

In the Opening Brief, Plaintiffs rely on general Fourth Amendment caselaw to attempt to show that Steckler and Otero violated Chinook's clearly established rights. (Op. Brf. 52-54) This is insufficient. *See Saucier v. Katz,* 533 U.S. 194, 201-02 (2001). <u>None</u> of the cases Plaintiffs cite to satisfy their burden to show that the law was clearly established involved a Facebook warrant, which is a "novel" breed of warrant. *Purcell*, 967 F.3d at 183. Indeed, as far as the City Defendants can tell, Plaintiffs do not cite a single case involving a Facebook warrant, let alone one finding a Facebook warrant to be unconstitutionally overbroad.

Instead, Chinook cites *Mink*, 613 F.3d 995; *Voss*, 774 F.2d at 404-405; *Poolaw v. Marcantel*, 565 F.3d 721, 734 (10th Cir. 2009); *Cassady v. Goering*, 567 F.3d 628, 639 (10th Cir. 2009), and *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005). (Op. Brf. 52-54) Of these, only one—*Mink*—involved the search and seizure of a computer, which, as discussed herein, differs from a Facebook warrant. *Mink*, 613 F.3d at 1010-1011.

Chinook fails to meet its burden to show that its clearly established Fourth Amendment rights were violated under these circumstances. *See, e.g., Palms*, 21 F.4th at 699–700; *United States v. Sadlowski*, 948 F.3d 1200, 1204-05 (10th Cir.

2020); *Pulliam*, 748 F.3d at 971–72; *United States v. Christie*, 717 F.3d 1156, 1165–66 (10th Cir. 2013).

In addition, Steckler and Otero also are entitled to qualified immunity on Chinook's Fourth Amendment claim because Chinook fails to allege that their reliance on the warrant was objectively unreasonable. *See Messerschmidt*, 565 U.S. at 546. As explained by the Supreme Court, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Id.* Few exceptions to this rule exist, and the "threshold" for establishing them "is a high one, and it should be. [That is because] '[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because '[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.'" *Id.* at 547. *See also United States v. Augustine*, 742 F.3d 1258, 1262 (10th Cir. 2014) (listing the exceptions to the presumption of objective reasonableness of an officer's reliance on a court-issued search warrant). Here, Chinook has not alleged that any of the exceptions to the rule exist. (A28-29 ¶¶45-55) In fact, Chinook does not even mention *Messerschmidt* in the Opening Brief.

Indeed, courts routinely, if not universally, extend the good faith exception to officers relying on far broader Facebook warrants than the one at issue here, in recognition that "applying the Fourth Amendment to social media accounts is a relatively unexplored area of law with nuances that have yet to be discovered." *United States v. Chavez*, 423 F. Supp. 3d 194, 208 (W.D.N.C. 2019). *See also Harris*, 2021 WL 4847832, at *8 ("'The extent to which social media profiles can be searched is an evolving issue ....'" (citation omitted)); *United States v. Westley,* No. 3:17-CR-171 (MPS), 2018 WL 3448161, at *17 (D. Conn. July 17, 2018) (unpublished) ("the application of search warrants to Facebook accounts is a relatively new area of the law"). "Courts should not punish law enforcement officers who are on the frontiers of new technology simply because 'they are at the beginning of a learning curve and have not yet been apprised of the preferences of courts on novel questions.'" *Chavez*, 423 F. Supp. 3d at 208. This Court should affirm the dismissal of Chinook's Fourth Amendment claims against Steckler and Otero.

## II.    The District Court correctly dismissed Plaintiffs' constitutional claims against the City.

*Issue raised and ruled on:* Again, the Opening Brief fails to show where this issue was raised below (as required by 10th Cir. R. 28(A)), and the Appellants' Appendix does not include the relevant briefing on this matter (as required by 10th Cir. R. 10.4(D)(2)). The Court may decline to address this issue based on either of these violations. *See* 10th Cir. R. 10.4(B); *Baca*, 1994 WL 75877, at *2.

46

The City addressed this issue in its motion to dismiss and reply. (Supp. App. 211-17, 335-339) The District Court found that "the FAC fails to state plausible First and Fourth Amendment claims against the City." (A151)

### A. Plaintiffs fail to state a constitutional violation claim against any City employee.

The City maintains, as the District Court found, that "because the FAC fails to plausibly allege a constitutional violation," Plaintiffs' constitutional "claims correspondingly fail against the City because there can be no municipal liability in the absence of a constitutional violation." (A122) Plaintiffs chastise the District Court for dismissing Armendariz's claim against the City without further analysis, because "the district court found only 'arguable' probable cause for the warrant to search Armendariz's devices." (Op. Brf. at 32) But Plaintiffs themselves devote scant attention to their municipal liability claims. (*See* Op. Brf. at 32-34, 52) In any event, the outcome is the same: the FAC fails to allege a plausible constitutional claim against the City.

### B. Plaintiffs fail to allege the existence of an unconstitutional custom of seeking overbroad search warrants against protestors.

In addition to showing that a municipal employee committed an underlying constitutional violation (which, to be sure, City Defendants assert Plaintiffs have failed to do), to state a Section 1983 claim against a municipality, a plaintiff must show the existence of an official policy or custom; a direct causal link between the

policy or custom and the injury alleged; and "at least for claims of inadequate hiring, training, or other supervisory practices," deliberate indifference on the part of the municipality. *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2020).

Here, Plaintiffs devote a single sentence of their Opening Brief to the existence of a purported unconstitutional municipal custom, summarily directing the Court to the FAC. (Op. Brf. at 33) In the FAC, Plaintiffs allege that the City has a "custom, policy, and practice" of seeking "broad-reaching warrants to search digital devices and social media accounts" of participants, associates of participants, and organizers of protests. (A48 ¶131) But Plaintiffs fail to allege facts showing that <u>any</u> of the warrants CSPD officers sought lacked probable cause to suspect a particular individual of criminal conduct, were unconstitutionally overbroad, or were substantially motivated by the exercise of First Amendment rights.

In addition to the Armendariz and Chinook warrants, Plaintiffs rely on three warrants, all of which arose out of the Pulpit Rock protest, as support for their allegation of the City's unconstitutional custom: (1) a cell phone of a woman (E.B.) whose vehicle was parked at the Pulpit Rock protest and whose longtime partner (M.A.) was believed to be one of the armed intimidators (Supp. App. 342-356), (2) the Facebook page of the Empowerment Solidarity Network ("ESN"), a promoter of

48

the "protest" (Supp. App. 357-364), and (3) a notebook found at the home of one of the armed suspects (Supp. App. 365-377). (A51 ¶¶140-146)

The search warrant for E.B.'s phone thoroughly demonstrated probable cause for believing that evidence of a crime would be found in it. In a detailed, 12-page warrant affidavit, the officer averred facts showing that at the Pulpit Rock protest, E.B.'s longtime partner, M.A., stood holding an "AR-15 style rifle in a 'low ready' stance while facing [a] vehicle," preventing it from proceeding. (Supp. App. 345) Others who engaged in such behavior had been "charged with engaging in a riot, menacing, obstructing highway or other passageway, and disobedience of public safety orders under riot conditions." (Supp. App. 347) E.B.'s own vehicle was parked nearby the protest, leading the affiant to believe it "likely that [E.B] was also present." (Supp. App. 350-351) In addition, publicly available Facebook posts showed that E.B. shared her Facebook account with M.A. (Supp. App. 348-350) In sum, as the officer averred, "Given the close relationship between [E.B] and [M.A], their history of sharing social media, and the presence of [E.B.]'s Ford Escape on 08/03/20, Your Affiant believes that [E.B.]'s cell phone will contain material evidence for this case." (Supp. App. 355) As to scope, the warrant was limited to specifically identified types of evidence for a specified time. (Supp. App. 356) The officer's supervisor reviewed and approved the warrant (Supp. App. 344, 356), and a neutral judge agreed that it should issue. (Supp. App. 342, 343, 355)

49

The ESN Facebook Warrant sought information for the limited period of July 20, 2020 to August 27, 2020, about the August 3, 2020 Pulpit Rock protest. (Supp. App. 357-364) "Based on the behaviors displayed …, the event evolved into a riot as defined by Colorado Revised Statute (CRS) 18-9-101 …." (Supp. App. 361) ESN had "marketed" the event through its Facebook account. (Supp. App. 359) The information collected would help officers in the ongoing criminal investigation in multiple ways:

> Your Affiant believes obtaining the information from [ESN's] Facebook profile … for the period of 07/20/2020 through 08/27/2020 would help identify persons that were in contact with the Empowerment Solidarity Network in the weeks and days leading up to, during, and after the event that took place on 08/03/2020. Obtaining the messages associated with the identified account will assist with better understanding the event planning process, specifically to determine if the armed subjects were directed to use intimidation and force towards uninvolved citizens travelling through the area, and to help identify the unknown actors.

> This is an ongoing criminal investigation into the criminal acts of Attempted Robbery, Menacing, and Riot related charges. The identification of those involved is paramount [to] further the investigation, to bring justice to the victims of the stated crimes, and to determine if the Empowerment Solidarity Network along with its contributors, are planning for further public disorder.

(Supp. App. 361) In addition, the ESN Facebook warrant's scope was limited to "Basic Subscriber Information" and "Expanded Subscriber Content," described further in the warrant, for the five-week period surrounding the August 3, 2020 protest. (Supp. App. 363-64) As with all the other warrants Plaintiffs challenge, a

neutral judge concluded that the warrant satisfied the Fourth Amendment. (Supp. App. 362, 364)

Finally, the zippered notebook was found when officers were executing a search warrant at the home of a woman suspected of "pointing an AR-15 style rifle" at a citizen's truck at the August 3, 2020 protest. (Supp. App. 375) When searching the primary bedroom of the home for "indicia" of occupancy, "detectives located a black in color portfolio zippered notebook underneath the bed." (*Id.*) "[T]he notebook contained arrest wills, organizational information, to include; rosters, contact information, and personal identification of other members pertaining to and related to both the John Brown Gun Club and Redneck Revolt," groups known to support "gun rights and members [that] often openly carry firearms." (*Id.*) "Upon locating [the notebook], [the detective] started applying for this search warrant," believing "that the documents located within the zippered notebook would be critical material evidence of identifying the outstanding unknown suspects who have yet to be identified and charged from the riot that occurred in Colorado Springs, CO on 08/03/2020." (*Id.*) The judge agreed, authorizing the search and seizure of the "notebook containing various documents." (Supp. App. 376-377)

In sum, all the warrants on which Plaintiffs rely for their unconstitutional custom claim against the City were justified by and tethered to crimes for which the warrant affidavits demonstrated probable cause: attempted assault, obstructing

passage, resisting arrest, attempted robbery, menacing, riot, etc. They all set forth why the affiants believed the places to be searched were likely to contain evidence of those crimes. They all constrained their search and seizure authority to the dates and to the search terms and/or specific locations in Facebook or elsewhere most likely to contain that evidence. And they all show that the CSPD officers' motivation in drafting, reviewing, obtaining, and executing the warrants was the desire to identify and prosecute individuals who engaged in criminal conduct during the August 3, 2020 Pulpit Rock protest and July 31, 2021 housing march. If Plaintiffs' position in this case that all the referenced warrants are unconstitutionally overbroad and invalid, not only are the officers who drafted them " 'plainly incompetent,' " but their supervisors who reviewed and all the judges who issued them "were as well." *Messerschmidt*, 565 U.S. at 554 (citation omitted).

Thus, it bears repeating that this Court's job is not to review the search warrants *de novo*. *See Gates*, 462 U.S. at 236. Rather, it must accord the issuing judges' probable cause determinations "great deference." *Id.* Even under the Tenth Circuit's general tenets of Fourth Amendment search warrant law, the E.B. cell phone warrant, the "novel"[9] ESN Facebook warrant, and the zippered notebook warrant fail to demonstrate a City custom of seeking overbroad and insufficiently

---

[9] *Purcell*, 967 F.3d at 183.

particular warrants. Plaintiffs fail to allege that the City has an unconstitutional custom and, thus, fail to state a Fourth or First Amendment claim against it.

**III.    Because the Opening Brief fails to adequately argue that Armendariz asserts her injunctive relief claim against the City, that the Chinook Facebook Warrant violates the Stored Communications Act, or that the District Court should have retained jurisdiction over Plaintiffs' state law claims, Plaintiffs have forfeited any argument that City Defendants are not entitled to the dismissal of such claims.**

*Issue raised and ruled on:* The Opening Brief fails to show where these three issues were raised below (as required by 10th Cir. R. 28(A)), and the Appellants' Appendix does not include the relevant briefing on these matters (as required by 10th Cir. R. 10.4(D)(2)). The Court may decline to address these issues based on either of these violations. *See* 10th Cir. R. 10.4(B); *Baca*, 1994 WL 75877, at *2.

City Defendants addressed these three issues in their motions to dismiss and replies. (Supp. App. 85, 96-98, 210 (the City "moves to dismiss all of Plaintiffs' claims against it"), 218-219, 326, 339-40) The District Court found that Armendariz failed to assert her injunctive relief claim against the City in the FAC (A152-53 n.8); that Chinook "fails to state a plausible claim" under the Stored Communications Act (A152); and that "[t]here is no compelling reason to maintain jurisdiction over the state law claims" against Ditzler, Steckler and Otero (A160).

Plaintiffs merely refer to the District Court's first finding—that Claim 6 was limited to the FBI—in a footnote at the end of their Statement of Facts. (Op. Brf. 10 n.3) It is not clear whether they seek to challenge that finding. To the extent they do,

53

they have waived that claim. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."); *United States v. Walker*, 918 F.3d 1134, 1153 (10th Cir. 2019) ("We have routinely declined to consider arguments that are only raised perfunctorily in footnote.").

Plaintiffs address the District Court's other findings in a footnote at the very end of their brief. (Op. Brf. 55 n.6) They offer no legal analysis or authority to support their suggestion that the District Court erred with respect to these three issues.

Plaintiffs have therefore waived their challenge to the District Court's rulings on Claims 3 through 5 as against the City Defendants by failing to brief them. *See Walker*, 918 F.3d at 1151-52; *Bronson v. Swensen*, 500 F.3d 1099, 1105 (10th Cir. 2007) ("[C]ursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the forfeiture doctrine."); *Adler v. Wal-Mart Stores*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

## IV.    Ditzler joins Summey's Fourth Amendment arguments.

*Issue raised and ruled on:* The Opening Brief fails to show where this issue was raised below (as required by 10th Cir. R. 28(A)), and the Appellants' Appendix does not include the relevant briefing on this matter (as required by 10th Cir. R.

10.4(D)(2)). The Court may decline to address this issue based on either of these violations. *See* 10th Cir. R. 10.4(B); *Baca*, 1994 WL 75877, at *2.

Ditzler addressed this issue in his motion to dismiss and reply. (Supp. App. 78-83, 378 (joining Supp. App. 299-310)) The District Court found that the Armendariz Warrants did not violate the Fourth Amendment, but even if they did, Ditzler was protected by qualified immunity. (A131-44)

Pursuant to Federal Rule of Appellate Procedure 28(i), Defendant Roy Ditzler joins in part(s) I and II of the Federal Defendants' Answer brief pertaining to Armendariz's Fourth Amendment claim against Detective Summey. As the District Court found, the reasons that support dismissal of Armendariz's Fourth Amendment claim against Summey apply equally to her Fourth Amendment claim against Ditzler. (A143-44) Plaintiffs nowhere argue that they do not.

## V.    Ditzler, Steckler and Otero join Summey's First Amendment arguments.

*Issue raised and ruled on:* The Opening Brief fails to show where this issue was raised below (as required by 10th Cir. R. 28(A)), and the Appellants' Appendix does not include the relevant briefing on this matter (as required by 10th Cir. R. 10.4(D)(2)). The Court may decline to address this issue based on either of these violations. *See* 10th Cir. R. 10.4(B); *Baca*, 1994 WL 75877, at *2.

Ditzler, Steckler, and Otero addressed this issue in their motions to dismiss and replies. (Supp. App. 83-85, 94-96, 326, 378 (joining Supp. App. 302)) The

District Court found "the FAC fails to allege a plausible violation of the First Amendment by the LEDs, further entitling them to qualified immunity on the First and Second Claims for Relief, respectively." (A148-51)

Pursuant to Federal Rule of Appellate Procedure 28(i), Defendants Ditzler, Steckler and Otero join part II.E of the Federal Defendants' Answer brief pertaining to Plaintiffs' First Amendment claims against Summey. The law and arguments demonstrating Armendariz's failure to allege a plausible First Amendment claim against Summey apply equally to Plaintiffs' First Amendment claims against Ditzler, Steckler and Otero. Plaintiffs nowhere argue that they do not. In addition, Ditzler, Steckler and Otero join Summey's arguments demonstrating that they are entitled to qualified immunity on Plaintiffs' First Amendment claims.

## <u>CONCLUSION</u>

The judgment below granting Defendants' motions dismiss should be affirmed.

Dated December 2, 2024

Respectfully submitted,

OFFICE OF THE CITY ATTORNEY OF THE
CITY OF COLORADO SPRINGS
Wynetta P. Massey, City Attorney

*s/ Anne H. Turner*
Anne H. Turner (Digital)
Assistant City Attorney
P. O. Box 1575, Mail Code 510
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80901-1575
Telephone: (719) 385-5909
Facsimile: (719) 385-5535
anne.turner@coloradosprings.gov

*Attorneys for Defendants-Appellees*
*City of Colorado Springs, Bradley K. Steckler,*
*Jason Otero, and Roy A. Ditzler*

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(A) and (B) because according to the word processing system used to prepare the brief, it contains 12,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2211 Build 16.0.15831.20280) 64-bit in Times New Roman 14-point type.

Dated this 2nd day of December, 2024

> OFFICE OF THE CITY ATTORNEY OF THE CITY OF COLORADO SPRINGS
> Wynetta P. Massey, City Attorney
>
> *s/ Anne H. Turner*
> Anne H. Turner, (Digital)
> Assistant City Attorney
> P. O. Box 1575, Mail Code 510
> 30 S. Nevada Ave., Suite 501
> Colorado Springs, Colorado 80901-1575
> Telephone:  (719) 385-5909
> Facsimile:  (719) 385-5535
> anne.turner@coloradosprings.gov
>
> *Attorneys for Defendants-Appellees*
> *City of Colorado Springs, Bradley K. Steckler,*
> *Jason Otero, and Roy A. Ditzler*

## CERTIFICATE OF DIGITAL SUBMISSION
## AND PRIVACY REDACTIONS

I hereby certify with respect to the foregoing:

1.     All required privacy redactions have been made per 10th Cir. R. 25.5;

2.     The ECF submission is an exact copy of the written document filed with the Clerk; and

3.     The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike Falcon Platform, sensor version 7.17.18721.0, most recently updated November 20, 2024, and according to the program, is free from viruses.

> _s/ Amy McKimmey_
> Amy McKimmey
> Senior Paralegal (Digital)
> Office of the City Attorney of the
> City of Colorado Springs
> 30 South Nevada Avenue, Suite 501
> Colorado Springs, CO  80903
> Telephone: (719) 385-5909
> Facsimile: (719) 385-5535

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on the 2nd day of December 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to participants in the case who are registered CM/ECF users.

<u>*s/ Amy McKimmey*</u>
Amy McKimmey
Senior Paralegal