**No. 24-1201**

IN THE
UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

JACQUELINE ARMENDARIZ and CHINOOK CENTER,

Plaintiffs-Appellants,

v.

CITY OF COLORADO SPRINGS; DANIEL SUMMEY, in his individual capacity; B.K. STECKLER, in his individual capacity; JASON S. OTERO, in his individual capacity; ROY A. DITZLER, in his individual capacity; FEDERAL BUREAU OF INVESTIGATION; and THE UNITED STATES OF AMERICA,

Defendants-Appellees.

On Appeal from the
United States District Court for the District of Colorado
Civil Action No. 23-cv-01951-SKC-MDB
(Hon. S. Kato Crews)

# DEFENDANTS-APPELLEES ROY A. DITZLER'S, JASON S. OTERO'S, AND BRADLEY K. STECKLER'S PETITION FOR REHEARING EN BANC

ANNE H. TURNER
OFFICE OF THE CITY ATTORNEY
30 South Nevada Avenue, Suite 501
Colorado Springs, Colorado 80903
(719) 385-5909 / anne.turner@coloradosprings.gov

Attorney for Defendants-Appellees City of Colorado Springs, Roy A. Ditzler, Jason S. Otero, and Bradley K. Steckler

## TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... ii

RULE 40(b)(2) STATEMENT .......... 1

QUESTIONS PRESENTED .......... 4

BACKGROUND .......... 5

ARGUMENT .......... 11

I. The Panel's Decision Violates Supreme Court Precedent Requiring Specificity and Factual Analogy in Clearly Established Law. .......... 11

II. The Panel's Decision Violates Supreme Court Precedent Extending Immunity to Officers Who Reasonably Rely on Judge-Issued Warrants. .......... 17

III. This Appeal Presents Issues of Exceptional Importance. .......... 20

CONCLUSION .......... 21

CERTIFICATE OF COMPLIANCE .......... 22

CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS .......... 23

CERTIFICATE OF SERVICE .......... 24

ATTACHMENTS:

Panel Decision .......... 26

First Warrant (Seizure of Amendariz's Digital Devices) (A069-086) .......... 117

Second Warrant (Search of Amendariz's Digital Devices) (A087-115) .......... 135

Third Warrant (Search of Chinook Center's Facebook) (A116-120) .......... 164

District Court Opinion (A121-161) .......... 169

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Cassady v. Goering*,
567 F.3d 628 (10th Cir. 2009) .......... 10, 14, 15

*City of Tahlequah v. Bond*,
595 U.S. 9 (2021) .......... 1, 11, 12, 17, 20

*D.C. v. Wesby*,
583 U.S. 48 (2018) .......... 11, 12

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .......... 3

*Messerschmidt v. Millender*,
565 U.S. 535 (2012) .......... 2, 17, 18, 20

*Mink v. Knox*,
613 F.3d 995 (10th Cir. 2010) .......... 9, 10, 14, 15

*Mullenix v. Luna*,
577 U.S. 7 (2015) .......... 1, 14, 17

*Rivas-Villegas v. Cortesluna*,
595 U.S. 1 (2021) .......... 1, 12, 17

*United States v. Contreras*,
905 F.3d 853 (5th Cir. 2018) .......... 13

*United States v. Griffith*,
867 F.3d 1265 (D.C. Cir. 2017) .......... 13

*United States v. Leary*,
846 F.2d 592 (10th Cir. 1988) .......... 10, 14

*United States v. Mora*,
989 F.3d 794 (10th Cir. 2021) .......... 9, 13

*United States v. Purcell*,
967 F.3d 159 (2d Cir. 2020) .......... 17

*United States v. Reichling*,
781 F.3d 883 (7th Cir. 2015) .................................................... 13

*Voss v. Bergsgaard*,
774 F.2d 402 (10th Cir. 1985) ............................................ 10, 14

*White v. Pauly*,
580 U.S. 73 (2017) .............................................................. 3, 20

**Statutes**

42 U.S.C. § 1983 ........................................................................... 8

## RULE 40(b)(2) STATEMENT

Rehearing en banc is warranted for three reasons:

1. First, the decision conflicts with Supreme Court precedent on the clearly-established prong of qualified immunity. *See, e.g.*, *Mullenix v. Luna*, 577 U.S. 7 (2015), *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021), and *City of Tahlequah v. Bond*, 595 U.S. 9 (2021). In these per curium decisions, among others, the Court held that a constitutional violation is not clearly established unless pre-existing precedent is both (a) specific to the "*particular* … context of the case, not … a broad general proposition," and (b) factually indistinguishable. *Mullenix*, 577 U.S. at 12 (emphasis in original) (reversing denial of qualified immunity where constitutionality of officer's conduct was not "beyond debate" but existed in "hazy legal backdrop"); *Rivas-Villegas*, 595 U.S. at 6 (reversing denial of qualified immunity where "[n]either [the plaintiff] nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here"); *Bond*, 595 U.S. at 13 (rejecting Tenth Circuit's reliance on cases with "dramatically different" facts from case at issue).

Here, the majority found that search warrants for digital devices and a Facebook account violated clearly established law by improperly

relying on the broad general principle that "warrants must … meet the particularity requirement of the Fourth Amendment" and factually dissimilar cases. Op. 49-50.[1] The dissenting judge correctly recognized that "case law hadn't kept up with technological advances" and that both "[r]easonable officers" and "[r]easonable judges could disagree" on how to apply existing law "to the digital devices and their contents." *Id.* 63. Because the majority's decision defined clearly established law at much too high a level of generality and relied on cases with materially distinguishable facts, it must be reversed.

2. The decision also conflicts with Supreme Court precedent that protects law enforcement officers who reasonably rely on a judicially-issued warrant: *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). Except in "four narrow circumstances," none of which apply here, an officer does not violate clearly established law where, as here, a neutral judge issues their warrant. Op. 23. The panel's decision thus conflicts with *Messerschmidt*.

[1] Page citations to the Opinion are keyed to the green PACER stamp at the top of the page.

3. This case presents issues of exceptional importance. The doctrine of qualified immunity is designed to mitigate "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). The Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases … both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 580 U.S. 73, 79 (2017). The Supreme Court itself deems qualified immunity, including its clearly established prong, to be an exceptionally important issue, deserving of this Court's en banc rehearing.

## QUESTIONS PRESENTED

Did two search warrants violate clearly established law where they allowed police to search for and seize from an active social media user suspected of attempting to assault a police officer (1) all the suspect's digital media storage devices and (2) information from those digital devices about that crime, limited by search terms, file type and a date range?

Did a search warrant directed to Facebook violate clearly established law where it allowed police to search for and seize information from a group's Facebook profile within a seven-day period, where the group organized and advertised through its Facebook profile the protest at which the attempted assault and other crimes occurred, and where protest participants shared information about the protest through Facebook?

## BACKGROUND

In July 2021, Plaintiff Chinook Center, a local activist group, organized and advertised a housing march through its Facebook page. Plaintiff Jacqueline Armendariz attended it.

During the march, roughly sixty protesters obstructed traffic when they marched in a busy roadway in downtown Colorado Springs. After multiple warnings, Colorado Springs Police Department ("CSPD") officers sought to arrest their leader, who actively resisted arrest. Another officer ran to assist them, but on the way, Armendariz dropped (or threw) her bicycle in his path. Only by taking evasive action did the officer avoid Armendariz's bike—and injury.

Armendariz's actions provided probable cause to believe that she committed attempted assault on a police officer. Deputized FBI Task Force Officer Daniel Summey was assigned to identify her, which he did by comparing footage of the incident with public photos and information on her Facebook and LinkedIn profiles.

***The First Warrant.*** Summey applied for a warrant to search Armendariz's home ("the First Warrant"). His application requested permission to seize all her "digital media storage devices," including all

"phones, computers, tablets, thumb drives, and external hard drives." A086.

Summey's affidavit referenced Armendariz's frequent use of social media (and thus at least one digital device) to document her presence at political events. In addition to Armendariz's cellphone, Summey sought to seize all her other digital devices based on his training and experience that:

- "people regularly attach their phones to their computers, and use their computers to back up their phones, or transfer photos from their phones to save space on their phones."
- "people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives."

A085. Summey's supervisor, Defendant Roy Ditzler, approved the application, and a Colorado judge issued the warrant.

***The Second Warrant.*** Next, Summey applied for a warrant to search and seize evidence from Armendariz's digital devices (the "Second Warrant"). Summey's affidavit expanded on Armendariz's political motive and relationships suggesting she planned the attempted assault.

The Second Warrant expressly incorporated Summey's affidavit as Attachment A. Attachment B identified the following things to be searched for and seized from Armendariz's devices:

- Photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer.
- key word search of the devices for the following words:
  Police, officer, cop, pig, bike, bicycle, attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Crustyansen, Chrischeeansen, Shaun, Walls, as these terms would be relevant to the investigation regardless of the time period in which they occurred.

NO OTHER ITEMS ARE SOUGHT FOR SEIZURE

A115. Again, Ditzler reviewed and approved Summey's warrant application, and a state judge issued the warrant.

***The Third Warrant.*** After the march, CSPD Officer Bradley Steckler found a Facebook post about it by Shaun Walls, the Chinook Center leader arrested at the protest. Steckler also learned about two more Facebook profiles relevant to the case. First, an individual's Facebook "account had pictures and videos from the protest and included some photographs of Mr. Walls being taken into custody." A119.

Second, Chinook Center's Facebook profile had the housing march advertised under its events tab. Steckler averred the Facebook account would "be material evidence" in the investigation of "Obstructing Passage" and "Resisting, Interference with a Public Official" at the march. A118-A119. In his experience, people involved in political protests

"use social media to organize planned events." A119. Steckler sought authority to seize the Chinook Center Facebook profile's subscriber information, posts, messenger chats, and events tab for the week of the housing march. A120.

Steckler had his supervisor, Defendant Jason Otero, review and approve the Facebook warrant application, which a state judge then granted.

**The District Court**

Two years later, Plaintiffs sued under 42 U.S.C. § 1983. Together, Armendariz and Chinook Center argued that all three warrants violated the Fourth Amendment.

On Defendants' motions to dismiss, the district court found that Plaintiffs failed to allege plausible Fourth Amendment violations. All three warrants demonstrated ample probable cause to believe evidence of the crimes under investigation would be found in the places to be searched and were sufficiently particular. A131-A140, A144-A147.

Even if the warrants did violate the Fourth Amendment, the district court held, the officers were entitled to qualified immunity. Plaintiffs failed to identify Supreme Court or Tenth Circuit authority

with the required level of specificity to clearly establish any violation. A141-A143, A147. Precedent clearly establishing the "particularized" right was especially necessary because the warrants were judicially-issued and were not alleged to contain material misrepresentations or omissions. A142-A143. Plaintiffs appealed.

**The Tenth Circuit**

In a split decision, the Tenth Circuit reversed the district court. The majority held that all three warrants violated the Fourth Amendment, and the violations were clearly established. The dissent disagreed that the unconstitutionality of the First and Second Warrants was clearly established but concurred that the Third Warrant violated clearly established law.

Citing *United States v. Mora*, 989 F.3d 794, 800 (10th Cir. 2021), the majority held that the First Warrant "lacked even arguable probable cause," because "[l]ike in *Mora*, the affidavit here did not contain facts connecting the criminal activity under investigation to [all of Armendariz's] electronic devices." Op. 25, 29.

To find the Second and Third Warrants clearly unconstitutional, the majority relied on four cases: *Mink v. Knox*, 613 F.3d 995 (10th Cir.

2010); *United States v. Leary*, 846 F.2d 592 (10th Cir. 1988); *Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985); and *Cassady v. Goering*, 567 F.3d 628 (10th Cir. 2009). *Mink* established that a "warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized." Op. 22. *Leary*, *Voss*, and *Cassady* all held "that warrants without sufficient limiting principles lack particularity." Op. 49.

The majority acknowledged that neutral judges had issued the warrants. But it found the First Warrant "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers c[ould not] reasonably presume it to be valid." Op. 32-33.

Judge Bacharach dissented, disagreeing with the majority's qualified immunity rulings on the First and Second Warrants. "Without meaningful guidance in the case law, law enforcement officers needed to apply eighteenth-century concepts to the rapidly developing world of digital data," he observed. Op. 63. Moreover, given that two state judges and one federal judge concluded that these warrants satisfied the Fourth

Amendment, "[r]easonable officers could differ in how to apply these concepts to the digital devices and their contents." *Id.*

On the Third Warrant, the panel denied qualified immunity to the officers. They concurred that they "need not point to a case considering a Facebook warrant to find a clearly established right here," because its constitutionality "turned on established principles of probable cause." Op. 58, 63.

## ARGUMENT

### I. The Panel's Decision Violates Supreme Court Precedent Requiring Specificity and Factual Analogy in Clearly Established Law.

The panel incorrectly held that the warrants' Fourth Amendment violations were clearly established. The decision violates controlling precedent from the Supreme Court and must therefore be overturned.

A constitutional violation is "clearly established" if "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *Bond*, 595 U.S. at 12.

"It is not enough" that a rule be "suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63.

"Specificity" is "especially important in the Fourth Amendment context." *Id.* at 64. "Probable cause turns on the assessment of probabilities in particular factual contexts," and "[g]iven its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered." *Id.* A "body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." *Id.*

The Supreme Court has also emphasized the need for factual analogy between existing law and the case at issue, reversing denials of qualified immunity that relied on factually distinguishable cases to clearly establish the law. *See, e.g.*, *Rivas-Villegas*, 595 U.S. at 6; *Bond*, 595 U.S. at 13.

Here, the panel's decision violates both tenets of clearly established law: *specificity* of the rule being enforced and *factual analogy* to existing cases.

***The First Warrant.*** The majority held that the First Warrant was unconstitutional because it failed to demonstrate the required nexus between Armendariz's crime and *all* her electronic devices. Op. 25. To deny qualified immunity, the majority relied on *Mora*. Op. 29-30.

But *Mora* did not address the nexus between a suspect's digital devices and their crime. It examined whether a nexus existed between human trafficking and the suspect's home. *Mora*, 989 F.3d at 800-01. *Mora* fails to establish the *specific* governing rule—namely, how the nexus requirement applies to *all* a suspect's digital devices. And it is factually distinguishable, given the ease with which digital information—unlike tangible evidence—is transferred.

Nor is there consensus among other circuits on this issue. The D.C. Circuit supports the majority. *See United States v. Griffith*, 867 F.3d 1265, 1273 (D.C. Cir. 2017). But two other circuits oppose it. *See United States v. Reichling*, 781 F.3d 883, 887 (7th Cir. 2015) (upholding similar warrant because it is "common knowledge … that images sent via cell phones or Facebook accounts may be readily transferred to other storage devices"); *United States v. Contreras*, 905 F.3d 853, 859 (5th Cir. 2018) (officers had probable cause to seize all suspect's "cell phones, computers,

and computer hardware" because "affidavit noted that cell phones can easily be used in conjunction with computers to transfer, view, back up, or store … images").

***The Second Warrant.*** The majority held that the Second Warrant was unconstitutional because it was overbroad, despite its (1) keyword and (2) date range and file type limitations on the search of Armendariz's devices. Op. 35-48. To find that the violation was clearly established, the majority relied on *Mink*, *Leary*, *Voss,* and *Cassady*. Op. 49-50.

But the majority's reliance on these cases violates Supreme Court precedent. First, the majority defined the right at issue at too high a level of generality, namely, as the right to a "particularized warrant" with "sufficient limiting principles." Op. 49, 56. That "broad general proposition" does not addresses the specific "context of [this] case." *Mullenix*, 577 U.S. at 12.

Second, the facts of the four cases lack any resemblance to this case. *See Leary*, 846 F.2d at 602 (customs agent's search warrant for business invalid because it allowed seizure of any business record related to any violation of federal export laws); *Voss*, 774 F.2d at 404-05 (IRS agent's warrant for all company's business records unconstitutional because it

lacked limitation to tax fraud); *Mink*, 613 F.3d at 1010-11 (warrant for "all computer and non-computer equipment and written materials" of student who satirized professor online unconstitutional because it contained no reference to any crime); *Cassady*, 567 F.3d at 639 (in investigation of illegal marijuana cultivation, search warrant for farm unconstitutional because it authorized seizure of all possible evidence of any crime). Indeed, only *Mink* involved the seizure of a computer, and its warrant was invalidated not because it contained *insufficient* limiting principles but rather because it contained none whatsoever. *Mink*, 613 F.3d at 1011.

In contrast, the Second Warrant both identified the specific crime under investigation[2] and imposed affirmative limits on the seizure of information using search terms and file types and date range. A115. None of the cases on which the majority relied espoused a *specific* rule in a *factually indistinguishable* case to invalidate a search warrant like the Second Warrant. As the dissent remarked, *no* court had "address[ed] the

---

[2] The Second Warrant cabined the files "relevant to this investigation" to Armendariz's "committing a violent act against a police officer." A115. The panel nonetheless disagreed on whether the Second Warrant identified the crime under investigation. Op. 46, 76.

sufficiency of key words as limits on the seizure of documents appearing in digital devices." Op. 78-79 n.2. And "neither the Supreme Court nor [the Tenth Circuit] has ever required a temporal limitation on search warrants containing limits involving key words." Op. 83. "Given the sparsity of pertinent case law," Judge Bacharach would grant qualified immunity on Armendariz's claims. *Id.* To avoid violating Supreme Court precedent, this Court should do so en banc.

***The Third Warrant.*** The majority held the Third Warrant was unconstitutionally overbroad. It permitted the seizure of all Facebook posts, chats and events for a one-week period "regardless of their relation to the crimes at issue." Op. 54. Because the Third Warrant "failed to employ the specificity available," it was "insufficiently particular." Op. 55.

To deny qualified immunity, the majority "adopt[ed] the same clearly-established-law analysis that [it] applied to the second warrant." Op. 58. It rejected the argument that it must "point to a case considering a Facebook warrant to find a clearly established right here." *Id.* Judge Bacharach concurred. Op. 87-88.

The panel's decision violates Supreme Court precedent. First, it relies on the same generic right to a "particularized warrant" with "sufficient limiting principles," not a rule specific to "the *particular* … context of the case." *Mullenix*, 577 U.S. at 12. Second, it relies on materially distinguishable cases in violation of *Rivas-Villegas* and *Bond*. Facebook warrants are a "novel hybrid of a traditional warrant and a subpoena;" specification of the suspected offense in a Facebook warrant is "functionally unnecessary." *United States v. Purcell*, 967 F.3d 159, 183 (2d Cir. 2020). By relying solely on cases involving traditional warrants to clearly establish law governing the Facebook warrant in this case, the panel violated Supreme Court precedent.

## II. The Panel's Decision Violates Supreme Court Precedent Extending Immunity to Officers Who Reasonably Rely on Judge-Issued Warrants.

Under controlling Supreme Court precedent, the fact that all three Warrants were approved by neutral judges provides an independent basis for shielding the officers from liability. *See Messerschmidt*, 565 U.S. at 553. Qualified immunity should be denied only if the issuing judge "so obviously erred that any reasonable officer would have recognized the error." *Id.* at 556. "The occasions on which this standard will be met may

be rare, but so too are the circumstances in which it will be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions." *Id.*

The majority concluded that *Messerschmidt* immunity did not apply to the First Warrant because it was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers could not reasonably presume it to be valid." Op. 32-33. But that conclusion does not square with the contents of the First Warrant. In his fifteen-page affidavit, Summey testified to particularized facts showing Armendariz's frequent use of social media (and thus at least one digital device) to document political events. A071-A085. Summey based his request to seize all Armendariz's devices on his training and experience that: (1) people at protests frequently carry their phones with them to take photos and message others at the protest; (2) people regularly transfer photos between their phones and computers to back them up or save space, and (3) people store digital data on numerous devices, including tablets, thumb drives, and external hard drives. A085.

The majority found that the First Warrant failed to demonstrate a nexus between all Armendariz's devices and her attempted assault only

because it discredited the nexus that Summey provided. It rejected the assertion that people regularly transfer data between their phones and computers as "entirely speculative" and "antiquated." Op. 30. But a nexus did appear on the face of the First Warrant; the majority simply did not accept it. Thus, the majority was incorrect that the First Warrant was "so *facially* deficient … that the executing officers could not reasonably presume it to be valid." Op. 32-33 (emphasis added).

The majority's conclusion is also difficult to reconcile with the procedural history of this case. Multiple people—Summey, his supervisor Ditzler, the state judge who issued them, and Judge Crews—thought the First and Second Warrants were constitutional. Furthermore, even the federal judges assigned to this case could not agree on whether those warrants violated clearly established law. Although two federal judges (Judges Federico and Phillips) concluded the first two warrants were obviously unconstitutional under existing precedent, another two (Judges Crews and Bacharach) concluded they weren't. Where, as here, there is a reasonable difference of opinion about the law between legal experts, it is particularly improper to impose personal liability on laymen like the Officers.

The same is true for the Third Warrant. The only difference is that Judge Bacharach concurred with the majority's conclusion that the Third Warrant violated clearly established law. But neither the majority nor the dissent addressed the *Messerschmidt* shield for the Third Warrant. And just like the First and Second Warrants, the Third Warrant was thought to be valid by (1) its author, (2) the reviewing supervisor, (3) the issuing judge, and (4) Judge Crews.

## III. This Appeal Presents Issues of Exceptional Importance.

The Supreme Court routinely grants certiorari to correct Circuit Courts' mishandling of the clearly established law prong of qualified immunity because of the doctrine's importance. *See supra* at 3 ¶ 3. *See also, e.g., Bond*, 595 U.S. at 12 (noting the Court has "repeatedly" had to tell courts how to analyze clearly established law); *White*, 580 U.S. at 79 (remarking that the Court "has issued a number of opinions reversing federal courts in qualified immunity cases"). The en banc Court should seize this opportunity to correct the panel's decision on this exceptionally important issue.

## CONCLUSION

The Petition for Rehearing En Banc should be granted and the judgment of the district court granting the individual Defendants qualified immunity should be affirmed.

Dated June 25, 2026.

Respectfully submitted,

OFFICE OF THE CITY ATTORNEY
Stefanie Boster, City Attorney

*s/ Anne H. Turner*
Anne H. Turner (Digital)
Assistant City Attorney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80901-1575
Telephone: (719) 385-5909
Facsimile: (719) 385-5535
anne.turner@coloradosprings.gov

Attorneys for Defendants-Appellees
City of Colorado Springs, Roy A. Ditzler,
Jason Otero, and Bradley K. Steckler

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(A) and (B) because according to the word processing system used to prepare the brief, it contains 3,562 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2605 Build 16.0.20026.20182) 64-bit in Century Schoolbook, 14-point type.

Dated this 25th day of June, 2026.

OFFICE OF THE CITY ATTORNEY
Stefanie Boster, City Attorney

*s/ Anne H. Turner*
Anne H. Turner (Digital)
Assistant City Attorney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80901-1575
Telephone: (719) 385-5909
Facsimile: (719) 385-5535
anne.turner@coloradosprings.gov

Attorneys for Defendants-Appellees
City of Colorado Springs, Roy A. Ditzler, Jason Otero, and Bradley K. Steckler

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify with respect to the foregoing:

1. All required privacy redactions have been made per 10th Cir. R. 25.5;

2. If required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

3. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike Falcon Platform, sensor version 7.37.20907.0, most recently updated June 4, 2026, and according to the program, is free from viruses.

*s/ Eri Howard*
Eri Howard
Legal Secretary (Digital)
Office of the City Attorney of the
City of Colorado Springs
30 South Nevada Avenue, Suite 501
Colorado Springs, CO 80903
Telephone: (719) 385-5909
Facsimile: (719) 385-5535

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on the 25th day of June 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to participants in the case who are registered CM/ECF users.

*s/ Eri Howard*
Eri Howard
Legal Secretary

# ATTACHMENTS

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 12, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JACQUELINE ARMENDARIZ, et al.,

Plaintiffs - Appellants,

v.

CITY OF COLORADO SPRINGS, et al.,

Defendants - Appellees.

----------------------------------------

ELECTRONIC FRONTIER FOUNDATION, et al.,

Amici Curiae.

No. 24-1201
(D.C. No. 1:23-CV-01951-SKC-MDB)
(D. Colo.)

---

**ORDER**

---

Before **BACHARACH**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

---

Appellants' *Petition for Panel Rehearing* is GRANTED to the extent of the modifications in the attached revised opinion. The court's February 24, 2026 opinion is withdrawn and replaced by the attached revised opinion, which shall be filed as of today's date.

Entered for the Court,

Per Curiam

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 12, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

| | |
|---|---|
| JACQUELINE ARMENDARIZ; CHINOOK CENTER,<br><br>Plaintiffs - Appellants,<br><br>v.<br><br>CITY OF COLORADO SPRINGS; DANIEL SUMMEY, in his individual capacity; UNITED STATES OF AMERICA; B.K. STECKLER, in his individual capacity; JASON S. OTERO, in his individual capacity; ROY A. DITZLER, in his individual capacity; FEDERAL BUREAU OF INVESTIGATION,<br><br>Defendants - Appellees.<br><br>----------------------------------------<br><br>CENTER FOR DEMOCRACY & TECHNOLOGY; ELECTRONIC FRONTIER FOUNDATION; ELECTRONIC PRIVACY INFORMATION CENTER; KNIGHT FIRST AMENDMENT INSTITUTE,<br><br>Amici Curiae. | No. 24-1201 |

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:23-CV-01951-SKC-MDB)**

---

Theresa Wardon Benz of Davis Graham & Stubbs LLP, Denver, Colorado (Jacqueline V. Roeder and Kylie L. Ngu, of Davis Graham & Stubbs LLP, Denver, Colorado, Timothy R. Macdonald, Sara R. Neel, Anna I. Kurtz, Mark Silverstein, and Laura Moraff, of American Civil Liberties Union Foundation of Colorado, Denver, Colorado, with her on the briefs), for Plaintiffs-Appellants.

Marissa R. Miller, Assistant United States Attorney (Matthew T. Kirsch, Acting United States Attorney, with her on the brief), Denver, Colorado, for Defendants-Appellees.

Anne H. Turner, Assistant City Attorney, Colorado Springs, Colorado, for Defendants-Appellees.

Samir Jain of Center of Democracy & Technology, Washington, DC, and Jennifer Lynch, Saira Hussain, and Brendan Gilligan of Electronic Frontier Foundation, San Francisco, California, filed an amicus brief on behalf of Electronic Frontier Foundation, Center for Democracy & Technology, Electronic Privacy Information Center, and Knight First Amendment Institute, in support of Plaintiffs-Appellants.

---

Before **BACHARACH**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

In July 2021, about fifty people participated in a housing-rights march in Colorado Springs. Afterward, the Colorado Springs Police Department began to investigate the conduct of some protesters at the march. CSPD obtained three search warrants: two targeting Jacqueline Armendariz, who dropped or pushed her bike in front of a running police officer during the march; and another targeting the Chinook Center, a nonprofit that helped organize the event.

The first warrant against Armendariz allowed officers to search for and seize her electronic devices. The second warrant went a step further, allowing

officers to search for and seize a variety of data stored on those devices. The third warrant, targeting the Chinook Center, allowed officers to obtain data from the Chinook Center's Facebook profile, including all Facebook posts, chats, and events from a seven-day period.

Armendariz and the Chinook Center sued the City and several officers—Armendariz sued Detective Daniel Summey and Sergeant Roy Ditzler, and the Chinook Center sued Detective B.K. Steckler and Sergeant Jason Otero—under 42 U.S.C. § 1983, arguing that the warrants were overbroad in violation of the Fourth Amendment's particularity requirement. Armendariz also sued the FBI for retaining electronic data, seized by CSPD, in violation of the Fourth Amendment.

The Chinook Center brought related state-law claims against the City, Detective Steckler, and Sergeant Otero. Likewise, Armendariz brought state-law claims against Detective Summey and Sergeant Ditzler, though the United States later substituted itself for Detective Summey. And the Chinook Center sued the City, Detective Steckler, and Sergeant Otero for violating the Stored Communications Act, 18 U.S.C. §§ 2701–13. After four motions to dismiss, the district court dismissed the entire complaint for failure to state a claim. Armendariz and the Chinook Center timely appealed.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the grant of qualified immunity to the officers involved with the three search warrants. Armendariz and the Chinook Center plausibly alleged that the warrants were

overbroad in violation of their clearly established right to be free from unreasonable searches and seizures. We also reverse the dismissal of Armendariz's and the Chinook Center's Fourth Amendment claims against the City.

As for Armendariz's Fourth Amendment claim against the FBI, she waived any challenge to the district court's ruling by failing to address it properly on appeal. So we affirm the district court's dismissal of that claim. For the same reason, we also affirm the dismissal of Armendariz's state-law claim against the United States. Finally, we reverse the dismissal of Armendariz's state-law claim against Sergeant Ditzler; the Chinook Center's state-law claims against the City, Detective Steckler, and Sergeant Otero; and the Chinook Center's Stored Communications Act claim.

## BACKGROUND

### I. Factual Background

When reviewing a decision on a motion to dismiss, we accept the complaint's well-pleaded allegations as true and consider them "in the light most favorable to the nonmoving party." *Johnson v. Smith*, 104 F.4th 153, 167 (10th Cir. 2024) (citation omitted). We may also consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted). With that in mind, we recount

the facts as alleged in the first amended complaint and contained in the search-warrant documents attached to the motions to dismiss.

**A. Tensions Between CSPD and Local Activists**

The CSPD has a fraught relationship with activists in Colorado Springs. Tensions rose in the summer of 2020, when racial-justice protests erupted throughout the country in response to the police killing of George Floyd. This cause felt close to home; just one year earlier, a CSPD officer shot and killed De'Von Bailey, a nineteen-year-old Black man. In response, Jon Christiansen, Shaun Walls, and other activists founded the Chinook Center, a community hub for activists and organizations to connect and collaborate on social-justice projects.

In August 2020—on the anniversary of Bailey's death—local activists organized a protest at the home of the CSPD officer who shot Bailey. Over 100 people showed up, and some of them carried weapons. Plaintiffs allege that this protest outraged CSPD officers, sparking a "campaign" to surveil and retaliate against activists and social-justice organizations in Colorado Springs.

In fact, the day after the protest at the CSPD officer's home, an undercover CSPD officer contacted the Chinook Center's leaders. Using a fake name, the officer posed as an activist wanting to support the Chinook Center's work. From there, the officer regularly communicated with the Chinook Center's leaders and volunteered with related nonprofits. The officer gained access to various organizations' membership records, email accounts, and cell

phones. CSPD then used this information to create reports on activists and organizations connected to the Chinook Center. Plaintiffs allege that CSPD prepared these reports as part of a program called Social Media Exploitation, through which the FBI and local police gathered information from social media to monitor and target activists.

**B. The Housing March and Arrests**

In 2021, the Chinook Center and other local activists sought to raise public awareness of the lack of affordable housing in Colorado Springs. They organized a housing march for July 31, 2021, to coincide with the end of the federal eviction moratorium. But Colorado Springs had planned another event for that day: a parade to celebrate its 150th anniversary. These dueling events generated friction between activists and CSPD officers.

Plaintiffs allege that CSPD heard about the housing march and decided to use it as an opportunity to arrest activists. CSPD officers expressed "general animus" toward the Chinook Center and related activists:

- A CSPD commander described Walls and the Chinook Center as "instrumental" to the protest outside the home of the officer who killed Bailey. App. vol. I at 24. He called that protest a "riot," even though the Chinook Center and its leaders were never charged with any crimes connected to the protest. *Id.*

- An officer observing the march asked "why the fuck" the media cared about it. *Id.* at 25. Another officer responded that CSPD "fucked up somebody from the media," so "they care." *Id.*

- Concerned about the march disrupting the parade, an officer quipped that CSPD should "get on that bullhorn" and tell parade attendees to "stone 'em all to death" if they wanted "these motherfuckers to quit

interrupting" the parade. *Id.* Another officer responded, "Call us when we need to collect the bodies." *Id.*

- While reviewing photos of key activists, an officer stated, "Boot to the face. It's going to happen." *Id.* at 26. The officer later remarked, "Should we EPSO SWAT the shit outta these dudes and just throw flash-bangs at everyone?" *Id.* Another officer responded that they should use Stinger grenades, a less-lethal grenade often used at protests.

Against this backdrop, activists met at a local park for the housing march as scheduled. Nearby, CSPD officers waited in their police vehicles for the march to begin. A lieutenant told the officers that—if the protesters marched in the street—the officers should "mak[e] contact and effect[] arrest." *Id.* at 26.

Protesters soon left the park and started marching. At times, some of them walked in the street. When officers asked the protesters to move out of the street, the protesters complied. Even so, a CSPD commander ordered officers to arrest those protesters for obstructing traffic.

That's when officers tackled and arrested Walls, a leader at the Chinook Center. He was at the front of the march carrying a white flag with the Chinook Center's logo. Officers also arrested Christiansen, another Chinook Center leader. About fifty other people walked in the street, but the officers focused specifically on the Chinook Center's leaders.

In the meantime, Jacqueline Armendariz was walking her bike in the bike lane near the front of the march. She wore a helmet, sunglasses, and a t-shirt reading, "Housing is a human right." *Id.* at 27. After watching the officers tackle Walls, Armendariz spotted another officer running in her direction

toward the Walls fracas. At that moment, she says, she dropped her bicycle, which landed between her and the officer.[1] The officer dodged the bicycle and continued running past her. Officers did not arrest Armendariz at the march, but CSPD later reviewed video footage and asserted that she had attempted to commit second-degree assault on a police officer, a felony under Colorado law. *See* Colo. Rev. Stat. §§ 18-2-101, 18-3-203.

### C. The Search Warrants

After the housing march, CSPD sought three warrants: (1) a warrant to search for and seize items from Armendariz's apartment, including her electronic devices; (2) a warrant to search for and seize data from those devices; and (3) a warrant directed at Facebook to search for and seize certain data from the Chinook Center's Facebook page. Because these warrants lie at the heart of this appeal, we describe each warrant and attached affidavit in detail.

#### 1. First Armendariz Warrant

CSPD tasked Detective Summey with investigating the bicycle incident. After identifying Armendariz as the individual involved, Detective Summey drafted a search warrant for Armendariz's apartment, along with a supporting affidavit. The warrant incorporated an attachment listing the items CSPD would

[1] As discussed below, the search-warrant affidavits describe the bicycle incident differently from the allegations in the complaint.

search for. Mostly, the list contained items Armendariz wore during the housing march, such as her bike helmet, t-shirt, and shoes. But the affidavit also requested permission to search for and seize certain electronic devices:

> Digital media storage devices, to include phones, computers, tablets, thumb drives, and external hard drives found to be associated with Jacqueline Armendariz.

App. vol. I at 86. The warrant stated that Detective Summey had probable cause to believe these items were in Armendariz's apartment and "[w]ould be material evidence in a subsequent criminal prosecution." *Id.* at 70.

The affidavit also described the bicycle incident, the housing march, Armendariz's background, and Detective Summey's training and experience. We summarize the affidavit's discussion of each topic.

***(1) Bicycle Incident:*** According to Detective Summey, video footage showed Armendariz riding her bicycle at the march. As an officer ran toward Walls, Armendariz got off her bike and threw it at the officer "with the clear intent to strike him with it." *Id.* at 72. The bike "nearly struck" the officer, who "had to slow his sprint" to avoid the bike. *Id.*

The affidavit thus concluded that Armendariz likely committed attempted second-degree assault, a class-five felony under Colorado law. The affidavit also included photos of the incident from body-worn camera and drone footage.

***(2) Housing March:*** According to the affidavit, protesters at the march "immediately and intentionally walked in the roadway and obstructed traffic." *Id.* As a result, officers arrested several protesters affiliated with the Chinook

Center. The affidavit noted that the protesters had worn red shirts stating, "Housing is a Human Right," and had carried red flags. According to the affidavit, a red flag "is a radical political symbol," "designates this march . . . as revolutionary and radical in nature," and is "a symbol of socialism and communism." *Id.* The affidavit also stated that the march "was declared unlawful." *Id.*

***(3) Armendariz's Background:*** The affidavit later detailed information about Armendariz that Detective Summey gathered from social media. Armendariz's Facebook page contained photos of her wearing the same helmet and shoes that she wore at the housing march. The affidavit then discussed Armendariz's public Twitter page, which referenced "yt supremacy." *Id.* at 82. Detective Summey described Armendariz's use of that term as "an attempt to disparage" and "show her disdain for white people." *Id.* at 83. He cited a description of "yt" from dictionary.com, which stated that "yt" derived "from the slang term *whitey*" and was "used by black Americans to disparage white people, especially implying oppression and racial discrimination." *Id.* at 82. He noted that Armendariz had attempted to assault a white officer.

***(4) Training and Experience:*** Finally, the affidavit explained that since 2018 Detective Summey has served as a subject-matter expert on bias-motivated crimes and has investigated "illegal protest activity," including by the Chinook Center and its members. *Id.* at 71. The affidavit stated that, from his training and experience, "people who engage in illegal protest activity

frequently carry their phones with them to take photos of their activity and message others who are also participating in illegal protest activity." *Id.* at 85. It also stated that "phones regularly track the location of their user and can show where a person is at a given date and time." *Id.* And it explained that people "regularly attach their phones to their computers, and use their computers to back up their phones," and that people "store digital data on numerous devices, to include tablets, thumb drives, and external hard drives." *Id.*

Sergeant Ditzler internally approved this search warrant and affidavit, and a state judge issued the warrant. About two weeks after the march, CSPD officers searched Armendariz's apartment. They seized the items identified in the warrant, including three cell phones, two computers, and an external hard drive.[2]

### 2. Second Armendariz Warrant

Two days after the apartment search, Detective Summey drafted a second warrant to search the electronic devices seized from Armendariz.[3] The warrant listed the digital data that the officers intended to search for and seize:

- Photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages)[,] emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this

[2] CSPD officers also obtained an arrest warrant for Armendariz and arrested her during the search.

[3] The search warrant specified each device and serial number.

investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer.

- key word search of the devices for the following words:

Police, officer, cop, pig, bike, bicycle, attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Crustyansen, Chrischeeansen, Shaun, [and] Walls, as these terms would be relevant to the investigation regardless of the time period in which they occurred.

App. vol. I at 115.[4] Detective Summey attested that the results of the keyword search "would be material evidence in the subsequent prosecution of Armendariz for attempting to assault" the officer at the housing march. *Id.* at 114.

The second search warrant's affidavit mirrored the first's, but with some important additions. For one thing, the second affidavit noted that Detective Summey spoke with Armendariz's supervisor, who confirmed that Armendariz attended the protest in her personal capacity. Next, the affidavit discussed Walls—who Detective Summey believed had "a close relationship" with Armendariz—and Walls's alarming Facebook posts. For instance, the affidavit included Facebook posts from Walls that supported violence against police officers and their families, with statements such as: "The revolution has come,

[4] We note that Detective Summey's affidavit omitted two search terms—Crustyansen and Chrischeeansen—that were included in Attachment B of the warrant, which listed the items for search and seizure.

off the pigs, time to pick up the guns," and "Kill three of [the cops'] wives or kids anywhere in the nation and watch the shit stop. Magically." *Id.* at 110–11. The affidavit also noted that Armendariz appeared on an episode of Walls's podcast focused on the August 2020 protest outside the CSPD officer's home.

Finally, the affidavit connected Armendariz's activism to her electronic devices. It described the Chinook Center as "an anarchist or anti-government organization," and it stated that "people who commit illegal activity in furtherance of the ideology or goals of anarchist or anti-government groups" often communicate electronically before or during "group activities leading up to the illegal activity." *Id.* at 106.

Once again, Sergeant Ditzler internally approved this search warrant and affidavit, and a state judge issued the warrant. Afterward, officers took Armendariz's devices to an FBI-run forensics lab. Armendariz alleges that CSPD and the FBI still retain the data they copied from her devices.

**3. Facebook Warrant**

Days after the housing march, Detective Steckler applied for a warrant directed at the Chinook Center's Facebook page. The warrant authorized the search and seizure of "[a]ll subscriber information tied to" the Chinook Center's "Facebook profile," including "names, phone numbers, and addresses." *Id.* at 120. It also allowed the search and seizure of certain records from a seven-day period, including the days before and after the march: (1) "All Facebook posts" from the Chinook Center's Facebook profile, (2) "All

Facebook Messenger chats tied to" the profile, and (3) "All Facebook Events" from the profile. *Id.* at 28, 120.

Detective Steckler provided a supporting affidavit. Summarized below, this affidavit recounted the housing march and its aftermath.

***(1) Housing March:*** During the march, about sixty protesters "illegally march[ed] northbound up" the street and "block[ed] vehicle traffic in the process." *Id.* at 118. Despite "numerous verbal warnings" from the police lieutenant that their actions were illegal, the protesters kept blocking the road. *Id*. Because Walls led the group, and "extended his middle finger toward the police line," the lieutenant ordered his arrest. *Id.* Walls "actively resist[ed] the officers['] attempts to control him by remaining on his feet and attempting to pull away from officers." *Id.* Officers eventually arrested him.

***(2) March Aftermath:*** After the march, CSPD received an anonymous tip about a Facebook post. The post—made under Walls's name and dated the night of the housing march—read:

> Now it's fun . . . it was work before[.] I could whoop all them pigs and they felt it too. I laid down so we could keep fighting with purpose. You can watch or help idgaf. I'm going to #Fuck12.

*Id*. at 118–19.

A few days later, CSPD found two other Facebook profiles with information about the march. One of those profiles was for the Chinook Center. Detective Steckler attested that, in his experience, "people involved in illegal demonstrations use social media to organize planned events." *Id.* at 119. So he

believed that information from the Facebook profile would "be material evidence in this case." *Id.*

Sergeant Otero reviewed and internally approved Detective Steckler's warrant application. The affidavit stated that CSPD requested the warrant under a provision of the Stored Communications Act, 18 U.S.C. § 2703(c). A state judge signed the warrant, which CSPD then served on Facebook. Facebook complied without any notice to the Chinook Center.

**D. CSPD's Policies and Practices**

Finally, Plaintiffs allege that the City targeted Armendariz and the Chinook Center as part of a custom, policy, and practice. According to Plaintiffs, CSPD uses minor offenses committed at protests to expansively search individuals' digital devices and social-media accounts. These warrants allegedly target information protected under the First Amendment, rather than evidence of suspected criminal activity. Plaintiffs allege that CSPD's affidavits include conclusory statements about how protesters "send and receive photos, messages, and other information through electronic communications." And Plaintiffs complain that the officers rely solely on their "experience" and "training" for these broad assertions. They cite various search warrants directed at other activists and organizations that allegedly amount to fishing expeditions unrelated to any criminal activity.

## II. Procedural Background

Soon after the housing march, Armendariz was charged for the bike incident and later pleaded guilty to obstructing a peace officer. She received a deferred judgment and served six months of unsupervised probation.

In August 2023, Armendariz and the Chinook Center sued the City, the CSPD officers responsible for their respective search warrants, and the FBI. The first amended complaint raises six claims for relief, which we categorize by type:

| **Claim** | **Plaintiff** | **Defendants** |
|---|---|---|
| ***(I) Fourth Amendment Claims*** | | |
| First Claim: Unlawful Search and Seizure, in violation of the First and Fourth Amendments, 42 U.S.C. § 1983 | Armendariz | Summey, Ditzler, and the City |
| Second Claim: Unlawful Search and Seizure, in violation of the First and Fourth Amendments, 42 U.S.C. § 1983 | The Chinook Center | Steckler, Otero, and the City |
| Sixth Claim: Injunctive Relief under the First and Fourth Amendments, 5 U.S.C. § 702 | Armendariz | FBI |
| ***(II) Statutory and State-Law Claims*** | | |
| Third Claim: Unlawful Search, in violation of the Stored Communications Act, 18 U.S.C. § 2703(a)–(b), (d) | The Chinook Center | Steckler, Otero, and the City |
| Fourth Claim: Deprivation of Rights, in violation of the Colorado constitution, Colo. Const. art. II, §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131 | Armendariz | United States[5] and Ditzler |
| Fifth Claim: Deprivation of Rights, in violation of the Colorado constitution, Colo. Const. art. II, §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131 | The Chinook Center | Steckler and Otero |

[5] The United States moved under 28 U.S.C. § 2679(d)(1) to substitute itself for Detective Summey on the fourth claim. The magistrate judge granted the request.

Defendants filed four motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).[6] Combined, these motions attacked every claim in the complaint.

The district court granted the motions, dismissed the complaint, and entered judgment. *Armendariz v. City of Colo. Springs*, No. 23-CV-01951, 2024 WL 2139316, at *1 (D. Colo. Apr. 10, 2024). Starting with the constitutional claims, the district court ruled that Plaintiffs failed to allege a plausible Fourth Amendment violation and that—even assuming a violation occurred—they never identified any clearly established law.[7] *Id.* at *4–12. So the district court held that the officers were entitled to qualified immunity for the search warrants and dismissed the Fourth Amendment claims against them. *Id.* By extension, the district court dismissed those claims against the City too. *Id.* at *13.

---

[6] The case involves four motions to dismiss: (1) Summey, the FBI, and the United States moved to dismiss the first, fourth, and sixth claims; (2) Ditzler moved to dismiss the first and fourth claims and to join the first motion; (3) Steckler and Otero moved to dismiss the second, third, and fifth claims; and (4) the City moved to dismiss the first, second, and third claims. The district court later requested and considered supplemental briefing on the officers' qualified immunity.

[7] For the first two claims, the district court also concluded that Plaintiffs failed to allege a plausible First Amendment violation. *Armendariz*, 2024 WL 2139316, at *12–13. On appeal, Plaintiffs clarify that they do not assert any freestanding First Amendment claims. Oral Arg. at 0:17:35–0:17:45. Rather, Plaintiffs invoke the First Amendment to reinforce their Fourth Amendment claims, arguing that "scrupulous exactitude" applies to search warrants implicating the First Amendment. Op. Br. at 29 (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

The district court then reviewed Armendariz's claim for injunctive relief against the FBI. *Id.* at *14–16. For this claim, Armendariz asserted that the FBI's retention of her digital data amounted to a Fourth Amendment violation and requested that the FBI return or destroy her data. *Id.* at *14. The district court disagreed, concluding that Armendariz failed to allege a plausible Fourth Amendment violation. *Id.* at *15. Instead, the district court determined that Armendariz should have moved for the FBI to return her property under Federal Rule of Criminal Procedure 41(g). *Id.*

The district court also dismissed the remaining claims. For the Chinook Center's Stored Communications Act claim, the court held that the Act's requirements were no more demanding than the Fourth Amendment's and thus failed for the same reasons. *Id.* at *14. The court also dismissed Armendariz's state-law claim against the United States because she failed to plead that she had exhausted the administrative process under the Federal Tort Claims Act. *Id.* at *16–17. Finally, after dismissing all the federal claims, the court found no compelling reason to exercise jurisdiction over the other state-law claims. *Id.* at *17.

Plaintiffs timely appealed.

## STANDARD OF REVIEW

We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim. *Stark v. Reliance Standard Life Ins.*, 142 F.4th 1252, 1256 (10th Cir. 2025). We accept all well-pleaded allegations as true and

view them in the light most favorable to Plaintiffs. *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021).

## DISCUSSION

Plaintiffs' Fourth Amendment claims take center stage. So we start with the unlawful-search-and-seizure claims before turning to Armendariz's injunctive-relief claim and Plaintiffs' state-law and statutory claims.

### I. Fourth Amendment Unlawful-Search-and-Seizure Claims (First and Second Claims)

To start, Plaintiffs appeal the district court's dismissal of their Fourth Amendment claims against the City and the officers involved in the search warrants. For each of the three warrants, the court determined that arguable probable cause supported the search and that the warrant described the search with sufficient particularity. *Armendariz*, 2024 WL 2139316, at *6–11. As a result, the court held that Plaintiffs failed to allege a plausible Fourth Amendment violation or a violation of clearly established law. *Id.* at *9–11. Thus, the district court concluded that (1) qualified immunity shielded the officers from liability, and (2) the lack of any constitutional violation defeated the municipal-liability claims against the City. *Id.* at *9–13.

On appeal, Plaintiffs argue that the district court erred in both its qualified-immunity and municipal-liability rulings. We first review whether qualified immunity protects the officers from liability for the Fourth

Amendment claims, then assess whether Plaintiffs adequately alleged these claims against the City.

**A. Qualified Immunity**

Qualified immunity shields officers from liability for violating a constitutional right that wasn't clearly established when the violation occurred. *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013). "Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). That said, defendants asserting qualified immunity through motions to dismiss face "a more challenging standard of review than would apply on summary judgment." *Id.* (citation omitted).

To survive a qualified-immunity defense at this stage in the litigation, "the plaintiff must [have] allege[d] facts sufficient to show (assuming they are true) that" (1) the "defendant plausibly violated their constitutional rights," and (2) "those rights were clearly established at the time." *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025) (citation modified). "The plaintiff must satisfy both prongs to overcome a qualified immunity defense . . . ." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 757–58 (10th Cir. 2021) (citation omitted).

***(1) Constitutional Violation:*** Plaintiffs argue that the complaint plausibly alleged that the officers who crafted the three search warrants and

supporting affidavits violated the Fourth Amendment. In essence, Plaintiffs argue that the search warrants lacked the particularity necessary to pass muster under the Fourth Amendment.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. A search or seizure is reasonable only if the warrant "particularly describ[es] the place to be searched, and the persons or things to be seized." *Id.* This particularity requirement prevents "a general exploratory rummaging of a person's belongings," *Mink v. Knox*, 613 F.3d 995, 1010 (10th Cir. 2010), and "ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause," *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985).

"A warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized." *Mink*, 613 F.3d at 1010. Without a proper nexus, a warrant violates the Fourth Amendment by "authoriz[ing] the seizure of items as to which there is no probable cause." *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021) (citation omitted). Whether a sufficient nexus exists "necessarily depends upon the facts of each case." *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009).

***(2) Clearly Established:*** Even if Plaintiffs alleged a plausible Fourth Amendment violation, they still must demonstrate that "those rights were

clearly established at the time." *Brown*, 124 F.4th at 1265 (citation omitted). In the search-warrant context, we ask "whether there was arguable probable cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (citation modified). An officer has arguable probable cause for a search warrant if his "conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* And importantly, "a neutral magistrate judge's issuance of a warrant is the clearest indication that the officers acted in an objectively reasonable manner or in objective good faith." *Id.* (citation modified). The issued warrant generally confers a "shield of immunity" to the officers because "in the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (citation modified).

All that said, even when a neutral magistrate issues a warrant, an officer may still violate clearly established law in four narrow circumstances: (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (2) "the issuing magistrate wholly abandoned his judicial role," (3) the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers [could not] reasonably presume it to be valid." *United*

*States v. Leon*, 468 U.S. 897, 923 (1984) (citation modified); *see Messerschmidt*, 565 U.S. at 547. In any of these circumstances, an officer violates clearly established law by relying on the warrant. *See Messerschmidt*, 565 U.S. at 547; *Stonecipher*, 759 F.3d at 1141–42.

With this legal framework in mind, we address whether qualified immunity protects the officers from liability for each search warrant.

**1. First Armendariz Search Warrant**

Armendariz argues that the complaint alleged plausible Fourth Amendment claims against Detective Summey and Sergeant Otero in relation to the first search warrant. This warrant allowed CSPD to search Armendariz's home and seize "[d]igital media storage devices, to include phones, computers, tablets, thumb drives, and external hard drives found to be associated with Jacqueline Armendariz." App. vol. I at 86.

The district court found no Fourth Amendment violation, reasoning that the warrant established probable cause for the search and seizure. *Armendariz*, 2024 WL 2139316, at *6. The court cited the affidavit's description of the alleged attempted assault, Armendariz's active use of social media, a selfie of Armendariz wearing the same bike gear that she wore during the housing march, and her association with Walls. *Id.* Yet Armendariz asserts that the warrant was overbroad because it did not explain why any of her digital devices would contain evidence of the bicycle incident.

This warrant allowed CSPD to search Armendariz's home, a location at the "very core" of the Fourth Amendment's protections. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. Mora*, 989 F.3d 794, 800 (10th Cir. 2021) (citations omitted).

To determine whether officers had probable cause, we ask whether "a nexus . . . exist[ed] between suspected criminal activity and the place to be searched." *Id.* We consider factors such as "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." *Id.* at 801. To search a house for electronic devices, the warrant should contain facts supporting a reasonable belief (1) that the individual possesses the devices, (2) that the devices are in the individual's residence, and (3) that the devices contain evidence of the suspected offense. *United States v. Griffith*, 867 F.3d 1265, 1273 (D.C. Cir. 2017).

Reviewing the first search warrant and affidavit, we conclude that the officers lacked even arguable probable cause to search for and seize Armendariz's electronic devices because there was no nexus established between the bulk of the devices and the crime being investigated. In the affidavit, Detective Summey attested to his belief that Armendariz committed

second-degree attempted assault, a class-five felony under Colorado law.[8] App. vol. I at 85. Criminal attempt requires that a "person . . . act[] with the kind of culpability otherwise required for commission of [the] offense." Colo. Rev. Stat. § 18-2-101(1). And to prove second-degree assault, the government must show that the defendant acted intentionally, knowingly, or recklessly, depending on the nature of the assault. *Id.* § 18-3-203.

The affidavit explained that during the housing march, Armendariz "got off [her] bicycle and threw it at [the officer] with the clear intent to strike him with it." App. vol. I at 72. The affidavit then sought to connect the alleged crime to Armendariz's digital presence. Specifically, the affidavit included information about her online activity from open-source social media:

- Information showing that Armendariz was "associated" with Walls on Facebook;
- A selfie dated July 3, 2021, posted on Armendariz's Facebook profile, of Armendariz wearing a blue bike helmet;

---

[8] The dissent concludes "[t]he probe focused on Ms. Armendariz's possible hostility to law enforcement rather than what she had done." Dissent at 8. We acknowledge that to prove this offense, the state would have to gather evidence of Armendariz's mens rea at the time she dropped the bicycle, which is no different than all other crimes under investigation in Colorado. *Gorman v. People*, 19 P.3d 662, 665 (Colo. 2000), *as modified* (July 24, 2000), *as corrected* (May 11, 2001) ("Generally, in order to subject a person to criminal liability, there must be concurrence of the actus reus, an unlawful act, and the mens rea, a culpable mental state." (citing *People v. Torres*, 848 P.2d 911, 914 (Colo. 1993))). However, the dissent's framing of the issue and its reasoning supports Armendariz's argument that the search warrants were overbroad because they used the criminal investigation as a pretext to inquire into her "hostility to law enforcement" rather than gather evidence of an attempted assault.

- A photo dated July 19, 2021, posted on Armendariz's Facebook profile by an affiliate of the Chinook Center, of Armendariz wearing her blue bike helmet with gray Nike shoes;
- A second photo of Armendariz posted by the same nonprofit showing her in the same shoes and helmet with a bicycle;
- A podcast episode, dated July 28, 2021, during which Armendariz discussed the importance of affordable housing; and
- Active Facebook, Twitter, and LinkedIn profiles that suggested Armendariz was "very active politically."

*Id.* at 78–84.

This information in the affidavit supports a reasonable belief that Armendariz had an online presence on social media, a reasonable inference that she possessed and used *some* electronic devices to take photos and participate in social media and that she may have kept the devices in her home. The affidavit also described Detective Summey's training and experience, including his knowledge about "people who engage in illegal protest activity," their phone usage, and their storage of digital data on multiple devices. *Id.* at 85. Detective Summey's training and experience thus attempted to connect Armendariz's devices to evidence of her conduct at the march and her intent when she dropped or threw her bicycle. Finally, we note that a state judge signed and issued the warrant that the officers relied on to seize the six devices. *Id.* at 69, 85.

Under these circumstances, we cannot conclude that Detective Summey's affidavit established the required nexus between Armendariz's suspected

criminal activity at the protest and the search of her home for various electronic devices. “The Fourth Amendment allows a search for evidence when there is probable cause to believe that the evidence sought will aid in a particular apprehension or conviction.” *Messerschmidt*, 565 U.S. at 551 (citation modified). But an officer could not reasonably believe that the information in Armendariz’s devices, if any information existed and whatever those devices may be, would further an investigation into the spontaneous attempted assault that happened at a certain time and place away from her home.

For one, the affidavit supported that Armendariz was active on social media, but it required an inference that she possessed the electronic devices that were listed to be seized. Second, the affidavit relied solely on Detective Summey’s “training and experience” about “people who engage in illegal protest activity” to establish a nexus between the electronic devices and the assault under investigation. This purported nexus is extremely flimsy and speculative. As we said in *Mora*, “[a]llowing officers to search a home based solely on an affiant’s experience and pure speculation would perpetuate that evil (which the Fourth Amendment is directed against).” 989 F.3d at 800.

In *Mora*, we considered whether a search warrant established a sufficient nexus between the suspected criminal activity and the defendant’s residence. *Id.* at 800. Officers arrested the defendant for alien smuggling and found a gun safe during a protective sweep of his home. *Id.* at 798. The officers then obtained a warrant to search the house for evidence of alien smuggling and

possessing a firearm as a felon. *Id.* We determined that the protective sweep violated the Fourth Amendment and thus reviewed whether the search warrant—absent information about the gun safe—provided probable cause for the search. *Id.* at 799–800. The government relied on conclusory statements in the search-warrant affidavit that "alien smugglers often use electronic communication devices, GPS devices, and electronic banking systems to conduct operations and store records." *Id.* at 801. We held that these statements failed to provide probable cause because none were "specific to Defendant's crime or circumstances." *Id.*

Like in *Mora*, the affidavit here did not contain facts connecting the criminal activity under investigation to the electronic devices. The affidavit included information about Armendariz's active online presence; her public postings about her social-justice activism; photos of her at an event posted by a nonprofit affiliated with the Chinook Center; and her Facebook connection to Walls. At most, the officers had reason to believe by inference that Armendariz had a cell phone on her possession at the protest (which is reasonable given the ubiquity of cellphones and the "selfies" she posted online), so it also may contain evidence of her presence at the housing march and possibly her mens rea during the bicycle incident.

But the warrant went well beyond seizing the phone. It allowed officers to seize a long list of electronic devices on the theory that Detective Summey "is also aware that people regularly attach their phones to their computers, and

use their computers to back up their phones, or transfer photos from their phones to save space on their phones. Your Affiant knows that people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives." App. vol. I at 85. This justification is entirely speculative, relying on purported knowledge—entirely without foundation—of how "people," in general, act. Further, it relies on an antiquated view of how people use their cell phones with other electronic devices. Regardless, it is insufficient to establish the nexus between all the electronic devices and the crime under investigation, as the law demands.

Similarly in *Griffith*, officers investigated the defendant for a year-old gang-related homicide. 867 F.3d at 1268. Officers obtained a warrant to search his apartment and seize any cell phones and electronic devices found there. *Id.* at 1269–70. The D.C. Circuit concluded that the warrant was overbroad. To begin, the affidavit never explained that the defendant likely owned a cell phone. *Id.* at 1272–73. Nor did it explain whether a cell phone "would be located in the home and would contain incriminating evidence about [the] suspected offense." *Id.* at 1273. Plus, the warrant permitted the seizure of any electronic device regardless of who owned it. *Id.* at 1276. The D.C. Circuit highlighted how these electronic devices were lawful items, not contraband, and cautioned against "a blanket authorization" to seize "innocuous objects." *Id.* (citation modified).

Though the warrant here did identify Armendariz as a social media user, it contained the same infirmities as the *Griffith* affidavit and was in essence "a blanket authorization" to seize all electronic devices without any showing they may contain evidence of the crime under investigation. As the *Griffith* court noted, "there is no commonsense reason simply to presume that individuals own a computer or a tablet. Those sorts of devices do not approach cell phones in their ubiquity[.]" *Id*. at 1272.

The dissent's reasoning rests heavily upon a factual predicate that Armendariz possessed a cellphone, which it then uses as the gateway to all the other electronic devices listed in the warrant. But this conclusion assumes that the warrant is severable and that we could or should break it apart based upon the items listed in the warrant to be searched for and seized. The parties did not argue or discuss severability of the warrant, so the dissent's assumption is molded from its own clay. Moreover, as best we can tell, this court has never held the severability doctrine applies in a civil case.

In *Cassady v. Goering*, we declined to decide whether the doctrine applied in a civil case because the court concluded that the severability doctrine would not apply to that case even if it were an appeal from a criminal suppression hearing. 567 F.3d 628, 637 (10th Cir. 2009). The court then proceeded through a lengthy analysis of the severability doctrine as if considering a criminal case. Here, the parties did not argue the severability

doctrine, which the dissent raises. The dissent simply concludes that the doctrine applies and that the warrant is severable.

In the criminal context, courts apply the severability doctrine in determining the scope of the exclusionary rule. *United States v. Sells*, 463 F.3d 1148, 1155 (10th Cir. 2006). But in the civil context, the exclusionary rule is not at issue. Instead, a jury is tasked at the liability phase to make a binary determination of whether the warrant violated the Fourth Amendment at all. We decline to adopt the dissent's approach or to consider whether there are valid parts of the warrant here (for instance, the dissent mentions severing the cellphone) from the invalid parts of the warrant.

For these reasons, we conclude that the officers lacked even arguable probable cause to seize Armendariz's electronic devices that were listed in the search warrant. And so, Armendariz has alleged a clearly established Fourth Amendment violation related to the first warrant. *See Stonecipher*, 759 F.3d at 1141.

Even with that conclusion, we must consider whether the state judge's issuance of the warrant overcomes our misgivings as to its legality under the Fourth Amendment. After all, "[a] neutral magistrate judge's issuance of a warrant is the clearest indication that the officers acted in an objectively reasonable manner or in objective good faith." *Id.* (citation modified). Still, we conclude that Armendariz plausibly alleged that the officers violated clearly established law, because the facts alleged support that the warrant was "so

facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers c[ould not] reasonably presume it to be valid." *Leon*, 468 U.S. at 923. We therefore reverse the district court's ruling that qualified immunity protects Detective Summey and Sergeant Ditzler from liability for this search warrant.[9]

**2. Second Armendariz Search Warrant**

Armendariz also challenges the second warrant authorizing the search and seizure of data from her electronic devices. She contends that the search-warrant affidavit turned the warrant into a "wide-ranging fishing expedition for political views and associations." Op. Br. at 20. The district court concluded otherwise, holding that the officers had at least arguable probable cause for the search warrant and that the warrant met the particularity requirement. *Armendariz*, 2024 WL 2139316, at *6–8.

We review the second search warrant under each qualified-immunity prong. In doing so, we conclude that Armendariz alleged a plausible Fourth

[9] The complaint suggests that CSPD officers had ulterior motives for obtaining the warrant. But that does not impact whether the warrant provides arguable probable cause. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 739 (2011). And though the complaint suggests that the officers acted in bad faith, Plaintiffs do not argue that the officers' alleged motives led to false statements in the search warrants. *See generally Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) (requiring the suppression of evidence obtained through false statements in a search warrant); *Leon*, 468 U.S. at 923 (same).

Amendment violation and reverse the district court's dismissal of this part of her claim.

**a. Constitutional Violation**

As discussed, the Fourth Amendment requires that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized." *Mink*, 613 F.3d at 1010. We focus on "practical accuracy rather than technical precision" when considering whether a search warrant satisfies the particularity requirement. *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (citation omitted). And at bottom, "[t]he 'touchstone' of the Fourth Amendment is 'reasonableness.'" *Biglow*, 562 F.3d at 1279 (quoting *Samson v. California*, 547 U.S. 843, 855 n.4 (2006)).

In the context of digital searches, we have recognized that "enormous amounts of information and relevant evidence can be stored" on digital devices. *United States v. Palms*, 21 F.4th 689, 698 (10th Cir. 2021). It follows that searching these devices can provide significant access to an individual's private affairs. *Otero*, 563 F.3d at 1132. To protect against unwarranted intrusions, "the Fourth Amendment requires warrants for computer searches to affirmatively limit the search to evidence of specific crimes or specific types of material." *Palms*, 21 F.4th at 698 (citation modified). In other words, warrants to search digital devices must contain a "limiting principle" that "establish[es]

practical guidelines about what can be searched and seized, leaving nothing to the discretion of the officers executing the warrant." *Id.* (citation omitted).

For the second search warrant, Armendariz contends that two aspects of the warrant violated the Fourth Amendment's particularity requirement: the keyword search and the file search. We consider each in turn.

***(1) Keyword Search:*** Armendariz argues that the warrant's keyword search lacked particularity because it was overbroad. The warrant allowed officers to search Armendariz's six devices for these keywords:

> Police, officer, cop, pig, bike, bicycle, attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Crustyansen, Chrischeeansen, Shaun, [and] Walls, as these terms would be relevant to the investigation regardless of the time period in which they occurred.

App. vol. I at 115.

We agree with Armendariz that this keyword search failed to include sufficient limits under the Fourth Amendment's particularity requirement. We detect several problems with the keyword search that contribute to the warrant's overbreadth.

First, the keyword search failed to limit the search and seizure to evidence related to the crime under investigation. Consider the type of information that would fall within this search warrant's scope:

- Discussions about any "protest," without reference to which protest or what is being protested;

- Discussions about any "officer," "cop," or "pig," regardless of whether the terms refer to police brutality or an actual animal;
- Armendariz's communications with or about any of the Chinook Center's founders and with or about anyone who shares their names;
- Any reference to the word "right," regardless of whether the communication refers to a human right or simply expresses agreement; and
- Any reference to an assault, regardless of which one.

Certainly, the keyword search allowed officers to search for and seize data completely unrelated to any crime. The warrant's failure to limit the search to evidence of the attempted assault contributes to its lack of particularity. *See, e.g.*, *Mink*, 613 F.3d at 1010–11 (holding that a search warrant was overbroad because it failed to limit the search to evidence of a specific crime); *cf. United States v. Burgess*, 576 F.3d 1078, 1091 (10th Cir. 2009) (holding that a search warrant met the particularity requirement in part because it limited the search of computer records to evidence of drug trafficking); *United States v. Brooks*, 427 F.3d 1246, 1252–53 (10th Cir. 2005) (same, where the warrant "naturally" limited the search of digital devices to evidence of child pornography).

Second, the officers had enough information to narrow the search warrant's scope but chose not to do so. "Failure to employ the specificity available will invalidate a general description in a warrant." *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988) (citation omitted). In *Leary*, officers obtained a search warrant while investigating the defendants' illegal export

scheme. *Id.* at 594. The warrant allowed officers to search for and seize "a long list of business records typical of the documents kept by an export company" so long as the records "relate[d] to the purchase, sale and illegal exportation of materials in violation of the federal export laws." *Id.* at 600–01 (citation modified). We held that the warrant was facially overbroad in part because "information was available to the government to make the description of the items to be seized much more particular." *Id.* at 604. For instance, the government could have narrowed the search to documents related to the suspect transaction, companies suspected of illegal export activity, or countries that were part of the export route. *Id.*

Like the warrant in *Leary*, the warrant's keyword search failed to sufficiently narrow the data to be searched and seized. For example, though the crime under investigation dealt with a discrete incident occurring on July 31, 2021, the keyword search specifically disclaimed any temporal limit on the data for search and seizure. True, the warrant stated that the keywords "would be relevant to the investigation regardless of the time period in which they occurred." App. vol. I at 115. Yet the affidavit did not explain *why* all data involving these keywords—including communications made years before the housing march—would be relevant to the alleged attempted assault. What's more, the keyword search identified individuals unrelated to the alleged assault, such as Jon and Samantha Christiansen. Granted, these individuals were affiliated with the Chinook Center and the housing march. But the absence of

any other limiting principle connecting their names to the attempted assault renders these search terms overbroad. All in all, the officers did not narrow the keyword search using available information, making the warrant overbroad. *See United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991) (concluding that a warrant was overbroad when it described the items for seizure as "jewelry" when the officers had a specific inventory of stolen items from the jewelry store).

Third, the keyword search failed to distinguish between the data officers could *search for* and the data officers could *seize*. The warrant allowed officers to seize any data responsive to the keyword search—even if the search returned data unrelated to the crime under investigation. We cannot endorse such a broad authorization. Doing so would transform minor crime investigations into opportunities to seize a wide range of information unrelated to the conduct at issue. *See Leary*, 846 F.2d at 602 (holding that warrants must "allow the executing officers to distinguish between items that may and may not be seized"); *United States v. Russian*, 848 F.3d 1239, 1245–46 (10th Cir. 2017) (holding that a warrant was overbroad for not identifying what material the officers could seize).

In *United States v. Zelaya-Veliz*, the Fourth Circuit addressed the "distinction between what may be searched and what can be seized" in the context of warrants for digital data. 94 F.4th 321, 337 (4th Cir. 2024). It endorsed a two-step approach for maintaining that distinction. *Id.* at 337–38

(citing Fed. R. Crim. P. 41(e)(2)(B) advisory committee's note to 2009 amendment). At step one—the search—officers may obtain and sift through a broader array of digital data. *Id.* at 338. Like any search, the officers will encounter information irrelevant to the crime. *Id.* At step two—the seizure—the officers may "seize only the fruits, evidence, or instrumentalities of the crimes for which they had established probable cause." *Id.*

But here, the warrant never distinguished between the search and the seizure. Instead, it allowed officers to seize all data responsive to the keyword search. Given the broad scope of the search—which encompassed any message with "right," "bike," or "housing"—the search would inevitably return data unrelated to the attempted assault. Without any principle limiting the data officers could seize, the warrant failed to protect against serious intrusions into Armendariz's privacy. This failure adds to the warrant's overbreadth.

Defendants make several arguments against finding a Fourth Amendment violation. None are persuasive. First, Defendants argue that Detective Summey's affidavit identified the crime at issue and explained how Armendariz became a suspect. So according to Defendants, incorporating the affidavit remedied any lack of specificity. We agree that a properly incorporated affidavit can cure a warrant's lack of particularity. But that's not the case here.

An affidavit can remedy a defective search warrant if "(1) the warrant and the affidavit [are] attached; and (2) the warrant . . . expressly incorporate[s] the affidavit." *United States v. Suggs*, 998 F.3d 1125, 1135 (10th

Cir. 2021). But when a warrant is overbroad, the incorporated affidavit must introduce a limiting principle. *See United States v. Sadlowski*, 948 F.3d 1200, 1205 (10th Cir. 2020) (concluding that a search warrant met the particularity requirement where it permitted a search of the residence "described in the affidavit" (citation modified)); *United States v. Kahre*, 737 F.3d 554, 566–67 (9th Cir. 2013) (same, where a search warrant for "all records" incorporated an affidavit that limited the search to "records" from "the period January 1, 1992, until December 31, 1993; and January 1, 1997 to present date").

The affidavit attached to the second warrant provided no such limiting principle. The warrant attached and expressly incorporated Attachments A and B. *See Suggs*, 998 F.3d at 1135. Attachment A was the supporting affidavit; Attachment B identified the file search and keyword search. App. vol. I at 91, 115. But despite incorporating both attachments, the warrant identified only Attachment B for the "property or thing(s) [that] will be searched for and, if found, seized." *Id.* at 87.

At no point did the warrant or Attachment B state that the affidavit limited the scope of the search or seizure. *See Sadlowski*, 948 F.3d at 1205 (warrant expressly incorporated the affidavit's description of the residence as the place to be searched); *Kahre*, 737 F.3d at 566–67 (same for the affidavit's timeframe, which limited the records to be searched). Instead, the warrant made clear that Attachment B, not the affidavit, defined the boundaries of the search and seizure.

Plus, even considering the affidavit, we fail to see how descriptions of the bicycle incident and various social-media posts amounted to a clear limiting principle on the scope of the search. Instead, the affidavit merely recounted the evidence that the officers believed formed the probable cause necessary for the search and seizure. That did not limit the scope of the keyword search, such that "nothing [was] left to the discretion of the officer executing the warrant." *Stanford v. Texas,* 379 U.S. 476, 485 (1965) (citation omitted).

Besides missing a limiting principle, parts of the affidavit directly contradicted the scope of the keyword search as stated in Attachment B. For example, the affidavit focused on the timeframe surrounding the attempted assault on July 31, 2021. But the keyword search disregarded this limit, stating that the search "terms would be relevant to the investigation regardless of the time period in which they occurred." App. vol. I at 115. To accept Defendants' argument that the affidavit limited the scope of the search and seizure would be to condone searches with murky boundaries and nebulous scopes. That result would frustrate the Fourth Amendment's proscription against warrants that allow "exploratory rummaging," *Mink*, 613 F.3d at 1010, or "authorize[] the seizure of items as to which there is no probable cause," *Cotto*, 995 F.3d at 798

(citation omitted). In sum, the affidavit fails to narrow the warrant's broad scope.[10]

Next, Defendants argue that the particularity requirement doesn't even apply to the keyword search. According to Defendants, the keyword search merely limited how officers could conduct the search. Put differently, they argue that the keyword search was only a search strategy, which need not meet the Fourth Amendment's particularity requirement.

Again, Defendants correctly state the law but misapply it to the warrant at issue. To comply with the Fourth Amendment, "a warrant must describe with particularity the items sought on a computer," but "need not include a particularized computer search strategy." *United States v. Wagner*, 951 F.3d 1232, 1247 (10th Cir. 2020) (citation modified); *see Russian*, 848 F.3d at 1245 n.1 (rejecting a "search methodology requirement" that would require law enforcement "to specify an ex ante search protocol before a warrant could issue" for digital devices). Thus, a preauthorized computer-search strategy does not affect whether a warrant meets the Fourth Amendment's particularity requirement.

---

[10] Defendants point to the affidavit's statement that the keyword search "would be material evidence in the subsequent prosecution of Armendariz for attempting to assault [the] [o]fficer." App. vol. I at 114. They claim that this language limited the scope of the search to evidence of the attempted assault. Yet the cited language did not restrict the keyword search. It merely commented on the materiality of the evidence responsive to the search. So we reject Defendants' position that this language cures the warrant's overbreadth.

Here, though, Defendants improperly equate the items for seizure with a computer-search strategy. The record belies this position. The warrant itself listed the keyword search under "property or thing(s) [that] will be searched for and, if found, seized." App. vol. I at 87; *see id.* at 115. Nowhere did the warrant state that officers should perform the keyword search and then cabin the items seized to evidence of the attempted assault.[11] Instead, the warrant authorized the seizure of *all* data responsive to the keyword search. With this in mind, we decline to characterize the keyword search as a computer-search strategy.[12]

[11] We considered whether we could construe the keyword search as a computer-search strategy that controlled how the officers went about the file search. But the keyword search's language directly contradicts this reading. Though the warrant limited the file search to data "for the time period of 6/5/2021 through 8/7/2021," the keyword search specified that the "terms would be relevant to the investigation regardless of the time period in which they occurred." App. vol. I at 115. So the warrant's plain language establishes that the keyword search was separate from—rather than a search methodology for—the file search.

[12] Defendants also argue that Armendariz should have challenged the reasonableness of the search instead of the warrant's particularity. They assert that, by never raising reasonableness, Armendariz forfeited her challenge to the keyword search. True enough, this argument carries weight if the keyword search was a search methodology. In that case, Armendariz should have challenged the reasonableness of the search, not the warrant's particularity. *See Palms*, 21 F.4th at 700–01 & n.12. But because we determine that the keyword search described the items to be searched and seized, not how to conduct the search, we conclude that Armendariz properly challenged the warrant's particularity.

For all these reasons, we conclude that Armendariz has plausibly alleged that the keyword search was overbroad. Though the keyword search alone violates the Fourth Amendment, we review the warrant's file search as well.

***(2) File Search:*** Armendariz also asserts that the warrant's file search was overbroad. That part of the warrant allowed the search and seizure of certain files:

> Photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages)[,] emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer.

App. vol. I at 115.

From the start, we note that many of the problems with the keyword search plague the file search as well. And so, like the keyword search, the file search was overbroad. We highlight several aspects of this search that contribute to its overbreadth.

First, the warrant sought location data from June 5, 2021, through August 7, 2021. But neither the warrant nor the affidavit explained why probable cause existed to search for and seize any data beyond Armendariz's location at the time of the attempted assault. *Cf. United States v. Barajas*, 710 F.3d 1102, 1109 (10th Cir. 2013) (doubting that an affidavit's description of the defendant's cell-phone use for a drug-trafficking conspiracy would provide sufficient

probable cause to search for GPS data). The Supreme Court has recognized the sensitive nature of location data: it "provides an intimate window into a person's life, revealing not only [her] particular movements, but through them [her] familial, political, professional, religious, and sexual associations." *Carpenter v. United States*, 585 U.S. 296, 311 (2018) (citation modified). Because the officers knew the date and time of the alleged assault, it is unclear why the officers had probable cause to search for and seize location data from a two-month period. *Cf. Leary*, 846 F.2d at 605.

Similarly, the file search encompassed photos, videos, messages, and emails during the specified timeframe. Again, despite the brief interaction between Armendariz and the officer she allegedly tried to assault, the warrant authorized the search and seizure of a wide range of files outside the timeframe of the interaction. The affidavit did not explain why a two-month period would be needed for this alleged attempted assault. Without additional limits on the scope of the search and seizure, we conclude that this two-month period was overbroad.

Defendants retort that the file search included certain qualifying phrases limiting the search's scope. They emphasize that the warrant referred to files "that are determined to be *relevant to this investigation*," and that the timeframe "would allow for any planning *leading up to the crime* . . . and the subsequent taking of credit for *committing a violent act against a police*

*officer*." App. vol. I at 115 (emphasis added). Thus, Defendants argue that these statements limited the search and seizure to evidence of the attempted assault.

We disagree. We acknowledge that the first phrase—items "that are determined to be relevant to this investigation"—limited the file search to "this investigation." But the affidavit did not sufficiently dispel the ambiguity inherent in the term "investigation." Though Defendants argue that the "investigation" related to the attempted assault, the affidavit reflected a broader investigation into the Chinook Center, individuals associated with the Chinook Center, and Armendariz's background and political views. *See id.* at 92, 102–05. Rather than limit the scope of the file search, the affidavit confirms its expansive reach.

The other mentions of the search's timeframe also did not limit the warrant's scope. The warrant's use of "the crime" and "committing a violent act against a police officer" adds to the confusion because the affidavit also referenced "illegal protest activity" and an "unlawful" march. *Id.* at 92, 105. And so, the search warrant allowed officers to seize evidence related to the housing march overall, not just the attempted assault.

Thus, under "a common sense and realistic" reading of the warrant and affidavit, the warrant allowed a search and seizure of evidence beyond that of the attempted assault. *See United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006); *Suggs*, 998 F.3d at 1133 (rejecting a warrant as overbroad that permitted the search and seizure of "any item identified as being involved in

the [crime]" (citation omitted)). We reject Defendants' invitation to treat this ambiguous language as sufficient to guard against overbreadth. Doing so would give undue discretion to the officer executing the warrant. *See Stanford*, 379 U.S. at 485.

We aren't persuaded by Defendants' other arguments, either. They argue that we should narrowly construe words or expressions in warrants that might be read expansively. But in the cases Defendants rely on, the warrants all contained other language that limited the scope of the authorized searches—unlike here.

In *Burgess*, we upheld the validity of a search warrant for "computer records" because other language in the warrant limited the search to "pay-owe sheets, address books, rolodexes," and "personal property which would tend to show conspiracy to sell drugs." 576 F.3d at 1091 (citation omitted). Likewise, in *Wagner*, we upheld a search warrant that delineated sixteen categories of items for seizure, even though some of the categories were open-ended. 951 F.3d at 1248. We reasoned that the warrant "contained sufficiently particularized language requiring a nexus with child pornography" to restrict those few categories that did not reference a specific subject matter. *Id.* (citation omitted).

Even better, the warrants' opening language in *Brooks*, *Palms*, and *United States v. Christie* expressly limited the searches and seizures to evidence of criminal activity. *Brooks*, 427 F.3d at 1252 (permitting a search of

two computers and some disks "for evidence of child pornography" (citation omitted)); *Palms*, 21 F.4th at 694, 697–98 (similar, for "evidence of human trafficking" (citation modified)); *Christie*, 717 F.3d 1156, 1165 (10th Cir. 2013) (similar, for "all records and information relating to the murder, neglect, and abuse" of a specific person between specific dates (citation modified)). By contrast, the second warrant here contained no comparable language limiting the search and seizure to evidence of the attempted assault.

We therefore hold that Armendariz alleged a plausible Fourth Amendment violation for the second search warrant. At bottom, this warrant authorized a far-reaching search and seizure of digital data for an alleged assault that occurred at a known, specific moment in time. We decline to permit "wide-ranging exploratory searches" of digital data merely because a minor crime with an intent requirement occurred at a protest.[13] *Palms*, 21 F.4th at 698 (citation omitted).

**b. Clearly Established**

Though Armendariz has alleged a plausible Fourth Amendment violation, Detective Summey and Sergeant Ditzler argue that qualified immunity still protects them from liability because they did not violate a clearly established

[13] For this warrant, Armendariz also argues that the First Amendment requires "scrupulous exactitude" when analyzing her Fourth Amendment claims, because the search targeted her political speech. Because we conclude that Armendariz pleaded a plausible Fourth Amendment violation, we need not consider the First Amendment's implications in this appeal.

right. The district court agreed. *Armendariz*, 2024 WL 2139316, at *9–10. On appeal, Armendariz contends that the district court was mistaken.[14]

We rely on four cases to conclude that the officers violated clearly established law: *Mink*, *Leary*, *Voss*, and *Cassady*. To begin, in *Mink* we held that "it was . . . clearly established that warrants must . . . meet the particularity requirement of the Fourth Amendment in order to be constitutionally valid." 613 F.3d at 1011. Indeed, "[g]iven that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). *Mink* thus leaves little doubt that the Fourth Amendment's particularity requirement is clearly established law. *See* 613 F.3d at 1011.

Next, *Leary*, *Voss*, and *Cassady* underscore that no officer could have "reasonably presume[d]" the warrant here "[was] valid." *Leon*, 468 U.S. at 923. All three cases held that warrants without sufficient limiting principles lack particularity. *See Leary*, 846 F.2d at 602, 605–06; *Voss*, 774 F.2d at 404–05;

---

[14] The dissent concludes that Armendariz waived her appellate argument about a clearly established violation because she did not "address the clarity of a violation involving the provisions in the first warrant to allow the seizure of the digital devices." Dissent at 7. In other words, as we understand the dissent, Armendariz needed to argue how the law was clearly established for each device mentioned in the warrant to avoid appellate waiver. This again depends on the warrants being severable, a point unraised by the defendants and thus subject to waiver. We disagree with the dissent's finding waiver by the plaintiff based on an invalid legal premise waived by the defendants.

*Cassady*, 567 F.3d at 636. And as explained, that's the case here. The second search warrant failed to "establish practical guidelines about what can be searched and seized, leaving nothing to the discretion of the officers executing the warrant." *Palms*, 21 F.4th at 698. Instead, it allowed officers to search and seize an array of data unconnected to the attempted assault. Our caselaw therefore supports that Armendariz has alleged a plausible violation of her clearly established rights.

Defendants argue that our decisions in *Brooks*, *Palms*, and *Christie* should sway us otherwise. But as we already explained, all three cases are distinguishable for the same reason: those warrants limited the searches and seizures to evidence of the crime at hand. *See Brooks*, 427 F.3d at 1252; *Palms*, 21 F.4th at 697–98; *Christie*, 717 F.3d at 1165. Again, the warrant here contained no such limit.

As in *Cassady*, "[i]n light of our conclusion that the warrant was impermissibly overbroad, the clearly established prong is easily satisfied." 567 F.3d at 643–44. We conclude that Armendariz plausibly alleged that Detective Summey and Sergeant Ditzler violated her clearly established right to be free from unreasonable searches and seizures.

**3. Facebook Search Warrant**

We turn now to the Facebook warrant directed at the Chinook Center, which allowed officers to search and seize certain categories of Facebook data. The district court held that the Chinook Center failed to allege any plausible

Fourth Amendment violation for this warrant. *Armendariz*, 2024 WL 2139316, at *11–12. Alternatively, the district court concluded that any Fourth Amendment violation did not violate clearly established law. *Id.* at *11. On appeal, the Chinook Center contends that the district court erred on this issue and asks us to reverse the dismissal of its Fourth Amendment claim.[15] We first review the alleged constitutional violation and then turn to whether that violation was clearly established.

**a. Constitutional Violation**

The Chinook Center argues that this warrant was overbroad because the warrant failed to establish a nexus between the Chinook Center's Facebook account and any crime.[16] As discussed, the search warrant targeted certain information from the Chinook Center's Facebook account:

> All subscriber information tied to Facebook profile: https:www.facebook.com/chinookcenter to include names, phone numbers, and addresses.

---

[15] Defendants do not challenge the Chinook Center's Fourth Amendment standing. And because Fourth Amendment "standing" is not jurisdictional, we need not address the issue. *United States v. White*, 584 F.3d 935, 952 n.7 (10th Cir. 2009).

[16] The Chinook Center also argues that the warrant did not identify a crime under investigation or establish that illegality pervaded the housing march. We disagree. First, the affidavit specified the crimes under investigation: "Obstructing Passage or Assembly, and Resisting, Interference with a Public Official." App. vol. I at 118. Second, the affidavit provided a factual basis for the allegedly pervasive illegality at the march by asserting that the "60 protesters illegally march[ed]," ignored "numerous verbal warnings" to move out of the street, and "block[ed] vehicle traffic." *Id.*

> All Facebook posts for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Messenger chats tied to Facebook profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Events for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.

App. vol. I at 120. The district court concluded that this warrant was "sufficiently particular" because it limited the search to evidence from a seven-day period and "involv[ed] specific arrests for specific infractions all occurring on July 31, 2021." *Armendariz*, 2024 WL 2139316, at *11.

We disagree and conclude that this warrant, too, violates the Fourth Amendment for overbreadth. As discussed, warrants to search computers and other digital devices present significant Fourth Amendment dangers. In effect, digital devices "store and intermingle a huge array of one's personal papers in a single place." *Otero*, 563 F.3d at 1132. To prevent unwarranted intrusions into these devices, we have instructed that "warrants for computer searches must *affirmatively limit* the search to evidence of specific federal crimes or specific types of material." *Id.* (citation omitted).

Some courts have expressed heightened concern when warrants involve Facebook. *See, e.g., United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017); *United States v. Shipp*, 392 F. Supp. 3d 300, 308 (E.D.N.Y. 2019). And rightly so. Facebook warrants risk significant Fourth Amendment intrusions.

First, "Facebook provides a single window through which almost every detail of a person's life is visible." *Shipp*, 392 F. Supp. 3d at 308. Users "voluntarily entrust information" to Facebook on "just about every aspect of their lives," and Facebook "proactively collects and aggregates information about its users." *Id.* Put differently, Facebook may have more data about its users than those users voluntarily store for themselves.

Second, unlike hard drives or other digital devices, Facebook carefully categorizes and sorts the user's data. *Id.* at 309. That eliminates certain compelling reasons for a broad data search. *Id.* "The means of hiding evidence on a hard drive—obscure folders, misnamed files, encrypted data—are not currently possible in the context of a Facebook account." *Blake*, 868 F.3d at 974. Also, a digital-device warrant often entails a time-consuming search of digital data with special forensic equipment. *Id.* A Facebook search, on the other hand, requires only that the government request the desired data from Facebook. *Id.*

Because of these differences in storing, categorizing, and searching data, broad requests to search and seize Facebook data merit particular scrutiny. With these principles in mind, we turn to the warrant at issue here.

To start, the warrant permitted the search and seizure of all subscriber information tied to the Chinook Center's Facebook profile, including names, phone numbers, and addresses. App. vol. I at 120. Yet even the Stored Communications Act contemplates disclosure of this information. *See* 18

U.S.C. § 2703(c). We see no Fourth Amendment issue with the request for subscriber information on these facts, nor does the Chinook Center argue otherwise.

Next, the warrant requested the search and seizure of all Facebook posts, Facebook Messenger chats, and Facebook Events from July 27, 2021, to August 2, 2021 (the days just before and after the march). App. vol. I at 120. As the district court recognized, including a timeframe significantly narrows the scope of the search and seizure. *See Armendariz*, 2024 WL 2139316, at *11; *Blake*, 868 F.3d at 974 ("[T]he warrants should have requested data only from the period of time during which [the defendant] was suspected of taking part in the [crime].").

At the same time, the warrant allowed CSPD to search for and seize *all* Facebook posts, Facebook Messenger chats, and Facebook Events, regardless of their relation to the crimes at issue. Despite the difficulty of sorting and searching through data, various cases show that officers can particularize their requests for information from Facebook. For example, the officers could have narrowed the search by limiting "the request to messages sent to or from persons suspected" of committing the crimes, *Blake*, 868 F.3d at 974, or to "evidence, fruits, and instrumentalities of the specified offenses," *United States v. Ulbricht*, 858 F.3d 71, 104 (2d Cir. 2017) (citation modified), *overruled on other grounds by Carpenter*, 585 U.S. 296. Given the information available to

CSPD, we conclude that the warrant "[f]ail[ed] to employ the specificity available," making the warrant insufficiently particular. *Leary*, 846 F.2d at 605.

Yet the district court concluded that the affidavit sufficiently narrowed the scope of the warrant to evidence of specific arrests and infractions. *Armendariz*, 2024 WL 2139316, at *11. We think otherwise. As discussed, "the particularity of an affidavit may cure an overbroad warrant" where (1) the affidavit and search warrant are "physically connected," and (2) the search warrant expressly refers to and incorporates the affidavit "using suitable words of reference." *Leary*, 846 F.2d at 603 (citation omitted). The Facebook warrant properly incorporated the affidavit. But the affidavit does little to clarify the scope of the search and seizure. In fact, the affidavit muddies the water by contradicting the warrant's plain language.

The warrant specifically permitted the search of "[a]ll" Facebook posts, Facebook Messenger chats, and Facebook Events. App. vol. I at 120. That term left no ambiguity about the scope of the items sought. *All*, Merriam-Webster, https://www.merriam-webster.com/dictionary/all (last visited Oct. 6, 2025) (defining "all" as, among other things, "the whole amount, quantity, or extent of," "every member or individual component of," and "every"). The warrant's language thus failed to limit the search and seizure to evidence of the identified crimes. *See Leary*, 846 F.2d at 605. Instead, the Facebook warrant allowed officers to search for and seize completely unrelated information. For example, the warrant could have covered Facebook messages as varied as discussions

about other marches to exchanges about favorite dinner recipes. Adopting the officers' position—that the affidavit limited the warrant to evidence of specific crimes—would mean disregarding the word "all" in the warrant itself. That's a leap too far.

As a result, we hold that an affidavit cannot save an insufficiently particularized warrant where the affidavit's language directly contradicts the warrant's language. In those cases, the affidavit does not merely "clarify an ambiguity on the face of the warrant." *United States v. Beaumont*, 972 F.2d 553, 561 (5th Cir. 1992) (emphasis and citation omitted). Instead, the district court reads the affidavit to change the warrant's clear meaning. That type of direct contradiction leaves too much discretion to the executing officers. *See Palms*, 21 F.4th at 698. The Fourth Amendment does not allow officers to choose between conflicting interpretations of the warrant and affidavit.

None of Defendants' other arguments change our minds. Detective Steckler and Sergeant Otero focus on the facts contained in the affidavit and argue that they established probable cause. That argument misses the mark. Sure, the affidavit articulated probable cause for at least some of the information in the broad search-and-seizure categories. But as we have explained, the availability of information to craft a more particularized warrant renders these broad categories deficient. *Leary*, 846 F.2d at 604–05.

The officers also cite various cases to argue against the warrant's overbreadth. None are persuasive. In *United States v. Purcell*, the Second

Circuit upheld a broad warrant that identified twenty-four categories of Facebook data for seizure. 967 F.3d 159, 180–81 (2d Cir. 2020). Importantly, the Second Circuit determined that this broad search satisfied the particularity requirement because the incorporated affidavit made clear that "the suspected criminal activity pervaded [the] entire [Facebook] account." *Id.* at 181 (citation modified). By contrast, the affidavit here never established that the alleged illegality "pervaded" the Chinook Center's Facebook account. The rationale justifying the broad Facebook search in *Purcell* does not apply in this case.

Defendants' reliance on *United States v. Turner*, No. 21-cr-00013, 2022 WL 195083 (D. Nev. Jan. 21, 2022), and *United States v. Liburd*, No. 17-CR-296, 2018 WL 2709199 (E.D.N.Y. June 5, 2018), is similarly misplaced. In both cases, the warrants incorporated affidavits that significantly narrowed the scopes of their respective searches. In *Turner*, the warrant and affidavit "explain[ed] with detail the particular crimes for which evidence was sought and provide[d] objective standards for segregating the responsive material from the non-responsive material." 2022 WL 195083, at *6. And the affidavit listed examples of items for seizure, including Facebook posts, a video showing a false driver's license, and a post with prices for forged documents. *Id.* Similarly, in *Liburd*, the warrant stated that the government "sought to seize information related to the existence of, and communications among, the [criminal organization] and evidence regarding [its crimes]." 2018 WL

2709199, at *2. But here, neither the warrant nor the affidavit narrowed the aims of the search and seizure.

With all this in mind, the Chinook Center plausibly alleged that the Facebook warrant is overbroad.

**b. Clearly Established**

Because we conclude that the Facebook warrant violates the Fourth Amendment for lack of particularity, we adopt the same clearly-established-law analysis that we applied to the second warrant directed at Armendariz. Contrary to the officers' assertions, we need not point to a case considering a Facebook warrant to find a clearly established right here. *See Mink*, 613 F.3d at 1001 ("There need not be precise factual correspondence between earlier cases and the case at hand, because general statements of the law are not inherently incapable of giving fair and clear warning." (citation omitted)). The cases we identified earlier establishing that the second warrant violated clearly established law apply just as well for the warrant targeting the Chinook Center. *See id.* at 1011; *Leary*, 846 F.2d at 602, 605–06; *Voss*, 774 F.2d at 404–05; *Cassady*, 567 F.3d at 636, 643–44.

We therefore reverse the district court's dismissal of the Chinook Center's Fourth Amendment claims against Detective Steckler and Sergeant Otero.

### B. Municipal Liability

Plaintiffs also challenge the district court's dismissal of their Fourth Amendment claims against the City. The district court ruled against Plaintiffs on these claims because it determined that Plaintiffs did not allege a plausible Fourth Amendment violation against the City's officers. *Armendariz*, 2024 WL 2139316, at *13.

The district court's reason for dismissing these claims no longer exists. Because we reverse the court's dismissal of the Fourth Amendment claims against the officers, we also reverse the district court's dismissal of these claims against the City. We remand these claims for the district court to determine whether Plaintiffs plausibly alleged municipal liability.

## II. Fourth Amendment Injunctive-Relief Claim (Sixth Claim)

Setting aside the search warrants, Armendariz alleged another Fourth Amendment violation—this time against the FBI for retaining her digital data.[17] She argues that the FBI must return or destroy its copies of the digital data that CSPD unlawfully seized from her. But the district court determined that Armendariz did not plead a plausible Fourth Amendment violation, because "[t]he appropriate claim appears to be one for return of property under Fed. R.

---

[17] Armendariz asserts in a footnote that the district court erred by construing her Fourth Amendment injunctive-relief claim "against only the FBI" and not the City as well. Setting aside that parties waive arguments made only in footnotes, *Griffith v. El Paso County*, 129 F.4th 790, 825 (10th Cir. 2025), the complaint lists the FBI as the only defendant on this claim. As a result, the district court did not err in limiting this claim to the FBI.

Crim. P. 41(g).” *Armendariz*, 2024 WL 2139316, at *15; *see generally* Fed. R. Crim. P. 41(g) (“A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property’s return.”).

Armendariz’s opening brief did not challenge the district court’s rationale for dismissing this claim. “Our law is clear: The first task of an appellant is to explain to us why the district court’s decision was wrong.” *United States v. Martinez*, 92 F.4th 1213, 1265 (10th Cir. 2024) (citation modified); *see also Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) (noting that counsel must “explain what was wrong with the reasoning that the district court relied on in reaching its decision”). Armendariz failed to complete that task.

True, Armendariz argues that the district court erred in dismissing this claim because retaining seized property “can raise independent Fourth Amendment concerns.” Op. Br. at 41. But her opening brief never mentions, let alone challenges, the court’s conclusion that Rule 41 is the proper avenue for relief. So Armendariz waived any argument challenging the district court’s rationale for dismissing this claim. *See Martinez*, 92 F.4th at 1265. We therefore affirm the district court’s ruling without reaching the merits. *See id.*

**III. Statutory and State Claims (Third, Fourth, and Fifth Claims)**

Finally, Plaintiffs assert that the district court erred by dismissing their Stored Communications Act and state-law claims. They contend that the district

court improperly premised its decision on their failure to allege any constitutional violation.

We agree, with one exception: Armendariz brought an FTCA claim against the United States for an alleged violation of her rights under the Colorado constitution. *See generally* Colo. Const. art. II, §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131. The district court dismissed this claim because Armendariz failed to plausibly allege that she exhausted administrative procedures under the FTCA. *Armendariz*, 2024 WL 2139316, at *16–17 (citing 28 U.S.C. § 2675(a)). On appeal, Armendariz does not challenge this rationale. Because this waives her argument on that point, we affirm the dismissal of her state-law claim against the United States. *See Martinez*, 92 F.4th at 1265.

On all other claims, Plaintiffs correctly argue for reversal. The district court dismissed the Stored Communications Act claim for the same reasons it dismissed the unlawful-search-and-seizure claims. *See Armendariz*, 2024 WL 2139316, at *14. And after dismissing the federal claims, the court declined to exercise jurisdiction over the remaining state-law claims. *Id.* at *17 (citing 28 U.S.C. § 1367(c)(3)). Because we conclude that Plaintiffs have alleged plausible Fourth Amendment violations, the district court's reasoning no longer applies. So we reverse the dismissal of these claims too.

**CONCLUSION**

For these reasons, we affirm the district court's dismissal of (1) Armendariz's Fourth Amendment claim for injunctive relief against the

FBI, and (2) Armendariz's state-law claim against the United States. We reverse on all other claims.

No. 24-1201, *Armendariz, et al. v. City of Colorado Springs, et al.*
**BACHARACH**, J., concurring in part and dissenting in part.

This appeal involves application of the Fourth Amendment to three search warrants for digital devices or their contents. These kinds of warrants might sometimes lack evidentiary support regardless of whether the information is stored in a paper file or in a digital form. An example is the third warrant, where constitutionality turned on established principles of probable cause.

For the other two warrants, however, application of Fourth Amendment principles proved difficult because our case law hadn't kept up with technological advances. *See* David Walker, *Privacy in the Digital Age: Encryption Policy–A Call for Congressional Action*, 1999 Stan. Tech. L. Rev. 3 at *3 ("The courts have historically had difficulty applying the strictures of the Fourth . . . amendment[] to new and emerging technology and have had a tendency to apply existing legal tests created at a time when the new technology was inconceivable."). Without meaningful guidance in the case law, law enforcement officers needed to apply eighteenth-century concepts to the rapidly developing world of digital data. Reasonable officers could differ in how to apply these concepts to the digital devices and their contents.

Reasonable judges could disagree, too. Here, for example, two state judges issued the search warrants and a federal judge concluded that these

warrants had satisfied the Fourth Amendment. Today, however, the majority concludes that those three judges were wrong. Even if the majority is correct, however, the law enforcement officers didn't violate a clearly established right when relying on the approval of two state judges.

**Background and Standard of Review**

**1. This case grew out of searches based on three warrants as the police investigated possible crimes involving a housing protest.**

Execution of the three warrants led Ms. Jacqueline Armendariz and the Chinook Center to sue

- four law enforcement officers who had participated in preparing affidavits to support issuance of the warrants,
- the city employing these officers (the City of Colorado Springs), and
- the federal agency (the FBI) that had allegedly retained digital data seized in the searches.

In the suit, Ms. Armendariz and the Chinook Center sued under 42 U.S.C. § 1983, asserting violation of the Fourth Amendment, the Stored Communications Act (18 U.S.C. § 2703 et seq.), and state law. The district court dismissed the federal causes of action for failure to state a claim on which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6).

**2. We review the rulings based on the standard for dismissal.**

We conduct de novo review over a dismissal for failure to state a valid claim. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010).

Conducting this review, we determine whether the complaint stated a plausible basis for relief under 42 U.S.C. § 1983. *Brown v. Montoya*, 662 F.3d 1152, 1162–63 (10th Cir. 2011).

**Personal-Capacity Claims Against the Four Officers**

**1. The personal-capacity claims turn on qualified immunity.**

Ms. Armendariz has sued the two officers who participated in obtaining the first two warrants: Detective Daniel Summey and Sergeant Roy Ditzler. And the Chinook Center sued the two officers who participated in seeking the third warrant: Detective B.K. Steckler and Sergeant Jason Otero. The district court dismissed the claims against the four officers based on their defenses of qualified immunity.

To overcome the defense of qualified immunity, Ms. Armendariz and the Chinook Center needed to show the violation of a clearly established constitutional right. *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). For purposes of qualified immunity, a right is clearly established if the Supreme Court, the Tenth Circuit, or a consensus of out-of-circuit authority has

- held that "materially similar conduct was unconstitutional" or
- identified a rule that applies "'with obvious clarity'" to the facts.

*Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). A right is clearly

established only if every reasonable law enforcement officer would have realized that the search warrants violated the Fourth Amendment. *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015).

To assess what every reasonable officer would have realized, we consider the specific circumstances. *E.g.*, *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021); *White v. Pauly*, 580 U.S. 73, 79 (2017). The need for specificity is heightened when the alleged violation involves the Fourth Amendment. *D.C. v. Wesby*, 583 U.S. 48, 64 (2018). When the Fourth Amendment is involved, we generally regard a neutral judge's approval of a search warrant as "the clearest indication that the officers acted in an objectively reasonable manner, or in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up). After all, the officers would generally regard the judges as better qualified to apply the Fourth Amendment. *Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986).

**2. Detective Summey and Sergeant Ditzler are entitled to qualified immunity for their roles in obtaining the first two warrants.**

**a. These warrants grew out of an investigation into interference with a police officer.**

The first two warrants grew out of a housing protest by a group called the *Chinook Center*. The attendees included Ms. Armendariz, who walked her bicycle as a police officer tried to arrest one of the protest leaders. Ms. Armendariz dropped her bicycle between herself and the

police officer. The police suspected that Ms. Armendariz had intentionally dropped the bicycle to prevent the officer from catching the protest leader.

The suspicion triggered an investigation of Ms. Armendariz for an attempt to commit aggravated assault against a police officer. The investigation spurred Detective Summey to apply for two search warrants. The first warrant would allow seizure of Ms. Armendariz's digital devices. The second warrant would allow two digital searches:

1. a search of all seized devices for photos, videos, messages, emails, and location data over a period of roughly two months (June 5, 2021, to August 7, 2021) and

2. a key word search for 26 key terms.

Sergeant Ditzler approved both applications, and state judges issued the warrants.

**b. First warrant: Seizure of the devices didn't violate a clearly established right.**

The issue surrounding the first warrant involves constitutional restrictions when a law enforcement officer seeks digital devices. This issue arises because the warrant allowed the police to enter Ms. Armendariz's residence and seize her cellphones, laptops, external hard drives, and thumb drives.

**i. The devices could contain information bearing on Ms. Armendariz's intent.**

Ms. Armendariz argues that the devices wouldn't have yielded relevant evidence about the events themselves, pointing out that she had

admittedly dropped the bicycle as a police officer ran toward one of the protest leaders. But the devices could have shed light on Ms. Armendariz's intent: Had she accidentally dropped the bicycle, or had she tried to impede the officer? Given the issue of intent, Detective Summey obtained a warrant to seize Ms. Armendariz's digital devices.

In requesting the warrant, the detective included evidence of Ms. Armendariz's

- active use of social media and
- political involvement.

The detective also relied on his knowledge that people regularly

- attach their phones to computers and use the computers to back up their phones and
- store digital data on numerous devices, including tablets, thumb drives, and external hard drives.

**ii. Ms. Armendariz waived her appellate argument about a clearly established violation.**

Ms. Armendariz denies probable cause to believe that she

- had relevant information on her devices or
- transferred information from a cellphone to another digital device.

For the sake of argument, we can assume that Ms. Armendariz is right. With this assumption, qualified immunity would turn on whether the Fourth Amendment violation had been clearly established. Ms. Armendariz argues

in her reply brief that the case law clearly established a lack of probable cause to seize a laptop, external thumb drive, or external hard drive. But Ms. Armendariz waived this argument.

In her opening appeal brief, Ms. Armendariz made a general argument involving a clearly established violation. But as to specific deficiencies, Ms. Armendariz addressed only the use of key words in the second warrant. Nowhere in this brief did Ms. Armendariz address the clarity of a violation involving the provisions in the first warrant to allow the seizure of digital devices. She did add this argument in her reply brief, but that was too late. *See WildEarth Guardians v. EPA*, 770 F.3d 919, 933 (10th Cir. 2014). Ms. Armendariz thus waived this argument. *See Campbell v. City of Spencer*, 777 F.3d 1073, 1080 (10th Cir. 2014).

**iii. Ms. Armendariz's appellate argument also fails on the merits.**

Even if Ms. Armendariz hadn't waived this argument, it would have failed on the merits. The underlying constitutional challenge requires us to ask if there was probable cause to believe that pertinent information existed in a cellphone, laptop, thumb drive, or external hard drive.

Ms. Armendariz questions reliance on Detective Summey's opinion regarding transfers of information between digital devices. For the sake of argument, we can disregard Detective Summey's opinion. Still, however, probable cause could arise from "practical considerations of everyday

life." *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009) (quoting *Anthony v. United States*, 667 F.2d 870, 874 (10th Cir. 1981)).

The resulting question is whether practical considerations of everyday life allow a reasonable inference that Ms. Armendariz transferred digital content among her devices. To answer that question, the issuing judge would have encountered uncertainty because of the nature of the expected information and a dearth of relevant case law.

The probe focused on Ms. Armendariz's possible hostility to law enforcement rather than what she had done. Everyone knew that Ms. Armendariz had impeded a law enforcement officer by dropping her bicycle; the question was why she had dropped the bicycle. Did she drop it by accident or because she wanted to impede the officer?

To investigate that question, Detective Summey requested a warrant for Ms. Armendariz's digital devices.[1] The issuing judge could issue the requested warrant if practical considerations of everyday life created

[1] Ms. Armendariz argues that "it [would have been] unreasonable to believe that a person would incriminate themselves on one device and then transfer that data to every device in her home." Appellants' Opening Br. at 16–17. This argument apparently assumes that the government was seeking evidence of a plan to interfere with the police. But the government was investigating possible hostility to law enforcement, not a plan to interfere with the police. Ms. Armendariz doesn't explain why she would have regarded hostility to the police as incriminating before the housing protest.

probable cause that Ms. Armendariz had transferred pertinent data between her digital devices. *Id.*

In considering these practical considerations, the issuing judge couldn't draw meaningful guidance from precedents because neither our court nor the Supreme Court had addressed the issue. In fact, the only circuit to address the issue (the Fifth Circuit) had rejected a similar challenge to a search warrant for a computer, reasoning that a suspect could have used his cellphone to transfer information to a computer. *United States v. Contreras*, 905 F.3d 853, 859 (5th Cir. 2018).

The majority questions this conclusion based on its perception of typical practices involving the syncing of information among thumb drives and external hard drives. Maj. Op. at 29. But Ms. Armendariz hasn't questioned whether it's common to sync information to these devices. If the majority is right, the resulting question would be whether the practice of syncing information among devices was so antiquated that a police officer should have instantly recognized that no one could reasonably rely on the issuing judge's legal conclusion. *See D.C. v. Wesby*, 583 U.S. 48, 63 (2018). I would answer that question *no* and conclude that any possible violation wouldn't have been clearly established.

The issuing judge implicitly concluded that probable cause existed for seizure of a cellphone, laptop, thumb drive, and external hard drive. In my view, a reasonable officer could competently rely on this resolution of

a debatable question of law. As a result, the alleged violation wouldn't have been clearly established.

**iv. The case law didn't clearly establish a requirement for particularized information about the likely presence of multiple devices.**

The majority also concludes that the officers violated a clearly established right by assuming that (1) Ms. Armendariz possessed the devices that were listed to be seized and (2) those devices would have the relevant information. Maj. Op. at 27–30. But Ms. Armendariz never made this argument. Absent an argument by Ms. Armendariz, I would decline to reverse on this basis. *See United States v. Tee*, 881 F.3d 1258, 1269 (10th Cir. 2018) (stating that we reverse sua sponte only sparingly and only when exceptional circumstances exist and the parties have obtained an opportunity to address the issue). Even if Ms. Armendariz had made this argument, however, it wouldn't support a clearly established violation.

The affidavit contained evidence of Ms. Armendariz's use of social media and political activism. Together, these statements could lead a reasonable officer to believe that

- Ms. Armendariz had owned a cellphone and
- it would have contained pertinent evidence of her intent.

Would that belief stretch the bounds of reasonableness for purposes of qualified immunity? And does an officer have to provide the same basis for every device sought in a warrant? For this issue, the inquiry would

begin with the case law in existence when the state judge issued the search warrant. *McWilliams v. Dinapoli*, 40 F.4th 1118, 1128 (10th Cir. 2022). But when the search warrant was issued, no meaningful guidance existed in our court or in nine of the other ten regional circuits.

The only regional circuit to address the issue was the D.C. Circuit, which decided *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017). There the court held that a search warrant for digital information was unconstitutional without any information that the homeowner had even owned a digital device. *Id.* at 1272–73. Despite the D.C. Circuit's holding in *Griffith*, we've never based a clearly established constitutional right on a single out-of-circuit opinion. *See Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1032 n.4 (10th Cir. 2020) (stating that "we cannot endorse the suggestion that one out-of-circuit authority" has created a clearly established right); *see also Avant v. Doke*, 104 F.4th 203, 211 (10th Cir. 2024) (concluding that two out-of-circuit opinions would not create a clearly established right); *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1130–31 (10th Cir. 2013) (concluding that a legal standard adopted by two other circuit courts and two district courts hadn't clearly established the underlying right). Under our past cases, *Griffith* alone wouldn't clearly establish a constitutional requirement for particularized information about the devices likely to be found in Ms. Armendariz's home.

In fact, the D.C. Circuit and other circuits have repeatedly distinguished *Griffith* based on its particular facts. *See United States v. Sueiro*, 59 F.4th 132, 139–41 (D.C. Cir. 2023) (distinguishing *Griffith* when the search warrant included computers and cellphones and the suspect had used some form of "an electronic communications device" to commit the alleged crime); *United States v. Smith*, 108 F.4th 872, 879 (D.C. Cir. 2024) (distinguishing *Griffith* based on evidence that the suspect and victim had used cellphones); *United States v. Vizcarra-Millan*, 15 F.4th 473, 505 (7th Cir. 2021) (distinguishing *Griffith* given the relative weakness of the application for a warrant in that case); *United States v. Davis*, 126 F.4th 610, 616–17 (8th Cir. 2025) (distinguishing *Griffith* because there the application had lacked any evidence involving the use of digital information). In addition, the D.C. Circuit has upheld search warrants after *Griffith*

- for computers and cellphones when the only evidence of a digital device consisted of information including a threat through email, *Sueiro*, 59 F.4th at 139–41 (D.C. Cir. 2023), and

- for cellphones, computers, digital storage devices, and thumb drives when the only evidence involved the use of cellphones and an investigator's experience, *Smith*, 108 F.4th at 878–79.

Even in the D.C. Circuit, then, it's not clear that the court would apply *Griffith* to the search for Ms. Armendariz's digital devices in light of her apparent possession of a cellphone.

Detective Summey obtained the search warrant with sworn statements demonstrating Ms. Armendariz's use of digital devices. These statements involved Ms. Armendariz's

- photos posted by an affiliate of the Chinook Center and
- use of social media to communicate with other protesters.

Detective Summey could reasonably question whether similar statements would have changed the outcome in *Griffith*. So Detective Summey didn't violate a clearly established right even if the issuing judge had lacked probable cause for the presence of multiple digital devices.

**c. Second warrant: Authorization of the search and seizure of the contents didn't violate a clearly established right.**

The second warrant specified the data that the police could duplicate from Ms. Armendariz's digital devices. The parties disagree over three aspects of the second warrant:

1. The subject-matter
2. The use of key words
3. The historical location data

**Limit of the subject-matter**

The first aspect involved a reference in the warrant to *this investigation*. Ms. Armendariz characterizes this reference as vague, allowing a search for anything that the officers wanted to view.

The issuing judge disagreed, concluding that the warrant satisfied the Fourth Amendment. We may assume for the sake of argument that

- the issuing judge was wrong and
- the officers shouldn't have relied on the issuing judge's legal conclusion.

Still, Detective Summey and Sergeant Ditzler would enjoy qualified immunity unless every reasonable officer would have realized the inadequacy of the reference to *this investigation*. *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).

The reference to *this investigation* didn't exist in a vacuum: Detective Summey explained that Ms. Armendariz had dropped a bicycle as a police officer ran toward one of the protest leaders. Given this explanation, Detective Summey could reasonably assume that the term *this investigation* referred to the inquiry involving Ms. Armendariz's intent when she dropped her bicycle.

Assume that Detective Summey conducted his own legal research before deciding whether he and Sergeant Ditzler could rely on the warrant. They would have come up empty, as we have, because no precedents existed on the sufficiency of a limit involving relevance to the existing investigation. Given the lack of precedent on this issue, a law enforcement officer could reasonably rely on the warrant's limitation to *this investigation*.

**Use of key words**

The second disagreement involves the use of key words.

A digital device contains a massive amount of information, and only a fraction would bear on this investigation. For example, investigators would have little use for Ms. Armendariz's digital messages about social engagements and birthdays. So Detective Summey proposed the use of 26 key words to narrow the review of digital information:

> police, officer, cop, pig, bike, bicycle, attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Crustyansen, Chrischeeansen, Shaun, Walls.

Appellants' App'x vol. 1, at 115. Ms. Armendariz argues that the key words didn't adequately constrain the officers. The issuing judge disagreed, concluding that the key words provided a constitutionally sufficient limit on the officers' discretion.

We may again assume that Ms. Armendariz is right and the issuing judge was wrong. Still, Detective Summey and Sergeant Ditzler would enjoy qualified immunity unless every reasonable officer should have realized that the issuing judge had erred in using these key words to constrain the search. *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).

Assume again that Detective Summey and Sergeant Ditzler would have conducted their own legal research to double-check the issuing judge

with respect to the sufficiency of these key words. The detectives would have found two strands of case law.

The first strand consists of Tenth Circuit cases rejecting a rigid requirement for search protocols. *See United States v. Russian*, 848 F.3d 1239, 1245 n.1 (10th Cir. 2017) (stating that "we have previously declined to require a search protocol for computer searches"); *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005) ("This court has never required warrants to contain a particularized computer search strategy."). Other courts had also taken the same approach, rejecting calls for search protocols and *ex ante* restrictions for warrants involving computerized data. Orin Kerr, *Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data*, 48 Tex. Tech L. Rev. 1, 8 (2015).

The second strand of case law approves the use of key words as a way to limit computer searches. *See United States v. Carey*, 172 F.3d 1268, 1276 (10th Cir. 1999) (dicta) (discussing key word searches as a way to limit computer searches); *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009) (adopting the *Carey* dicta on constraining searches with methods like key word searches).[2]

---

[2] The majority downplays these cases, stating that they refer only to search methodologies while the warrant here permits seizure of the information. Maj. Op. at 42. Ms. Armendariz hasn't drawn this distinction, and we lack briefing on the significance of the wording allowing a *seizure* as well as a *search* of the responsive documents. But even if the majority were right, its distinction crystallizes the difficulty facing the issuing

These two strands of case law reflect the challenge facing law enforcement officers as they applied case law involving conventional searches to the ever-changing world of digital data. The difficulty was magnified with algorithms and cloud technology, creating uncharted challenges for officers seeking relevant information among the limitless data on a typical digital device.

Confronting that challenge, Detective Summey proposed 26 key words to constrain the review of the digital devices. Sergeant Ditzler and the issuing judge approved the key words. If Detective Summey and Sergeant Ditzler had double-checked the issuing judge by doing their own legal research, they would have found little basis in the case law to question the validity of the warrant.

Granted, an error would be obvious if the search warrant had omitted any limiting principles. *See, e.g.*, *Mink v. Knox*, 613 F.3d 995, 1010–11 (10th Cir. 2010) (addressing a warrant that referred only to a general provision permitting the seizure of property that was material to a later criminal prosecution); *Cassady v. Goering*, 567 F.3d 628, 632, 637 (10th Cir. 2009) (addressing a warrant that allowed the search and seizure of "all evidence of any crime"); *United States v. Leary*, 846 F.2d 592, 605–06

---

judge and the officers: They lacked any case law addressing the sufficiency of key words as limits on the seizure of documents appearing on digital devices.

(10th Cir. 1988) (addressing a warrant that covered all communications involving a violation of federal export laws); *Voss v. Bergsgaard*, 774 F.2d 402, 405–06 (10th Cir. 1985) (addressing a warrant that authorized the seizure of any information pertaining to any federal crime). But the search warrant did contain limiting principles through the 26 key words. With these key words, Detective Summey lacked any case law suggesting a failure to adequately constrain the search. Absent such case law, a possible violation of the Fourth Amendment wouldn't have been obvious.

Ms. Armendariz also criticizes some of the key words, invoking a doctrine known as *scrupulous exactitude*. This doctrine could apply when a search warrant targets materials protected by the First Amendment. A classic example arose in *Stanford v. Texas*, 379 U.S. 476 (1965). There officers searched a house and seized over 300 books because they involved suspected connections to the Communist Party of Texas. *Id.* at 477–79. The Supreme Court pointed to a need for "scrupulous exactitude" because the warrant had targeted information protected by the First Amendment. *Id.* at 485.

Ms. Armendariz characterizes the second warrant as authorization of a search targeting protected information. For this characterization, Ms. Armendariz refers to the key words reflecting hostility to the police (such as *pig*, *cop*, and *police*).

The issuing judge rejected this characterization, but we may again assume for the sake of argument that the issuing judge was wrong. With this assumption, qualified immunity would apply unless every reasonable officer should have characterized the key words as code words for information protected by the First Amendment. *D.C. v. Wesby*, 583 U.S. 48, 63 (2018).

Assume again that Detective Summey and Sergeant Ditzler had conducted their own legal research. They again would have come up empty, as we have, because no precedents had addressed the interplay between the First and Fourth Amendments when a warrant targets evidence of hostility toward the police.

Perhaps the issuing judge had erred in overlooking potential parallels to *Stanford*. Even so, obvious differences also existed: There the police targeted information bearing on connections to a communist party because those connections had constituted the underlying crime. *Stanford*, 379 U.S. at 476–77. Here the officers were investigating why Ms. Armendariz had dropped her bicycle: Was it an accident or an effort to impede the police? Answering that question involved intent, and hostility to the police might suggest an intent to impede an officer. *See* Colo. Rev. Stat. § 18-3-203 (stating that intent to cause bodily injury is an element of second-degree assault); *People v. Banks*, 983 P.2d 102, 107 (Colo. App. 1999) (stating that an element of § 18-3-203(c), second-degree assault on a police officer, is

an intent "to cause bodily injury to prevent a police officer from performing a lawful duty").

Ms. Armendariz downplays the difference, and perhaps she's right to do so. But the issuing judge and the officers lacked any meaningful case law on the applicability of *Stanford* when the protected information relates to evidence of intent. Absent meaningful guidance in the case law, a reasonable officer could rely on the issuing judge's legal analysis. So I would reject Ms. Armendariz's reliance on scrupulous exactitude in connection with the search warrant.

**Absence of a temporal limitation involving the key words**

Despite the use of key words, the warrant didn't include a temporal limitation. Ms. Armendariz argues that the lack of a temporal limitation violated a clearly established constitutional right. For the sake of argument, we can assume that the key words should have contained a temporal limitation. In my view, though, the absence of a temporal limitation didn't render a constitutional violation clearly established.

The key words didn't expand the search—they narrowed it. *See United States v. Carey*, 172 F.3d 1268, 1276 (10th Cir. 1999) (dicta) (discussing the use of key words as a way for officers to avoid searching irrelevant material on a digital device); *United States v. Burgess*, 576 F.3d 1078, 1092–93 (10th Cir. 2009) (adopting the *Carey* dicta regarding the use of key words as a method to constrain searches). The digital data contained

a limitless trove of information, and the key words targeted data suggesting hostility to the police.

Ms. Armendariz points out that her act was undisputed: She admittedly dropped her bicycle in the path of an officer running toward one of the protest leaders. So the investigation naturally focused on her intent: Did she accidentally drop the bicycle or try to interfere with an officer? The answer could come from the digital information reflecting Ms. Armendariz's attitude toward the police.

But Ms. Armendariz suggests that the information obviously lost any relevance at some point. We can assume that Ms. Armendariz is right. But neither the Supreme Court nor our court has ever required a temporal limitation on search warrants containing limits involving key words. And one other circuit has resisted efforts to mandate temporal limitations on search warrants for digital data. *See United States v. Zelaya-Veliz*, 94 F.4th 321, 340 (4th Cir. 2024) (declining "to mandate a temporal restriction in every compelled disclosure of social media account data" given the inability to "anticipate all future circumstances").[3] Given the sparsity of pertinent case law, the lack of a temporal limit didn't violate a clearly established right.

---

[3] There the Fourth Circuit declined to require suppression of account data from a social media account, reasoning that the "unsettled nature" of requirements involving temporal limitations would allow an officer with reasonable training to rely on the search warrant. 94 F.4th at 340–41.

**Historical data involving Ms. Armendariz's location**

The second warrant also allowed officers to seize digital data about Ms. Armendariz's location over a period of roughly two months. She argues that officers had no reason to investigate her whereabouts before the day of the protest. We assume for the sake of argument that Ms. Armendariz is right. But she still had the burden to show that a constitutional violation would have been clearly established. *See* p. 3, above.

On appeal, Ms. Armendariz doesn't argue that a violation would have been clearly established. In her opening brief, she addresses the requirement of a clearly established violation, but only as to the use of key words. For the historical location data, she makes no argument about a clearly established violation. So she has waived that argument. *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1192 n.5 (10th Cir. 2014) (stating that an argument is waived when omitted in the appellant's briefs).

**3. Detective Steckler and Sergeant Otero are not entitled to qualified immunity for their roles in obtaining the third warrant.**

Detective Steckler obtained a third search warrant, which involved the Facebook account for the organization sponsoring the protest (the Chinook Center).[4]

The investigation included potential crimes when protesters allegedly blocked city streets. For this investigation, Detective Steckler requested a warrant identifying

- all subscribers to the Chinook Center's Facebook page and messenger chats,
- Facebook Events, and
- Facebook posts for the four-day period preceding the protest and the two days following the protest.

A state judge approved the warrant, and officers carried out the search. The Chinook Center argues that the warrant obviously failed to establish probable cause for the requested information.

Detective Steckler and Sergeant Otero argue that the search warrant was designed to uncover evidence bearing on plans to block city streets. But Detective Steckler obtained the warrant without presenting any reason to believe that the Facebook materials would include a plan to block the streets.

---

[4] Sergeant Otero approved the application before it was presented to the state judge.

The majority concludes that the warrant was overbroad, Maj. Op. at 49–57, and the Chinook Center argues that we should view the warrant with scrupulous exactitude. In my view, however, we need not address overbreadth or the need for scrupulous exactitude because the warrant lacked any arguable nexus to evidence of a crime.

To obtain the warrant, Detective Steckler presented an affidavit stating that

- the Chinook Center had organized the protest on a Facebook page,
- a tipster had told the police that someone owned a Facebook account with pictures and videos of the protest and the arrest of a protest leader,
- a leader of the protest had posted Facebook messages hostile to the police, and
- a police officer had experience showing that illegal demonstrators use social media to plan events.

The affidavit referred to particular crimes, but didn't say why the Chinook Center's Facebook page would contain information bearing on the blockage of city streets.

The officers argue that the Facebook page could help identify masked protesters.[5] But the affidavit didn't provide a reason to expect information identifying the masked protesters.

Granted, Detective Steckler referred to his experience with the use of social media to plan illegal protests. But the affidavit didn't say why that experience would suggest the presence of digital information bearing on (1) a plan to block the streets or (2) the identification of masked protesters blocking the streets.

Detective Steckler and Sergeant Otero also point out that they lacked meaningful guidance from the case law on Facebook searches. The lack of such guidance could affect the inquiry on overbreadth, but the need for probable cause doesn't turn on the novelty of social media sites like Facebook. For example, suppose that the search warrant had targeted the Chinook Center's paper files rather than a digital site like Facebook. For paper files, Detective Steckler would need a reason to believe that the search would yield evidence of a plan for protesters to block the streets. The same is true for a search warrant targeting a digital site like Facebook.

Despite the relative novelty of Facebook, Detective Steckler provided no reason to believe that the Chinook Center's Facebook account would

---

5 The officers also say that the Facebook information would bear on a separate prosecution involving one of the protest leaders. But the officers don't develop this statement into a meaningful argument.

reflect planning to block the streets. As a result, the scarcity of case law involving Facebook wouldn't entitle Detective Steckler and Sergeant Otero to qualified immunity for their roles in obtaining the third warrant.

**4. The dismissal of state claims should be reversed in light of the majority's conclusion on the federal claims.**

The remaining claims against the individual officers arise under Colorado's constitution and laws. Colo. Const. art. II, §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131. The district court declined to exercise jurisdiction over these claims after dismissing the federal claims.

The majority concludes that Ms. Armendariz and the Chinook Center have alleged plausible federal claims. Based on this conclusion, the majority reverses the dismissal of the state claims against the officers. The reversal is appropriate in light of the majority's conclusions on the federal claims.

**Liability of the City Under the First and Fourth Amendments and the Stored Communications Act**

Ms. Armendariz and the Chinook Center challenge dismissal of the claims against the City of Colorado Springs for violating the First and Fourth Amendments and the Stored Communications Act (18 U.S.C. § 2703 et seq.). The district court dismissed these claims based on the lack of a constitutional violation, and the majority concludes that municipal employees violated the Constitution in obtaining the three warrants. Given that conclusion, the majority remands for the district court to reconsider

the claims against the city under the First and Fourth Amendments and the Stored Communications Act. This remand is appropriate in light of the majority's conclusion that Ms. Armendariz and the Chinook Center have adequately pleaded constitutional violations.[6]

**Claim for Damages Against the Federal Government**

Ms. Armendariz also sued the federal government under the Federal Tort Claims Act, seeking damages based on violations of Colorado's constitution and laws. Colo. Const. art. II, §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131. The district court dismissed these claims, concluding that Ms. Armendariz had failed to satisfy the statutory requirements. The majority concludes that Ms. Armendariz waived her appellate arguments on this claim by failing to challenge the district court's reasoning. Maj. Op. at 60. I agree with the majority and would affirm the dismissal of her claim against the federal government for violating Colorado's constitution and

[6] On the claims involving municipal liability, the city argues in the alternative that Ms. Armendariz and the Chinook Center failed to adequately plead an unconstitutional policy or custom. The district court didn't reach this issue, and the preferred approach is to remand for the district court to address this issue in the first instance. *See Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 649 (10th Cir. 2017); *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1290 (10th Cir. 2011).

Given this preference, the majority remands for the district court to resolve this issue in the first instance. I agree with this remand in light of the majority's determination that Ms. Armendariz and the Chinook Center adequately pleaded constitutional violations.

laws. *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015).

**Claims Against the FBI for an Injunction**

Ms. Armendariz sought an injunction that would require the FBI to return or destroy copies of the digital data obtained in the searches. The district court dismissed this claim, reasoning that (1) a remedy otherwise existed under Federal Rule of Criminal Procedure 41(g) and (2) Ms. Armendariz did not plead a plausible Fourth Amendment violation. The majority correctly upholds this dismissal based on waiver. Maj. Op. at 58–59.

The district court reasoned that Ms. Armendariz and the Chinook Center had an available remedy under Rule 41(g). But Ms. Armendariz and the Chinook Center don't address this reasoning in their opening brief.

They do address this rationale in their reply brief. But the reply brief was too late. *See WildEarth Guardians v. EPA*, 770 F.3d 919, 933 (10th Cir. 2014). Because Ms. Armendariz and the Chinook Center waived their challenge to the district court's reliance on Rule 41(g), I too would affirm the dismissal of this claim. *See Reedy v. Werholz*, 660 F.3d 1270, 1275 (10th Cir. 2011).

**Conclusion**

The investigations into Ms. Armendariz and the Chinook Center included searches based on three warrants. In my view, Detective Summey

and Sergeant Ditzler enjoyed qualified immunity for their roles in obtaining the first two search warrants. For the third warrant, however, I agree with the majority as to the denial of qualified immunity on the claims against Detective Steckler and Sergeant Otero.

For the claim against the FBI for destruction of the seized data, I believe that Ms. Armendariz and the Chinook Center waived their challenge to the district court's reliance on the availability of another remedy. So I would affirm the grant of the FBI's motion to dismiss.

**EXHIBIT 1**

| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
|---|---|
| RE: Search Warrant of<br>**2002 Legacy Ridge View, Apartment [redacted] City of Colorado Springs, County of El Paso, State of Colorado** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency: Colorado Springs Police Department Agency Number: 21-29044 | Division: **Criminal** Ctrm: |

## SEARCH WARRANT

Whereas Task Force Officer Daniel Summey, 5156 has made an Application and Affidavit, which is attached and expressly incorporated into this Search Warrant in reference, to the Court for the issuance of a Search Warrant, and; Whereas the application is in proper form and probable cause is found for the issuance of a Search Warrant to search the person(s) and or premises specified in the application.

THEREFORE, the applicant, and any other peace officer into whose hands this Search Warrant shall come, is hereby ordered, with the necessary and proper assistance, to enter and search within the next fourteen (14) days the person(s), property, and/or premise(s), location and any appurtenances thereto, description of which is:

**2002 Legacy Ridge View, Apartment [redacted], City of Colorado Springs, County of El Paso, State of Colorado; 2002 Legacy Ridge View, Apartment [redacted], is a two story townhome in a row of townhomes. The exterior front is red brick on the first floor, and tan siding on the second floor. The front door is green in color, with the numbers [redacted], black in color, above the front door**

The following person(s), property or thing(s) will be searched for and, if found, seized:

**See Attachment B which is hereby incorporated in reference**

as probable cause has been found to believe that it:

- ☐ Is stolen or embezzled, or
- ☐ Is designed or intended for use in committing a criminal offense, or
- ☒ Is or has been used as a means of committing a criminal offense, or
- ☐ Is illegal to possess, or
- ☒ Would be material evidence in a subsequent criminal prosecution, or required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is a person, property or thing the seizure of which is expressly required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is kept, stored, transported, sold, dispensed, or possessed in violation of a statute of the State of Colorado under circumstances involving a serious threat to the public safety, or order, or to the public health, or
- ☐ That would aid in the detection of the whereabouts of or in the apprehension of a person for whom a lawful arrest order is outstanding.

Furthermore, a copy of this warrant is to be left with the person whose premises or person is searched along with a list of any and all items seized at the time of its execution. If said person cannot be located or identified, a copy of the search Warrant and the list of property seized shall be left at the place from which the property was taken.

Further, a return shall be promptly made to this Court upon the execution of this Search Warrant along with an inventory of any property taken. The property seized shall be held in some safe place until the Court shall further order.

Sworn and subscribed before me this day Friday, August 6, 2021 at 2:05 AM / PM

Magistrate / Judge: [signature]

A 069

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**2002 Legacy Ridge View, Apartment [redacted], City of Colorado Springs, County of El Paso, State of Colorado** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency: Colorado Springs Police Department Agency Number: 21-29044 | Division: **Criminal** Ctrm: |

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

The undersigned, a peace officer as defined in 16-2.5.101, Colorado Revised Statutes 1973, as amended, being first duly sworn on oath moves the Court to issue a Warrant to search those person(s), property, and/or premises known as:

**2002 Legacy Ridge View, Apartment [redacted], City of Colorado Springs, County of El Paso, State of Colorado; 2002 Legacy Ridge View, Apartment [redacted], is a two story townhome in a row of townhomes. The exterior front is red brick on the first floor, and tan siding on the second floor. The front door is green in color, with the numbers [redacted], black in color, above the front door**

The undersigned states that there exists probable cause to believe that the following person, property or thing(s) to be searched for, and if found, seized will be found on the aforementioned person(s) and or premises and are described as follows:

**See Attachment B which is hereby incorporated in reference**

The grounds for the seizure of said person(s), property or thing(s) are that probable cause exists to believe that it:

- ☐ Is stolen or embezzled, or
- ☐ Is designed or intended for use as a means of committing a criminal offense, or
- ☒ Is or has been used as a means of committing a criminal offense, or
- ☐ Is illegal to possess, or
- ☒ Would be material evidence in a subsequent criminal prosecution, or required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is a person, property or thing the seizure of which is expressly required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is kept, stored, transported, sold, dispensed, or possessed in violation of a statute of the State of Colorado under circumstances involving a serious threat to the public safety, or order, or to the public health, or
- ☐ That would aid in the detection of the whereabouts of or in the apprehension of a person for whom a lawful arrest order is outstanding.

The facts submitted in support of this application are set for in the accompanying attachment designated as **Attachment A** which is attached hereto and made a part hereof.

Applicant: Daniel Summey 5156
Daniel Summey 5156

Employed By: Colorado Springs Police Department

Position: Task Force Officer

Sworn and subscribed before me this day Friday, August 6, 2021.

Magistrate / Judge: ____________

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**2002 Legacy Ridge View, Apartment [redacted] City of Colorado Springs, County of El Paso, State of Colorado** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency Name: Colorado Springs Police Department Agency Number: 21-29044 | Division: **Criminal** Ctrm: |

## ATTACHMENT A

The following affidavit is made in the support of a request for the issuance of a search warrant for: **2002 Legacy Ridge View, Apartment [redacted], City of Colorado Springs, County of El Paso, State of Colorado; 2002 Legacy Ridge View, Apartment [redacted], is a two story townhome in a row of townhomes. The exterior front is red brick on the first floor, and tan siding on the second floor. The front door is green in color, with the numbers [redacted] black in color, above the front door.**

Your Affiant, Task Force Officer Daniel Summey, 5156, a Police Officer for the Colorado Springs Police Department and so employed for over 6 years and now currently assigned to the FBI Joint Terrorism Task Force, state under oath that I have personal knowledge of the following facts:

Your Affiant is a sworn peace officer with the Colorado Springs Police Department (CSPD), and has served as a Task Force Officer in the Federal Bureau of Investigation (FBI) Joint Terrorism Task Force (JTTF) since August of 2020, and served as a CSPD Intelligence Detective from 2018 to 2020. Your Affiant has served as a Bias-Motivated Crimes subject matter expert for CSPD since 2018 and has collected information regarding Bias-Motivated Crimes and Groups in the Colorado Springs metro area. Your Affiant has also provided in-person training and information to outside agencies in the Colorado Springs metro area regarding white supremacists and hate groups. Your Affiant has participated in investigations regarding illegal protest activity and has become familiar with people who are regularly involved in illegal protest activity, including members and associates of the Chinook Center.

On 7/31/2021, the City of Colorado Springs hosted a celebration for the 150th anniversary of the founding of the city. In the leadup to the event, the Chinook Center, a local umbrella organization that is the central hub for multiple political activist groups and their members, posted on social media that a march was planned regarding housing in Colorado Springs. Please see the following snip of social media discussing a march:

Supervisor Initials / IBM: RAD/2145




During the ensuing march, protesters immediately and intentionally walked in the roadway and obstructed traffic. Several protesters were arrested, to include Jonathan Christiansen DOB: [redacted]1978 and Shaun Walls DOB: [redacted]1980, both of whom are affiliated with the Chinook Center. Protesters involved in the march wore similar clothing, to include red shirts with the words "Housing is a Human Right". Several of the protesters carried red flags. Your Affiant would note that the red flag is significant in that it is a radical political symbol, and designates this march, which ultimately was declared unlawful, as revolutionary and radical in nature. The website Age of Revolution states – "Today the red flag has, predominantly, become a symbol of socialism and communism. Its European origins date back to the Middle Ages, when a red streamer flying from the mast of a warship signalled a willingness to fight to the death, with no surrender. But its radical political roots lie firmly in the Age of Revolution." Information can be found at https://ageofrevolution.org/200-object/red-flag/.

On 8/4/2021, Your Affiant was tasked with assisting Gold Hill property detectives with identifying a female that attempted to strike a uniformed Colorado Springs Police Department Officer, Anthony Spicuglia 4925, with a bicycle as he ran to assist other police officers who were attempting to take Shaun Walls into custody. Walls was actively resisting officers who were attempting to take him into custody. Your Affiant observed Officer Thane Gilmore's 1697 bodycam, which offered a good view of the attempted assault on Officer Spicuglia by the unidentified female.

Your Affiant observed Officer Spicuglia enter the recording from the left side of the screen at a sprint, heading towards officers who were attempting to take Shaun Walls into custody. A female was riding up the street on a bicycle in the path Officer Spicuglia was taking to get to Walls. As Officer Spicuglia approached the female, she got off the bicycle and threw it at Officer Spicuglia with the clear intent to strike him with it, as he was sprinting at and by her. Officer Spicuglia was very nearly struck by the bicycle and had to slow his sprint towards other officers and jump to avoid the bicycle as it hit the ground in front of him. Had the bicycle made contact with

Officer Spicuglia as he was running by at a sprint, it almost certainly would have caused bodily injury to him, possibly even serious bodily injury, as he was sprinting on a paved roadway while wearing bulky, heavy police gear. The bodycam video clearly showed the female showed intent to strike Officer Spicuglia with the bicycle as he sprinted by, as there was no logical reason for her to exit the bicycle and throw it at an officer as he was sprinting at and by her. There were no other protesters around the female, and therefore no one she could have been attempting to throw or roll the bicycle to.

Your Affiant understands that sometimes one or two angles may not tell the whole story, so your Affiant located footage from a CSPD Unmanned Aerial Surveillance (UAS) drone. The UAS captured a good view of the attempted assault from above the crowd. Your Affiant noted that the unidentified female was far away from all other protesters and had no logical reason to exit the bicycle and throw it directly at Officer Spicuglia as he sprinted past. Your Affiant again noted Officer Spicuglia had to slow his sprint towards officers in need of assistance taking an actively resisting subject into custody, and jump, to avoid the bicycle the female attempted to strike him with.

Your Affiant snipped several images of the female from Officer Gilmore's bodycam. Your Affiant also snipped a photo of the bicycle from Officer Spicuglia's bodycam and a photo of the incident taken by the UAS. Please see the following photos with relevant information about each photo:





The above photos are taken from Officer Gilmore's bodycam, and captures the moment the suspect attempted to assault Officer Spicuglia as he was sprinting by to assist Officers with taking Walls into custody.



The photo above, taken from Officer Gilmore's bodycam footage, shows the female directly after she attempted to assault Officer Spicuglia. Please note that she has a unique cat tattoo on her right hip/thigh area. The cat appears to be black in color with uncolored eyes. Also note the handlebars on the bicycle are straight with white on the grips.




The above photo was taken from Officer Gilmore's bodycam. Please note the gray Nike shoes with white soles, and the purple colored bicycle used by the suspect to attempt to assault Officer Spicuglia. Please also note the helmet, which is light blue in color at the top, and gets darker towards the bottom of the helmet.




The above photo is taken from Officer Gilmore's bodycam. Please note again the unique cat tattoo with uncolored eyes, and the light blue helmet that gets darker towards the bottom of the helmet.



The above photo was taken from Officer Spicuglia's bodycam and shows the bicycle just as it was thrown down in front of him while he was running towards the crowd to assist officers with taking Shaun Walls' into custody. Please note the bicycle is purple in color and has handlebars with white grips on them. There is a green sticker on the front of the bicycle just below where the handlebars connect to the bicycle.



The above photo was taken from CSPD UAS footage as the attempted assault on Officer Spicuglia occurred. Please note the black police SUV in the bottom right of the image. The female with light colored helmet, standing by the downed bicycle, with Officer Spicuglia directly beside the suspect and the bicycle, is the suspect in this case. Please note, there is no one she could have been attempting to pass the bicycle to in the area.

Your Affiant began to look into open source social media to determine if the female is an associate of Jonathan Christiansen or Shaun Walls, as she was participating in a protest that was advertised by the Chinook Center and Shaun Walls. Your Affiant discovered Shaun Walls is associated with a person on Facebook who uses the name J.R. Armendariz (Facebook ID: 10103081958348051). Your Affiant checked local law enforcement databases and discovered CSPD has had contact with Jacqueline Rose Armendariz DOB: [redacted]1987 SSN: [redacted]9489 in the past. Your Affiant checked the driver's license photo of Jacqueline Rose Armendariz, and discovered the driver's license photo matches the female in the photos on J.R. Armendariz's Facebook profile, which means this is likely a Facebook profile owned by Jacqueline Rose Armendariz.




Please see above snip from Facebook of Shaun Walls promoting the protest.

Your Affiant located the following photo on Armendariz's open Facebook profile, dated July 3rd, 2021. Please note the helmet that is light blue in color and gets darker towards the bottom. This helmet appears to be the same helmet worn by the suspect that attempted to assault Officer Spicuglia.




On Armendariz's Facebook page, Your Affiant located a photo from RISE Southeast showing Armendariz standing in front of a camera dated July 19th, 2021. Your Affiant noted Armendariz is on multiple photos associated to RISE Southeast. The photo below shows Armendariz wearing gray Nike shoes with a white sole that appear to be the same shoes worn by the suspect that attempted to assault Officer Spicuglia. Your Affiant would also note that tattoos are visible on Armendariz's hip in the same location the suspect has a tattoo.



The following photo is also from RISE Southeast, and is located on Armendariz's Facebook profile. Armendariz appears to be again wearing the same shoes and helmet as the female that attempted to assault Officer Spicuglia. Please note the bicycle Armendariz is holding is purple in color with straight handlebars that are white on the grips. The bicycle also has a green sticker just below where the handlebars connect to the bicycle. The bicycle appears to be the same bicycle the female attempted to assault Officer Spicuglia with.



Your Affiant located a twitter handle for Armendariz. Pease see the following photo from @JRArmendarizTwitter, which also appears to be owned by Armendariz. Please note the same cat tattoo with uncolored eyes on her right hip/thigh area. This tattoo matches the tattoo location and shape of the tattoo on the suspect that attempted to assault Officer Spicuglia:



The female in the bodycam snips and Jacqueline Armendariz appear to be the same person due to multiple similarities.

First, the female that attempted to assault Officer Spicuglia has a tattoo of a cat head with unfilled eyes on her right hip. Multiple bodycam snips and photos from social media show it appears to be the same tattoo located on the same spot on the body as Jacqueline Armendariz.

Second, Armendariz can be seen on a bicycle in the photo from RISE Southeast. The bicycle is purple with straight white colored handlebars. The bicycle also has a green sticker located just below the area where the handlebars connect to the bicycle. The bicycle used in the attempted assault on Officer Spicuglia appears to be the same bicycle.

Third, the female that attempted to assault Officer Spicuglia has on gray Nike shoes with white soles. Armendariz can be seen wearing what appears to be the same shoes on her open source social media.

Fourth, the helmet worn by the suspect matches the helmet worn by Armendariz in multiple photos on her social media.

Your Affiant also discovered a professional Twitter profile for Armendariz, in which she appears to appeal for social justice causes. Please see photo of Armendariz's Twitter profile:




In her profile, Armendariz references "yt supremacy". Your Affiant was unfamiliar with the term "yt", and using dictionary.com found the following definition for "yt folx":

"The *yt* in *yt folx* appears to stem from the slang term *whitey*. *Whitey*, evidenced since at least the 1830s, has been used by black Americans to disparage white people, especially implying oppression and racial discrimination. By at the early 2000s online, *whitey* was spelled phonetically at *yt*." The information can be found at https://www.dictionary.com/e/slang/yt-folx/.

It appears Armendariz uses the term "yt" in an attempt to disparage white people, showing her disdain for white people. Please note that the officer she attempted to assault was a white male.

Your Affiant located a LinkedIn account for Armendariz, which shows she is active politically in Colorado Springs and Pueblo. Please see the following photos of the LinkedIn page:




**Jacqueline Armendariz**

Regional Representative at U.S. Senate

Greater Colorado Springs Area · 322 connections

Join to Connect

U.S. Senate

New Mexico State University

## About

Bilingual public servant and communications professional powered by a passion for accountability, integrity and building community. Diverse spectrum of skills and knowledge gained through more than a decade of media and government career experience, including as an award-winning journalist for metro dailies with circulations of up to 88,880 and publishing work cited by outlets such as The Rachel Maddow Show and The Texas Tribune. Experience creating strategic plans and partnerships in the community, addressing concerns and questions from the public and delivering effective, engaging presentations to a wide array of audiences and stakeholders.

## Experience

**U.S. Senate**
2 years 10 months

**Regional Representative**
Jul 2020 - Present · 1 year 2 months
Pueblo, Colorado, United States

**Military & Veterans Constituent Advocate**
Nov 2018 - Jul 2020 · 1 year 9 months
Colorado Springs, Colorado Area

**Legislative Aide**
City of Colorado Springs
Dec 2017 - Nov 2018 · 1 year
City Hall Council Office

**Independent Contractor**
Various
Dec 2016 - Oct 2017 · 11 months
Colorado Springs, Colorado Area
Contractor/Associate with:
Walker Schooler District Management
Colorado Springs Independent
MiNDFUL
New Age Medical
Nike Factory Store

Your Affiant further discovered Armendariz is a Regional Representative for US Senator Michael Bennet. Armendariz is listed as a Regional Representative for Bennet on legistorm.com, which appears to be a website that tracks congressional staffers and has other information on the US Government. Armendariz's information can be found at: https://www.legistorm.com/person/Jacqueline_R_Armendariz/313120.html.

Your Affiant would note Armendariz appears to be very active politically, and the protest that turned unlawful on 7/31/2021 was politically motivated.

Your Affiant located a podcast, wherein Jacqueline Armendariz from the RISE movement discussed the need for affordable housing in the southeast part of town. The podcast was dated 7/28/2021. During the interview with Armendariz, she stated she lives at the intersection of Circle and Monterey and discussed an apartment complex being gutted near her. That podcast can be found at: http://studio809radio.com/the-renewal-of-southeast-colorado-springs-with-jacqueline-armendariz-from-rise-and-catherine-duarte-from-the-city-of-colorado-springs/.

At this time, Your Affiant believes Armendariz is in violation of the following Colorado Revised Statutes:

18-2-101 Criminal Attempt - Second Degree Assault – Class 5 Felony (F5)

Your Affiant is familiar with illegal protest activity and people who protest as part of a group. Due to Your Affiant's training and experience, Your Affiant knows people who engage in illegal protest activity frequently carry their phones with them to take photos of their activity and message others who are also participating in illegal protest activity. Your Affiant also knows that phones regularly track the location of their user and can show where a person is at a given date and time. Your Affiant is also aware that people regularly attach their phones to their computers, and use their computers to back up their phones, or transfer photos from their phones to save space on their phones. Your Affiant knows that people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives.

Your Affiant had a check of local utilities conducted and discovered Armendariz has an active utilities at 2002 Legacy Ridge View, apartment [redacted] located in the city of Colorado Springs, county of El Paso, State of Colorado. Your Affiant also had Armendariz's driver's license (issued on 5/6/2017) and vehicle registration (Updated in June 2021) checked, and found 2002 Legacy Ridge View, apartment [redacted] listed there as well. This corroborates the information Armendariz provided on the podcast dated 7/28/2021, as the intersection of South Circle Drive and Monterey Road is approximately 300 feet from Armendariz's apartment building.

Your Affiant is requesting permission to search 2002 Legacy Ridge View, apartment [redacted] and to seize the blue helmet seen being worn by the suspect, the red shirt reading "Housing is a Human Right", grey Nike shoes with white soles, the purple bicycle with green sticker located just below where the handlebars attach, and all digital media storage devices, to include phones, computers, tablets, thumb drives, external hard drives, or any other item that holds digital media. Your Affiant also requests permission to photo the tattoo on Armendariz's right hip/thigh.

The above mentioned items would be material evidence in the subsequent prosecution of Armendariz for attempting to assault Officer Spicuglia

Your Affiant is a Task Force Officer with the FBI and regularly works joint investigations with CSPD and the FBI. As such, Your Affiant requests permission for the FBI to be allowed to participate in the search.

Therefore, based on the above described facts and circumstances, Your Affiant respectfully moves the Court for issuance of a search warrant for search of those person(s), property and/or premises known as: **2002 Legacy Ridge View, Apartment [redacted] City of Colorado Springs, County of El Paso, State of Colorado; 2002 Legacy Ridge View, Apartment [redacted], is a two story townhome in a row of townhomes. The exterior front is red brick on the first floor, and tan siding on the second floor. The front door is green in color, with the numbers [redacted], black in color, above the front door.**

Applicant: *Daniel Summey 5156*
Daniel Summey 5156
Employed By: Colorado Springs Police Department
Position: Task Force Officer

This affidavit was sworn and subscribed before me this day Friday, August 6, 2021.

Magistrate / Judge: *[signature]*

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**2002 Legacy Ridge View, Apartment [redacted] City of Colorado Springs, County of El Paso, State of Colorado** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency Name: Colorado Springs Police Department Agency Number: 21-29044 | Division: **Criminal** Ctrm: |

## ATTACHMENT B

The following person(s), property and/or premise(s) will be searched for and, if found, seized:

- Blue helmet seen being worn by the suspect in attachment A.
- Red Shirt with "Housing is a Human Right" written on it, seen being worn by the suspect in attachment A
- Grey Nike shoes with white soles, seen being worn by the suspect in attachment A
- Purple bicycle with green sticker just below where the handlebars attach, used by the suspect as a weapon and seen in attachment A
- Digital media storage devices, to include phones, computers, tablets, thumb drives, and external hard drives found to be associated with Jacqueline Armendariz
- Photo of the cat tattoo with unfilled eyes located on Jacqueline Armendariz's right hip/thigh
- Indicia of ownership or occupancy to include but not limited to telephone bills, utility bills, letters of: **2002 Legacy Ridge View, Apartment [redacted], located in the City of Colorado Springs, County of El Paso, State of Colorado**

NO OTHER ITEMS ARE SOUGHT FOR SEIZURE

Supervisor Initials / IBM: ____________

**EXHIBIT 2**

RECEIVED

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | AUG 3 0 2021<br>CLERK'S OFFICE<br>▲COURT USE ONLY▲ |
| RE: Search Warrant of<br>**Black Seagate External Hard Drive Serial: NA87E7RW**<br>**Silver HP Laptop with unknown Serial**<br>**HP Elite 735G6 Computer Serial: 5CG00226VH**<br>**Motorla XT1687 cell phone with unknown serial**<br>**Apple iPhone A1660 with unknown serial**<br>**Samsung 9M-N97OU1 Serial: 359197100383638**<br>**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**<br>**; Located within: City of Colorado Springs, County of El Paso, State of Colorado** | Case/File Number:<br>21-2351 |
| Agency: Colorado Springs Police Department Agency Number: 21-29044 | Division: **Criminal** Ctrm: |

## SEARCH WARRANT

Whereas Task Force Officer Daniel Summey, 5156 has made an Application and Affidavit, which is attached and expressly incorporated into this Search Warrant in reference, to the Court for the issuance of a Search Warrant, and; Whereas the application is in proper form and probable cause is found for the issuance of a Search Warrant to search the person(s) and or premises specified in the application.

THEREFORE, the applicant, and any other peace officer into whose hands this Search Warrant shall come, is hereby ordered, with the necessary and proper assistance, to enter and search within the next fourteen (14) days the person(s), property, and/or premise(s), location and any appurtenances thereto, description of which is:

**Black Seagate External Hard Drive Serial: NA87E7RW**

**Silver HP Laptop with unknown Serial**

**HP Elite 735G6 Computer Serial: 5CG00226VH**

**Motorla XT1687 cell phone with unknown serial**

**Apple iPhone A1660 with unknown serial**

**Samsung 9M-N97OU1 Serial: 359197100383638**

**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**

**; Located within: City of Colorado Springs, County of El Paso, State of Colorado**

The following person(s), property or thing(s) will be searched for and, if found, seized:

**See Attachment B which is hereby incorporated in reference**

as probable cause has been found to believe that it:

☐ Is stolen or embezzled, or
☐ Is designed or intended for use in committing a criminal offense, or
☐ Is or has been used as a means of committing a criminal offense, or
☐ Is illegal to possess, or
☒ Would be material evidence in a subsequent criminal prosecution, or required, authorized or permitted by a statute of the State of Colorado, or
☐ Is a person, property or thing the seizure of which is expressly required, authorized or permitted by a statute of the State of Colorado, or
☐ Is kept, stored, transported, sold, dispensed, or possessed in violation of a statute of the State of Colorado under circumstances involving a serious threat to the public safety, or order, or to the public health, or
☐ That would aid in the detection of the whereabouts of or in the apprehension of a person for whom a lawful arrest order is outstanding.

Furthermore, a copy of this warrant is to be left with the person whose premises or person is searched along with a list of any and all items seized at the time of its execution. If said person cannot be located or identified, a copy of the search Warrant and the list of property seized shall be left at the place from which the property was taken.

Further, a return shall be promptly made to this Court upon the execution of this Search Warrant along with an inventory of any property taken. The property seized shall be held in some safe place until the Court shall further order.

Sworn and subscribed before me this day Friday, August 20, 2021 at 4:28 AM / PM

Magistrate / Judge: ______________

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**Black Seagate External Hard Drive Serial: NA87E7RW**<br>**Silver HP Laptop with unknown Serial**<br>**HP Elite 735G6 Computer Serial: 5CG00226VH**<br>**Motorla XT1687 cell phone with unknown serial**<br>**Apple iPhone A1660 with unknown serial**<br>**Samsung 9M-N97OU1 Serial: 359197100383638**<br>**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**<br>**; Located within: City of Colorado Springs, County of El Paso, State of Colorado** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency: Colorado Springs Police Department Agency Number: 21-29044 | Division:**Criminal** Ctrm: |

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

The undersigned, a peace officer as defined in 16-2.5.101, Colorado Revised Statutes 1973, as amended, being first duly sworn on oath moves the Court to issue a Warrant to search those person(s), property, and/or premises known as:

**Black Seagate External Hard Drive Serial: NA87E7RW**

**Silver HP Laptop with unknown Serial**

**HP Elite 735G6 Computer Serial: 5CG00226VH**

**Motorla XT1687 cell phone with unknown serial**

**Apple iPhone A1660 with unknown serial**

**Samsung 9M-N97OU1 Serial: 359197100383638**

**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**

**; Located within: City of Colorado Springs, County of El Paso, State of Colorado**

The undersigned states that there exists probable cause to believe that the following person, property or thing(s) to be searched for, and if found, seized will be found on the aforementioned person(s) and or premises and are described as follows:

**See Attachment B which is hereby incorporated in reference**

The grounds for the seizure of said person(s), property or thing(s) are that probable cause exists to believe that it:

- ☐ Is stolen or embezzled, or
- ☐ Is designed or intended for use as a means of committing a criminal offense, or
- ☐ Is or has been used as a means of committing a criminal offense, or
- ☐ Is illegal to possess, or
- ☒ Would be material evidence in a subsequent criminal prosecution, or required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is a person, property or thing the seizure of which is expressly required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is kept, stored, transported, sold, dispensed, or possessed in violation of a statute of the State of Colorado under circumstances involving a serious threat to the public safety, or order, or to the public health, or
- ☐ That would aid in the detection of the whereabouts of or in the apprehension of a person for whom a lawful arrest order is outstanding.

The facts submitted in support of this application are set for in the accompanying attachment designated as **Attachment A** which is attached hereto and made a part hereof.

Attachment B

Applicant: [signature] 5156
Daniel Summey 5156

Employed By: Colorado Springs Police Department

Position: Task Force Officer

Sworn and subscribed before me this day Friday, August 20, 2021.

Magistrate / Judge: [signature]

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**Black Seagate External Hard Drive Serial: NA87E7RW**<br>**Silver HP Laptop with unknown Serial**<br>**HP Elite 735G6 Computer Serial: 5CG00226VH**<br>**Motorla XT1687 cell phone with unknown serial**<br>**Apple iPhone A1660 with unknown serial**<br>**Samsung 9M-N97OU1 Serial: 359197100383638**<br>**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**<br>**; Located within: City of Colorado Springs, County of El Paso, State of Colorado** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency Name: Colorado Springs Police Department Agency Number: 21-29044 | Division: **Criminal** Ctrm: |
| **ATTACHMENT A** | |

The following affidavit is made in the support of a request for the issuance of a search warrant for: **Black Seagate External Hard Drive Serial: NA87E7RW**

**Silver HP Laptop with unknown Serial**

**HP Elite 735G6 Computer Serial: 5CG00226VH**

**Motorla XT1687 cell phone with unknown serial**

**Apple iPhone A1660 with unknown serial**

**Samsung 9M-N97OU1 Serial: 359197100383638**

**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**

**; Located within: City of Colorado Springs, County of El Paso, State of Colorado.**

Your Affiant, Task Force Officer Daniel Summey, 5156, a Police Officer for the Colorado Springs Police Department and so employed for over 6 years and now currently assigned to the FBI Joint Terrorism Task Force, state under oath that I have personal knowledge of the following facts:

Your Affiant is a sworn peace officer with the Colorado Springs Police Department (CSPD), and has served as a Task Force Officer in the Federal Bureau of Investigation (FBI) Joint Terrorism Task Force (JTTF) since August of 2020, and served as a CSPD Intelligence Detective from 2018 to 2020. Your Affiant has served as a Bias-Motivated Crimes subject matter expert for CSPD since 2018 and has collected information regarding Bias-Motivated Crimes and Groups in the Colorado Springs metro area. Your Affiant has also provided in-person training and information to outside agencies in the Colorado Springs metro area regarding white supremacists and hate groups. Your Affiant has participated in investigations regarding illegal protest activity and has become familiar with people who are regularly involved in illegal protest activity, including members and associates of the Chinook Center.

On 7/31/2021, the City of Colorado Springs hosted a celebration for the 150th anniversary of the founding of the city. In the leadup to the event, the Chinook Center, a local umbrella organization that is the central hub for multiple political activist groups and their members, posted on social media that a march was planned regarding housing in Colorado Springs. Please see the following snip on social media by the Chinook Center:

Supervisor Initials / IBM:

A 091

Chinook Center
July 10 at 8:43 AM

The Housing Crisis in this city can't be ignored any longer. We are going to March on July 31 and we'll also be distributing meals, personal items, and tents to our unhoused community members who bear the worst of the crisis daily. This affects us all! Greed got us this crisis - solidarity is the way we take the power back!
Keep your eye out as details emerge and save the date!




During the ensuing march, protesters immediately and intentionally walked in the roadway and obstructed traffic. Several protesters were arrested, to include Jonathan Christiansen DOB: [redacted]1978 and Shaun Walls DOB: [redacted]1980, both of whom are affiliated with the Chinook Center. Protesters involved in the march wore similar clothing, to include red shirts with the words "Housing is a Human Right". Several of the protesters carried red flags. Your Affiant would note that the red flag is significant in that it is a radical political symbol, and designates this march, which ultimately was declared unlawful, as revolutionary and radical in nature. The website Age of Revolution states – "Today the red flag has, predominantly, become a symbol of socialism and communism. Its European origins date back to the Middle Ages, when a red streamer flying from the mast of a warship signalled a willingness to fight to the death, with no surrender. But its radical political roots lie firmly in the Age of Revolution." Information can be found at https://ageofrevolution.org/200-object/red-flag/.

On 8/4/2021, Your Affiant was tasked with assisting Gold Hill property detectives with identifying a female that attempted to strike a uniformed Colorado Springs Police Department Officer, Anthony Spicuglia 4925, with a bicycle as he ran to assist other police officers who were attempting to take Shaun Walls into custody. Walls was actively resisting officers who were attempting to take him into custody. Your Affiant observed Officer Thane Gilmore's 1697 bodycam, which offered a good view of the attempted assault on Officer Spicuglia by the unidentified female.

Your Affiant observed Officer Spicuglia enter the recording from the left side of the screen at a sprint, heading towards officers who were attempting to take Shaun Walls into custody. A female was riding up the street on a bicycle in the path Officer Spicuglia was taking to get to Walls. As Officer Spicuglia approached the female, she got off the bicycle and threw it at Officer Spicuglia with the clear intent to strike him with it, as he was sprinting at and by her. Officer Spicuglia was very nearly struck by the bicycle and had to slow his sprint towards other officers and jump to avoid the bicycle as it hit the ground in front of him. Had the bicycle made contact with Officer Spicuglia as he was running by at a sprint, it almost certainly would have caused bodily injury to him, possibly even serious bodily injury, as he was sprinting on a paved roadway while wearing bulky, heavy police gear. The bodycam video clearly showed the female showed intent to strike Officer Spicuglia with the bicycle as he sprinted by, as there was no logical reason for her to exit the bicycle and throw it at an officer as he was

sprinting at and by her. There were no other protesters around the female, and therefore no one she could have been attempting to throw or roll the bicycle to.

Your Affiant understands that sometimes one or two angles may not tell the whole story, so your Affiant located footage from a CSPD Unmanned Aerial Surveillance (UAS) drone. The UAS captured a good view of the attempted assault from above the crowd. Your Affiant noted that the unidentified female was far away from all other protesters and had no logical reason to exit the bicycle and throw it directly at Officer Spicuglia as he sprinted past. Your Affiant again noted Officer Spicuglia had to slow his sprint towards officers in need of assistance taking an actively resisting subject into custody, and jump, to avoid the bicycle the female attempted to strike him with.

Your Affiant snipped several images of the female from Officer Gilmore's bodycam. Your Affiant also snipped a photo of the bicycle from Officer Spicuglia's bodycam and a photo of the incident taken by the UAS. Please see the following photos with relevant information about each photo:





The above photos are taken from Officer Gilmore's bodycam, and captures the moment the suspect attempted to assault Officer Spicuglia as he was sprinting by to assist Officers with taking Walls into custody.



The photo above, taken from Officer Gilmore's bodycam footage, shows the female directly after she attempted to assault Officer Spicuglia. Please note that she has a unique cat tattoo on her right hip/thigh area. The cat appears to be black in color with uncolored eyes. Also note the handlebars on the bicycle are straight with white on the grips.



The above photo was taken from Officer Gilmore's bodycam. Please note the gray Nike shoes with white soles, and the purple colored bicycle used by the suspect to attempt to assault Officer Spicuglia. Please also note the helmet, which is light blue in color at the top, and gets darker towards the bottom of the helmet.



The above photo is taken from Officer Gilmore's bodycam. Please note again the unique cat tattoo with uncolored eyes, and the light blue helmet that gets darker towards the bottom of the helmet.



The above photo was taken from Officer Spicuglia's bodycam and shows the bicycle just as it was thrown down in front of him while he was running towards the crowd to assist officers with taking Shaun Walls' into custody. Please note the bicycle is purple in color and has handlebars with white grips on them. There is a green sticker on the front of the bicycle just below where the handlebars connect to the bicycle.



The above photo was taken from CSPD UAS footage as the attempted assault on Officer Spicuglia occurred. Please note the black police SUV in the bottom right of the image. The female with light colored helmet, standing by the downed bicycle, with Officer Spicuglia directly beside the suspect and the bicycle, is the suspect in this case. Please note, there is no one she could have been attempting to pass the bicycle to in the area.

Your Affiant began to look into open source social media to determine if the female is an associate of Jonathan Christiansen or Shaun Walls, as she was participating in a protest that was advertised by the Chinook Center and Shaun Walls. Your Affiant discovered Shaun Walls is associated with a person on Facebook who uses the name J.R. Armendariz (Facebook ID: 10103081958348051). Your Affiant checked local law enforcement databases and discovered CSPD has had contact with Jacqueline Rose Armendariz DOB: [redacted]1987 SSN: [redacted]9489 in the past. Your Affiant checked the driver's license photo of Jacqueline Rose Armendariz, and discovered the driver's license photo matches the female in the photos on J.R. Armendariz's Facebook profile, which means this is likely a Facebook profile owned by Jacqueline Rose Armendariz.




Please see above snip from Facebook of Shaun Walls promoting the protest.

Your Affiant located the following photo on Armendariz's open Facebook profile, dated July 3rd, 2021. Please note the helmet that is light blue in color and gets darker towards the bottom. This helmet appears to be the same helmet worn by the suspect that attempted to assault Officer Spicuglia.




On Armendariz's Facebook page, Your Affiant located a photo from RISE Southeast showing Armendariz standing in front of a camera dated July 19th, 2021. Your Affiant noted Armendariz is on multiple photos associated to RISE Southeast. The photo below shows Armendariz wearing gray Nike shoes with a white sole that appear to be the same shoes worn by the suspect that attempted to assault Officer Spicuglia. Your Affiant would also note that tattoos are visible on Armendariz's hip in the same location the suspect has a tattoo.



The following photo is also from RISE Southeast, and is located on Armendariz's Facebook profile. Armendariz appears to be again wearing the same shoes and helmet as the female that attempted to assault Officer Spicuglia. Please note the bicycle Armendariz is holding is purple in color with straight handlebars that are white on the

grips. The bicycle also has a green sticker just below where the handlebars connect to the bicycle. The bicycle appears to be the same bicycle the female attempted to assault Officer Spicuglia with.



Your Affiant located a twitter handle for Armendariz. Pease see the following photo from @JRArmendarizTwitter, which also appears to be owned by Armendariz. Please note the same cat tattoo with uncolored eyes on her right hip/thigh area. This tattoo matches the tattoo location and shape of the tattoo on the suspect that attempted to assault Officer Spicuglia:



The female in the bodycam snips and Jacqueline Armendariz appear to be the same person due to multiple similarities.

First, the female that attempted to assault Officer Spicuglia has a tattoo of a cat head with unfilled eyes on her right hip. Multiple bodycam snips and photos from social media show it appears to be the same tattoo located on the same spot on the body as Jacqueline Armendariz.

Second, Armendariz can be seen on a bicycle in the photo from RISE Southeast. The bicycle is purple with straight white colored handlebars. The bicycle also has a green sticker located just below the area where the handlebars connect to the bicycle. The bicycle used in the attempted assault on Officer Spicuglia appears to be the same bicycle.

Third, the female that attempted to assault Officer Spicuglia has on gray Nike shoes with white soles. Armendariz can be seen wearing what appears to be the same shoes on her open source social media.

Fourth, the helmet worn by the suspect matches the helmet worn by Armendariz in multiple photos on her social media.

Your Affiant also discovered a professional Twitter profile for Armendariz, in which she appears to appeal for social justice causes. Please see photo of Armendariz's Twitter profile:




In her profile, Armendariz references "yt supremacy". Your Affiant was unfamiliar with the term "yt", and using dictionary.com found the following definition for "yt folx":

"The *yt* in *yt folx* appears to stem from the slang term *whitey*. *Whitey*, evidenced since at least the 1830s, has been used by black Americans to disparage white people, especially implying oppression and racial discrimination. By at the early 2000s online, *whitey* was spelled phonetically at *yt*." The information can be found at https://www.dictionary.com/e/slang/yt-folx/.

It appears Armendariz uses the term "yt" in an attempt to disparage white people, showing her disdain for white people. Please note that the officer she attempted to assault was a white male.

Your Affiant located a LinkedIn account for Armendariz, which shows she is active politically in Colorado Springs and Pueblo. Please see the following photos of the LinkedIn page:

Attachment A
Page 13 of 24




## Jacqueline Armendariz

Regional Representative at U.S. Senate

Greater Colorado Springs Area · 322 connections

Join to Connect

U.S. Senate

New Mexico State University

### About

Bilingual public servant and communications professional powered by a passion for accountability, integrity and building community. Diverse spectrum of skills and knowledge gained through more than a decade of media and government career experience, including as an award-winning journalist for metro dailies with circulations of up to 88,880 and publishing work cited by outlets such as The Rachel Maddow Show and The Texas Tribune. Experience creating strategic plans and partnerships in the community, addressing concerns and questions from the public and delivering effective, engaging presentations to a wide array of audiences and stakeholders.

## Experience

**U.S. Senate**
2 years 10 months

**Regional Representative**
Jul 2020 - Present · 1 year 2 months
Pueblo, Colorado, United States

**Military & Veterans Constituent Advocate**
Nov 2018 - Jul 2020 · 1 year 9 months
Colorado Springs, Colorado Area

**Legislative Aide**
City of Colorado Springs
Dec 2017 - Nov 2018 · 1 year
City Hall Council Office

**Independent Contractor**
Various
Dec 2016 - Oct 2017 · 11 months
Colorado Springs Colorado Area
Contractor/Associate with:
Walker Schooler District Management
Colorado Springs Independent
MiNDFUL
New Age Medical
Nike Factory Store

Your Affiant further discovered Armendariz is a Regional Representative for US Senator Michael Bennet. Armendariz is listed as a Regional Representative for Bennet on legistorm.com, which appears to be a website that tracks congressional staffers and has other information on the US Government. Armendariz's information can be found at: https://www.legistorm.com/person/Jacqueline_R_Armendariz/313120.html.

Your Affiant would note Armendariz appears to be very active politically, and the protest that turned unlawful on 7/31/2021 was politically motivated.

Your Affiant located a podcast, wherein Jacqueline Armendariz from the RISE movement discussed the need for affordable housing in the southeast part of town. The podcast was dated 7/28/2021. During the interview with Armendariz, she stated she lives at the intersection of Circle and Monterey and discussed an apartment complex being gutted near her. That podcast can be found at: http://studio809radio.com/the-renewal-of-southeast-colorado-springs-with-jacqueline-armendariz-from-rise-and-catherine-duarte-from-the-city-of-colorado-springs/.

At this time, Your Affiant believes Armendariz is in violation of the following Colorado Revised Statutes:

18-2-101 Criminal Attempt - Second Degree Assault – Class 5 Felony (F5)

Your Affiant is familiar with illegal protest activity and people who protest as part of a group. Due to Your Affiant's training and experience, Your Affiant knows people who engage in illegal protest activity frequently carry their phones with them to take photos of their activity and message others who are also participating in illegal protest activity. Your Affiant also knows that phones regularly track the location of their user and can show where a person is at a given date and time. Your Affiant is also aware that people regularly attach their phones to their computers, and use their computers to back up their phones, or transfer photos from their phones to save space on their phones. Your Affiant knows that people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives. On 8/19/2021, Armendariz contacted Your Affiant by phone, and requested I contact her employer's office and speak with her supervisor. On 8/19/2021, I contacted Amy Friedman by phone at [redacted] Friedman confirmed Armendariz attended the protest in her personal capacity, and said Armendariz sent her digital media of the protest. Your Affiant requested the videos from Friedman, who stated Senator Bennet's Office and lawyers would look into it.

Your Affiant had a check of local utilities conducted and discovered Armendariz has an active utilities account at 2002 Legacy Ridge View, apartment [redacted], located in the city of Colorado Springs, county of El Paso, State of Colorado. Your Affiant also had Armendariz's driver's license (issued on 5/6/2017) and vehicle registration (Updated in June 2021) checked, and found 2002 Legacy Ridge View, apartment [redacted] listed there as well. This corroborates the information Armendariz provided on the podcast dated 7/28/2021, as the intersection of South Circle Drive and Monterey Road is approximately 300 feet from Armendariz's apartment building.

On 8/6/2021, Your Affiant authored an arrest warrant for Armendariz for Criminal Attempt – Second Degree Assault, and a search warrant for her residence, 2002 Legacy Ridge View, apartment [redacted]. Your Affiant met with the Honorable Judge Miles at the El Paso County Courthouse on 8/6/2021, where Judge Miles granted the search and arrest warrant.

On 8/18/2021, at approximately 0750 hours, Armendariz was taken into custody outside of her residence. A search of her residence was completed, and the blue helmet, red shirt with "Housing is a Human Right", gray Nike shoes with white soles, a black Seagate External Hard Drive serial number NA87E7RW, a silver HP laptop with unknown serial number, an HP Elite 735G6 serial number 5CG00226VH, a Motorola XT1687, an Apple iPhone A1660 with unknown serial number, and a blue Samsung Galaxy cell phone serial number 359197100383638, and indicia of occupancy were seized. Your Affiant would note there are stickers on the HP Elite 735G6 denoting it is a work computer, and is property of US Senator Michael Bennet's Office, and is US Senate Property. Your Affiant is aware that this is a work computer given to Armendariz, as Your Affiant spoke with a staff member of Senator Bennet's Office over the phone. The work computer was found in Armendariz's possession during a search of her residence. In Your Affiant's training and experience, people often engage in personal communications with their work devices even though it is oftentimes not allowed by company policy.

Your Affiant saw a bicycle in the back of Armendariz's vehicle, visible from outside the vehicle through the windows, that was purple in color with a green sticker below where the handlebars attach to the vehicle. The bicycle clearly matched the bicycle that was used in the attempted assault on Officer Spicuglia. Your Affiant had the vehicle secured and towed to the CSPD Impound Lot.

On 8/18/2021, Your Affiant authored a search warrant to search Armendariz's vehicle, a 2014 Blue Nissan Rogue VIN: [redacted]4726 with Colorado license plate [redacted]431 and seize the bicycle, along with indicia of ownership of the vehicle. On 8/18/2021, Your Affiant met with the Honorable Judge Rotolo at the El Paso County Courthouse, where Judge Rotolo reviewed and granted the search warrant.

On 8/18/2021, at approximately 1120 hours, Your Affiant arrived at the CSPD Impound Lot, where the vehicle was located. Your Affiant searched the vehicle, and seized the bicycle, found to be a purple Diamondback Topanga bicycle with serial number I4H09771. Your Affiant observed the bicycle had damage to the outside of the left handlebar. The damage appeared to be scratch marks consistent with being thrown down hard on the ground. Your Affiant would note that it appears on bodycam that the bicycle used in the attempted assault on Officer Spicuglia struck the ground hard on the left outside of the handlebars.

Your Affiant is familiar with digital technology, and is aware that people regularly attach their phones to their computers, and use their computers to back up their phones, or transfer photos from their phones to save space on their phones. Your Affiant knows that people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives. In Your Affiant's training and experience, people who commit illegal activity in furtherance of the ideology or goals of anarchist or anti-government groups share this information with others though messaging applications, emails, or texts in order to take credit for their actions and gain standing or notoriety in such groups. In Your Affiant's training and experience, people who engage in illegal activity in furtherance of the ideology or goals of anarchist or anti-government groups take videos or photos of themselves or others engaged in illegal activity, or engaged in group activities leading up to the illegal activity. Your Affiant is aware the cell phones regularly track location information of the user and can oftentimes place a person at a location if given a date and time.

Your Affiant is aware that Chinook Center is an anarchist or anti-government organization as mentioned in the previous paragraph, and a leader of the Chinook Center, namely Shaun Walls, has called for violence against police officers and their families in the past, and has discussed revolution and uprisings against the government. Please see social media snips from Shaun Walls calling for violence against police officers and their families, revolution against the government, and riots:



**Shaun Walls**
14 hrs

Riots work (.)

Rioting is more effective than following the process and always has been

The process isn't set up to bring about changing anything You have to break the process

39 — 21 Comments

Attachment A
Page 17 of 24

**Shaun Walls**
Yesterday at 6:19 AM

A lot of us never did shit to them.. They're so used to ppl being scared of them I bet they'd be beside themselves if their houses started getting shot up randomly




35    6 Comments 11 Shares

Attachment A
Page 18 of 24

**Shaun Walls**
3 hrs

This is what will make them think twice since losing their job is off the table.



THEBLAZE.COM

**More than 36 street gangs in Chicago reportedly vow to shoot on sight any cop who has a weapon drawn in public**

Attachment A
Page 19 of 24

**Shaun Walls**
17 hrs

Good cops believe they are the actual Law itself this is why they treat ppl however they want. And he has other good cops to back him up not tell him to back up.
But they don't think about you pulling up to their house the next day.. bet CSPD better think twice because they terrorize ppl where they live everyday.. Life has taught me over and over it's no fun when the rabbit got the gun.

Watch the oohhhhh "be careful" comments lol keep that shit to yourself.. I know exactly what I said and so do they



2,919 Views

**Jay Moody**
17 hrs

!!!SPREAD THE WORD!! Ladies and Gents! Now you see why we do what we do! So lets stop talking about blacks killing blacks! Look at this mess Wayment the fact that the cops dont care about being recorded is crazy sickness ARREST THE COPS!!!! Spread the word!!!! ALL THE COPS!!!!

A 109

Attachment A
Page 20 of 24

Shaun Walls
52 mins

Who's next



Trash Syndicate
12 hrs ·

Like Page

Wisconsin Department of Corrections Building Kenosha WI

ht CJ TV

Shaun Walls
23 hrs ·

Here's why you cant tell me voting changes shit.. Especially when you're telling me a cop being the VP is the right answer.

I'm telling y'all there won't be not a damn thing changing until this shit gets burnt or blown tf up.
Cops aren't going to suddenly change and switch up how it's being played until every one of them needs to hurry home to protect their families when they do this shit.

Kill three of their wives or kids anywhere in the nation and watch the shit stop. Magically.
Tired of tap dancing around what's a threat and what's not these mfs is killing us for free and then still going to Walmart in the same city got to be fuckin kidding me.

In a war the logistics lines are evaluated and destroyed. The only thing feeding that system is the people that still go to be cops. Might as well stop trying to "fix" the system and trick it into reversing its self , takes its fuel away

Attachment A
Page 21 of 24

**Shaun Walls**
21 hrs ·

I just realized the fear these police put in y'all got you thinking I'm scared too. When's the last time you looked me in the face and talked to me?

You're trippin like a mf bro. I left my fear somewhere and forgot where it's at already ..got me fucked up.

The revolution has come, off the pigs, time to pick up the guns..
We repeated that shit and meant every last word of it. Come see

https://youtu be/Fe4RVOw3Cdk



Like Comment Share

15

Your Affiant would note that Walls actively resisted arrest, and it appears Armendariz attempted to assault a uniformed police officer at protest march that was sponsored by Chinook Center that turned unlawful. Your Affiant would note there appears to be a close relationship that exists between Walls and Armendariz, wherein they are friends on social media, Armendariz attended an event that Walls promoted on social media, and she attempted to assault an officer who was attempting to take Walls into custody. Your Affiant is aware that along with Shaun Walls, the previously mentioned Jonathan Christiansen and his wife Samantha Christiansen DOB: [redacted]1978, are leaders of the Chinook Center, and opened the Chinook Center. This is made evident by a social media post from Shaun Walls on the next page:




Your Affiant would note that the above post, wherein Walls is with "Jon Crustyansen" and "Sam Roberts Chrischeeansen and references opening the Chinook Center, shows the connection between Walls and Jon and Sam Christiansen, and that they were the ones that opened the Chinook Center. Jon Crustyansen (FBID: 1075987819) and Sam Roberts Chrischeeansen (FBID: 677499237) are accounts that, due to the numerous photos of both Jon and Sam Christiansen on both pages, appear to be owned by Jon and Sam Christiansen.

Your Affiant is aware that the Chinook Center, and Chinook Center member groups, have promoted other protests that turned violent in the past, namely the Pulpit Rock protest where numerous activist groups and their members unlawfully protested outside of CSPD Officer Van't Land's residence on the anniversary of Van't Land shooting and killing De'Von Bailey. During that protest, numerous protesters showed up armed, and several were arrested after pointing their weapons at people who were driving through the neighborhood, attempting to get to their respective homes.

Your Affiant is aware that Armendariz appeared in an episode of Just COS, which is hosted by Jon Christiansen and Shaun Walls, that was posted to YouTube on August 16, 2020, seen at https://www.youtube.com/watch?v=E8n_-dcRsac

The Episode is titled Episode Lucky 13, and it contains discussion from Jon Christiansen and Shaun Walls about the Pulpit Rock Protest. Christiansen initially states that MOVE (Note that Chinook Center lists MOVE as a member organization on their website) and Empowerment Solidarity Network were the organizers, but later numerous context clues provided by Walls and Christiansen show that they also helped plan the protest. Note that

at the 5:16 mark of the video, Walls states, "We were very well organized", and went on to state, "We got our message across." At the 5:35 mark, Jon Christiansen states, "We had decided it was ok for people to bring long guns, um, because we knew that there were some threats out there." This statement shows that Jon Christiansen played a role in okaying protesters bringing firearms to the protest, and therefore had a hand in the planning of the protest. Those firearms, which by his own words were okayed by Christiansen, were later used to menace citizens driving through the neighborhood, and several arrests were made. This shows a pattern of protest activity that has turned illegal associated with the Chinook Center and Chinook Center member organizations.

At the 8:13 mark, Armendariz introduces herself to the audience, providing her name as Jacqueline Armendariz. Armendariz appearing on Just COS shows her connection to the activist community, and her closeness with Christiansen and Walls.

Your Affiant is seeking permission to search the digital devices recovered from Armendariz's person and residence, , a black Seagate External Hard Drive serial number NA87E7RW, a silver HP laptop with unknown serial number, an HP Elite 735G6 serial number 5CG00226VH, a Motorola XT1687, an Apple iPhone A1660 with unknown serial number, and a blue Samsung Galaxy cell phone serial number 359197100383638, to seize any photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer.

Your Affiant is aware that Shaun Walls began posting about "Housing is a Human Right" on 6/5/2021 and has provided a snip of that post below. Your Affiant believes this is likely the time that planning for the unlawful protest began.

Shaun Walls
June 5 ·

As you get yourself together this morning for this beautiful weather don't forget that you live in a city where human beings are forced to sleep in fields under tents with their kids.. a city where you most definitely will have to step over or around a human being sleeping on the concrete sidewalk in the middle of the day. And don't forget today's the 5th.. late fees start today -that's the punishment capitalists apply when you don't have enough of their money on time. Have a great day guys
#HousingForAll #NOW

https://www.facebook.com/Colorado-Springs-Housing-4-All-Coalition-109577171298115/



Colorado Springs Housing 4 All Coalition — Like

22

Your Affiant is also requesting permission to perform a key word search of the devices for the following words:

Police, officer, cop, pig, bike, bicycle, attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Shaun, Walls, as these terms would be relevant to the investigation regardless of the time period in which they occurred.

The above mentioned items would be material evidence in the subsequent prosecution of Armendariz for attempting to assault Officer Spicuglia.

Your Affiant is a Task Force Officer with the FBI and regularly works joint investigations with CSPD and the FBI. As such, Your Affiant requests permission for the FBI to be allowed to participate in the search.

Therefore, based on the above described facts and circumstances, Your Affiant respectfully moves the Court for issuance of a search warrant for search of those person(s), property and/or premises known as: **Black Seagate External Hard Drive Serial: NA87E7RW**

**Silver HP Laptop with unknown Serial**

**HP Elite 735G6 Computer Serial: 5CG00226VH**

**Motorla XT1687 cell phone with unknown serial**

**Apple iPhone A1660 with unknown serial**

**Samsung 9M-N97OU1 Serial: 359197100383638**

**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**

**; Located within: City of Colorado Springs, County of El Paso, State of Colorado.**

Applicant: Daniel Summey 5156 (signature)
Daniel Summey 5156
Employed By: Colorado Springs Police Department
Position: Task Force Officer

This affidavit was sworn and subscribed before me this day Friday, August 20, 2021.

~~Magistrate /~~ Judge: (signature)

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**Black Seagate External Hard Drive Serial: NA87E7RW**<br>**Silver HP Laptop with unknown Serial**<br>**HP Elite 735G6 Computer Serial: 5CG00226VH**<br>**Motorla XT1687 cell phone with unknown serial**<br>**Apple iPhone A1660 with unknown serial**<br>**Samsung 9M-N97OU1 Serial: 359197100383638**<br>**Currently located at the Colorado Springs Police Department Police Operations Center, located at 705 S Nevada Ave**<br>**; Located within: City of Colorado Springs, County of El Paso, State of Colorado** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency Name: Colorado Springs Police Department Agency Number: 21-29044 | Division: **Criminal** Ctrm: |
| **ATTACHMENT B** | |

The following person(s), property and/or premise(s) will be searched for and, if found, seized:

- Photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer.
- key word search of the devices for the following words:
  Police, officer, cop, pig, bike, bicycle, attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Crustyansen, Chrischeeansen, Shaun, Walls, as these terms would be relevant to the investigation regardless of the time period in which they occurred.

NO OTHER ITEMS ARE SOUGHT FOR SEIZURE

Supervisor Initials / IBM: ___________

| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | RECEIVED<br>AUG 03 2021<br>CLERK'S OFFICE |
|---|---|
| RE: Search Warrant of<br>**Facebook, Inc**<br>**1601 Willow Road, Menlo Park, CA 94025**<br>**Target Identifier: https://www.facebook.com/chinookcenter** | ▲COURT USE ONLY▲<br>Case/File Number:<br>21-2156 |
| Agency: Colorado Springs Police Department Agency Number: 21-28345 | Division: **Criminal** Ctrm: |

## SEARCH WARRANT

Whereas Detective B. K. Steckler, 2771 has made an Application and Affidavit, which is attached and expressly incorporated into this Search Warrant in reference, to the Court for the issuance of a Search Warrant, and; Whereas the application is in proper form and probable cause is found for the issuance of a Search Warrant to search the person(s) and or premises specified in the application.

THEREFORE, the applicant, and any other peace officer into whose hands this Search Warrant shall come, is hereby ordered, with the necessary and proper assistance, to enter and search within the next fourteen (14) days the person(s), property, and/or premise(s), location and any appurtenances thereto, description of which is:

**Facebook, Inc, 1601 Willow Road, Menlo Park, CA 94025, Target Identifier: https://www.facebook.com/chinookcenter**

The following person(s), property or thing(s) will be searched for and, if found, seized:

**See Attachment B which is hereby incorporated in reference**

as probable cause has been found to believe that it:

- ☐ Is stolen or embezzled, or
- ☐ Is designed or intended for use in committing a criminal offense, or
- ☐ Is or has been used as a means of committing a criminal offense, or
- ☐ Is illegal to possess, or
- ☒ Would be material evidence in a subsequent criminal prosecution, or required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is a person, property or thing the seizure of which is expressly required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is kept, stored, transported, sold, dispensed, or possessed in violation of a statute of the State of Colorado under circumstances involving a serious threat to the public safety, or order, or to the public health, or
- ☐ That would aid in the detection of the whereabouts of or in the apprehension of a person for whom a lawful arrest order is outstanding.

Furthermore, a copy of this warrant is to be left with the person whose premises or person is searched along with a list of any and all items seized at the time of its execution. If said person cannot be located or identified, a copy of the search Warrant and the list of property seized shall be left at the place from which the property was taken.

Further, a return shall be promptly made to this Court upon the execution of this Search Warrant along with an inventory of any property taken. The property seized shall be held in some safe place until the Court shall further order.

Sworn and subscribed before me this day AUG 03 2021 at 1400 ~~AM~~ (PM)

~~Magistrate~~ / Judge: [signature]

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**Facebook, Inc**<br>**1601 Willow Road, Menlo Park, CA 94025**<br>**Target Identifier: https://www.facebook.com/chinookcenter** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency: Colorado Springs Police Department Agency Number: 21-28345 | Division: **Criminal** Ctrm: |

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

The undersigned, a peace officer as defined in 16-2.5.101, Colorado Revised Statutes 1973, as amended, being first duly sworn on oath moves the Court to issue a Warrant to search those person(s), property, and/or premises known as:

**Facebook, Inc, 1601 Willow Road, Menlo Park, CA 94025, Target Identifier: https://www.facebook.com/chinookcenter**

The undersigned states that there exists probable cause to believe that the following person, property or thing(s) to be searched for, and if found, seized will be found on the aforementioned person(s) and or premises and are described as follows:

**See Attachment B which is hereby incorporated in reference**

The grounds for the seizure of said person(s), property or thing(s) are that probable cause exists to believe that it:

- ☐ Is stolen or embezzled, or
- ☐ Is designed or intended for use as a means of committing a criminal offense, or
- ☐ Is or has been used as a means of committing a criminal offense, or
- ☐ Is illegal to possess, or
- ☒ Would be material evidence in a subsequent criminal prosecution, or required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is a person, property or thing the seizure of which is expressly required, authorized or permitted by a statute of the State of Colorado, or
- ☐ Is kept, stored, transported, sold, dispensed, or possessed in violation of a statute of the State of Colorado under circumstances involving a serious threat to the public safety, or order, or to the public health, or
- ☐ That would aid in the detection of the whereabouts of or in the apprehension of a person for whom a lawful arrest order is outstanding.

The facts submitted in support of this application are set for in the accompanying attachment designated as **Attachment A** which is attached hereto and made a part hereof.

Applicant: [signature] #2771
B. K. Steckler 2771

Employed By: Colorado Springs Police Department

Position: Detective

Sworn and subscribed before me this day AUG 03 2021

~~Magistrate~~ / Judge: [signature]

Appellate Case: 24-1201 Document: 010111098653 Date Filed: 08/21/2024 Page: 120

| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
|---|---|
| RE: Search Warrant of<br>**Facebook, Inc**<br>**1601 Willow Road, Menlo Park, CA 94025**<br><br>**Target Identifier: https://www.facebook.com/chinookcenter** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency Name: Colorado Springs Police Department Agency Number: 21-28345 | Division: **Criminal** Ctrm: |

## ATTACHMENT A

The following affidavit is made in the support of a request for the issuance of a search warrant for: **Facebook, Inc, 1601 Willow Road, Menlo Park, CA 94025, Target Identifier: https://www.facebook.com/chinookcenter**.

Your Affiant, Detective B. K. Steckler, 2771D, who has been employed for the past seventeen years as a sworn police officer for the Colorado Springs Police Department. Your affiant's current assignment is working as an investigator within the Colorado Springs Police Department's Gold Hill Investigations Unit.

On 08/02/21, your affiant was contacted by Lieutenant M. Chacon, 2300, who asked if your affiant would research a tip regarding a Facebook post that was posted after arrest were made for Obstructing Passage or Assembly, and Resisting, Interference with a Public Official on South Tejon Street just south of East Fountain Boulevard on 07/31/21 at approximately 1137 hours. Your affiant is aware South Tejon Street just south of East Fountain Boulevard is located in the City of Colorado Springs, County of El Paso, and State of Colorado.

On 07/31/21 in the morning hours, Colorado Springs Police Officers were working in the Colorado Springs Downtown area for the "COS 150: Downtown Celebration." The event included a parade route through the downtown commercial district of Colorado Springs and included a festival following the parade.

At approximately 1137 hours, officers were summoned by Lieutenant Chacon to the area of South Tejon Street, just south of East Fountain Boulevard in response to a group of approximately 60 protestors illegally marching northbound up South Tejon Street, blocking vehicle traffic in the process. Officers arrived and formed a line in the road to block the path of the protestors. The protestors turned eastbound on East Mill Street in an apparent attempt to move around the police line. Officers repositioned their police line to block the protestors from moving northbound up South Nevada Avenue. The group was led by a black male with a bald head and wearing a red shirt with camouflage shorts. The male was carrying a wooden stick that was approximately four feet in length, that he utilized as a walking stick. Lieutenant Chacon gave numerous verbal warnings to the group to inform them it was illegal to march in the roadway and they needed to immediately exit the roadway to the sidewalk or face arrest. The announcements were made with a bullhorn megaphone and could be heard clearly. The protestors continued to block both northbound and southbound lanes of South Nevada Avenue. The male with the bald head and wearing the red shirt and camouflage shorts extended his middle finger toward the police line. Lieutenant Chacon ordered the arrest of the male who was later identified as Mr. Shaun Eugen Walls DOB [redacted] Prior to the arrest of Mr. Walls, the protestors turned back toward South Tejon Street by walking through the Nevada Auto Sales car lot located between South Nevada Avenue and South Tejon Street.

Officers attempted to arrest Mr. Walls in the area of South Tejon Street and East Fountain Boulevard on the east sidewalk. Mr. Walls was actively resisting the officers attempts to control him by remaining on his feet and attempting to pull away from officers. Officers were eventually able to affect the arrest of Mr. Walls.

On 08/02/21, an anonymous tip was received regarding a Facebook post from 07/31/21 under the name of Shaun Walls. The post was from 07/31/21 at 10:39 P.M. and stated, "Now it's fun… it was work before.. I could whoop all them pigs and they felt it too. I laid down so we could keep fighting with purpose. You can watch or

Supervisor Initials / IBM: ________

help idgaf. I'm going to #Fuck12." The profile for the post was https://www.facebook.com/profile.php?id=100008489040279.

Your affiant completed a search warrant for the Facebook profile under the name of Shaun Walls and it was presented to the Honorable Judge D. Peacock. Judge Peacock signed the warrant, and it was served to Facebook, Inc on 08/02/21.

On 08/03/21, your affiant became aware of two more Facebook profiles that had bearing on this case. The first profile was provided by the same anonymous who stated a profile under the name of Nicholas Crutcher had a Facebook account that had pictures and videos from the protest and included some photographs of Mr. Walls being taken into custody by Colorado Springs Police officers. The profile was https://facebook.com/sir.n.crutcher.

On 08/03/21 at approximately 1015 hours, Detective J. Granillo, 3876, contacted me and stated a second profile was under the name of the Chinook Center was located in which the protest was organized under the events tab. The profile for the Chinook Center was https:www.facebook.com/chinookcenter. I went to the site and was able to see details regarding a "March for Housing" set for 07/31/21 and stating the rally point was Dorchester Park, located at 1130 South Nevada Avenue.

Your affiant believes the information gained from the two Facebook profiles will be material evidence in this case. It is your affiant's experience people involved in illegal demonstrations use social media to organize planned events. It is your affiant's belief the demonstration was organized prior to 07/31/21.

Your Affiant has checked and verified that the service for the target identified as https://www.facebook.com/chinookcenter is provided by Facebook, Inc . Your Affiant has received training in conducting investigations involving social networking and cellular communications service providers such as Facebook, Inc. Your Affiant has personal knowledge that Facebook, Inc will accept service of Search Warrants issued from other states and will comply with orders of the Court to provide records as requested pursuant to provisions of the United States Electronics Communications Privacy Act, 18 U.S.C. § 2703.

Your affiant would respectfully request that pursuant to the Stored Communications Act, Title 18 USC 2703(c), specific and articulable facts have been shown to reasonably believe the target https://www.facebook.com/chinookcenter, service provider, Facebook, Inc, for which records are being sought is of relevant interest in the offense shown.Therefore, based on the above described facts and circumstances, Your Affiant respectfully moves the Court for issuance of a search warrant for search of those person(s), property and/or premises known as: **Facebook, Inc, 1601 Willow Road, Menlo Park, CA 94025, Target Identifier: https://www.facebook.com/chinookcenter**.

Applicant: [signature] #2771
B. K. Steckler 2771

Employed By: Colorado Springs Police Department

Position: Detective

This affidavit was sworn and subscribed before me this day AUG 03 2021

Magistrate / Judge: [signature]

Appellate Case: 24-1201 Document: 010111098653 Date Filed: 08/21/2024 Page: 122

| | |
|---|---|
| (DISTRICT) (COUNTY) COURT, EL PASO COUNTY COLORADO<br>Court Address: 270 South Tejon Street<br>Colorado Springs, Colorado 80903 | |
| RE: Search Warrant of<br>**Facebook, Inc**<br>**1601 Willow Road, Menlo Park, CA 94025**<br><br>**Target Identifier: https://www.facebook.com/chinookcenter** | ▲COURT USE ONLY▲<br>Case/File Number: |
| Agency Name: Colorado Springs Police Department Agency Number: 21-28345 | Division:**Criminal** Ctrm: |

## ATTACHMENT B

The following person(s), property and/or premise(s) will be searched for and, if found, seized:

All subscriber information tied to Facebook profile: https:www.facebook.com/chinookcenter to include names, phone numbers, and addresses.

All Facebook posts for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.

All Facebook Messenger chats tied to Facebook profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.

All Facebook Events for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.

---

Pursuant to 18 U.S.C. § 2705(b) this Court Orders that: Facebook, Inc

The target user account(s) identified above; subscriber: ☐ ~~MAY~~ be notified

☒ MAY NOT be notified

~~Magistrate~~ / Judge: [signature]

NO OTHER ITEMS ARE SOUGHT FOR SEIZURE

Supervisor Initials / IBM: ____________

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:23-cv-01951-SKC-MDB

JACQUELINE ARMENDARIZ and
CHINOOK CENTER,

Plaintiffs,

v.

CITY OF COLORADO SPRINGS,
DANIEL SUMMEY, in his individual capacity,
B.K. STECKLER, in his individual capacity,
JASON S. OTERO, in his individual capacity,
ROY A. DITZLER, in his individual capacity,
FEDERAL BUREAU OF INVESTIGATION, and
UNITED STATES OF AMERICA.

---

**ORDER ON MOTIONS TO DISMISS (DKTS. 49, 50, 51, 52)**

---

Before the Court are four separate motions to dismiss the First Amended Complaint (FAC). Dkts. 49, 50, 51, and 52.[1] The FAC alleges six claims for relief. Dkt. 12. The first Motion to Dismiss is by Defendants Daniel Summey, the Federal Bureau of Investigation, and the United States. Their Motion (Dkt. 49) seeks dismissal of Claims 1, 4, and 6. The second Motion to Dismiss is by Defendant Roy Ditzler. His

[1] The Court uses "Dkt. __" to refer to entries from the CM/ECF electronic docket. All references to page numbers within an electronic docket entry are to the page number found in the CM/ECF blue-font header.

Motion (Dkt. 50) seeks dismissal of Claims 1 and 4, and he also joins in the first Motion to Dismiss. The third Motion to Dismiss is brought by Defendants B.K. Steckler and Jason Otero. Their Motion (Dkt. 51) seeks dismissal of Claims 2, 3, and 5. The fourth and final Motion to Dismiss is brought by Defendant City of Colorado Springs. Its Motion (Dkt. 52) seeks dismissal of Claims 1, 2, and 3.

The Motions to Dismiss are all fully briefed. The Court requested additional briefing related to the individual law enforcement defendants' claims of qualified immunity. Dkt. 93. The Court has carefully considered the Motions and their full briefing, the additional briefing submitted in compliance with the Court's order, and relevant legal authorities. No hearing is necessary.

As explained in detail below, because the FAC fails to plausibly allege a constitutional violation, the First and Second Claims for Relief are barred against Defendants Summey, Ditzler, Steckler, and Otero, based on their qualified immunity. Those claims correspondingly fail against the City because there can be no municipal liability in the absence of a constitutional violation. The Third Claim for Relief against Defendants Steckler, Otero, and the City fails for similar reasons considering the FAC's failure to plausibly plead a constitutional violation regarding the Facebook Warrant. The Sixth Claim for Relief against Defendant FBI fails because the FAC does not plausibly plead a Fourth Amendment violation for the return of copies of records obtained with a lawful search warrant. And because all the federal law claims fail, the Court declines to exercise supplement jurisdiction over the state law claims—

Claims 4 and 5, and the Court additionally lacks subject matter jurisdiction over Claim 4 as asserted against the United States. The Motions to Dismiss are thus GRANTED.

**BACKGROUND**

This background is taken from the well-pleaded factual allegations in the FAC, which the Court accepts as true and views in the light most favorable to Plaintiffs. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010). The individual defendants are all law enforcement personnel employed by Defendant City of Colorado Springs. The Court sometimes refers to Defendants Summey, Steckler, Otero, and Ditzler as the Law Enforcement Defendants or LEDs. The case arises out of the LEDs' actions following a housing rights march in Colorado Springs on July 31, 2021. Dkt. 12 at ¶3. Plaintiff Chinook Center and several other groups helped organize the march. *Id.* Plaintiff Jacqueline Armendariz marched at the event, along with prominent Chinook Center members and other activists concerned about the local housing crisis. *Id.*

Ultimately, a commander from the Colorado Springs Police Department ordered arrests of prominent Chinook Center members for marching in the street even after they complied with police requests to move onto the sidewalk. *Id.* at ¶¶4, 40. The arrests included Chinook Center leader Shaun Walls who had been at the front of the march carrying a white flag with the Chinook Center logo. *Id.* at ¶41.

Plaintiff Armendariz was also eventually arrested. During the march, she was walking her bicycle in the bike lane near the front of the march when police tackled Walls, which she witnessed. *Id.* at ¶42. When she saw another officer in riot gear running towards her, she dropped her bike. *Id.* The bike landed between her and the officer. *Id.* The officer avoided the bike and continued toward the protestors. *Id.* The encounter was captured on multiple police body-worn cameras and a police department overhead drone. *Id.*

Although officers did not arrest Armendariz at the scene, they subsequently decided that dropping the bicycle in front of the officer was a case of felony attempted aggravated assault on a police officer, identified as Officer Anthony Spicuglia. *Id.* at ¶43. Defendant Summey was assigned the task of identifying the person who committed the alleged offense. *Id.* at ¶57. He pored over officer body worn camera, drone footage, and conducted multiple internet searches. *Id.* He found photographs and other information showing that Armendariz was the person who dropped her bike in front of the officer at the housing march. *Id.* He also found information indicating that she had been politically active and had some connection to the Chinook Center. *Id.*

On August 6, 2021, Summey submitted an affidavit to obtain an arrest warrant for Armendariz. *Id.* At the same time, he submitted, and Defendant Ditzler approved, an affidavit to obtain a search warrant to search Armendariz's home and seize the items they determined she was wearing or using at the housing march. *Id.* at ¶¶160,

162, 200; *see also* Dkt. 49-1. The warrant included the seizure of all "digital media storage devices" associated with Armendariz, including all "phones, computers, tablets, thumb drives, and external hard drives" found in her home. Dkt. 12 at ¶88; Dkt. 49-1 at p.18. When officers arrested Armendariz outside her home on August 18, 2021, they searched her home and seized items specified in the warrant. Dkt. 12 at ¶¶89-94.

On August 20, 2021, after conclusively determining that Armendariz was the person who dropped her bike in front of the officer at the rally, Summey submitted a second affidavit to obtain a warrant to search Armendariz's three cell phones, her two computers, and her external hard drive. *Id.* at ¶95. Summey's affidavit to search the devices repeated the litany of conclusions from his arrest affidavit and his affidavit to seize the devices, but also added more, including specified key words to use to search the electronic devices. *Id.* at ¶¶95-96. Ditzler reviewed and approved Summey's warrant application and affidavit for the search of Armendariz's devices. *Id.* at ¶¶160, 162, 200.

The police department enlisted the help of the FBI to search, seize, and copy Armendariz's electronic devices. *Id.* at ¶¶126-28. The FBI continues to retain copies of the data. *Id.* at ¶129. Armendariz ultimately reached a plea agreement for obstructing a peace officer, received a deferred judgment, and successfully served six months of unsupervised probation. Dkt. 12 at ¶119.

As for Plaintiff Chinook Center, a few days after the housing demonstration, police sought a search warrant for "All Facebook Messenger chats tied" to the Chinook Center Facebook page. Dkt. 12 at ¶45; *see also* Dkt. 51-1. Steckler drafted, and Otero reviewed and approved, the affidavit submitted to the state district court in support of the warrant. Dkt. 12 at ¶55. The warrant was served on Facebook, which complied with it. *Id.* at ¶56.

Plaintiffs bring six claims for relief, asserted as follows:

| PLAINTIFF | CLAIM | DEFENDANTS |
|---|---|---|
| Armendariz | **First Claim for Relief:** unlawful search and seizure in violation of First and Fourth Amendments; 42 U.S.C. § 1983 | Summey<br>Ditzler<br>City of Colorado Springs |
| Chinook Center | **Second Claim for Relief:** unlawful search and seizure in violation of First and Fourth Amendments; 42 U.S.C. § 1983 | Steckler<br>Otero<br>City of Colorado Springs |
| Chinook Center | **Third Claim for Relief:** unlawful search in violation of Stored Communications Act | Steckler<br>Otero<br>City of Colorado Springs |
| Armendariz | **Fourth Claim for Relief:** Deprivation of Rights in violation of Colo. Const. Art. II §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131 | United States[2]<br>Ditzler |
| Chinook Center | **Fifth Claim for Relief:** Deprivation of Rights in violation of Colo. Const. Art. II §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131 | Steckler<br>Otero |

[2] In a prior order (Dkt. 62), the Honorable Magistrate Judge Maritza Dominguez Braswell granted the United States' Motion to substitute itself as a party for Summey as to Claim 4.

| | | |
|---|---|---|
| Armendariz | **Sixth Claim for Relief:** injunctive relief under First[3] and Fourth Amendments; 5 U.S.C. § 702 | FBI |

## LEGAL PRINCIPLES

### A. Motions under Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While the Court accepts the well-pleaded facts as true and views the allegations in the light most favorable to the non-movant, the Court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (cleaned up).

The *Twombly/Iqbal* pleading standard requires courts to take a two-prong approach to evaluating the sufficiency of a complaint. *Iqbal*, 556 U.S. at 678–79. The first prong requires the court to identify which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id.* at 678. The second prong requires the court to

[3] *See infra* n.9.

assume the truth of the well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "Accordingly, in examining a complaint under Rule 12(b)(6), [courts] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). Conclusory allegations are those that express "a factual inference without stating the underlying facts on which the inference is based." Black's Law Dictionary (11th ed. 2019); *see also Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) (Conclusory allegations fail to apprise defendants "of the conduct that forms the basis of the charges against them."); *Morris v. Thaler*, 425 F. App'x 415, 421 (5th Cir. 2011) (Conclusory allegations are "vague, lacking in specifics, or amount to mere recitations of the relevant legal standards without any supporting factual narrative.").

**B. Qualified Immunity**

Qualified immunity shields individual defendants in Section 1983 actions unless their conduct was unreasonable based on clearly established law. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). The court has discretion to consider these prongs in any order. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011).

Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Raising the qualified immunity defense with a motion under Rule 12(b)(6) subjects the defendant to a more challenging standard than what applies at the summary judgment stage. *Id.* "At the motion to dismiss stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness." *Id.* (cleaned up). The court must consider whether the facts alleged in the complaint plausibly allege a violation of a constitutional right, and whether the right at issue was clearly established. *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013).

And because the Section 1983 claims here involve allegations of unconstitutional search and seizure warrants obtained and executed by law enforcement, the Court may also consider the warrants and their supporting affidavits because these documents are alleged in the FAC, they are central to Plaintiff's Section 1983 claims, and no party has raised a dispute about their authenticity. *See N. Arapaho Tribe v. Becerra*, 61 F.4th 810, 814 (10th Cir. 2023). Any "factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir.1997).

"Qualified immunity applies equally to reasonable mistakes of law and fact." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014). When a defendant raises qualified immunity in defense of an unlawful search and seizure claim, courts examine whether the defendant violated clearly established law by determining whether the officer's conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists. *Id.* at 1141. This is known as "arguable probable cause." *Id.* A defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed for the search or seizure. *Id.*

Further, "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). But the inquiry doesn't end there. Qualified immunity should not be granted when the officer seeking the warrant misrepresented or omitted material facts to the judge rising to the level of a deliberate falsehood or reckless disregard for the truth. *Stonecipher*, 759 F.3d at 1142. Or, when it is obvious no reasonably competent officer would have concluded a warrant should issue, such as when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt*, 565 U.S. at 547 (internal quotations and citation omitted). But the threshold to establish the latter is high—the Supreme Court has explained that in the ordinary course, "an officer cannot be

expected to question the magistrate [judge]'s probable-cause determination" because it is the judge's "responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.* (quoting and citing *United States v. Leon*, 468 U.S. 897, 921 (1984)).

## ANALYSIS

Plaintiffs sued Summey, Steckler, Otero, and Ditzler, each in their individual capacity for their respective roles in securing one or more of the warrants alleged in the FAC. The LEDs each claim qualified immunity on Plaintiffs' First and Fourth Amendment claims (Claims 1 and 2). The Court first addresses application of qualified immunity to the Fourth Amendment claims.

### A. Qualified Immunity and the FAC's Fourth Amendment Claims

#### 1. Summey and the Armendariz Warrants

The Court first considers whether the FAC plausibly alleges Summey violated a constitutional right by obtaining and executing Warrant 1 (home search and seizure) and Warrant 2 (device search and seizure). Because the Court finds the FAC fails to plausibly allege a constitutional violation respecting Summey and the Armendariz Warrants, he is entitled to qualified immunity.

The Fourth Amendment's warrant requirement provides "no Warrants shall issue, but upon probable cause," and a warrant must "particularly [describe] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The

warrant must "describe the things to be seized with sufficient particularity to prevent a 'general, exploratory rummaging in a person's belongings.'" *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). The Fourth Amendment also requires "the scope of the warrant be limited to the specific areas and things for which there is probable cause to search." *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988).

Whether probable cause exists is a "flexible, common-sense standard, and no single factor or factors is dispositive." *United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir. 2018) (cleaned up). It "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). Generally, a reviewing court should give great deference to a neutral judge's determination of probable cause who approved the warrant. *See United States v. Leon*, 468 U.S. 897, 914 (1984).

Probable cause exists only when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). There must be a "nexus . . . between suspected criminal activity and the place to be searched." *United States v. Mora*, 989 F.3d 794, 800 (10th Cir. 2021) (quoting *United States v. Biglow*, 562 F.3d 1272, 1278 (10th Cir. 2009)). A finding of probable cause also considers the totality of the information in any affidavit attached to, and incorporated into, the warrant. *See United States v. Suggs*, 998 F.3d 1125, 1135 (10th Cir. 2021).

**a. Violation of a Constitutional Right**

The Court has examined Warrants 1 and 2 and Summey's supporting affidavits. *Eckert v. Dougherty*, 658 F. App'x 401, 411 n.1 (10th Cir. 2016) (taking judicial notice of warrant application and search warrant, even though they were not submitted by the plaintiff, to review a motion to dismiss based on qualified immunity); *Rathbun v. Montoya*, 628 F. App'x 988, 990 n.2 (10th Cir. 2015) (considering motion to dismiss based on qualified immunity and drawing facts from the search warrant and supporting affidavit referenced in the amended complaint). The Court finds the Armendariz Warrants have sufficient indicia of probable cause and particularity to support their issuance and execution.

Warrant 1 is a packet consisting of a completed Application and Affidavit for Search Warrant, Attachment A ("Affidavit 1"), and Attachment B which lists the items to be seized. Dkt. 49-1. According to Affidavit 1, Summey was investigating Armendariz for a violation of Colo. Rev. Stat. § 18-2-101, criminal attempt – second degree assault (a class five felony), for her alleged attempted assault of Officer Spicuglia with her bicycle. *Id.* at p.17. Summey was tasked with helping detectives identify "a female that attempted to strike [Officer Spicuglia] with a bicycle as he ran to assist other police officers who were attempting to take Shaun Walls into custody." *Id.* at p.4.

Warrant 1 sought entry into Armendariz's home to search and seize property that was or had "been used as a means of committing" the crime or that "[w]ould be

material evidence in a subsequent criminal prosecution[.]" *Id.* at 49-1 at pp.1, 2. More specifically, and in pertinent part, it sought the seizure of "Digital media storage devices, to include phones, computers, tablets, thumb drives, and external hard drives found to be associated with Jacqueline Armendariz." *Id.* at p.18.

Affidavit 1 describes Summey's observations of the alleged assault as seen from another officer's body camera and it contains multiple still photo images of the alleged assault from drones or other cameras. *Id.* at pp.4-10. The affidavit also describes Summey's identification of Armendariz through her active use of multiple social media sites, to include Facebook, a personal Twitter handle, a professional Twitter profile, and LinkedIn. *Id.* at pp. 11-15. Her Facebook post from July 3, 2021, includes what appears to be a "selfie" of Armendariz while wearing the same or similar bicycle gear she wore during the protest leading to her arrest. Dkt. 49 at p. 12; Dkt. 49-1 at p.11. The affidavit also describes her association with Shaun Walls, who was the individual Officer Spicuglia was running to arrest when Armendariz is alleged to have attempted to assault the officer with her bicycle. *Id.* at p.10.

The Court finds this information alone establishes probable cause for the search and seizure of the items listed in Warrant 1. As concerns Armendariz's digital devices that were the subject of Warrant 1, based on the evidence of her use of social media, her social media connection to Walls, the selfie she took and posted to Facebook days before the protest while out on her bike, and her other various posts referencing her social activism, it was reasonable for Summey to believe there was

probable cause that material evidence for use in a subsequent prosecution of the alleged crime would be found on those devices. *See Messerschmidt*, 565 U.S. at 1248-49 (noting the Fourth Amendment allows a search for evidence that will aid in a particular conviction such as evidence that helps to establish motive); *Andresen v. Maryland*, 427 U.S. 463, 483-84 (1976) (although a warrant authorized only search and seizure of evidence relating to a crime involving one described property lot, the seizure of documents pertaining to another lot in the same subdivision was allowed because it was relevant to the target's intent to defraud); *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 3749449, at *17 (N.D. Cal. Sept. 22, 2010) ("Certainly, the Ginn affidavit established that there was probable cause to seize cell phone records in relation to the Estrada homicide—records that may have offered insight into the motive, execution, cover-up, and publicity of the homicide.").

Warrant 2 is also comprised of an Application and Affidavit for Search Warrant, Attachment A ("Affidavit 2"), and Attachment B which lists the items to be seized. Dkt. 49-2. Affidavit 2 contains all the information from Affidavit 1, in addition to a description of the items law enforcement seized from their execution of Warrant 1. And in the Affidavit 2, Summey indicates he learned that Armendariz sent her employer digital media of the protest. *Id.* at p.19.

Affidavit 2 also contains averments about Summey's claimed awareness of the "Chinook Center [as] an anarchist or anti-government organization" whose members have promoted protests that turned violent in the past; purported ties between

Armendariz and the Chinook Center and its founders, including Walls; numerous descriptions of Walls' social activism including his calling for "violence against police officers and their families;" and a "pattern of protest activity that has turned illegal associated with the Chinook Center and Chinook Center member organizations." Dkt. 49-2 at pp.20-27.

Summey also stated the following in Affidavit 2:

> Your Affiant would note that Walls actively resisted arrest, and it appears Armendariz attempted to assault a uniformed police officer at (sic) protest march that was sponsored by Chinook Center that turned unlawful. Your Affiant would note there appears to be a close relationship that exists between Walls and Armendariz, wherein they are friends on social media, Armendariz attended an event that Walls promoted on social media, and she attempted to assault an officer who was attempting to take Walls into custody.

*Id.* at p.25. Summey sought permission to search the digital devices recovered from Armendariz's person and residence during the execution of Warrant 1, and to seize "any photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation." *Id.* at p.27. He claimed this "time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer." *Id.*

He also requested permission to perform a key word search of the devices using specified terms stating "these terms would be relevant to the investigation regardless of the time period in which they occurred:" "Police, officer, cop, pig, bike, bicycle,

attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Shaun, Walls[.]" *Id.* at pp.27 and 29.

The Court also finds Warrant 2 was supported by arguable probable cause for the search of the specified electronic devices and using the proposed search terms. *See Stonecipher*, 759 F.3d at 1141 ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."). The factual averments Summey lays out in both warrants are colored by his descriptions of what he either knows from, or has encountered based on, his training and experience, which is an appropriate consideration bearing on probable cause. *See, e.g.*, *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009) ("Our reading of the scope of the 'computer records' subject to search, narrowing it to looking for drug related evidence, comes from the text of the warrant . . . coupled with the specifics of the supporting affidavit[.]"); *United States v. Spruell-Ussery*, No. 22-cr-20027-01, 2023 WL 7696546, at *6 (D. Kan. Nov. 15, 2023) (officer's professional experience may serve as a source of probable cause). And notably, both warrants experienced two levels of approval, first by Summey's supervisor and then by a neutral judicial officer who found probable cause and signed the warrants. Dkt. 49-1 at p.1; Dkt. 49-2 at p.2; *Messerschmidt*, 565 U.S. at 555 ("The fact that the officers secured these approvals is certainly pertinent in

assessing whether they could have held a reasonable belief that the warrant was supported by probable cause.").

Both warrants also meet the particularity requirement. The purpose of particularity "is to establish practical guidelines about what can be searched and seized, leaving nothing to the discretion of the officers executing the warrant." *United States v. Palms*, 21 F.4th 689, 698 (10th Cir. 2021). The Fourth Amendment requires warrants for computer searches to "affirmatively limit the search to evidence of specific . . . crimes or specific types of material." *Id.* (cleaned up). But "practical accuracy rather than technical precision" is what matters. *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (internal quotations and citations omitted). For example, search warrants need not identify a specific criminal statute under investigation for them to possess the requisite particularity. *Palms*, 21 F.4th at 698-99. Nor do warrants involving computer searches have to contain "a particularized computer search strategy." *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005).

Warrants 1 and 2 are sufficiently particular. Both attached and incorporated by reference Affidavits 1 and 2, respectively. Dkt. 49-1 at p.1; Dkt. 49-2 at p.1. Both Affidavits referenced the specific criminal statute under investigation—*i.e.*, Colo. Rev. Stat. § 18-2-101. Dkt. 49-1 at p.17; Dkt. 49-2 at p.18; *cf. Palms*, 21 F.4th at 698–99 ("To be sufficiently particular, search warrants do not have to identify specific statutes for the crimes to which they are limited."). Warrant 1 identified the specific

residential premises to be searched and requested the seizure of specific items listed in Attachment B and "used as a means of committing a criminal offense" or that would be "material in a subsequent criminal prosecution[.]" Dkt. 49-1 at pp.1, 17 ("The above mentioned items would be material evidence in the subsequent prosecution of Armendariz for attempting to assault Officer Spicuglia."), 18.

Warrant 2 identified six different electronic devices seized during the first search and requested to seize from those devices "material evidence in a subsequent criminal prosecution[.]" Dkt. 49-2 at p.1. And Warrant 2 is limited to a three-month period (6/5/2021 to 8/7/2021) for the seizure of certain tangible items and uses specified key words to limit the forensic search of the seized electronic devices. *Palms*, 21 F.4th at 698 ("Such a broad authorization is permissible under our precedent, so long as the warrant contained some 'limiting principle.'") (citing *United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017)). The supporting affidavit, Affidavit 2 sought permission to perform a key word search of the seized devices using at least 24 specified search terms. *Id.* at p.28. Its Attachment B listed those key words and noted no time frame applied to the key word search because "these terms would be relevant to the investigation regardless of the time period in which they occurred." Dkt. 49-2 at p.29. Attachment B also listed tangible items to be seized, including: "Photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this

investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer." *Id.*

Plaintiff raises Summey's arguably self-serving descriptions of certain facts and events in his supporting affidavits—such as his references to "illegal" protest activity; his positing that red flags symbolize socialism and communism; his conclusion that Armendariz uses "yt" to disparage white people; and his conclusion that Armendariz is "active politically"—to argue these demonstrate the unlimited bounds of the Warrants. *See generally* Dkt. 60. But those descriptions and characterizations, whether or not accurate or self-serving, are not material to the finding of probable cause or particularity for the reasons stated above. *See also Messerschmidt*, 565 U.S. at 546 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.") (cleaned up).

For these reasons, the FAC fails to plausibly allege a violation of the Fourth Amendment against Summey, entitling him to qualified immunity. *See Eckert*, 658 F. App'x at 401 (affirming trial court's dismissal of Section 1983 Fourth Amendment claim and finding of qualified immunity where facts described in affidavit supporting search warrant amounted to probable cause).

**b. A Clearly Established Right**

To be sure, even assuming there was a violation of Armendariz's Fourth Amendment rights, the Court agrees with Summey that Plaintiff has failed to discern any clearly established law. Plaintiff has not adduced Tenth Circuit or Supreme Court precedent, or a clear weight of authority from other courts, clearly establishing that an officer violates the Fourth Amendment when they specify a criminal statute under investigation in a search and seizure warrant, include limiting principles in the warrant around the criminal statute or criminal conduct under investigation, and have that warrant approved first by a supervisor and second by a neutral judicial officer who found probable cause.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). This means the law cannot merely be implicated by applicable precedent; instead, "the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (cleaned up); *see also Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6 (2021) (Supreme Court precedent does not require a case directly on point but does require a case that places the constitutional question beyond debate; the inquiry is in the specific context of the case and not general propositions). This level of specificity is particularly important in Fourth Amendment cases where it is "'sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer

confronts.'" *City of Tahlequah*, 595 U.S. at 12-13 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (the clearly established right must be defined with specificity particularly in the Fourth Amendment context); *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) ("While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate.") (cleaned up).

Armendariz argues in her Response that her "right to be free from unreasonable searches and seizures was clearly established when Defendants prepared and obtained the warrants at issue." Dkt. 60 at p.24. No doubt. But this formulation defines the clearly established right at the too-high-level of generality the Supreme Court shuns. *City of Tahlequah*, 595 U.S. at 12. The right at issue in this case is more particularized. *City of Escondido, Cal.*, 139 S. Ct. at 503; *D.C.*, 583 U.S. at 64.

This is principally true when considering Supreme Court and Tenth Circuit precedent holding that "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in 'objective good faith.'" *Messerschmidt*, 565 U.S. at 546 (2012); *see also Stonecipher*, 759 F.3d at 1142-43. This is particularly apt where, as here, there is insufficient pleading that the officer who sought the warrant misrepresented or omitted material facts to the judge rising to the level of a deliberate

falsehood or reckless disregard for the truth, or that the warrant was so obviously lacking in probable cause that no reasonably competent officer would have concluded a warrant should issue. *See Messerschmidt*, 565 U.S. at 547; *Stonecipher*, 759 F.3d at 1142-43; *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. [T]he challenger's attack must be more than conclusory[.]").

Based on the above, Armendariz has failed to show Summey's conduct violated clearly established law, further entitling him to qualified immunity on the First Claim for Relief. *See Cuervo v. Salazar*, No. 20-CV-0671-WJM-GPG, 2021 WL 1534607, at *9 (D. Colo. Apr. 19, 2021) (dismissing Fourth Amendment claim where plaintiff failed to demonstrate defendants violated a clearly established right in conducting the search of her property and thus failed to meet her burden to overcome the defense of qualified immunity).

**2. Ditzler and the Armendariz Warrants**

Defendant Ditzler reviewed and approved Warrants 1 and 2 prior to their approval by the judges.[4] Dkt. 12 at ¶¶160-63. The FAC fails to plausibly allege a

[4] The FAC inconsistently pleads that Steckler approved one or more of the Armendariz Warrants. *Compare* Dkt. 12 at ¶¶87, 113 (referring to Steckler's approval), *with* ¶¶160-63, 200 (referring to Ditzler's approval). But the inconsistency is of no matter because the documents themselves show they were approved by Ditzler. Dkt. 49-1 at p.3 (initialed by "RAD"); Dkt. 49-2 at p.5 (same); *see also* Dkt. 50 n.1.

constitutional violation against him for the same reasons discussed above concerning Summey. Thus, Ditzler also enjoys qualified immunity.

**3. Steckler and the Chinook Facebook Warrant**

The Court has examined the Facebook Warrant and Steckler's supporting affidavit. Dkt. 51-1. The Facebook Warrant is a packet consisting of a completed Application and Affidavit for Search Warrant, Attachment A ("Steckler Affidavit"), and Attachment B which lists the items to be seized. *Id.* The Facebook Warrant attaches and incorporates the Steckler Affidavit and Attachment B by reference. *Id.* at p.1.

According to the Steckler Affidavit, Steckler was investigating arrests made for "Obstructing Passage or Assembly, and Resisting, Interference with a Public Official" that occurred during a protest involving approximately 60 individuals on July 31, 2021. Dkt. 51-1 at p.3. He received an "anonymous tip" on August 2, 2021, regarding a Facebook post from the date of the protest under the name of Shaun Walls (who was arrested). The following day Steckler "became aware" of two more Facebook profiles "that had bearing on this case." *Id.* at p.4. One of the profiles contained pictures and videos from the protest and included photos of Walls being arrested. *Id.*

Detective Granillo alerted Steckler to the second Facebook profile, which was under the name Chinook Center and "in which the protest was organized under the events tab." *Id.* Steckler went to Chinook's Facebook page and "was able to see details

regarding a 'March for Housing' set for 07/31/21 . . . ." *Id.* Steckler went on to aver he believed "the information gained from the two Facebook profiles will be material evidence in this case. It is your affiant's experience people involved in illegal demonstrations use social media to organize planned events. It is your affiant's belief the demonstration was organized prior to 07/31/21." *Id.*

His affidavit cites 18 U.S.C. § 2703 as the basis for his warrant request, and Steckler avers that "specific and articulable facts have been shown to reasonably believe the target [Facebook URL], service provider, Facebook, Inc., for which records are being sought is of relevant interest in the offense shown." *Id.* Attachment B identifies the items to be seized as:

> All subscriber information tied to Facebook profile: https:www.facebook.com/chinookcenter to include names, phone numbers, and addresses.
>
> All Facebook posts for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Messenger chats tied to Facebook profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Events for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.

*Id.* at p.5. And the warrant states there is probable cause to believe the information to be seized "[w]ould be material evidence in a subsequent criminal prosecution[.]" *Id.* at p.1.

Steckler sought the Facebook Warrant under 18 U.S.C. § 2703(c), which allows a governmental entity to "require a provider of electronic communication service or

remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity" either obtains a search warrant or a court order for disclosure. *See* 18 U.S.C. § 2703(c)(1)(A) (regarding a warrant); *id.* §§ 2703(c)(1)(B) (regarding a court order for disclosure). The latter is a lower standard than the probable cause required for issuing a warrant. *United States v. Herron*, 2 F. Supp. 3d 391, 401 (E.D.N.Y. 2014); *United States v. Cooper*, No. 13-CR-00693-SI-1, 2015 WL 881578, at *4 n.3 (N.D. Cal. Mar. 2, 2015); *United States v. Mack*, No. 3:13-CR-00054 MPS, 2014 WL 6085306, at *1 (D. Conn. Nov. 13, 2014).

Under either standard, the Court finds the Facebook Warrant meets it. After Walls and others were arrested during the protest on July 31, 2021, Steckler was investigating "Obstructing Passage or Assembly, and Resisting, Interference with a Public Official" related to those arrests. He had evidence of Walls' and others' use of Facebook to post information about the July 31 protest that resulted in multiple arrests, including evidence that Chinook organized and had details about the protest on the events tab on its Facebook account. On these facts alone, it was objectively reasonable for Steckler to believe there was probable cause that material evidence for use in a subsequent prosecution(s) involving those arrested would be found within the subscriber information, posts, messenger chats, and events tab of the Chinook Facebook profile.

The Facebook Warrant is also sufficiently particular. It is limited to evidence involving specific arrests for specific infractions all occurring on July 31, 2021, and Attachment B further limits the information sought to a seven-day period of July 27 to August 2, 2021. *Matter of Search of Kitty's E.*, 905 F.2d at 1374 (stating "there is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized.") (internal quotations and citation omitted). And like the Armendariz Warrants discussed above, Steckler presented the Facebook warrant first to a supervisor for approval and second to a judge who reviewed and approved the warrant, finding probable cause. Dkt. 51-1; Dkt. 12 at ¶177.

For these reasons, the FAC fails to plausibly allege a violation of the Fourth Amendment against Steckler entitling him to qualified immunity. In the alternative, Chinook has also failed to adduce clearly established law for the reasons discussed above regarding the Armendariz Warrants.

**4. Otero and the Facebook Warrant**

Defendant Otero reviewed and approved the Facebook Warrant prior to its submission to the judge. Dkt. 12 at ¶177. The FAC fails to plausibly allege a constitutional violation against him for the same reasons discussed above concerning Steckler. Thus, Otero also enjoys to qualified immunity.

**B. Qualified Immunity and the FAC's First Amendment Claims**

The FAC alleges the Armendariz and Facebook Warrants also violated the First Amendment. It alleges the warrants were obtained as an action of retaliation against Plaintiffs and that the warrants swept up "First Amendment-protected information" and "expressive and associational materials." Dkt. 12 at ¶¶151-52, 172-73.

To establish a § 1983 retaliation claim alleging a violation of the First Amendment, a plaintiff must plead and prove (1) she was engaged in a constitutionally protected activity; (2) the defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's actions were substantially motivated as a response to her exercise of her First Amendment speech rights. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). In the paradigm of cases involving alleged retaliatory arrests or retaliatory prosecutions based on the First Amendment, the Supreme Court has held the lack of probable cause is also a required element of these retaliation claims. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723-25 (2019) (retaliatory arrest); *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006) (retaliatory prosecution). Other district courts have applied this requirement to pleading claims for retaliatory searches. *See Chavez v. City of Albuquerque*, No. 13-cv-557, 2014 WL 12796875, at *3 (D.N.M. Apr. 14, 2014) ("[T]he Court believes that the reasoning set forth in *Hartman* applies equally to this situation. . . . Therefore, . . . a plaintiff claiming that a search

warrant was executed in retaliation for a protected activity is required to show a lack of probable cause as an element of that claim."); *see also Hall v. Putnam Cnty. Comm'n*, No. 22-cv-0277, 2024 WL 559603, at *10 (S.D.W. Va. Feb. 12, 2024).

The Court finds these authorities persuasive and agrees that the reasoning in *Hartman* for requiring pleading the lack of probable cause in a retaliatory prosecution case applies equally to a claim of a retaliatory search especially where, as here, the searches were conducted based on warrants approved by neutral judicial officers.[5] *Hartman*, 547 U.S. at 261-62 (discussing the absence of probable cause is a necessary showing in part because "the defendant will be a nonprosecutor, an official, like an inspector here, who may have influenced the prosecutorial decision but did not himself make it[.]"); *see also Nieves*, 139 S. Ct. at 1725 (discussing the need for a showing of the absence of probable cause in a retaliatory arrest case in part because "policing certain events like an unruly protest would pose overwhelming litigation risks. Any inartful turn of phrase or perceived slight during a legitimate arrest could land an officer in years of litigation.").

---

[5] The cases Plaintiffs rely on for the proposition that warrants must describe the things to be seized with "scrupulous exactitude" pertain to situations where the basis for the search and seizure was the ideas or speech itself. *See Stanford v. Texas*, 379 U.S. 476, 485 (1965); *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1372–73 (10th Cir. 1990). The FAC here fails to plausibly plead the basis of the warrants in this case was in and of itself the ideas, speech, or associations of either Plaintiff versus the alleged criminal statutes or criminal conduct under investigation.

For the reasons discussed above, the FAC fails to plausibly plead the absence of probable cause regarding the Armendariz and Facebook Warrants.[6] *Frey v. Town of Jackson*, 41 F.4th 1223, 1238 (10th Cir. 2022) ("Even accepting Plaintiff's allegations as true that retaliatory animus motivated officers in whole or in part when they prolonged Plaintiff's detention, probable cause still supported the detention."). The FAC's numerous allegations that the warrants lacked probable cause are conclusory, particularly after this Court's review of the warrants. *GFF Corp.*, 130 F.3d at 1385 ("factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true.").

[6] The Court requested additional briefing from the parties (Dkt. 93) regarding a case they did not discuss which appeared to the Court may be applicable to the matters at hand. Dkt. 93 (citing *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642 (10th Cir. 1988). The parties' submissions were appreciated and informative. But based on the Court's analysis herein, it has determined *Pueblo Neighborhood Health Centers* is not applicable to the circumstances of this case. *See, e.g., Davis v. Gracey,* 111 F.3d 1472, 1484 (10th Cir. 1997) ("We have held in our discussion of plaintiffs' constitutional claim that plaintiffs' inference of subjective bad faith in the officers' omission of information from the affidavit does not eliminate the officers' ability to rely on a valid warrant supported by probable cause."); *see also Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) ("Our cases have repeatedly rejected this approach [of considering officers' subjective motivations]. An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify [the] action." (cleaned up; emphasis and bracketed text in original); *New York v. P.J. Video, Inc.*, 475 U.S. 868, 875 (1986) ("We think, and accordingly hold, that an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally.").

Nor does the FAC allege any similarly situated individuals were treated differently than either or both Plaintiffs. *See, e.g., id.* at 1232 ("[W]hen pursuing a claim for retaliatory arrest against a law-enforcement officer, a plaintiff must plead either that the officer lacked probable cause to arrest or that the officer historically has not arrested similarly situated people who were not engaged in the same type of speech.") (citing *Nieves*, 139 S. Ct. at 1726-27). Indeed, it in fact appears to allege the opposite. *See* Dkt. 12 at ¶¶130-47.

For these reasons, the FAC fails to allege a plausible violation of the First Amendment by the LEDs, further entitling them to qualified immunity on the First and Second Claims for Relief, respectively.

**C. The City's Municipal Liability Re: the First and Fourth Amendments**

Plaintiffs' First and Second Claims for Relief as against the City are based on a theory of municipal liability. Dkt. 12 at ¶¶130-47, 165, 182; *see Monell v. Department of Social Services*, 436 U.S. 658 (1978). Because the Court has found the FAC fails to plausibly allege a constitutional violation by the LEDs, it necessarily means the FAC fails to state plausible First and Fourth Amendment claims against the City. *Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established . . . that a municipality cannot be held liable under section 1983 for the acts of an employee if [the] employee committed no constitutional violation.").

**D. Third Claim for Relief Alleging a Violation of the Stored Communications Act (SCA)**

Based on this Court's above-conclusion and analysis that the Facebook Warrant was supported by sufficient probable cause under 18 U.S.C. § 2703(c), and thus, the FAC fails to state a plausible constitutional violation respecting that warrant, Chinook's Third Claim for Relief fails to state a plausible claim. *See Davis v. Gracey*, 111 F.3d 1472, 1484 (10th Cir. 1997) (where a valid warrant authorized seizure of computer equipment, officers were entitled to the good faith defense under 18 U.S.C. § 2707(e), as a matter of law, for their reliance on the warrant). The Plaintiffs cite no authority to suggest the SCA imposes requirements more demanding than the Fourth Amendment.[7] *See, e.g., id.* ("The plaintiffs have not persuaded us the statute imposes a requirement stricter than the Fourth Amendment[.]")

**E. Sixth Claim for Injunctive Relief**

Armendariz asserts this claim against the FBI.[8] Aside from incorporating previous allegations in the FAC by reference, the Sixth Claim reads, in its entirety:

---

[7] This is true even when considering the FAC's allegations that Chinook received no prior notice of the Facebook Warrant. The judge who issued the warrant did so under 18 U.S.C. § 2705(b), which allows the government to apply for, and the court to issue, an order delaying notification of the existence of a warrant. Dkt. 51-1; 18 U.S.C. § 2705(b); see also 18 U.S.C. 2703(b)(1)(B)(ii) ("except that delayed notice may be given pursuant to section 2705 of this title").

[8] In her Response to the City's Motion to Dismiss, Armendariz suggests Claim 6 is also brought against the City. Dkt. 61 at p.16 ("Plaintiffs acknowledge that the headings of their state constitutional and injunctive relief claims erroneously did not

> 215. On information and belief, Defendant Federal Bureau of Investigation retains copies of electronic files obtained from Ms. Armendariz's digital devices. The Federal Bureau of Investigation's failure to return or destroy the materials constitutes a continuing and ongoing seizure that violates the Fourth Amendment.
>
> 216. Ms. Armendariz is entitled to an award of injunctive relief under the Constitution of the United States and 5 U.S.C. § 702 ordering the return or destruction of Ms. Armendariz's digital data.

Dkt. 12. The FAC does not allege the FBI continues to possess Armendariz's electronic devices; rather, it alleges she seeks the return or destruction of the digital *copies* they made (and retain) from those devices. Dkt. 12 at ¶215.

The FBI argues, in relevant part, that its collection of this evidence was lawful under the Fourth Amendment, and even if it wasn't, its retention of electronic copies obtained in violation of the Fourth Amendment does not violate the constitution. Armendariz counters generally that the FBI's continued retention of these copies raises constitutional issues distinct from the lawfulness of the search and seizure, and in any event, other courts have recognized the Fourth Amendment is implicated by a delay in the return of property seized by the government for a criminal

---

identify the City. But the Amended Complaint makes clear throughout that Plaintiffs have stated a claim for injunctive relief against the City for the wrongful retention of Armendariz's files.") This argument is insincere. The FAC expressly indicates it is asserted *only* against the FBI. Dkt. 12 at p.50. To the extent Armendariz now claims it is also asserted against the City, the Court finds it fails to state a plausible claim against the City, and moreover, Plaintiff may not amend the FAC in this regard with her responsive pleading. *See Sudduth v. Citimortgage, Inc.*, 79 F. Supp. 3d 1193, 1201 n.2 (D. Colo. 2015) ("Plaintiffs cannot amend their complaint by adding factual allegations in response to [a] motion to dismiss.").

investigation.[9] Dkt. 28 at pp.27-28. The Court agrees with the FBI that the Fourth Amendment does not provide a remedy for its ongoing retention of these digital copies, but for reasons not discussed by either party.

What appears to distinguish this case from those cited by the parties is the fact that Armendariz pleaded guilty to a lesser offense—obstructing a peace officer—received a deferred judgment, and successfully completed her six-month unsupervised probation. Dkt. 12 at ¶119. The prior criminal proceedings against her have ended. And Armendariz does not seek monetary damages associated with the FBI's ongoing retention of the copies of her digital media. She instead only seeks injunctive relief in the form of an order for the return or destruction of those copies. *Id.* at ¶216.

Based on these allegations, the Sixth Claim for Relief does not plausibly plead a violation of the Fourth Amendment. The appropriate claim appears to be one for return of property under Fed. R. Crim. P. 41(g) (formerly Rule 41(e) until the rule was amended in 1989). "A cause of action under Rule 41(e) for return of property has been recognized as a valid cause of action in the Tenth Circuit and other federal courts[.]" *Lowrie v. United States*, 558 F. Supp. 1029, 1032 (D. Colo. 1983) (citing

[9] While the heading for the Sixth Claim for Relief titles the claim as seeking injunctive relief under the First and Fourth Amendments, the claim expressly alleges only a violation of the Fourth Amendment. Dkt. 12 at ¶215 (alleging "The [FBI]'s failure to return or destroy the materials constitutes a continuing and ongoing seizure that violates the Fourth Amendment.").

cases). "Where criminal proceedings against the movant have already been completed, a district court should treat a rule 41(e) motion as a civil complaint." *United States v. Clark*, 84 F.3d 378, 381 (10th Cir. 1996) (internal quotations and citations omitted); *see also Clymore v. United States*, 415 F.3d 1113, 1117 (10th Cir. 2005) ("Although Clymore's action is brought pursuant to Rule 41(e), a federal rule of *criminal* procedure, proceedings surrounding the motion for return of property seized in a criminal case are *civil in nature*[.]") (cleaned up; emphases in original); *Allen v. Grist Mill Cap. LLC*, 88 F.4th 383, 394 (2d Cir. 2023) ("[W]hile Rule 41(g) is a rule of criminal procedure, we have also long held that where, as here, a motion under that rule is filed after a criminal proceeding has ended, the district court should construe such a motion as initiating a civil action in equity.") (cleaned up); *U.S. v. Martinez*, 241 F.3d 1329, 1330-31 (11th Cir. 2001) (noting Second, Third, Sixth, Seventh, Eighth, and Ninth Circuits agree that motions for return of property under then Rule 41(e) made after criminal proceedings ended should be treated as civil proceedings for equitable relief).

Rule 41(g) provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). Prior to its amending in 1989, then Rule 41(e) "provided a method for enforcing the protection against unreasonable search and seizure guaranteed by the Fourth Amendment." 3A Fed. Prac. & Proc. Crim. § 690 (4th ed. 2023). But, as amended, Rule 41(g) now "provides that an aggrieved person

may seek return of property that has been unlawfully seized, and a person whose property has been lawfully seized may seek return of property when aggrieved by the government's continued possession of it." Fed. R. Crim. P. 41(g) notes to 1989 amendment.

Following the 1989 amendments, the Tenth Circuit has held that Rule 41(g) motions are now "solely for the return of property[,]" drawing a distinction between Fourth Amendment claims seeking redress for an alleged unlawful seizure and claims seeking the return of property (whether or not lawfully seized).[10] *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1370 (10th Cir. 1990) ("Illegality of a search for purposes of Rule 41(e) and the scope of the exclusionary rule have been separated by the 1989 amendments."); *see also United States v. Anh Ngoc Dang*, 559 F. App'x 660, 662 (10th Cir. 2014) ("The issue of whether the deputy marshals violated the Fourth Amendment is distinct from the appropriate disposition of the cash seized."); *United*

---

[10] The partial concurrence in the *Lindell* case, which case Armendariz cites extensively, also draws this distinction. Concurring in part, Circuit Judge Colloton dissented from that portion of the majority opinion that purported to reverse the district court for not balancing the interests of the parties to determine whether the government could justify its continued possession of Lindell's cell phone that it lawfully seized. *Lindell v. United States*, 82 F.4th 614, 623 (8th Cir. 2023). Judge Colloton observed that the majority's "discussion concerns a ruling that was never made on a motion that was never filed. . .. The majority exceeds the proper scope of appellate jurisdiction by purporting to rule on a different dispute concerning the retention of seized property[.]" *Id.* He explained: "If Lindell now wishes to secure a return of his old phone . . . then he may file a straightforward motion for return of property based on the length of retention. The parties may then address the matter in proper briefing and evidentiary presentations[.]" *Id.*

*States v. Giannukos*, No. 15-20016-01-DDC, 2020 WL 6680384, at *2 (D. Kan. Nov. 12, 2020) (Rule 41(g) "governs requests for return of property seized in connection with a criminal investigation."); *Lintzeris v. City of Chicago*, 276 F. Supp. 3d 845, 849 (N.D. Ill. 2017) ("Complaints about the return of property, lawfully seized, do not implicate the Fourth Amendment.").

The Sixth Claim for Relief simply seeks the return or destruction of copies of property seized in connection with a completed criminal case. And in this Court's above-analysis, the Court has found the seizure to be lawful. For these reasons, the Sixth Claim for Relief fails to state a plausible claim for relief under the Fourth Amendment.[11] *See Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992) (holding the validity of a claim is determined by which constitutional right is alleged to have been infringed and then by the specific standard governing that right).

**F. State Law Claims under Colo. Rev. Stat. § 13-21-131**

**1. Claim 4 against the United States**

During a hearing before the Honorable Magistrate Judge Maritza Dominguez Braswell on December 18, 2023, Judge Dominguez Braswell granted the United

---

[11] The Court considered whether it was appropriate to construe the Sixth Claim for Relief as alleging a claim for return of property under Rule 41(g). But first, Armendariz is represented by counsel, and therefore, the rule requiring the Court to liberally construe a *pro se* litigant's filings does not inure to her. Second, it is not clear to the Court that, even if so construed, it would be fair to then attempt to analyze the allegations as currently pleaded under a Rule 41(g) standard, particularly also where the parties have not briefed or argued the matter under a Rule 41(g) analysis.

States' motion brought under 28 U.S.C. § 2679(d)(1) to substitute itself for Summey on Claim 4. Dkt. 62; *see also* Dkt. 39. The United States generally enjoys sovereign immunity from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). But Congress has waived the United States' sovereign immunity through the Federal Tort Claims Act ("FTCA") for the wrongful act or omission of an employee of the federal government while acting within the scope of their employment, and if a private person would be liable to the claimant under the law of the state where the allegedly wrongful act occurred. *See* 28 U.S.C. § 1346(b)(1). It is the plaintiff's burden to establish subject matter jurisdiction under the FTCA. *Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005).

To benefit from the FTCA's waiver of sovereign immunity, claimants must first exhaust administrative processes with the appropriate federal agency before suing in federal court. *See* 28 U.S.C. § 2675(a). Under Section 2675(a), no action may be filed against the United States "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." This presentment requirement is jurisdictional, must be strictly construed, and cannot be waived. *Bradley v. United States ex rel. Veterans Admin.*, 951 F.2d 268, 270 (10th Cir. 1991).

The FAC does not plausibly allege compliance with 28 U.S.C. § 2675(a). True, as she argues, Armendariz had no reason to know Summey was acting as a federal employee. But Supreme Court and Tenth Circuit case law require strict compliance

with the administrative procedures mandated by the FTCA. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) (requiring "strict adherence to the procedural requirements" of § 2675(a)); *Bradley*, 951 F.2d at 270 (the FTCA's requirements must be strictly construed); *see also Smith v. United States*, 245 F.3d 790 (5th Cir. 2000) (unpublished table decision) (finding lack of subject-matter jurisdiction where plaintiffs failed FTCA exhaustion because they did not know the defendant was a federal employee); *Miller v. Mayers Mem'l Hosp.*, No. 209CV01687 MCE KJM, 2009 WL 3048690, at *2 (E.D. Cal. Sept. 18, 2009) ("[E]ven assuming that Plaintiff was indeed unaware of Watson's employment status, that lack of knowledge does not excuse compliance with § 2675(a)."); *Chin v. Wilhelm*, 291 F. Supp. 2d 400, 403-04 (D. Md. 2003) (dismissing claims under the FTCA for failure to present an administrative claim despite plaintiffs' lack of knowledge that the officer was a federal agent); *Bigg v. Selective Serv. Sys.*, No. CV-92-2610 (CPS), 1993 WL 547458, at *2 (E.D.N.Y. Nov. 26, 1993), *aff'd*, 28 F.3d 102 (2d Cir. 1994) (dismissing complaint where "plaintiff has not given any indication in his complaint or in his response papers of having met the requirements of section 2675(a). Indeed, plaintiff admits that he did not know that he could (or should) have filed an administrative claim with the Selective Service.").

The out-of-circuit cases Armendariz cites are either at odds with the required strict construction of the FTCA or they also involved issues related to the statute of limitations, which is not an issue here. Because the FAC fails to plausibly allege

Armendariz's compliance with 28 U.S.C. § 2675(a), Claim 4 is dismissed as against the United States.

**2. Claims 4 (against Ditzler) and 5 (against Steckler and Otero)**

"Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990). Plaintiff's remaining claims (Claims 4 and 5) arise under a Colorado statute, Colo. Rev. Stat. § 13-21-131. There is no compelling reason to maintain jurisdiction over the state law claims considering this Court's findings pertaining to, and dismissal of, Plaintiff's federal law claims and state law claim against the United States. The Court thus declines to exercise jurisdiction over the state law claims and dismisses them on that basis.[12] 28 U.S.C. § 1367(c)(3).

* * *

---

[12] Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, the Court need not address the merits of the arguments concerning those claims. Moreover, the parties have a dispute pending before Judge Dominguez Braswell regarding Plaintiffs' challenge to the United States' substitution for Summey. Even assuming Summey was the proper party to Claim 4, the claim would still be dismissed based on the Court's declination of supplemental jurisdiction.

For the reasons shared above, the Motions to Dismiss at Dkts. 49, 50, 51, and 52, are GRANTED as follows:[13]

1. The First Claim for Relief is DISMISSED without prejudice, against Summey, Ditzler, and the City;
2. The Second and Third Claims for Relief are DISMISSED without prejudice, against Steckler, Otero, and the City;
3. The Fourth and Fifth Claims for Relief are DISMISSED without prejudice;
4. The Sixth Claim for Relief is DISMISSED without prejudice; and
5. The Clerk of Court shall terminate this action.

DATED: April 10, 2024

BY THE COURT:

S. Kato Crews
United States District Judge

[13] The Court does not reach the parties *Bivens'* or other arguments not addressed herein.