No. 24-1201

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JACQUELINE ARMENDARIZ and CHINOOK CENTER,

*Plaintiffs–Appellants*,

v.

CITY OF COLORADO SPRINGS; DANIEL SUMMEY, a detective with the Colorado Springs Police Department, in his individual capacity; B.K. STECKLER, a detective with the Colorado Springs Police Department, in his individual capacity; JASON S. OTERO, a sergeant with the Colorado Springs Police Department, in his individual capacity; ROY A. DITZLER, a police officer with the Colorado Springs Police Department, in his individual capacity; FEDERAL BUREAU OF INVESTIGATION; and THE UNITED STATES OF AMERICA,

*Defendants–Appellees.*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Theresa Wardon Benz
Jacqueline V. Roeder
Kylie L. Ngu
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, Colorado 80202
Tel.: (303) 892-9400
theresa.benz@davisgraham.com

Timothy R. Macdonald
Sara R. Neel
Anna I. Kurtz
Mark Silverstein
Laura Moraff
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF COLORADO
303 East 17th Avenue, Suite 350
Denver, Colorado 80203
Tel.: (720) 402-3151
lmoraff@aclu-co.org

*Counsel for Jacqueline Armendariz and Chinook Center*

## ORAL ARGUMENT REQUESTED

August 21, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES .................................................1

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES ON APPEAL ...........................................1

STATEMENT OF THE CASE...............................................................2

    A.    Defendants Surveil Colorado Springs Activists After a
Protest at an Officer's Home.......................................................2

    B.    Defendants Obtain Search Warrants After a 2021
Housing March..............................................................................4

    C.    Procedural History. ....................................................................9

STANDARD OF REVIEW ..................................................................10

SUMMARY OF THE ARGUMENT ...................................................11

ARGUMENT ........................................................................................13

I.    Plaintiffs Plausibly Allege Defendants Violated the Fourth and
First Amendments in Obtaining the Warrants to Seize and
Search Armendariz's Digital Devices. ..................................13

    A.    The Warrant to Seize All of Armendariz's Digital
Devices Is Overbroad.................................................................14

    B.    The Warrant to Search Armendariz's Devices Violates
the Fourth and First Amendments. ...........................................18

        1.    The affidavit broadens the scope of the device
search by treating the "investigation" as a wide-
ranging fishing expedition for political views and
associations. ....................................................................20

        2.    The keyword search is overbroad.................................22

        3.    The search for photos, videos, messages, emails,
and location data is overbroad. .....................................27

        4.    The warrant cannot survive the scrupulous
exactitude required here..................................................29

II.    The City Is Plausibly Liable Under Section 1983.............................32

III.    Defendants Summey and Ditzler Are Not Entitled to Qualified Immunity. ........................................................................34

IV.    Defendants Must Return or Destroy Copies of Armendariz's Digital Data. ....................................................................40

        A.    The Return or Destruction of Armendariz's Data Is a Proper Remedy for the Government's Unconstitutional Seizure....................................................................40

        B.    Defendants Continue to Violate Armendariz's Rights by Retaining Copies of Her Data Without Justification. .............41

V.    Plaintiffs Plausibly Allege Defendants Violated the Fourth and First Amendments in Obtaining the Warrant to Search Chinook's Facebook Data. ....................................................45

        A.    The Chinook Warrant Is Overbroad. ........................................45

        B.    The Chinook Warrant's Overbreadth Is Especially Egregious Because It Encompasses First Amendment-Protected Speech and Association. ..........................................49

VI.    Plaintiffs Plausibly Allege the City Is Liable for Obtaining the Chinook Warrant. ..................................................................52

VII.    Defendants Steckler and Otero Are Not Entitled to Qualified Immunity. ........................................................................52

CONCLUSION .................................................................................55

CERTIFICATE OF COMPLIANCE........................................................56

STATEMENT REGARDING ORAL ARGUMENT ...........................................57

**ATTACHMENTS:**

(1) ECF No. 103, Order on Motions to Dismiss (ECF Nos., 49, 50, 51, 52)
(2) ECF No. 104, Final Judgment
(3) *Ziegler v. Sarasota Police Dep't*, No. 2024-CA-001409-NC (Fla. Dist. Ct. App. July 1, 2024)

# TABLE OF AUTHORITIES

**Cases**

*In re: [REDACTED]@gmail.com*,
   62 F. Supp. 3d 1100 (N.D. Cal. 2014) .................................................................. 23

*ADAPT of Phila. v. Phila. Hous. Auth.*,
   417 F.3d 390 (3d Cir. 2005) ............................................................................ 41

*Almeida v. Holder*,
   588 F.3d 778 (2d Cir. 2009) ............................................................................ 43

*Anderson v. Blake*,
   469 F.3d 910 (10th Cir.2006) ......................................................................... 35

*Archuleta v. Wagner*,
   523 F.3d 1278 (10th Cir. 2008) ...................................................................... 35

*Asinor v. D.C.*,
   No. 22-7129, 2024 WL 3733171 (D.C. Cir. Aug. 9, 2024) ...................... 41, 42

*Bates v. City of Little Rock*,
   361 U.S. 516 (1960) ........................................................................................ 51

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 10, 11

*Bowling v. Rector*,
   584 F.3d 956 (10th Cir. 2009) ....................................................................... 13

*Brewster v. Beck*,
   859 F.3d 1194 (9th Cir. 2017) .................................................................. 41, 42

*Bryson v. City of Oklahoma City*,
   627 F.3d 784 (10th Cir. 2010) ....................................................................... 33

*Carpenter v. United States*,
   585 U.S. 296 (2018) ................................................................................. 28, 43

*Cassady v. Goering*,
   567 F.3d 628 (10th Cir. 2009) ...................................... 22, 34, 35, 37, 39, 48, 53

*Citizens Against Rent Control/Coal. For Fair Hous. v. City of Berkeley*,
454 U.S. 290 (1981)........................................................................51

*Clinton v. Sec. Benefit Life Ins. Co.*,
63 F.4th 1264 (10th Cir. 2023) ........................................................10

*Cortez v. McCauley*,
478 F.3d 1108 (10th Cir. 2007) .......................................................53

*Cox v. State of Louisiana*,
379 U.S. 559 (1965).................................................................31, 52

*Doe v. U.S. Air Force*,
812 F.2d 738 (D.C. Cir. 1987).........................................................40

*Entick v. Carrington*,
19 How. St. Tr. 1029......................................................................37

*Fowler v. Stitt*,
104 F.4th 770 (10th Cir. 2024) ........................................................10

*Frank v. Maryland*,
359 U.S. 360 (1959).......................................................................29

*Green v. Thomas*,
No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133 (S.D. Miss. May 20, 2024) ....................................................................................40

*Groh v. Ramirez*,
540 U.S. 551 (2004).......................................................................35

*Hoggard v. Rhodes*,
141 S. Ct. 2421 (2021)....................................................................40

*Illinois v. Gates*,
462 U.S. 213 (1983).......................................................................48

*Jordan v. Adams Cnty. Sheriff's Office*,
73 F.4th 1162 (10th Cir. 2023) ........................................................39

*Lindell v. United States*,
82 F.4th 614 (8th Cir. 2023) ................................................43, 44, 45

*Lowe v. Raemisch*,
    864 F.3d 1205 (10th Cir. 2017) ............................................................39

*Marcus v. Search Warrant of Property*,
    367 U.S. 717 (1961) ..............................................................................37

*Maryland v. Garrison*,
    480 U.S. 79 (1987) ................................................................................24

*Mayfield v. Bethards*,
    826 F.3d 1252 (10th Cir. 2016) ...............................................34, 35, 38

*Melton v. City of Okla. City*,
    879 F.2d 706 (10th Cir. 1989) ..............................................................38

*Mink v. Knox*,
    613 F.3d 995 (10th Cir. 2010) ..................... 13, 20, 35, 37, 39, 46, 52

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ..............................................................................32

*Myers v. Oklahoma Cnty. Bd. of Cnty. Commr's*,
    151 F.3d 1313 (10th Cir. 1998) ............................................................32

*NAACP v. Alabama*,
    357 U.S. 449 (1958)...............................................................................51

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982).........................................................................46, 50

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)...............................................................................31

*Packingham v. North Carolina*,
    582 U.S. 98 (2017).............................................................................49, 50

*Pauly v. White*,
    814 F.3d 1060 (10th Cir. 2016) .......................................................34, 35

*People v. Coke*,
    461 P.3d 508 (Colo. 2020).....................................................................24

*Poolaw v. Marcantel*,
565 F.3d 721 (10th Cir. 2009) ...............................................................48, 53, 54

*Pyle v. Woods*,
874 F.3d 1257 (10th Cir. 2017) ...........................................................32

*Quintana v. Santa Fe Cnty. Bd. of Commissioners*,
973 F.3d 1022 (10th Cir. 2020) ...........................................................33

*Reich v. Nat'l Eng'g & Contracting. Co.*,
13 F.3d 93 (4th Cir. 1993) ...................................................................41

*Reno v. ACLU*,
521 U.S. 844 (1997)..............................................................................50

*Riley v. California*,
573 U.S. 373 (2014)...............................................................18, 30, 43

*Rosales v. Bradshaw*,
72 F.4th 1145 (10th Cir. 2023) ............................................................39

*Sanchez v. Hartley*,
810 F.3d 750 (10th Cir. 2016) .............................................................11

*Schneider v. City of Grand Junction Police Dep't*,
717 F.3d 760 (10th Cir. 2013) .............................................................33

*Soldal v. Cook Cnty.*,
506 U.S. 56 (1992)................................................................................42

*Stanford v. Texas*,
379 U.S. 476 (1965)........................................................................29, 49

*Stonecipher v. Valles*,
759 F.3d 1134 (10th Cir. 2014) ...........................................................32

*United States v. Abboud*,
438 F.3d 554 (6th Cir. 2006) ...............................................................23

*United States v. Diaz*,
841 F.2d 1 (1st Cir. 1988).....................................................................23

*United States v. Garcia*,
No. 3:20-CR-00058 (KAD), 2023 WL 4850553 (D. Conn. July 28,
2023) ................................................................................................17

*United States v. Gonzales*,
399 F.3d 1225 (10th Cir. 2005) .........................................................54

*United States v. Griffith*,
867 F.3d 1265 (D.C. Cir. 2017) ..................................................16, 17

*United States v. Karo*,
468 U.S. 705 (1984) ...........................................................................43

*United States v. Koyomejian*,
970 F.2d 536 (9th Cir. 1992) .............................................................18

*United States v. Lauria*,
70 F.4th 106 (2d Cir. 2023) ...............................................................28

*United States v. Leary*,
846 F.2d 592 (10th Cir. 1988) ..................................13, 22, 26, 36, 37

*United States v. Mora*,
989 F.3d 794 (10th Cir. 2021) .....................................................15, 16

*United States v. Oglesby*,
No. 4:18-CR-0626, 2019 WL 1877228 (S.D. Tex. Apr. 26, 2019)....................17

*United States v. Otero*,
563 F.3d 1127 (10th Cir. 2009) ..........................................19, 20, 24

*United States v. Santos*,
No. 23-CR-436 (OEM), 2024 WL 3566983 (E.D.N.Y. July 29,
2024) ................................................................................................17

*United States v. Suggs*,
998 F.3d 1125 (10th Cir. 2021) .........................................................20

*United States v. Torres*,
751 F.2d 875 (7th Cir. 1984) .............................................................19

*United States v. U.S. Dist. Court*,
407 U.S. 297 (1972)...........................................................................30

*United States v. Ukhuebor*,
    No. 20-MJ-1155 (LDH), 2021 WL 1062535 (E.D.N.Y. Mar. 19,
    2021) .................................................................................................17

*United States v. Valenzuela*,
    365 F.3d 892 (10th Cir.2004) ...........................................................48

*United States v. Zemlyansky*,
    945 F. Supp. 2d 438 (S.D.N.Y. 2013) ..............................................23

*Voss v. Bergsgaard*,
    774 F.2d 402 (10th Cir. 1985) ......... 13, 22, 24, 25, 29, 35, 36, 45, 47, 49, 52, 53

*Wayte v. United States*,
    470 U.S. 598 (1985)..........................................................................46

*Ziegler v. Sarasota Police Dep't*,
    No. 2024-CA-001409-NC (Fla. Dist. Ct. App. July 1, 2024) ...........43

*Zurcher v. Stanford Daily*,
    436 U.S. 547 (1978).................................................................29, 32

## Statutes

C.R.S. § 13-21-131 ...................................................................................1

5 U.S.C. § 702 ..........................................................................................1

18 U.S.C § 2707(c) ...................................................................................1

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

28 U.S.C. § 1343 .......................................................................................1

28 U.S.C. § 1367(a) ..................................................................................1

28 U.S.C. § 2679(d)(1)..............................................................................9

42 U.S.C. § 1983 ..............................................................................1, 32, 40

**Other Authorities**

Hon. James L. Oakes, *"Property Rights" in Constitutional Analysis
    Today*, 56 Wash. L. Rev. 583, 589 (1981)..........................................................43

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

Plaintiffs' claims arise under the United States and Colorado constitutions and the Stored Communications Act. Plaintiffs sought relief under 42 U.S.C. § 1983, C.R.S. § 13-21-131, 18 U.S.C § 2707(c), and 5 U.S.C. § 702. The district court had original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367(a). The district court granted Defendants' Motions to Dismiss, disposing of all claims, on April 10, 2024. Plaintiffs timely filed a notice of appeal on May 9, 2024. ECF No. 107.[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES ON APPEAL

1.    Has Plaintiff Jacqueline Armendariz plausibly alleged that the warrants to seize and search her digital devices violate her constitutional rights?

2.    Has Armendariz plausibly alleged that Defendant City of Colorado Springs is liable for the constitutional violations against her?

---

[1] Citations to the district court docket appear as "ECF No." followed by the docket number. Citations to the Appendix appear as "Aplt. App. Vol. I" followed by the page number and paragraph number, if applicable.

3.      Are Defendants Colorado Springs Police Department ("CSPD") officers Daniel Summey and Roy Ditzler entitled to qualified immunity for their role in the seizure and search of Armendariz's digital devices?

4.      Has Armendariz plausibly alleged that Defendants Federal Bureau of Investigation ("FBI") and City of Colorado Springs must return or destroy copies of Armendariz's digital data, or can the government retain a person's private data indefinitely without justification?

5.      Has Plaintiff Chinook Center ("Chinook") plausibly alleged that the warrant to obtain its Facebook data violates the Fourth and First Amendments?

6.      Has Chinook plausibly alleged that Defendant City of Colorado Springs is liable for the constitutional violations against it?

7.      Are Defendant CSPD officers B.K. Steckler and Jason Otero entitled to qualified immunity for their role in the search of Chinook's Facebook data?

## STATEMENT OF THE CASE

This case challenges CSPD's and its officers' use of unconstitutionally overbroad search warrants to amass the digital data of local protesters and fish for information about their constitutionally protected political speech and associations.

### A.      Defendants Surveil Colorado Springs Activists After a Protest at an Officer's Home.

The summer of 2020 saw racial justice protests spread across the country in response to highly publicized police killings of Black Americans. In the Pulpit

2

Rock neighborhood of Colorado Springs, one such protest had special local significance: one year earlier, CSPD Officer Van't Land had killed De'Von Bailey, a local Black 19-year-old. On August 3, 2020, the anniversary of Bailey's death, more than 100 people gathered in protest outside Van't Land's home. Aplt. App. Vol. I at 23 ¶ 26, 50 ¶ 137.

CSPD officers were angered by the Van't Land protest and sought to retaliate against and surveil the activists and organizations they regarded as responsible, including Plaintiff Chinook, a hub for progressive activism in Colorado Springs. *Id.* at 23 ¶ 26, 24 ¶¶ 30–31. The day after the protest, an undercover CSPD detective, April Rogers, reached out to Chinook leaders. *Id.* at 23 ¶ 26. For the next year, Rogers masqueraded as an activist, participant, and volunteer with Chinook, surreptitiously gathering intelligence on its activities. *Id.* at 22 ¶ 25.

At the same time, CSPD obtained warrants to search the digital devices and social media accounts of participants in the Van't Land protest and people in their networks—without limiting their searches to evidence of any specific crime. *Id.* at 51 ¶ 139, 52 ¶ 141. CSPD also sought First Amendment-protected materials such as organizational information and rosters for Colorado Springs political groups that CSPD characterized as "anti-capitalist, antiracist[], and anti-fascist," without

linking those groups or their members to any criminal activity whatsoever. *Id.* at

53–54 ¶¶ 145–46.

### B. Defendants Obtain Search Warrants After a 2021 Housing March.

In the summer of 2021, as CSPD continued to spy on Chinook, officers

learned that activists were planning a march for housing rights on July 31, which

was both the day that the federal eviction moratorium was set to end and the day of

the Colorado Springs sesquicentennial parade. Aplt. App. Vol. I at 24 ¶ 29.

Officers resolved to arrest Chinook leaders, including Shaun Walls and Jon

Christiansen, if they had the opportunity at the march. *Id.* CSPD Commander John

Koch, who was in charge of CSPD's response to the 2021 housing march, had

perceived Walls and Chinook to be "instrumental" in the 2020 Van't Land protest.

*Id.* at 24 ¶¶ 30–31.

On July 31, 2021, as CSPD officers were waiting for the housing march to

begin, they discussed inflicting violence to suppress the protest. *Id.* at 25 ¶ 35.

Referencing the City's sesquicentennial parade, one of the officers remarked: "Just

get on that bullhorn and be like, 'Hey if y'all would like to see a parade and like to

see these motherfuckers to quit interrupting it, just handle that for us . . . stone 'em

all to death.'" *Id.* While looking through photos CSPD had obtained on the

activists, one officer proclaimed: "Boot to the face. It's going to happen." *Id.* at 26

¶ 36.

At various points during the march, protesters walked in the street. *Id.* at 26 ¶ 39. When police ordered protesters to get out of the street, they complied. *Id.* Notwithstanding their compliance, Commander Koch ordered officers to arrest protesters for previously marching in the street. *Id.* at 27 ¶ 40. Out of at least 50 people who had marched in the street, CSPD chose to arrest only a handful— including Chinook leaders Shaun Walls and Jon Christiansen. *Id.* at 27 ¶ 41.

Plaintiff Armendariz attended the march with her bicycle. As police officers were tackling Walls behind her, Armendariz saw an officer in riot gear running towards her, and she dropped her bicycle between herself and the officer. *Id.* at 27 ¶ 42. The bicycle never touched the officer; he continued running towards the protesters. *Id.* Armendariz was not arrested at the march. *Id.* at 27 ¶ 43. But nearly a week later—after police learned Armendariz was associated with Chinook—they obtained a warrant to arrest her for attempted aggravated assault on a police officer, as well as a warrant to search her home, drafted by Defendant Summey and reviewed by Defendant Ditzler. *Id.* at 27 ¶ 43, 29 ¶ 57, 57 ¶ 160; *id.* at 69. The search warrant authorized the seizure of Armendariz's bicycle and other accessories Summey had identified using footage of the march, including her blue bicycle helmet, her "Housing Is A Human Right" t-shirt, and her gray Nike shoes. *Id.* at 39 ¶ 87. But the warrant did not stop there. It also authorized the seizure of "digital media storage devices" including "phones, computers, tablets, thumb

drives, and external hard drives" found to be associated with Jacqueline Armendariz. *Id.* at 39–40 ¶ 88.

CSPD took Armendariz into custody outside her home and seized all items authorized by the warrant, including three cell phones, a personal computer, a work computer, and an external hard drive. *Id.* at 40 ¶¶ 89–91.

Summey and Ditzler then obtained another warrant to search all six of her seized devices for 26 keywords. *Id.* at 41–42 ¶¶ 95–96. The keyword search allows officers to discover all data referencing Chinook leaders Shaun Walls and Jon and Sam Christiansen. *Id.* To ensure that *no* communication with or about these activists would go unpoliced, the warrant includes nicknames and alternative spellings, authorizing a search for every mention of "Jon, Jonathan, Sam, Samantha, Christiansen, Crustyansen, Chrischeeansen, Shaun," and "Walls," along with "Chinook" and "Center." *Id.* at 115.

The keyword search also includes the terms "Police," "officer," "cop," "pig," and "protest." *Id*. These keywords would turn up information on past and future protests against police brutality, such as the Van't Land protest, and any other protest Armendariz ever considered participating in. The warrant also targets other political speech using keywords "housing, human, right" and "yt"—a term Armendariz used in her Twitter bio to condemn "yt [white] supremacy." *Id.* at 36–37 ¶ 75; *id.* at 102, 115. Other keywords include "150th," "celebration," and

"assault." *Id.* at 41–42 ¶ 96; *id.* at 115. After listing all 26 keywords, the warrant rejects any time limitation to confine the search, asserting that "these terms would be relevant to the investigation regardless of the time period in which they occurred." *Id.* at 115.

The warrant also authorizes a search of all Armendariz's devices for "[p]hotos, videos, messages . . . emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation," *id.*, without providing any guidance on what "this investigation" entailed or what is relevant to it.

The affidavit indicates that "this investigation" targets Armendariz's political beliefs and the activism of others associated with Chinook. The affidavit asserts that "Armendariz appears to be very active politically" and claims that the July 31 housing march was "politically motivated." *Id.* at 39 ¶ 86; *id.* at 104. It notes that protest participants were carrying "red flags" and quotes a website called "Age of Revolution" claiming that the red flag has "become a symbol of socialism and communism." *Id.* at 35 ¶¶ 69–71; *id.* at 92. The affidavit includes a screenshot of Armendariz's Twitter profile referencing "yt supremacy" and concludes: "It appears that Armendariz uses the term 'yt' in an attempt to disparage white people, showing her disdain for white people." *Id.* at 38 ¶ 83; *id.* at 102. The affidavit makes this leap based on an online slang dictionary definition of "yt folx" saying

that the term "has been used by black Americans to disparage white people,
especially implying oppression and racial discrimination." *Id*. The affidavit
characterizes Chinook as "anarchist or anti-government," without explanation of
how Summey reached this conclusion. *Id.* at 106. And it notes that "there appears
to be a close relationship that exists between Walls and Armendariz, wherein they
are friends on social media, Armendariz attended an event that Walls promoted on
social media, and she attempted to assault an officer who was attempting to take
Walls into custody." *Id*. at 111. The affidavit devotes several pages to Walls' social
media posts. *Id.* at 106–112. The affidavit does not explain how any of these
references to constitutionally protected views, speech, or associations are relevant
to the alleged attempted assault with a bicycle. *Id.* at 36 ¶ 72, 39 ¶ 86, 44 ¶ 106.

After the housing march, CSPD also obtained a warrant—drafted by
Defendant Steckler and reviewed by Defendant Otero—to search Chinook's
Facebook account and seize "[a]ll subscriber information" and, for a period from
July 27, 2021 to August 2, 2021, "[a]ll Facebook Messenger chats," "[a]ll
Facebook posts," and "[a]ll Facebook Events" for Chinook's profile. *Id.* at 120.
While the supporting affidavit states "Your affiant believes the information gained
from the . . . Facebook profile[] will be material evidence in this case," no reason
for this belief is provided—let alone a description of what "this case" is. *Id.* at 28 ¶
49; *id.* at 119. The affidavit also refers to the housing march as an "illegal

demonstration" but does not identify any relationship between particular crimes and Chinook's Facebook account. *Id.* at 28 ¶¶ 51–52; *id.* at 119.

CSPD's custom, policy, and practice of using unconstitutionally overbroad search warrants to discover protesters' beliefs and associations is ongoing. *See id.* at 48 ¶¶ 131–132. Ultimately, Armendariz reached a plea agreement for the bicycle incident, received a deferred judgment, and successfully served six months of unsupervised probation. *Id.* at 46 ¶ 119. But years later, the FBI and CSPD continue to retain her digital data. *Id.* at 48 ¶ 129.

### C.    Procedural History.

Plaintiffs filed their Complaint on August 1, 2023, ECF No. 1, and their First Amended Complaint on August 18, 2023, Aplt. App. Vol. I at 17–68. Plaintiffs asserted First and Fourth Amendment claims against all individual defendants and the City (Claims 1 and 2), a Stored Communications Act claim against Defendants Steckler, Otero, and the City (Claim 3), state constitutional claims against all individual defendants and the City (Claims 4[2] and 5), and claims

---

[2] On November 3, 2023, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(1), the United States moved to substitute itself for Defendant Summey on Claim 4. ECF No. 39. Limited discovery on whether Summey should be resubstituted was ongoing when the district court granted Defendants' Motions to Dismiss.

for injunctive relief against the City and the FBI requiring them to return or destroy copies of Armendariz's digital data they retain (Claims 1, 4, and 6).[3]

On November 20, 2023, Defendants moved to dismiss all claims. ECF Nos. 49, 50, 51, and 52. On April 10, 2024, the district court granted Defendants' Motions to Dismiss. Aplt. App. Vol. I at 121–61. On May 9, 2024, Plaintiffs timely filed a Notice of Appeal. ECF No. 107.

## STANDARD OF REVIEW

The district court's dismissal is subject to *de novo* review. *Fowler v. Stitt*, 104 F.4th 770, 781 (10th Cir. 2024). This Court must "accept all well pleaded facts as true and view them in the light most favorable to Plaintiffs," and reverse if Plaintiffs' complaint includes "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (citation and quotation marks omitted). "[A] well-pleaded

---

[3] The district court construed Claim 6 as a claim against only the FBI and concluded that Armendariz had not sought injunctive relief against the City for return or destruction of her data. Aplt. App. Vol. I at 152– 53 n.8. Claim 1, however, pleads that the City "has no legitimate interest in retaining copies of Armendariz's digital devices" and requests "injunctive relief ordering the City . . . to return or destroy all copies of Armendariz's digital devices and all files of information extracted." *Id.* at 58 ¶¶ 168–69; *see also id.* at 64 ¶¶ 203–05 (Claim 4).

complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Sanchez v. Hartley*, 810 F.3d 750, 756 (10th Cir. 2016) (quoting *Bell Atl. Corp.*, 550 U.S. at 556).

## SUMMARY OF THE ARGUMENT

For the last several years, CSPD has targeted its critics, including Plaintiffs, with overbroad search warrants that authorize police to accumulate massive amounts of private information about their beliefs, communications, and associations—even when police have no reason to believe the searches will produce evidence of a particular crime. It is no surprise that those who dedicate their careers to enforcing the law look suspiciously at those who seek to change the law, or the policies, institutions, and contexts surrounding it. But the federal and state constitutions preclude that suspicion from manifesting as unjustified government intrusions into people's entire digital lives—especially when the intrusions target private beliefs and ideas.

After Defendant Summey determined that Plaintiff Armendariz, the protestor who dropped her bicycle during the march, was associated with Plaintiff Chinook, he obtained warrants to seize every digital device in her house and then search them for political speech and information about other activists CSPD had been monitoring. The search swept in any criticisms of "police," complaints about

any "officer," discussions of any "protest," and communications with or about "Chinook" and other activists in Colorado Springs—all from any point in time and without even arguable probable cause to believe the targeted information pertained to the alleged attempted assault with a bicycle. Defendants also obtained a warrant to seize private messages, posts, event information, and subscriber information from Chinook's Facebook account. This warrant unjustifiably authorized a clear view into Chinook's organizing and advocacy activities, without any reason to believe that evidence of any particular crime would be found there.

Plaintiffs have plausibly alleged that the City is liable for the Armendariz and Chinook warrants, which exemplified CSPD's policy, pattern, and practice of using its search and seizure powers to rummage through activists' private data for indicia of their political beliefs and associations. Plaintiffs have likewise plausibly pled that the individual Defendants are not entitled to qualified immunity because any reasonable officer would know these warrants violated the Fourth Amendment's particularity requirement. Additionally, Defendants must return or destroy copies of Armendariz's digital data, which they continue to retain without justification.

This Court should reverse the district court's erroneous holdings—which essentially nullify Fourth Amendment protections for protesters and others with phones—allow the case to proceed to discovery and reaffirm that the requirements

12

of the Fourth Amendment remain a bulwark against abuses of the search and

seizure power that target First Amendment-protected activities.

## ARGUMENT

**I.    Plaintiffs Plausibly Allege Defendants Violated the Fourth and First Amendments in Obtaining the Warrants to Seize and Search Armendariz's Digital Devices.**

The Fourth Amendment's particularity requirement "ensures that a search is

confined in scope to particularly described evidence relating to a specific crime for

which there is demonstrated probable cause." *Voss v. Bergsgaard*, 774 F.2d 402,

404 (10th Cir. 1985). The requirement is designed to prevent "intrusion[s] in the

way of search or seizure [from] occur[ring] without a careful prior determination

of necessity" and to "prevent[] the specific evil of the general warrant abhorred by

the colonists." *Mink v. Knox*, 613 F.3d 995, 1003 (10th Cir. 2010) (quoting

*Bowling v. Rector*, 584 F.3d 956, 967 (10th Cir. 2009)). A warrant is overbroad in

violation of the particularity requirement when its scope exceeds the probable

cause on which it is based. *United States v. Leary*, 846 F.2d 592, 605 (10th Cir.

1988). In other words, "[a] warrant is overly broad if it does not contain

sufficiently particularized language that creates a nexus between the suspected

crime and the items to be seized." *Mink*, 613 F.3d at 1010. Such is the case here.

The affidavits in support of the warrants to seize and search Armendariz's

digital devices purport to be investigating Armendariz's alleged attempted assault

of an officer with her bicycle. Aplt. App. Vol. I at 85, 104. While the affidavits review non-criminal, political activity at length—discussing "red flags" as radical political "symbol[s] of socialism and communism," *id.* at 35–36 ¶¶ 71–72; *id.* at 92, noting Armendariz's political activism, *id.* at 39 ¶ 86; *id.* at 102, 104, and examining the meaning of "yt folx," a phrase Armendariz never used, *id.* at 37 ¶¶ 78–79; *id.* at 102—the actual alleged crime was a momentary incident where Armendariz dropped her bicycle in the path of an officer. The warrants fail the Fourth Amendment's particularity requirement because they authorize the seizure of materials completely untethered to this bicycle incident: *all* of Armendariz's digital devices, *all* digital files from any timeframe mentioning words like "police," "protest," and "Chinook," and photos, videos, messages, emails, and location data from a two-month period.

### A.    The Warrant to Seize All of Armendariz's Digital Devices Is Overbroad.

After the housing march, CSPD obtained a warrant to search Armendariz's home and seize "[d]igital media storage devices, to include phones, computers, tablets, thumb drives, and external hard drives found to be associated with Jacqueline Armendariz." Aplt. App. Vol. I at 39–40 ¶ 88; *id.* at 86. The affidavit provides no reason to believe that evidence of the only crime mentioned in the affidavit—the split-second bicycle incident—would be found on *any* of Armendariz's digital devices, let alone *all* of them. Summey's affidavit does not

explain what evidence of the bicycle incident he could possibly hope to find on Armendariz's devices. Indeed, the affidavit contains no discussion of *Armendariz's* devices at all. The affidavit includes only boilerplate statements about how people use electronics generally:

> Your Affiant knows people who engage in illegal protest activity frequently carry their phones with them to take photos of their activity and message others who are also participating in illegal protest activity. Your Affiant also knows that phones regularly track the location of their user and can show where a person is at a given date and time. Your Affiant is also aware that people regularly attach their phones to their computers, and use their computers to back up their phones, or transfer photos from their phones to save space on their phones. Your Affiant knows that people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives.

*Id.* at 43 ¶ 103; *id.* at 85. These generalizations do not establish a substantial basis to believe that evidence of the alleged attempted assault with a bicycle would be found on every single device in Armendariz's home.

In *United States v. Mora*, this Court held that, although the government had established probable cause to believe the defendant was smuggling aliens, "the government failed to articulate how evidence of alien smuggling justified the search of his home." 989 F.3d 794, 801 (10th Cir. 2021). While the affiant had recounted his "training and experience[] that alien smugglers often use electronic communication devices, GPS devices, and electronic banking systems to conduct

operations and store records," the Court held those "boilerplate statements" insufficient to establish probable cause for the search because they were not "specific to Defendant's crime or circumstances." *Id.*

The same principle applies to searches of digital devices. In *United States v. Griffith*, the D.C. Circuit considered a search warrant authorizing the seizure of all electronic devices from Griffith's home in connection with a homicide investigation. 867 F.3d 1265, 1269 (D.C. Cir. 2017). In order "[t]o justify a search of the apartment to seize any cell phone owned by Griffith . . . police needed reason to think not only that he possessed a phone, but also that the device would be located in the home and would contain incriminating evidence about his suspected offense." *Id.* at 1273. Because the affidavit in *Griffith*—like Summey's affidavit—contained nothing beyond boilerplate assertions about how people (there, gang members) use phones, it failed to establish the requisite nexus between the particular phones to be seized from Griffith's apartment and Griffith's alleged crime. *Id.* at 1271.

Here, it was plainly unreasonable to believe that all of Armendariz's digital devices would contain evidence of the bicycle incident. Armendariz attended the housing march with her bicycle, so carrying all of her devices with her would have been quite a challenge. And while a person *can* copy data from one device to another, it is unreasonable to believe a person would incriminate themselves on

16

one device and then transfer that data to every device in her home—including devices provided by her employer. Here, as in *Griffith*, the warrant was overbroad for "allowing the seizure of all electronic devices found in the residence" when the affidavit "failed to establish probable cause to suspect that any cell phones or other electronic devices . . . containing incriminating information would be found in the apartment." *Id.* at 1275–76.

Summey's generalizations about phones and other devices are couched in language about his training, experience, and knowledge. Aplt. App. Vol. I at 43 ¶¶ 103, 105; *id.* at 85. While an officer's professional opinion and experience as described in the warrant affidavit can be considered, they are "generally not 'sufficient to establish a link between the item to be searched and the alleged criminal activity.'" *United States v. Garcia,* No. 3:20-CR-00058 (KAD), 2023 WL 4850553, at *7 (D. Conn. July 28, 2023) (quoting *United States v. Ukhuebor*, No. 20-MJ-1155 (LDH), 2021 WL 1062535, at *3 (E.D.N.Y. Mar. 19, 2021)). This is because "[p]ermitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect." *United States v. Santos*, No. 23-CR-436 (OEM), 2024 WL 3566983, at *9 (E.D.N.Y. July 29, 2024) (quoting *Ukhuebor*, 2021 WL 1062535, at *3); *see also United States v. Oglesby,*

No. 4:18-CR-0626, 2019 WL 1877228, at *6 (S.D. Tex. Apr. 26, 2019) (While "a person's cell phone contains evidence of almost any activity in which they participate," "[i]f these statements are held sufficient [to establish the nexus required for probable cause], every accusation of criminal activity would automatically authorize a search of the suspect's cell phone, transforming every arrest warrant into a search warrant and directly contravening the Supreme Court's decision in *Riley* [*v. California*, 573 U.S. 373 (2014)]"). Because Summey's affidavit fails to establish a nexus between the alleged crime and *all devices in Armendariz's home*, the warrant is unconstitutionally overbroad.

## B. The Warrant to Search Armendariz's Devices Violates the Fourth and First Amendments.

After arresting Armendariz at her home, seizing the bicycle, helmet, shirt, and shoes she was wearing at the time of the incident, and seizing all of Armendariz's digital devices, Defendants obtained a warrant to search those devices for every mention of protest, police, right, and her political associations as well as photos, videos, messages, and location information from a two-month period. Aplt. App. Vol. I at 41–42 ¶¶ 95–96; *id.* at 115. This highly intrusive search through all of Armendariz's digital data was wholly unreasonable because Summey had already confirmed that Armendariz was the person who dropped her bicycle at the march. *See United States v. Koyomejian*, 970 F.2d 536, 550 (9th Cir. 1992) (Kozinski, J., concurring) ("[R]easonableness is an independent requirement

of the Fourth Amendment, over and above the Warrant Clause requirements of probable cause and particularity."); *United States v. Torres*, 751 F.2d 875, 883 (7th Cir. 1984) ("[A] search could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law."). And the warrant plainly violated the Fourth Amendment's particularity requirement.

As this Court has recognized, "[t]he modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important." *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). The warrant to search Armendariz's devices violates this crucial particularity requirement because, first, the search is not restricted to evidence of any crime, but rather to evidence "relevant to this investigation"—and according to the affidavit, the "investigation" is sprawling and amorphous. Second, the keyword search is confined neither to a reasonable timeframe nor to keywords relevant to the bicycle incident. Third, the affidavit fails to establish probable cause to search for photos, videos, messages, emails, and location data from a two-month period. Finally, given that the warrant fails to

satisfy bedrock Fourth Amendment requirements, it certainly cannot withstand the scrupulous exactitude that applies in this context.

      1.    The affidavit broadens the scope of the device search by treating the "investigation" as a wide-ranging fishing expedition for political views and associations.

Because of their enhanced potential for intrusiveness, "warrants for computer searches must *affirmatively limit* the search to evidence of specific . . . crimes . . . ." *Mink*, 613 F.3d at 1010 (quoting *Otero*, 563 F.3d at 1132).

Yet the warrant to search Armendariz's devices specifies no crime and refers only to "this investigation." While "[a] supporting affidavit can sometimes cure a warrant's lack of particularity," *United States v. Suggs*, 998 F.3d 1125, 1135 (10th Cir. 2021), the opposite is true here. Rather than providing additional context to narrow the scope of the search, Summey's affidavit suggests that "this investigation" is a fishing expedition, encompassing political viewpoints and any information about Chinook or any of its leaders. Aplt. App. Vol. I at 30–31 ¶¶ 60–64; *id.* at 98, 106.

"[T]his investigation" apparently involves tracking down evidence of "socialism and communism," *id.* at 35–36 ¶¶ 71–72; *id.* at 92, Shaun Walls' views on police brutality, *id.* at 44 ¶ 109; *id.* at 106–12, and condemnations of white supremacy, *id.* at 36–37 ¶¶ 75–76; *id.* at 102. Summey's affidavit notes that Armendariz's Twitter profile references "yt supremacy," *id.*, quotes a slang

dictionary saying "[t]he *yt* in *yt folx* spears to stem from the slang term *whitey*," which has been "used by black Americans to disparage white people, especially implying oppression and racial discrimination," *id*., at 37 ¶ 79; *id.* at 102, and then requests to search Armendariz's devices for every mention of "yt," *id.* at 114. When an investigation uses political speech that criticizes white supremacy or "yt supremacy" as the basis to seize all communications containing the term "yt," constitutional alarm bells should be ringing.

The affidavit also repeatedly refers to protest activity as "illegal." *Id.* at 71, 85, 91, 105, 113. Summey's impression that any instance of illegality at a protest renders the entire protest "illegal," *see id.* at 111, suggests that any protest-related activity is relevant to "this investigation"—a suggestion that threatens to unravel the guarantees of the Fourth and First Amendments.

When stripped of its faulty assumptions and facially dubious Internet research, Summey's affidavit establishes only that Armendariz "was riding up the street on a bicycle in the path Officer Spicuglia was taking to get to Walls. As Officer Spicuglia approached [Armendariz], she got off the bicycle and threw it at Officer Spicuglia with the clear intent to strike him with it, as he was sprinting at and by her." *Id.* at 72, 92. For Summey and Ditzler, "this investigation" reached far beyond evidence of that incident.

By treating "this investigation" as a wide-ranging, unfocused probe into political views and associations, the warrant gives executing officers license to define the investigation for themselves, contrary to the Fourth Amendment's requirement that "nothing [be] left to the discretion of the officer." *Voss*, 774 F.2d at 404. Because nothing in the affidavit provides probable cause for such a wide-ranging search, the warrant is unconstitutionally overbroad. *See Cassady v. Goering*, 567 F.3d 628, 639 (10th Cir. 2009); *Leary*, 846 F.2d at 600-01.

The district court found that the warrant to search Armendariz's digital data was supported by "arguable" probable cause. Aplt. App. Vol. I at 137. But the court provided no explanation for how or why the extensive search for political viewpoints, social commentary, and months of location information could reasonably be expected to turn up evidence related to the momentary bicycle incident. Indeed, it could not.

2.     The keyword search is overbroad.

The warrant to search all of Armendariz's devices authorizes a seizure of every mention of 26 keywords from any point in time. Aplt. App. Vol. I at 41–42 ¶ 96; *id.* at 115. The warrant expressly rejects any temporal limitation on the keyword search, baselessly asserting that "these terms would be relevant to the investigation regardless of the time period in which they occurred." *Id.* at 115. The warrant thus authorizes the seizure of every file in which Armendariz mentioned

"police" at any point in her life; all communications with or about Chinook

founders "Shaun" "Walls" and "Jon" and "Sam" "Christiansen," or anyone

Armendariz ever communicated with who shares their names; and all discussions

about "housing" and "human" "rights." Discussions about any "protest," whether

against a government policy, a school board, or a parent's decision? Seized.

Discussions about every "officer," "cop," or "pig," whether about police brutality

in Colorado Springs or animal cruelty? Seized. Lamentations about a friend's

sexual "assault" from ten years ago? Seized.

 Courts have rightfully recognized that the absence of an appropriate

temporal limitation for a warrant can render it unconstitutionally overbroad. The

Sixth Circuit held overbroad a warrant that authorized a search for records from a

six-year period when the evidence in support of probable cause all came from a

three-month period. *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006).

And the First Circuit held overbroad a warrant that authorized a seizure of records

from before the first instance of wrongdoing mentioned in the affidavit. *United*

*States v. Diaz*, 841 F.2d 1, 4–5 (1st Cir. 1988); *see also United States v.*

*Zemlyansky*, 945 F. Supp. 2d 438, 460 (S.D.N.Y. 2013) (finding that the absence of

a temporal limit on items to be searched "reinforces the Court's conclusion that the

[ ] warrant functioned as a general warrant."); *In re: [REDACTED]@gmail.com*,

62 F. Supp. 3d 1100, 1104 (N.D. Cal. 2014) (denying warrant application to search

a particular email account because "there is no date restriction of any kind."); *People v. Coke*, 461 P.3d 508, 516 (Colo. 2020) (holding overbroad a warrant that "contains no particularity as to . . . the time period during which the assault allegedly occurred."). Here, the Armendariz warrant is unconstitutionally overbroad for authorizing a search for records from an *unlimited time period* with no reason to believe that texts mentioning "right" or documents concerning any "officer" from years before the alleged crime occurred would turn up relevant evidence.

Moreover, the keywords themselves extend the scope of the search far beyond the scope of any conceivable probable cause to support it. The particularity requirement is meant to "ensure[] that the search will be carefully tailored to its justifications." *Otero*, 563 F.3d at 1131–32 (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). But Summey did not carefully tailor the keyword search to target evidence of the only crime alleged in the affidavit: attempted assault with a bicycle. Instead, the keywords target speech about other activists, law enforcement, and wholly unrelated words like "yt" and "right."

This Court confronted a similarly overbroad warrant in *Voss*. There, a warrant issued in relation to an investigation into tax fraud by the National Commodities and Barter Association (NCBA). 774 F.2d at 403. The warrant authorized the seizure of "all books, records or documents relating to . . . customer

24

accounts; financial transactions; financial services . . ." as well as "books, literature and tapes advocating nonpayment of federal income taxes; publications of tax protestor organizations; and literature relating to communications between persons conspiring to defraud the IRS, or to conceal such fraud." *Id.* at 404. Because "[t]he bulk of the warrant was not restricted to evidence relating to tax fraud," this Court not only held that the warrant was insufficiently particular, but also emphasized "the dangers inherent in allowing a warrant so broadly drawn as the one here at issue." *Id.* at 404–05. Namely, "evidence in a customer's file indicating a conspiracy on that customer's part to import marijuana, even if unrelated to tax fraud, is within the scope of the warrant and may lawfully be seized . . . despite the fact that the government presented no evidence even suggesting probable cause for believing a drug crime had been committed." *Id.* at 405.

The same is true here. The keyword search is not confined to evidence of the alleged attempted assault with the bicycle. Searching through all of Armendariz's digital data for the names of other activists would not produce any evidence of the alleged crime—the affidavit even acknowledges that "there [was] no one [Armendariz] could have been attempting to pass the bicycle to in the area." Aplt. App. Vol. I at 98. Instead, the search would help CSPD understand the activists' roles in political organizing, their relationship with Armendariz and Chinook, and

25

any political ideas that Armendariz had discussed with them. Those objectives are not proper in a valid warrant.

This Court also invalidated a warrant that authorized the seizure of records unrelated to the specified crime in *Leary*, 846 F.2d at 604. There, the officer had written a "very specific" affidavit "alleging the attempted illegal export of a specific product to the People's Republic of China via a series of specific companies in Hong Kong." *Id.* Yet the warrant authorized the seizure of "[c]orrespondence, Telex messages, contracts, invoices, purchase orders . . . and other records and communications relating to the purchase, sale and illegal exportation of materials in violation of [two export statutes]." *Id.* at 594. The Court held that the warrant violated the particularity requirement because "even if [it] assume[d] that [the officer's] affidavit established probable cause to issue a search warrant, the scope of the warrant far exceeded the probable cause to support it." *Id.* at 605.

Similarly, while the alleged criminal act mentioned in the Armendariz warrants is very specific—throwing down a bicycle in the path of an officer at the July 31 housing march—the scope of the warrant reaches far beyond evidence of that incident to unrelated communications about police, pigs, human rights, Chinook, Jon, and Shaun. Because the scope of the keyword search is not confined to particularly described evidence for which there was probable cause, and instead

authorizes officers to probe as broadly as possible into the political views, activities, and associations of Armendariz, Chinook, and activists connected with them in any way, the warrant violates the Fourth Amendment's particularity requirement.

> 3.  The search for photos, videos, messages, emails, and location data is overbroad.

In addition to the keyword search, the warrant to search Armendariz's devices authorizes a search for "[p]hotos, videos, messages . . . emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation." Aplt. App. Vol. I at 41–42 ¶ 96; *id.* at 115.

The affidavit does not establish probable cause for this free-ranging search of all messages, emails, photos, and videos "relevant" to "this investigation"— which the affidavit confirms is targeted at Armendariz's political beliefs and the activism of others who had some association with Chinook. *See supra* Section I.B.1. Nor does it establish probable cause for a search of data from almost two months before the alleged attempted assault and a week afterwards.

Nothing in the affidavit suggests that the alleged attempted assault was planned. On the contrary, the affidavit suggests that the bicycle incident was Armendariz's split-second reaction to a CSPD officer "sprinting at and by her." Aplt. App. Vol. I at 92–93. While there may have been reason to believe that the planning of the *protest* began on June 5, *id.* at 113, the affidavit provides no reason

to believe that the alleged bicycle crime was—or even could have been—planned in advance.

In recognizing an individual's reasonable expectation of privacy in records of his past movements, the Supreme Court noted that cellphones "follow[] [the device's] owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Carpenter v. United States*, 585 U.S. 296, 311 (2018). "Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 311–12.

The breadth of the search for location information (which, judging from the affidavit, could encompass every trip Armendariz took to and from Jon or Shaun's house or any organization that might be associated with socialism or communism) is far wider than any conceivable probable cause on which it is based—body-worn camera footage of Armendariz dropping her bicycle between herself and an officer at a single moment during the march. Condoning this search would mean that police could obtain a near-perfect location history of anyone who had allegedly committed any crime, without demonstrating probable cause to believe that location data from before or after the crime would be relevant. The Fourth Amendment requires more. *See United States v. Lauria*, 70 F.4th 106, 128–29 (2d Cir. 2023) (communication between suspects' cell phone numbers shortly before

alleged robbery was insufficient to establish probable cause to obtain months of location information).

4.    The warrant cannot survive the scrupulous exactitude required here.

The First and Fourth Amendments are "closely related, safeguarding not only privacy . . . but 'conscience and human dignity and freedom of expression as well.'" *Stanford v. Texas*, 379 U.S. 476, 485 (1965) (quoting *Frank v. Maryland*, 359 U.S. 360, 376 (1959) (Douglas, J., dissenting)). Thus, "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." *Id.*; *see also Voss*, 774 F.2d at 408 (The Fourth Amendment "requires 'scrupulous exactitude'—in both particularity of description *and* in establishment of probable cause—in search cases in which the First Amendment may protect the materials sought to be seized." (emphasis in original) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 564–65 (1978)).

The keyword search expressly targets Armendariz's ideas about law enforcement, protest, and other activists. The email and message search authorizes a free-ranging expedition into any communications the searcher determines are relevant to an "investigation" that targets political speech. As explained in Sections

I.B.1–I.B.3, the warrant fails any Fourth Amendment analysis. It certainly cannot withstand the scrupulous exactitude required here.

When the warrant and its keywords are examined with scrupulous exactitude, it is evident that they represent a fishing expedition that impermissibly "view[s] with suspicion those who most fervently dispute [the government's] policies." *United States v. U.S. Dist. Court*, 407 U.S. 297, 314 (1972). Because Armendariz was participating in what the affidavit characterized as a "revolutionary and radical" protest in support of housing rights, Aplt. App. Vol. I at 35 ¶ 69; *id.* at 92, CSPD sought to find everything Armendariz had ever said about "protest," "housing," and "police" in her digital history. Because Armendariz advocated against white supremacy, *id.* at 36–37 ¶¶ 75–76, CSPD sought to scour her digital history for any thoughts she ever had about "yt" people or "human" "right[s]." Because Summey believed Chinook was "an anarchist or anti-government organization," *id.* at 106, CSPD sought any information Armendariz might have ever had about it.

If the district court's opinion is allowed to stand, then the right to be free from unreasonable searches that seek to discover a person's political ideas and associations is a hollow one in the Tenth Circuit. Adults almost always carry phones with them that contain their most private ideas. *See Riley*, 573 U.S. at 395, 403. And police seeking to understand a person's political beliefs and aspirations

have a plethora of laws to use as pretext for an arrest or search. *See Nieves v. Bartlett,* 587 U.S. 391, 412 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("[C]riminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something."). Under the district court's analysis, these facts of modern life would allow officers to comb through almost anyone's digital history in search of their ideas and beliefs just as they did with Armendariz. An antiabortion protester who jaywalks at a rally would lose her right to privacy in any communications she ever made about abortion, life, rights, and pro-life organizations with which she associates. A pro-Israel activist who draws a Jewish star on the side of a building would lose his right to privacy in any of his digital files mentioning Israel, Judaism, and stars, as well as his associations with other activists and pro-Israel lobbyist groups. A woman who obstructs traffic during a women's march would lose her right to privacy in any discussions of women—and their rights, health, issues, and obligations—and in her associations with any other women who might have participated in the same or other women's marches.

These dystopian visions are devoid of the "breathing space" that First Amendment freedoms need to survive. *Cox v. State of Louisiana*, 379 U.S. 559, 574 (1965). Because the warrant targets Armendariz's constitutionally protected views, activities, and political associations, this Court must apply the warrant

requirements with "particular exactitude." *Zurcher*, 436 U.S. at 565. Plaintiffs have plausibly alleged they were not met here.

## II.    The City Is Plausibly Liable Under Section 1983.

The district court dismissed Plaintiffs' municipal liability claims because it concluded there was no Fourth Amendment violation. Aplt. App. Vol. I at 151. That conclusion was wrong. *See supra* Section I. Moreover, the district court found only "arguable" probable cause for the warrant to search Armendariz's devices. *Id.* at 137 (citing *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable even if mistaken belief that probable cause exists.")). Because "arguable" probable cause is not enough to dismiss a municipal liability claim, the district court erred in dismissing the claim without analysis. *See Pyle v. Woods*, 874 F.3d 1257, 1264–65 (10th Cir. 2017) (noting the Court's conclusion that an officer did not violate clearly established law did not resolve claims against the city).

To establish municipal liability, plaintiffs must prove that (1) a municipal employee committed a constitutional violation, and (2) a municipal custom, policy, or practice was the moving force behind the constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *Myers v. Oklahoma Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). A municipal policy,

practice, or custom includes "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted).

As explained in Section I, Plaintiffs have alleged sufficient facts showing the individual defendants committed constitutional violations by drafting and obtaining the Armendariz warrants. They did so pursuant to a custom, policy, or practice of the City of Colorado Springs. Aplt. App. Vol. I at 48 ¶¶ 130–132. Plaintiffs' complaint describes several other instances of the City obtaining warrants to search protest participants' and organizations' private information, including their digital devices and social media communications, without probable cause to believe that doing so would turn up evidence of a particular crime. *Id.* at 28 ¶¶ 47–50, 52 ¶ 141, 53–55 ¶¶ 143–147. Plaintiffs also plausibly alleged that the City's custom, policy, or practice caused the constitutional violations at issue here. *Id.* at 48 ¶¶ 130–132; *see Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). Moreover, the City's actions stemmed from deliberate indifference. Aplt. App. Vol. I at 60 ¶ 180; *see Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1034 (10th Cir. 2020). Because the

district court failed to consider any of these allegations, dismissal of Plaintiffs'

municipal liability claim should be reversed.

## III. Defendants Summey and Ditzler Are Not Entitled to Qualified Immunity.

The district court found that Defendants Summey and Ditzler were entitled

to qualified immunity because there was probable cause to seize Armendariz's

devices, Aplt. App. Vol. I at 134, and at least "arguable probable cause" for their

subsequent search, *id.* at 137. Allowing the district court's opinion to stand—

holding that it is objectively reasonable to believe that dropping a bicycle in an

officer's path at a protest justifies scouring *all* of the suspect's communications

from any time period for mentions of "human," "protest," or "Jon"—would, in

practice, nullify the guarantees of the Fourth Amendment for protesters and others

who use digital devices in the Tenth Circuit.

Plaintiffs can overcome a qualified immunity defense by showing "(1) that

the defendant violated a constitutional or statutory right, and (2) that this right was

clearly established at the time of the defendant's conduct." *Cassady*, 567 F.3d at

634. As explained in Section I, Plaintiffs satisfy the first prong. As explained

below, they also satisfy the second prong.

"A right is clearly established if 'it would be clear to a reasonable officer

that his conduct was unlawful in the situation he confronted.'" *Mayfield v.*

*Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (quoting *Pauly v. White*, 814 F.3d

1060, 1074 (10th Cir. 2016)). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008) (quoting *Anderson v. Blake,* 469 F.3d 910, 914 (10th Cir.2006)). "There need not be precise factual correspondence between earlier cases and the case at hand, because general statements of the law are not inherently incapable of giving fair and clear warning." *Mink*, 613 F.3d at 1001 (quoting *Archuleta*, 523 F.3d at 1283); *see also Mayfield*, 826 F.3d at 1258 ("The question is not whether there is a prior case with precisely the same facts, but 'whether the law put officials on fair notice that the described conduct was unconstitutional.'" (quoting *Pauly*, 814 F.3d at 1075)).

As explained in Section I, the Armendariz warrants are overbroad in violation of the Fourth Amendment's particularity requirement. "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *Groh v. Ramirez*, 540 U.S. 551, 563 (2004); *Cassady*, 567 F.3d at 644. And the warrants violate the particularity requirement in a manner that has been specifically condemned by this Court.

In *Voss*, this Court reaffirmed the longstanding principle that "[t]he particularity requirement ensures that a search is confined in scope to particularly

described evidence relating to a specific crime for which there is demonstrated probable cause." 774 F.2d at 404. It invalidated a warrant based on an affidavit that "alleged a scheme of tax fraud" where "[t]he bulk of the warrant was not restricted to evidence related to tax fraud." *Id.*

Here, too, while the affidavits describe a momentary bicycle drop, the search is not restricted to evidence of that incident. The Armendariz warrants present the exact same "dangers inherent in allowing a warrant so broadly drawn" as in *Voss*, *id.* at 405, because, for example, a search for "police" sweeps in criticisms of any police officer, communications about any misconduct reports, and political ideas about police power. A keyword search for "right" sweeps in commentary on any constitutional or human right, as well as ideas with which Armendariz expressed agreement ("yes, that's right"). The government lacked probable cause to believe this sort of information would constitute evidence of the alleged bicycle crime. *Voss* clearly establishes that the Armendariz warrants violate the particularity requirement.

The Tenth Circuit also held in *Leary* that officers cannot reasonably rely on warrants that violate the particularity requirement. 846 F.2d at 607, 609. There, the court considered a warrant that directed officers to seize records "'relating to' violations of the federal export laws." *Id.* at 609. The court held not only that the warrant provided insufficient guidance, but also that the warrant was "so facially

deficient" that officers' reliance on it was unreasonable. *Id.* And in *Cassady*, this Court held that where a warrant is "impermissibly overbroad, the clearly established prong is easily satisfied." 567 F.3d at 644 (holding that a warrant authorizing a search of any evidence of any criminal activity violated clearly established law); *see also Mink*, 613 F.3d at 1010-12 (denying qualified immunity to deputy district attorney who approved search warrant that violated the particularity requirement).

As in *Leary*, *Cassady*, and *Mink*, the Armendariz warrants violate the particularity requirement by failing to limit the search to evidence of particular criminal activity. Even a cursory glance at the keyword search makes clear that its scope exceeds evidence of the bicycle incident in order to target Armendariz's First Amendment-protected activities and find information about Chinook, its leaders, and Colorado Springs activism.

The proscription against this type of overbroad warrant is not only clearly established in the Tenth Circuit—it was "part of the intellectual matrix within which our own constitutional fabric was shaped." *Marcus v. Search Warrant of Property*, 367 U.S. 717, 729 (1961). Historically, broad search and seizure powers in England were used to suppress speech. *Id.* But "[e]nforcement through general warrants was finally judicially condemned" in 1765 in *Entick v. Carrington*, 19 How. St. Tr. 1029, "one of the landmarks of English liberty." *Id.* at 728. There,

Lord Camden invalidated a warrant that authorized the seizure of all papers of a writer for an opposition paper, holding it was impermissible for the writer's "most valuable secrets [to be] taken out of his possession" before he was found to have committed a crime. *Id.*

The Armendariz warrants permit the same type of rummaging that was condemned in England and that motivated the Fourth Amendment—only with enhanced potential for intrusion afforded by modern technological advances. Now, officers need not physically rummage through every drawer in a person's home to locate dissenting literature; they can simply seize every digital device a person has, and then search them for all mentions of "protest," "pig," or "yt." In today's world, officers can obscure their abusive searches by making them appear narrower—e.g., by including specific search terms—to target disfavored speech while sweeping in vast amounts of protected activity unrelated to a particular crime.

While the district court emphasized the need to identify clearly established law with specificity, Aplt. App. Vol. I at 141, this Court has recognized that "defining a right too narrowly risks making recovery against a public official virtually impossible because only 'those rare cases in which a precedential case existed which was "on all fours" factually with the case at bar' would abrogate qualified immunity." *Mayfield,* 826 F.3d at 1258 (quoting *Melton v. City of Okla. City*, 879 F.2d 706, 729 n.37 (10th Cir. 1989)). And "some things are so obviously

unlawful that they don't require detailed explanation[,] and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Rosales v. Bradshaw*, 72 F.4th 1145, 1156 (10th Cir. 2023) (quoting *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017)).

It is "clearly established that 'a government official may not base her probable cause determination on . . . speech protected by the First Amendment.'" *Jordan v. Adams Cnty. Sheriff's Office*, 73 F.4th 1162, 1171 (10th Cir. 2023) (quoting *Mink*, 613 F.3d at 1003–04). Summey is not entitled to qualified immunity because any reasonable officer would know that using a person's political speech and associations to broaden the scope of a search warrant is unlawful. Ditzler is likewise liable for deliberately signing off on Summey's warrant because it was obviously unconstitutional on its face, authorizing officers to rummage through Armendariz's entire digital life for any mention of "cop," "protest," or "right" rather than to uncover evidence of a crime. *See Mink*, 613 F.3d at 1012 (denying qualified immunity to deputy district attorney who reviewed and approved an unconstitutional search warrant); *Cassady*, 567 F.3d at 644 (denying qualified immunity to an officer whose subordinate obtained an unconstitutional warrant). Plaintiffs have plausibly alleged that Defendants Summey and Ditzler are

liable for obtaining unconstitutional warrants to search Armendariz's digital devices.[4]

## IV. Defendants Must Return or Destroy Copies of Armendariz's Digital Data.

Armendariz is entitled to the return or destruction of her data because Defendants seized it illegally. *See supra* Section I. Moreover, Defendants' retention of her data is unconstitutional because Defendants have no reasonable justification for continuing to possess the data. It is now years after Armendariz reached a plea agreement in her criminal case and completed six months of unsupervised probation; there is no justification for retaining her most intimate ideas about assaults, officers, and human rights. Aplt. App. Vol. I at 46–66 ¶¶ 119, 129, 167–69, 203–205, 215–16.

### A. The Return or Destruction of Armendariz's Data Is a Proper Remedy for the Government's Unconstitutional Seizure.

When the government unlawfully seizes a person's property, return of that property is a proper remedy. *See, e.g.*, *Doe v. U.S. Air Force*, 812 F.2d 738, 740-41 (D.C. Cir. 1987) (appropriate relief includes the government's surrender of

---

[4] The doctrine of qualified immunity, which "cannot be located in § 1983's text and may have little basis in history," should not insulate Defendants from liability in any event. *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting denial of certiorari); *see also Green v. Thomas,* No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133, at *18 (S.D. Miss. May 20, 2024) ("Qualified immunity . . . does not appear in the text of [Section 1983] . . . [and] nullifies the guarantees of the Bill of Rights.").

retained copies and information obtained by an unreasonable search and seizure);

*ADAPT of Phila. v. Phila. Hous. Auth.*, 417 F.3d 390, 394 (3rd Cir. 2005) (finding

"return or destruction" of compilations made from confidential information would

"alleviate, at least in part, any affront to the privacy rights of the individuals . . .");

*Reich v. Nat'l Eng'g & Contracting. Co.*, 13 F.3d 93, 98 (4th Cir. 1993) (In a

challenge to the collection of confidential information by the Occupational Safety

and Health Administration, the court found that the "privacy interest . . . in the

delivered copies . . . plainly would be benefited by an order requiring OSHA to

return or destroy these copies."). Because Armendariz's digital data was

unconstitutionally seized, the data copied therefrom must be returned or destroyed.

**B.    Defendants Continue to Violate Armendariz's Rights by Retaining Copies of Her Data Without Justification.**

Even when a seizure is initially executed in a constitutional manner, the

retention of the seized property for an unreasonable duration can raise independent

Fourth Amendment concerns. *See, e.g.*, *Asinor v. D.C.*, No. 22-7129, 2024 WL

3733171, at *9 (D.C. Cir. Aug. 9, 2024); *Brewster v. Beck*, 859 F.3d 1194, 1197

(9th Cir. 2017). For example, in *Asinor*, the D.C. Circuit reversed the dismissal of

Fourth Amendment claims premised on the retention of phones that were lawfully

seized when plaintiffs were arrested at a protest. 2024 WL 3733171, at *1, *9.

Plaintiffs were released shortly after their arrests, but police kept their phones for

months. *Id.* at *1–2. The court recognized that "[m]odern caselaw confirms that the

Fourth Amendment governs what happens after the government initially seizes property," *id.* at *4, and held that "plaintiffs' allegations raise serious questions about the reasonableness of the [police department's] handling of their property for months or years after their release from custody without charges," *id.* at *9.

Likewise in *Brewster*, the Ninth Circuit recognized that "[t]he Fourth Amendment doesn't become irrelevant once an initial seizure has run its course." *Brewster*, 859 F.3d at 1197. There, police seized Brewster's vehicle because Brewster's brother-in-law was driving it with a suspended license. *Id.* at 1195. State statute provided that seized vehicles be impounded for 30 days. *Id*. Three days after the seizure, Brewster appeared at a hearing with proof that she owned the vehicle and had a valid license. *Id.* The court decided that the Fourth Amendment required further authorization to continue holding the vehicle, "[b]ecause a 30-day impound is a 'meaningful interference with an individual's possessory interests in [his] property.'" *Id.* at 1196–97 (quoting *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992)). And "[a] seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force. Thereafter, the government must cease the seizure or secure a new justification." *Id.* at 1197.

Here, Defendants' prolonged retention of Armendariz's data is also a "meaningful interference," *id.* at 1196, with Armendariz's possessory and privacy

rights. Armendariz cannot exercise her right to destroy her data, *see Almeida v. Holder*, 588 F.3d 778, 788 (2d Cir. 2009) ("The rights and benefits of property ownership . . . include not only the right to actual possession of a thing, but also the right to . . . destroy it." (citing Hon. James L. Oakes, *"Property Rights" in Constitutional Analysis Today*, 56 Wash. L. Rev. 583, 589 (1981))), or her right to exclude others from it, *see United States v. Karo*, 468 U.S. 705, 729 (1984) (Stevens, J., concurring in part, dissenting in part) ("The owner of property, of course, has a right to exclude from it all the world, including the Government, and a concomitant right to use it exclusively for his own purposes."); *see also Ziegler v. Sarasota Police Dep't*, No. 2024-CA-001409-NC, at 34 (Fla. Dist. Ct. App. July 1, 2024) (government's retention of copies of data would violate owner's property rights "because it destroys his ability to control that property and exclude others from it").[5] And the Supreme Court has established that individuals have a reasonable expectation of privacy in the contents of their phone and in months' worth of historical cell-site records. *Carpenter*, 585 U.S. at 311; *Riley*, 573 U.S. at s403.

In *Lindell v. United States*, the Eighth Circuit considered the retention of MyPillow CEO Mike Lindell's phone and digital data as part of an investigation into an election-related security breach. 82 F.4th 614, 621 (8th Cir. 2023). The

---

[5] This decision is not electronically available, so it is attached to the brief.

court recognized that "[t]he government's continued retention of the phone and all its data raises constitutional issues distinct from the lawfulness of the search warrant or its execution." *Id.* And "[g]iven the necessity of cell phones in everyday life and the related privacy concerns regarding the breadth of data that they contain, the government's continued retention of Lindell's cell phone and all its data (including that which is entirely unrelated to the government's investigation), without adequate justification, could amount to a callous disregard of Lindell's constitutional rights." *Id.* at 622.

The Eighth Circuit remanded the case, directing the district court to properly "balance the government's interest in retaining Lindell's cell phone and all its data against Lindell's right to get the property back . . ." *Id.* Here, in reversing the district court's dismissal, this Court should balance the government's interest in retaining all of Armendariz's digital data against Armendariz's right to have it returned or destroyed.

The balance weighs heavily in Armendariz's favor. Despite Armendariz's significant possessory and privacy interests in her data, Defendants continue to have unfettered access to her most private thoughts, communications, and documents that were stored on any of her digital devices seized more than two years ago.

On the other side of the scale, the government has *no* interest in continuing to retain all of Armendariz's digital data because the criminal case against her is over. "[A]bsent sufficient justification, the government has no right to hold onto property that is not contraband indefinitely." *Id.* at 621. The court must therefore "determine from the record before [it] whether the government can reasonably justify its continued refusal to return [the property]." *Id.* at 622. Here, Armendariz has adequately pled that the government has no justification for retaining her data, and Armendariz has every interest in its return or destruction. The district court erred in dismissing Armendariz's claims for the return or destruction of her digital data.

**V.    Plaintiffs Plausibly Allege Defendants Violated the Fourth and First Amendments in Obtaining the Warrant to Search Chinook's Facebook Data.**

**A.    The Chinook Warrant Is Overbroad.**

The Fourth Amendment requires that a search be confined to "evidence relating to a specific crime for which there is demonstrated probable cause." *Voss*, 774 F.2d at 404. But the Chinook warrant fails to identify any specific crime under investigation. Aplt. App. Vol. I at 28 ¶ 50. While the first page of the affidavit says "arrest were made [*sic*] for Obstructing Passage or Assembly, and Resisting, Interference with a Public Official," the only actual arrest discussed is that of

Shaun Walls. *Id.* at 118. The affidavit fails to connect Chinook's Facebook account to Walls' arrest or to any other arrest.

Instead, the warrant appears to be in service of a generalized investigation into the July 31 housing march itself—which Steckler's affidavit impermissibly treats as "illegal" in its entirety. *See id.* at 28–29 ¶¶ 48–53.

But protest activity itself is not "illegal" and cannot form the sole basis for a Fourth Amendment search. *Mink*, 613 F.3d at 1003–04 ("It goes without saying that a government official may not base her probable cause determination on an 'unjustifiable standard,' such as speech protected by the First Amendment." (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Even if individual criminal acts occur during a protest, the protest itself is not rendered illegal—and its participants are not all automatically rendered criminals. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 915–16 (1982) (although acts of violence occurred, nonviolent elements of boycotters' activities were protected by the First Amendment); *id.* at 933 ("A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts.").

The Chinook affidavit does not provide probable cause to believe that illegality pervaded every aspect of the housing march, the Chinook Center, or

Chinook's Facebook account; the broad search of the account is therefore unjustified. *See Voss*, 774 F.2d at 406 ("Even if the allegedly fraudulent activity constitutes a large portion, or even the bulk, of the NCBA's activities, there [was] no justification for seizing records and documents relating to its legitimate activities.").

The Chinook affidavit also does not establish a nexus between Chinook's Facebook account and any crime. The affidavit mentions obstruction and interference offenses, and states that protesters blocked traffic after being told not to. Aplt. App. Vol. I at 118. But there is no suggestion that any information from Chinook's Facebook account relates to these alleged offenses. While the affidavit cites Defendant Steckler's experience that "people involved in illegal demonstrations use social media to organize planned events," the affidavit provides no facts to suggest that any illegal activity "was organized prior to 07/31/21." *Id.* at 119. Relying on this conclusory assertion to justify such a broad search would mean that, no matter the alleged crime, an officer could get authorization to rummage through a person or organization's communications simply by stating an unfounded belief that the crime was planned prior to the date of its occurrence. Moreover, the affidavit provides no justification for why the timeframe of the search extends two days after the march. Merely mentioning crimes in an affidavit

"is not enough" when those crimes are unrelated to the place to be searched and the items to be seized. *Cassady*, 567 F.3d at 636.

The furthest Steckler goes in attempting to justify the search of Chinook's Facebook account is stating that he "believes the information gained from the . . . Facebook profile[] will be material evidence in this case." Aplt. App. Vol. I at 119. Here again, Steckler does not specify what "this case" is. And the Supreme Court has held that, in assessing whether an affidavit establishes probable cause for a search, "[a] sworn statement of an affiant that 'he has cause to suspect and does believe that' liquor illegally brought into the United States is located on certain premises will not do," because such a conclusory statement "gives the magistrate virtually no basis at all for making a judgment regarding probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *see also Poolaw v. Marcantel*, 565 F.3d 721, 733–34 (10th Cir. 2009) ("[P]robable cause cannot be established . . . 'simply by piling hunch upon hunch.'" (quoting *United States v. Valenzuela,* 365 F.3d 892, 897 (10th Cir.2004))).

The only information Steckler's affidavit provides about the Chinook account is that another detective contacted Steckler "and stated a second profile was under the name of the Chinook Center was located [sic] in which the protest was organized under the events tab," and when Steckler went to the page, he saw details about the housing march, including its starting location. Aplt. App. Vol. I at

119. At best, this information indicates that Chinook's Facebook profile contains information about the housing march. It does not indicate that Chinook's Facebook data constitutes evidence of a particular crime. Nor does it provide any basis to find probable cause to believe that Chinook's Facebook account contains evidence of any particular crime.

### B. The Chinook Warrant's Overbreadth Is Especially Egregious Because It Encompasses First Amendment-Protected Speech and Association.

Here, as in *Voss*, "[t]he warrant['s] overbreadth is made even more egregious by the fact that the search at issue implicated free speech and associational rights." *Voss*, 774 F.2d at 405. In *Voss*, this Court noted that the NCBA "espouses dissident views on the federal tax system and advocates a return to currency backed by gold and/or silver." *Id.* NCBA's speech and advocacy—like Chinook's speech and advocacy—is protected by the First Amendment, and so the Fourth Amendment's warrant requirements must be applied with "the most scrupulous exactitude." *Id.* (quoting *Stanford*, 379 U.S. at 485).

This is doubly true where the warrant is not only targeting an advocacy organization, but also targeting speech on social media, which is one of the "most important places . . . for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). "Social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human

thought.'" *Id.* at 105 (quoting *Reno v. ACLU*, 521 U.S. 844, 852 (1997)). Yet the Chinook warrant is not limited to data related to a particular crime—it authorizes a search of *all* Facebook Messenger chats, posts, and events from a six-day period, as well as all subscriber information tied to Chinook's account.

The district court held that, because Defendant Steckler had evidence that Chinook organized the protest and that Chinook "had details about the protest on the events tab on its Facebook account," it was objectively reasonable for Steckler to believe there was probable cause to search the subscriber information, posts, messenger chats, and events for Chinook's Facebook profile. Aplt. App. Vol. I at 146. The district court's erroneous interpretation of the probable cause requirement would have drastic consequences for the right to privacy in one's associations and the right to protest. It would mean that, after any protest at which minor crimes were allegedly committed, law enforcement could search all the data of any organization that had posted the time and location of the protest on Facebook. In other words, an organization's association with a protest at which anything illegal happened would constitute probable cause to search all of the organization's digital data. This is inconsistent with the Supreme Court's admonition that speech and assembly "do[] not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *Claiborne*, 458 U.S. at 908. And it threatens "the practice

50

of persons sharing common views banding together to achieve a common end," which is "deeply embedded in the American political process." *Citizens Against Rent Control/Coal. For Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981).

Moreover, "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). By seizing all subscriber information tied to Chinook's Facebook profile, thereby disclosing individuals' association with Chinook, the warrant pierces the "[i]nviolability of privacy in group association" which "may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* And, as this case demonstrates, once CSPD believes an individual is associated with Chinook, that individual may be subjected to unconstitutionally overbroad warrants targeting their own political beliefs and activism.

The Supreme Court has recognized that the right to protest may be stifled "not only [by] heavy-handed frontal attack" but also by "more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *see also NAACP*, 357 U.S. at 461 ("In the domain of [First Amendment freedoms], the decisions of this Court recognize that abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action.").

Defendants' practices here are precisely the sort of governmental interference that this Court must condemn in order to protect the "peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society." *Cox*, 379 U.S. at 574.

## VI. Plaintiffs Plausibly Allege the City Is Liable for Obtaining the Chinook Warrant.

As explained in Section V, Plaintiffs have pled sufficient facts that Defendants Steckler and Otero committed constitutional violations by drafting and obtaining the Chinook warrant. Plaintiffs have also pled sufficient facts that they did so pursuant to the same custom, policy, or practice of using controversial protests as justification to rummage through activists' communications and associations that led to the unconstitutional Armendariz warrants. Aplt. App. Vol. I at 48–49 ¶¶ 130–132, 60 ¶ 182. For the reasons explained in Section II, the district court erred in dismissing Plaintiffs' municipal liability claim. Aplt. App. Vol. I at 151.

## VII. Defendants Steckler and Otero Are Not Entitled to Qualified Immunity.

It has long been "clearly established that warrants must contain probable cause that a *specific crime* has occurred and meet the particularity requirement of the Fourth Amendment in order to be constitutionally valid." *Mink*, 613 F.3d at 1011 (emphasis in original); *Voss*, 774 F.2d at 404. There must be "more than a *possibility* that evidence of the [crime] would be found [in the place to be

searched.]" *Poolaw*, 565 F.3d at 734. Yet the Chinook warrant fails to identify which crime is being investigated, and why any evidence of that crime would be found in Chinook's Facebook account.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Cassady*, 567 F.3d at 643 (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007)). In *Cassady*, officers had probable cause to search for evidence of marijuana cultivation, but they obtained a warrant to seize "all other evidence of criminal activity," which, in practice, "authorized the seizure of *all* possible evidence of *any* crime in *any* jurisdiction." *Id.* at 635. There, as here, it was "not enough that the warrant makes reference to a particular offense; the warrant must 'ensure[] that [the] search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause.'" *Id.* 636 (quoting Voss, 774 F.2d at 404). Like *Cassady*, "the clearly established prong is easily satisfied" here. *Id.* at 644.

The district court held that, because Steckler had "evidence of Walls' and others' use of Facebook to post information about the July 31 protest that resulted in multiple arrests, including evidence that Chinook organized and had details about the protest on the events tab on its Facebook account," "it was objectively reasonable for Steckler to believe there was probable cause that material evidence

for use in a subsequent prosecution(s) involving those arrested would be found within the subscriber information, posts, messenger chats, and events tab of the Chinook Facebook profile." Aplt. App. Vol. I at 146.

But accepting the district court's conclusion would mean that officers could never be held liable for an overbroad search of an organization's digital data so long as there was some reason to believe the organization played some role in a protest at which some violation like jaywalking occurred. Clearly established law is to the contrary; it is "well-settled that for probable cause to exist there must be a 'nexus between . . . suspected criminal activity and the place to be searched.'" *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005). Indeed, "the necessity of a nexus between the suspected criminal activity and the particular place to be searched is so well established that in the absence of such a connection, 'the affidavit and resulting warrant are so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Poolaw*, 565 F.3d at 734 (quoting *Gonzales*, 399 F.3d at 1231). Because the Chinook affidavit fails to identify any nexus between the Chinook Facebook account and any particular crime, Defendants Steckler and Otero's reliance on it was entirely unreasonable, and they are not entitled to qualified immunity.

## CONCLUSION

For the above reasons, the District Court's order dismissing Plaintiffs-Appellants' claims should be reversed in full, and this case should be allowed to proceed to discovery.[6]

Date: August 21, 2024

Respectfully submitted,

/s/ *Theresa Wardon Benz*
Theresa Wardon Benz
Jacqueline V. Roeder
Kylie L. Ngu
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, Colorado 80202
Tel.: (303) 892-9400
theresa.benz@davisgraham.com

/s/ *Laura Moraff*
Timothy R. Macdonald
Sara R. Neel
Anna I. Kurtz
Mark Silverstein
Laura Moraff
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF COLORADO
303 East 17th Avenue, Suite 350
Denver, Colorado 80203
Tel.: (720) 402-3151
lmoraff@aclu-co.org

*Counsel for Plaintiffs-Appellants*

---

[6] The district court dismissed Chinook's claim under the Stored Communications Act and Plaintiffs' state law claims based on its erroneous conclusion that Defendants did not violate the Fourth or First Amendments. Aplt. App. Vol. I at 152, 160. Accordingly, Plaintiffs request that the Court reverse the dismissal of those claims as well and remand for proper consideration.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Times New Roman in 14-point type with the exception of the caption which is in Time New Roman 13-point type.

I further certify that this brief complies with the length of Fed. R. App. P. 32(a)(7)(B) because it contains 12,876 words, excluding the parts of the brief exempted under Rule 32(f), according to the count of Microsoft Word.

Dated: August 21, 2024                    /s/ *Theresa Wardon Benz*
                                          Theresa Wardon Benz

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs' counsel believe that oral argument would aid this Court's disposition of the appeal, which raises critical issues for protestors in the digital age. The disposition of this appeal will impact many activists beyond the parties to this case who attend protests, use digital devices and social media, and aim to exercise their First Amendment rights without losing their right to privacy in their political speech and associations.


/s/ *Theresa Wardon Benz*
Theresa Wardon Benz

## CERTIFICATE OF SERVICE

I certify that on August 21, 2024, the foregoing opening brief was filed

electronically through CM/ECF. Notice of this filing will be sent by email to all

parties by operation of the Court's electronic filing system, including:

Anne Hall Turner
OFFICE OF THE CITY ATTORNEY OF THE CITY OF COLORADO SPRINGS
30 South Nevada Avenue, Suite 501
Colorado Springs, Colorado 80903
anne.turner@coloradosprings.gov

*Counsel for Defendants City of Colorado Springs, B.K. Steckler, Jason S. Otero and Roy S. Ditzler*


Marissa R. Miller
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Marissa.Miller@usdoj.gov

*Attorney for Defendants Daniel Summey, Federal Bureau of* Investigation*, and the United States*


Dated: August 21, 2024                    /s/ *Theresa Wardon Benz*
                                          Theresa Wardon Benz

# ATTACHMENT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:23-cv-01951-SKC-MDB

JACQUELINE ARMENDARIZ and
CHINOOK CENTER,

      Plaintiffs,

v.

CITY OF COLORADO SPRINGS,
DANIEL SUMMEY, in his individual capacity,
B.K. STECKLER, in his individual capacity,
JASON S. OTERO, in his individual capacity,
ROY A. DITZLER, in his individual capacity,
FEDERAL BUREAU OF INVESTIGATION, and
UNITED STATES OF AMERICA.

---

## ORDER ON MOTIONS TO DISMISS (DKTS. 49, 50, 51, 52)

---

      Before the Court are four separate motions to dismiss the First Amended

Complaint (FAC). Dkts. 49, 50, 51, and 52.[1] The FAC alleges six claims for relief. Dkt.

12. The first Motion to Dismiss is by Defendants Daniel Summey, the Federal Bureau

of Investigation, and the United States. Their Motion (Dkt. 49) seeks dismissal of

Claims 1, 4, and 6. The second Motion to Dismiss is by Defendant Roy Ditzler. His

---

[1] The Court uses "Dkt. __" to refer to entries from the CM/ECF electronic docket. All
references to page numbers within an electronic docket entry are to the page number
found in the CM/ECF blue-font header.

1

Motion (Dkt. 50) seeks dismissal of Claims 1 and 4, and he also joins in the first Motion to Dismiss. The third Motion to Dismiss is brought by Defendants B.K. Steckler and Jason Otero. Their Motion (Dkt. 51) seeks dismissal of Claims 2, 3, and 5. The fourth and final Motion to Dismiss is brought by Defendant City of Colorado Springs. Its Motion (Dkt. 52) seeks dismissal of Claims 1, 2, and 3.

The Motions to Dismiss are all fully briefed. The Court requested additional briefing related to the individual law enforcement defendants' claims of qualified immunity. Dkt. 93. The Court has carefully considered the Motions and their full briefing, the additional briefing submitted in compliance with the Court's order, and relevant legal authorities. No hearing is necessary.

As explained in detail below, because the FAC fails to plausibly allege a constitutional violation, the First and Second Claims for Relief are barred against Defendants Summey, Ditzler, Steckler, and Otero, based on their qualified immunity. Those claims correspondingly fail against the City because there can be no municipal liability in the absence of a constitutional violation. The Third Claim for Relief against Defendants Steckler, Otero, and the City fails for similar reasons considering the FAC's failure to plausibly plead a constitutional violation regarding the Facebook Warrant. The Sixth Claim for Relief against Defendant FBI fails because the FAC does not plausibly plead a Fourth Amendment violation for the return of copies of records obtained with a lawful search warrant. And because all the federal law claims fail, the Court declines to exercise supplement jurisdiction over the state law claims—

Claims 4 and 5, and the Court additionally lacks subject matter jurisdiction over Claim 4 as asserted against the United States. The Motions to Dismiss are thus GRANTED.

## BACKGROUND

This background is taken from the well-pleaded factual allegations in the FAC, which the Court accepts as true and views in the light most favorable to Plaintiffs. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010). The individual defendants are all law enforcement personnel employed by Defendant City of Colorado Springs. The Court sometimes refers to Defendants Summey, Steckler, Otero, and Ditzler as the Law Enforcement Defendants or LEDs. The case arises out of the LEDs' actions following a housing rights march in Colorado Springs on July 31, 2021. Dkt. 12 at ¶3. Plaintiff Chinook Center and several other groups helped organize the march. *Id.* Plaintiff Jacqueline Armendariz marched at the event, along with prominent Chinook Center members and other activists concerned about the local housing crisis. *Id.*

Ultimately, a commander from the Colorado Springs Police Department ordered arrests of prominent Chinook Center members for marching in the street even after they complied with police requests to move onto the sidewalk. *Id.* at ¶¶4, 40. The arrests included Chinook Center leader Shaun Walls who had been at the front of the march carrying a white flag with the Chinook Center logo. *Id.* at ¶41.

3

Plaintiff Armendariz was also eventually arrested. During the march, she was walking her bicycle in the bike lane near the front of the march when police tackled Walls, which she witnessed. *Id.* at ¶42. When she saw another officer in riot gear running towards her, she dropped her bike. *Id.* The bike landed between her and the officer. *Id.* The officer avoided the bike and continued toward the protestors. *Id.* The encounter was captured on multiple police body-worn cameras and a police department overhead drone. *Id.*

Although officers did not arrest Armendariz at the scene, they subsequently decided that dropping the bicycle in front of the officer was a case of felony attempted aggravated assault on a police officer, identified as Officer Anthony Spicuglia. *Id.* at ¶43. Defendant Summey was assigned the task of identifying the person who committed the alleged offense. *Id.* at ¶57. He pored over officer body worn camera, drone footage, and conducted multiple internet searches. *Id.* He found photographs and other information showing that Armendariz was the person who dropped her bike in front of the officer at the housing march. *Id.* He also found information indicating that she had been politically active and had some connection to the Chinook Center. *Id.*

On August 6, 2021, Summey submitted an affidavit to obtain an arrest warrant for Armendariz. *Id.* At the same time, he submitted, and Defendant Ditzler approved, an affidavit to obtain a search warrant to search Armendariz's home and seize the items they determined she was wearing or using at the housing march. *Id.* at ¶¶160,

162, 200; *see also* Dkt. 49-1. The warrant included the seizure of all "digital media storage devices" associated with Armendariz, including all "phones, computers, tablets, thumb drives, and external hard drives" found in her home. Dkt. 12 at ¶88; Dkt. 49-1 at p.18. When officers arrested Armendariz outside her home on August 18, 2021, they searched her home and seized items specified in the warrant. Dkt. 12 at ¶¶89-94.

On August 20, 2021, after conclusively determining that Armendariz was the person who dropped her bike in front of the officer at the rally, Summey submitted a second affidavit to obtain a warrant to search Armendariz's three cell phones, her two computers, and her external hard drive. *Id.* at ¶95. Summey's affidavit to search the devices repeated the litany of conclusions from his arrest affidavit and his affidavit to seize the devices, but also added more, including specified key words to use to search the electronic devices. *Id.* at ¶¶95-96. Ditzler reviewed and approved Summey's warrant application and affidavit for the search of Armendariz's devices. *Id.* at ¶¶160, 162, 200.

The police department enlisted the help of the FBI to search, seize, and copy Armendariz's electronic devices. *Id.* at ¶¶126-28. The FBI continues to retain copies of the data. *Id.* at ¶129. Armendariz ultimately reached a plea agreement for obstructing a peace officer, received a deferred judgment, and successfully served six months of unsupervised probation. Dkt. 12 at ¶119.

As for Plaintiff Chinook Center, a few days after the housing demonstration, police sought a search warrant for "All Facebook Messenger chats tied" to the Chinook Center Facebook page. Dkt. 12 at ¶45; *see also* Dkt. 51-1. Steckler drafted, and Otero reviewed and approved, the affidavit submitted to the state district court in support of the warrant. Dkt. 12 at ¶55. The warrant was served on Facebook, which complied with it. *Id.* at ¶56.

Plaintiffs bring six claims for relief, asserted as follows:

| PLAINTIFF | CLAIM | DEFENDANTS |
|---|---|---|
| Armendariz | **First Claim for Relief:** unlawful search and seizure in violation of First and Fourth Amendments; 42 U.S.C. § 1983 | Summey Ditzler City of Colorado Springs |
| Chinook Center | **Second Claim for Relief:** unlawful search and seizure in violation of First and Fourth Amendments; 42 U.S.C. § 1983 | Steckler Otero City of Colorado Springs |
| Chinook Center | **Third Claim for Relief:** unlawful search in violation of Stored Communications Act | Steckler Otero City of Colorado Springs |
| Armendariz | **Fourth Claim for Relief:** Deprivation of Rights in violation of Colo. Const. Art. II §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131 | United States[2] Ditzler |
| Chinook Center | **Fifth Claim for Relief:** Deprivation of Rights in violation of Colo. Const. Art. II §§ 7, 10, 24; Colo. Rev. Stat. § 13-21-131 | Steckler Otero |

---

[2] In a prior order (Dkt. 62), the Honorable Magistrate Judge Maritza Dominguez Braswell granted the United States' Motion to substitute itself as a party for Summey as to Claim 4.

| Armendariz | **Sixth Claim for Relief:** injunctive relief under First[3] and Fourth Amendments; 5 U.S.C. § 702 | FBI |

## LEGAL PRINCIPLES

### A.    Motions under Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While the Court accepts the well-pleaded facts as true and views the allegations in the light most favorable to the non-movant, the Court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (cleaned up).

The *Twombly/Iqbal* pleading standard requires courts to take a two-prong approach to evaluating the sufficiency of a complaint. *Iqbal*, 556 U.S. at 678–79. The first prong requires the court to identify which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id.* at 678. The second prong requires the court to

---

[3] *See infra* n.9.

assume the truth of the well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "Accordingly, in examining a complaint under Rule 12(b)(6), [courts] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). Conclusory allegations are those that express "a factual inference without stating the underlying facts on which the inference is based." Black's Law Dictionary (11th ed. 2019); *see also Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) (Conclusory allegations fail to apprise defendants "of the conduct that forms the basis of the charges against them."); *Morris v. Thaler*, 425 F. App'x 415, 421 (5th Cir. 2011) (Conclusory allegations are "vague, lacking in specifics, or amount to mere recitations of the relevant legal standards without any supporting factual narrative.").

## B.    Qualified Immunity

Qualified immunity shields individual defendants in Section 1983 actions unless their conduct was unreasonable based on clearly established law. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). The court has discretion to consider these prongs in any order. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011).

Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Raising the qualified immunity defense with a motion under Rule 12(b)(6) subjects the defendant to a more challenging standard than what applies at the summary judgment stage. *Id.* "At the motion to dismiss stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness." *Id.* (cleaned up). The court must consider whether the facts alleged in the complaint plausibly allege a violation of a constitutional right, and whether the right at issue was clearly established. *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013).

And because the Section 1983 claims here involve allegations of unconstitutional search and seizure warrants obtained and executed by law enforcement, the Court may also consider the warrants and their supporting affidavits because these documents are alleged in the FAC, they are central to Plaintiff's Section 1983 claims, and no party has raised a dispute about their authenticity. *See N. Arapaho Tribe v. Becerra*, 61 F.4th 810, 814 (10th Cir. 2023). Any "factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1385 (10th Cir.1997).

"Qualified immunity applies equally to reasonable mistakes of law and fact." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014). When a defendant raises qualified immunity in defense of an unlawful search and seizure claim, courts examine whether the defendant violated clearly established law by determining whether the officer's conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists. *Id.* at 1141. This is known as "arguable probable cause." *Id.* A defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed for the search or seizure. *Id.*

Further, "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). But the inquiry doesn't end there. Qualified immunity should not be granted when the officer seeking the warrant misrepresented or omitted material facts to the judge rising to the level of a deliberate falsehood or reckless disregard for the truth. *Stonecipher*, 759 F.3d at 1142. Or, when it is obvious no reasonably competent officer would have concluded a warrant should issue, such as when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Messerschmidt*, 565 U.S. at 547 (internal quotations and citation omitted). But the threshold to establish the latter is high—the Supreme Court has explained that in the ordinary course, "an officer cannot be

expected to question the magistrate [judge]'s probable-cause determination" because it is the judge's "responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.* (quoting and citing *United States v. Leon*, 468 U.S. 897, 921 (1984)).

## ANALYSIS

Plaintiffs sued Summey, Steckler, Otero, and Ditzler, each in their individual capacity for their respective roles in securing one or more of the warrants alleged in the FAC. The LEDs each claim qualified immunity on Plaintiffs' First and Fourth Amendment claims (Claims 1 and 2). The Court first addresses application of qualified immunity to the Fourth Amendment claims.

**A.    Qualified Immunity and the FAC's Fourth Amendment Claims**

**1.    Summey and the Armendariz Warrants**

The Court first considers whether the FAC plausibly alleges Summey violated a constitutional right by obtaining and executing Warrant 1 (home search and seizure) and Warrant 2 (device search and seizure). Because the Court finds the FAC fails to plausibly allege a constitutional violation respecting Summey and the Armendariz Warrants, he is entitled to qualified immunity.

The Fourth Amendment's warrant requirement provides "no Warrants shall issue, but upon probable cause," and a warrant must "particularly [describe] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The

warrant must "describe the things to be seized with sufficient particularity to prevent a 'general, exploratory rummaging in a person's belongings.'" *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). The Fourth Amendment also requires "the scope of the warrant be limited to the specific areas and things for which there is probable cause to search." *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988).

Whether probable cause exists is a "flexible, common-sense standard, and no single factor or factors is dispositive." *United States v. Knox*, 883 F.3d 1262, 1275 (10th Cir. 2018) (cleaned up). It "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). Generally, a reviewing court should give great deference to a neutral judge's determination of probable cause who approved the warrant. *See United States v. Leon*, 468 U.S. 897, 914 (1984).

Probable cause exists only when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). There must be a "nexus . . . between suspected criminal activity and the place to be searched." *United States v. Mora*, 989 F.3d 794, 800 (10th Cir. 2021) (quoting *United States v. Biglow*, 562 F.3d 1272, 1278 (10th Cir. 2009)). A finding of probable cause also considers the totality of the information in any affidavit attached to, and incorporated into, the warrant. *See United States v. Suggs*, 998 F.3d 1125, 1135 (10th Cir. 2021).

12

###### a.      Violation of a Constitutional Right

The Court has examined Warrants 1 and 2 and Summey's supporting affidavits. *Eckert v. Dougherty*, 658 F. App'x 401, 411 n.1 (10th Cir. 2016) (taking judicial notice of warrant application and search warrant, even though they were not submitted by the plaintiff, to review a motion to dismiss based on qualified immunity); *Rathbun v. Montoya*, 628 F. App'x 988, 990 n.2 (10th Cir. 2015) (considering motion to dismiss based on qualified immunity and drawing facts from the search warrant and supporting affidavit referenced in the amended complaint). The Court finds the Armendariz Warrants have sufficient indicia of probable cause and particularity to support their issuance and execution.

Warrant 1 is a packet consisting of a completed Application and Affidavit for Search Warrant, Attachment A ("Affidavit 1"), and Attachment B which lists the items to be seized. Dkt. 49-1. According to Affidavit 1, Summey was investigating Armendariz for a violation of Colo. Rev. Stat. § 18-2-101, criminal attempt – second degree assault (a class five felony), for her alleged attempted assault of Officer Spicuglia with her bicycle. *Id.* at p.17. Summey was tasked with helping detectives identify "a female that attempted to strike [Officer Spicuglia] with a bicycle as he ran to assist other police officers who were attempting to take Shaun Walls into custody." *Id.* at p.4.

Warrant 1 sought entry into Armendariz's home to search and seize property that was or had "been used as a means of committing" the crime or that "[w]ould be

material evidence in a subsequent criminal prosecution[.]" *Id.* at 49-1 at pp.1, 2. More specifically, and in pertinent part, it sought the seizure of "Digital media storage devices, to include phones, computers, tablets, thumb drives, and external hard drives found to be associated with Jacqueline Armendariz." *Id.* at p.18.

Affidavit 1 describes Summey's observations of the alleged assault as seen from another officer's body camera and it contains multiple still photo images of the alleged assault from drones or other cameras. *Id.* at pp.4-10. The affidavit also describes Summey's identification of Armendariz through her active use of multiple social media sites, to include Facebook, a personal Twitter handle, a professional Twitter profile, and LinkedIn. *Id.* at pp. 11-15. Her Facebook post from July 3, 2021, includes what appears to be a "selfie" of Armendariz while wearing the same or similar bicycle gear she wore during the protest leading to her arrest. Dkt. 49 at p. 12; Dkt. 49-1 at p.11. The affidavit also describes her association with Shaun Walls, who was the individual Officer Spicuglia was running to arrest when Armendariz is alleged to have attempted to assault the officer with her bicycle. *Id.* at p.10.

The Court finds this information alone establishes probable cause for the search and seizure of the items listed in Warrant 1. As concerns Armendariz's digital devices that were the subject of Warrant 1, based on the evidence of her use of social media, her social media connection to Walls, the selfie she took and posted to Facebook days before the protest while out on her bike, and her other various posts referencing her social activism, it was reasonable for Summey to believe there was

probable cause that material evidence for use in a subsequent prosecution of the alleged crime would be found on those devices. *See Messerschmidt*, 565 U.S. at 1248-49 (noting the Fourth Amendment allows a search for evidence that will aid in a particular conviction such as evidence that helps to establish motive); *Andresen v. Maryland*, 427 U.S. 463, 483-84 (1976) (although a warrant authorized only search and seizure of evidence relating to a crime involving one described property lot, the seizure of documents pertaining to another lot in the same subdivision was allowed because it was relevant to the target's intent to defraud); *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 3749449, at *17 (N.D. Cal. Sept. 22, 2010) ("Certainly, the Ginn affidavit established that there was probable cause to seize cell phone records in relation to the Estrada homicide—records that may have offered insight into the motive, execution, cover-up, and publicity of the homicide.").

Warrant 2 is also comprised of an Application and Affidavit for Search Warrant, Attachment A ("Affidavit 2"), and Attachment B which lists the items to be seized. Dkt. 49-2. Affidavit 2 contains all the information from Affidavit 1, in addition to a description of the items law enforcement seized from their execution of Warrant 1. And in the Affidavit 2, Summey indicates he learned that Armendariz sent her employer digital media of the protest. *Id.* at p.19.

Affidavit 2 also contains averments about Summey's claimed awareness of the "Chinook Center [as] an anarchist or anti-government organization" whose members have promoted protests that turned violent in the past; purported ties between

Armendariz and the Chinook Center and its founders, including Walls; numerous descriptions of Walls' social activism including his calling for "violence against police officers and their families;" and a "pattern of protest activity that has turned illegal associated with the Chinook Center and Chinook Center member organizations." Dkt. 49-2 at pp.20-27.

> Summey also stated the following in Affidavit 2:

> Your Affiant would note that Walls actively resisted arrest, and it appears Armendariz attempted to assault a uniformed police officer at (sic) protest march that was sponsored by Chinook Center that turned unlawful. Your Affiant would note there appears to be a close relationship that exists between Walls and Armendariz, wherein they are friends on social media, Armendariz attended an event that Walls promoted on social media, and she attempted to assault an officer who was attempting to take Walls into custody.

*Id.* at p.25. Summey sought permission to search the digital devices recovered from Armendariz's person and residence during the execution of Warrant 1, and to seize "any photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation." *Id.* at p.27. He claimed this "time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer." *Id.*

He also requested permission to perform a key word search of the devices using specified terms stating "these terms would be relevant to the investigation regardless of the time period in which they occurred:" "Police, officer, cop, pig, bike, bicycle,

attack, assault, 150th, celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Shaun, Walls[.]" *Id.* at pp.27 and 29.

The Court also finds Warrant 2 was supported by arguable probable cause for the search of the specified electronic devices and using the proposed search terms. *See Stonecipher*, 759 F.3d at 1141 ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."). The factual averments Summey lays out in both warrants are colored by his descriptions of what he either knows from, or has encountered based on, his training and experience, which is an appropriate consideration bearing on probable cause. *See, e.g.*, *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009) ("Our reading of the scope of the 'computer records' subject to search, narrowing it to looking for drug related evidence, comes from the text of the warrant . . . coupled with the specifics of the supporting affidavit[.]"); *United States v. Spruell-Ussery*, No. 22-cr-20027-01, 2023 WL 7696546, at *6 (D. Kan. Nov. 15, 2023) (officer's professional experience may serve as a source of probable cause). And notably, both warrants experienced two levels of approval, first by Summey's supervisor and then by a neutral judicial officer who found probable cause and signed the warrants. Dkt. 49-1 at p.1; Dkt. 49-2 at p.2; *Messerschmidt*, 565 U.S. at 555 ("The fact that the officers secured these approvals is certainly pertinent in

assessing whether they could have held a reasonable belief that the warrant was supported by probable cause.").

Both warrants also meet the particularity requirement. The purpose of particularity "is to establish practical guidelines about what can be searched and seized, leaving nothing to the discretion of the officers executing the warrant." *United States v. Palms*, 21 F.4th 689, 698 (10th Cir. 2021). The Fourth Amendment requires warrants for computer searches to "affirmatively limit the search to evidence of specific . . . crimes or specific types of material." *Id.* (cleaned up). But "practical accuracy rather than technical precision" is what matters. *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (internal quotations and citations omitted). For example, search warrants need not identify a specific criminal statute under investigation for them to possess the requisite particularity. *Palms*, 21 F.4th at 698-99. Nor do warrants involving computer searches have to contain "a particularized computer search strategy." *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005).

Warrants 1 and 2 are sufficiently particular. Both attached and incorporated by reference Affidavits 1 and 2, respectively. Dkt. 49-1 at p.1; Dkt. 49-2 at p.1. Both Affidavits referenced the specific criminal statute under investigation—*i.e.*, Colo. Rev. Stat. § 18-2-101. Dkt. 49-1 at p.17; Dkt. 49-2 at p.18; *cf. Palms*, 21 F.4th at 698–99 ("To be sufficiently particular, search warrants do not have to identify specific statutes for the crimes to which they are limited."). Warrant 1 identified the specific

residential premises to be searched and requested the seizure of specific items listed in Attachment B and "used as a means of committing a criminal offense" or that would be "material in a subsequent criminal prosecution[.]" Dkt. 49-1 at pp.1, 17 ("The above mentioned items would be material evidence in the subsequent prosecution of Armendariz for attempting to assault Officer Spicuglia."), 18.

Warrant 2 identified six different electronic devices seized during the first search and requested to seize from those devices "material evidence in a subsequent criminal prosecution[.]" Dkt. 49-2 at p.1. And Warrant 2 is limited to a three-month period (6/5/2021 to 8/7/2021) for the seizure of certain tangible items and uses specified key words to limit the forensic search of the seized electronic devices. *Palms*, 21 F.4th at 698 ("Such a broad authorization is permissible under our precedent, so long as the warrant contained some 'limiting principle.'") (citing *United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017)). The supporting affidavit, Affidavit 2 sought permission to perform a key word search of the seized devices using at least 24 specified search terms. *Id.* at p.28. Its Attachment B listed those key words and noted no time frame applied to the key word search because "these terms would be relevant to the investigation regardless of the time period in which they occurred." Dkt. 49-2 at p.29. Attachment B also listed tangible items to be seized, including: "Photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this

investigation. This time period would allow for any planning leading up to the crime, the period when the crime took place, and the subsequent taking of credit for committing a violent act against a police officer." *Id.*

Plaintiff raises Summey's arguably self-serving descriptions of certain facts and events in his supporting affidavits—such as his references to "illegal" protest activity; his positing that red flags symbolize socialism and communism; his conclusion that Armendariz uses "yt" to disparage white people; and his conclusion that Armendariz is "active politically"—to argue these demonstrate the unlimited bounds of the Warrants. *See generally* Dkt. 60. But those descriptions and characterizations, whether or not accurate or self-serving, are not material to the finding of probable cause or particularity for the reasons stated above. *See also Messerschmidt*, 565 U.S. at 546 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.") (cleaned up).

For these reasons, the FAC fails to plausibly allege a violation of the Fourth Amendment against Summey, entitling him to qualified immunity. *See Eckert*, 658 F. App'x at 401 (affirming trial court's dismissal of Section 1983 Fourth Amendment claim and finding of qualified immunity where facts described in affidavit supporting search warrant amounted to probable cause).

### b.    A Clearly Established Right

To be sure, even assuming there was a violation of Armendariz's Fourth Amendment rights, the Court agrees with Summey that Plaintiff has failed to discern any clearly established law. Plaintiff has not adduced Tenth Circuit or Supreme Court precedent, or a clear weight of authority from other courts, clearly establishing that an officer violates the Fourth Amendment when they specify a criminal statute under investigation in a search and seizure warrant, include limiting principles in the warrant around the criminal statute or criminal conduct under investigation, and have that warrant approved first by a supervisor and second by a neutral judicial officer who found probable cause.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021). This means the law cannot merely be implicated by applicable precedent; instead, "the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (cleaned up); *see also Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6 (2021) (Supreme Court precedent does not require a case directly on point but does require a case that places the constitutional question beyond debate; the inquiry is in the specific context of the case and not general propositions). This level of specificity is particularly important in Fourth Amendment cases where it is "'sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer

21

confronts.'" *City of Tahlequah*, 595 U.S. at 12-13 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (the clearly established right must be defined with specificity particularly in the Fourth Amendment context); *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) ("While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate.") (cleaned up).

Armendariz argues in her Response that her "right to be free from unreasonable searches and seizures was clearly established when Defendants prepared and obtained the warrants at issue." Dkt. 60 at p.24. No doubt. But this formulation defines the clearly established right at the too-high-level of generality the Supreme Court shuns. *City of Tahlequah*, 595 U.S. at 12. The right at issue in this case is more particularized. *City of Escondido, Cal.*, 139 S. Ct. at 503; *D.C.*, 583 U.S. at 64.

This is principally true when considering Supreme Court and Tenth Circuit precedent holding that "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in 'objective good faith.'" *Messerschmidt*, 565 U.S. at 546 (2012); *see also Stonecipher*, 759 F.3d at 1142-43. This is particularly apt where, as here, there is insufficient pleading that the officer who sought the warrant misrepresented or omitted material facts to the judge rising to the level of a deliberate

falsehood or reckless disregard for the truth, or that the warrant was so obviously lacking in probable cause that no reasonably competent officer would have concluded a warrant should issue. *See Messerschmidt*, 565 U.S. at 547; *Stonecipher*, 759 F.3d at 1142-43; *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. [T]he challenger's attack must be more than conclusory[.]").

Based on the above, Armendariz has failed to show Summey's conduct violated clearly established law, further entitling him to qualified immunity on the First Claim for Relief. *See Cuervo v. Salazar*, No. 20-CV-0671-WJM-GPG, 2021 WL 1534607, at *9 (D. Colo. Apr. 19, 2021) (dismissing Fourth Amendment claim where plaintiff failed to demonstrate defendants violated a clearly established right in conducting the search of her property and thus failed to meet her burden to overcome the defense of qualified immunity).

## 2.   Ditzler and the Armendariz Warrants

Defendant Ditzler reviewed and approved Warrants 1 and 2 prior to their approval by the judges.[4] Dkt. 12 at ¶¶160-63. The FAC fails to plausibly allege a

---

[4] The FAC inconsistently pleads that Steckler approved one or more of the Armendariz Warrants. *Compare* Dkt. 12 at ¶¶87, 113 (referring to Steckler's approval), *with* ¶¶160-63, 200 (referring to Ditzler's approval). But the inconsistency is of no matter because the documents themselves show they were approved by Ditzler. Dkt. 49-1 at p.3 (initialed by "RAD"); Dkt. 49-2 at p.5 (same); *see also* Dkt. 50 n.1.

constitutional violation against him for the same reasons discussed above concerning Summey. Thus, Ditzler also enjoys qualified immunity.

### 3.    Steckler and the Chinook Facebook Warrant

The Court has examined the Facebook Warrant and Steckler's supporting affidavit. Dkt. 51-1. The Facebook Warrant is a packet consisting of a completed Application and Affidavit for Search Warrant, Attachment A ("Steckler Affidavit"), and Attachment B which lists the items to be seized. *Id.* The Facebook Warrant attaches and incorporates the Steckler Affidavit and Attachment B by reference. *Id.* at p.1.

According to the Steckler Affidavit, Steckler was investigating arrests made for "Obstructing Passage or Assembly, and Resisting, Interference with a Public Official" that occurred during a protest involving approximately 60 individuals on July 31, 2021. Dkt. 51-1 at p.3. He received an "anonymous tip" on August 2, 2021, regarding a Facebook post from the date of the protest under the name of Shaun Walls (who was arrested). The following day Steckler "became aware" of two more Facebook profiles "that had bearing on this case." *Id.* at p.4. One of the profiles contained pictures and videos from the protest and included photos of Walls being arrested. *Id.*

Detective Granillo alerted Steckler to the second Facebook profile, which was under the name Chinook Center and "in which the protest was organized under the events tab." *Id.* Steckler went to Chinook's Facebook page and "was able to see details

regarding a 'March for Housing' set for 07/31/21 . . . ." *Id.* Steckler went on to aver he believed "the information gained from the two Facebook profiles will be material evidence in this case. It is your affiant's experience people involved in illegal demonstrations use social media to organize planned events. It is your affiant's belief the demonstration was organized prior to 07/31/21." *Id.*

His affidavit cites 18 U.S.C. § 2703 as the basis for his warrant request, and Steckler avers that "specific and articulable facts have been shown to reasonably believe the target [Facebook URL], service provider, Facebook, Inc., for which records are being sought is of relevant interest in the offense shown." *Id.* Attachment B identifies the items to be seized as:

> All subscriber information tied to Facebook profile: https:www.facebook.com/chinookcenter to include names, phone numbers, and addresses.
>
> All Facebook posts for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Messenger chats tied to Facebook profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.
>
> All Facebook Events for profile: https:www.facebook.com/chinookcenter from 07/27/21 to 08/02/21.

*Id.* at p.5. And the warrant states there is probable cause to believe the information to be seized "[w]ould be material evidence in a subsequent criminal prosecution[.]" *Id.* at p.1.

Steckler sought the Facebook Warrant under 18 U.S.C. § 2703(c), which allows a governmental entity to "require a provider of electronic communication service or

remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity" either obtains a search warrant or a court order for disclosure. *See* 18 U.S.C. § 2703(c)(1)(A) (regarding a warrant); *id.* §§ 2703(c)(1)(B) (regarding a court order for disclosure). The latter is a lower standard than the probable cause required for issuing a warrant. *United States v. Herron*, 2 F. Supp. 3d 391, 401 (E.D.N.Y. 2014); *United States v. Cooper*, No. 13-CR-00693-SI-1, 2015 WL 881578, at *4 n.3 (N.D. Cal. Mar. 2, 2015); *United States v. Mack*, No. 3:13-CR-00054 MPS, 2014 WL 6085306, at *1 (D. Conn. Nov. 13, 2014).

Under either standard, the Court finds the Facebook Warrant meets it. After Walls and others were arrested during the protest on July 31, 2021, Steckler was investigating "Obstructing Passage or Assembly, and Resisting, Interference with a Public Official" related to those arrests. He had evidence of Walls' and others' use of Facebook to post information about the July 31 protest that resulted in multiple arrests, including evidence that Chinook organized and had details about the protest on the events tab on its Facebook account. On these facts alone, it was objectively reasonable for Steckler to believe there was probable cause that material evidence for use in a subsequent prosecution(s) involving those arrested would be found within the subscriber information, posts, messenger chats, and events tab of the Chinook Facebook profile.

The Facebook Warrant is also sufficiently particular. It is limited to evidence involving specific arrests for specific infractions all occurring on July 31, 2021, and Attachment B further limits the information sought to a seven-day period of July 27 to August 2, 2021. *Matter of Search of Kitty's E.*, 905 F.2d at 1374 (stating "there is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized.") (internal quotations and citation omitted). And like the Armendariz Warrants discussed above, Steckler presented the Facebook warrant first to a supervisor for approval and second to a judge who reviewed and approved the warrant, finding probable cause. Dkt. 51-1; Dkt. 12 at ¶177.

For these reasons, the FAC fails to plausibly allege a violation of the Fourth Amendment against Steckler entitling him to qualified immunity. In the alternative, Chinook has also failed to adduce clearly established law for the reasons discussed above regarding the Armendariz Warrants.

### 4.     Otero and the Facebook Warrant

Defendant Otero reviewed and approved the Facebook Warrant prior to its submission to the judge. Dkt. 12 at ¶177. The FAC fails to plausibly allege a constitutional violation against him for the same reasons discussed above concerning Steckler. Thus, Otero also enjoys to qualified immunity.

**B.     Qualified Immunity and the FAC's First Amendment Claims**

The FAC alleges the Armendariz and Facebook Warrants also violated the First Amendment. It alleges the warrants were obtained as an action of retaliation against Plaintiffs and that the warrants swept up "First Amendment-protected information" and "expressive and associational materials." Dkt. 12 at ¶¶151-52, 172-73.

To establish a § 1983 retaliation claim alleging a violation of the First Amendment, a plaintiff must plead and prove (1) she was engaged in a constitutionally protected activity; (2) the defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's actions were substantially motivated as a response to her exercise of her First Amendment speech rights. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). In the paradigm of cases involving alleged retaliatory arrests or retaliatory prosecutions based on the First Amendment, the Supreme Court has held the lack of probable cause is also a required element of these retaliation claims. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723-25 (2019) (retaliatory arrest); *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006) (retaliatory prosecution). Other district courts have applied this requirement to pleading claims for retaliatory searches. *See Chavez v. City of Albuquerque*, No. 13-cv-557, 2014 WL 12796875, at *3 (D.N.M. Apr. 14, 2014) ("[T]he Court believes that the reasoning set forth in *Hartman* applies equally to this situation. . . . Therefore, . . . a plaintiff claiming that a search

warrant was executed in retaliation for a protected activity is required to show a lack of probable cause as an element of that claim."); *see also Hall v. Putnam Cnty. Comm'n*, No. 22-cv-0277, 2024 WL 559603, at *10 (S.D.W. Va. Feb. 12, 2024).

The Court finds these authorities persuasive and agrees that the reasoning in *Hartman* for requiring pleading the lack of probable cause in a retaliatory prosecution case applies equally to a claim of a retaliatory search especially where, as here, the searches were conducted based on warrants approved by neutral judicial officers.[5] *Hartman*, 547 U.S. at 261-62 (discussing the absence of probable cause is a necessary showing in part because "the defendant will be a nonprosecutor, an official, like an inspector here, who may have influenced the prosecutorial decision but did not himself make it[.]"); *see also Nieves*, 139 S. Ct. at 1725 (discussing the need for a showing of the absence of probable cause in a retaliatory arrest case in part because "policing certain events like an unruly protest would pose overwhelming litigation risks. Any inartful turn of phrase or perceived slight during a legitimate arrest could land an officer in years of litigation.").

---

[5] The cases Plaintiffs rely on for the proposition that warrants must describe the things to be seized with "scrupulous exactitude" pertain to situations where the basis for the search and seizure was the ideas or speech itself. *See Stanford v. Texas*, 379 U.S. 476, 485 (1965); *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1372–73 (10th Cir. 1990). The FAC here fails to plausibly plead the basis of the warrants in this case was in and of itself the ideas, speech, or associations of either Plaintiff versus the alleged criminal statutes or criminal conduct under investigation.

For the reasons discussed above, the FAC fails to plausibly plead the absence of probable cause regarding the Armendariz and Facebook Warrants.[6] *Frey v. Town of Jackson*, 41 F.4th 1223, 1238 (10th Cir. 2022) ("Even accepting Plaintiff's allegations as true that retaliatory animus motivated officers in whole or in part when they prolonged Plaintiff's detention, probable cause still supported the detention."). The FAC's numerous allegations that the warrants lacked probable cause are conclusory, particularly after this Court's review of the warrants. *GFF Corp.*, 130 F.3d at 1385 ("factual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true.").

---

[6] The Court requested additional briefing from the parties (Dkt. 93) regarding a case they did not discuss which appeared to the Court may be applicable to the matters at hand. Dkt. 93 (citing *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642 (10th Cir. 1988). The parties' submissions were appreciated and informative. But based on the Court's analysis herein, it has determined *Pueblo Neighborhood Health Centers* is not applicable to the circumstances of this case. *See, e.g., Davis v. Gracey*, 111 F.3d 1472, 1484 (10th Cir. 1997) ("We have held in our discussion of plaintiffs' constitutional claim that plaintiffs' inference of subjective bad faith in the officers' omission of information from the affidavit does not eliminate the officers' ability to rely on a valid warrant supported by probable cause."); *see also Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) ("Our cases have repeatedly rejected this approach [of considering officers' subjective motivations]. An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify [the] action." (cleaned up; emphasis and bracketed text in original); *New York v. P.J. Video, Inc.*, 475 U.S. 868, 875 (1986) ("We think, and accordingly hold, that an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally.").

Nor does the FAC allege any similarly situated individuals were treated differently than either or both Plaintiffs. *See, e.g., id.* at 1232 ("[W]hen pursuing a claim for retaliatory arrest against a law-enforcement officer, a plaintiff must plead either that the officer lacked probable cause to arrest or that the officer historically has not arrested similarly situated people who were not engaged in the same type of speech.") (citing *Nieves*, 139 S. Ct. at 1726-27). Indeed, it in fact appears to allege the opposite. *See* Dkt. 12 at ¶¶130-47.

For these reasons, the FAC fails to allege a plausible violation of the First Amendment by the LEDs, further entitling them to qualified immunity on the First and Second Claims for Relief, respectively.

## C.   The City's Municipal Liability Re: the First and Fourth Amendments

Plaintiffs' First and Second Claims for Relief as against the City are based on a theory of municipal liability. Dkt. 12 at ¶¶130-47, 165, 182; *see Monell v. Department of Social Services*, 436 U.S. 658 (1978). Because the Court has found the FAC fails to plausibly allege a constitutional violation by the LEDs, it necessarily means the FAC fails to state plausible First and Fourth Amendment claims against the City. *Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established . . . that a municipality cannot be held liable under section 1983 for the acts of an employee if [the] employee committed no constitutional violation.").

### D.     Third Claim for Relief Alleging a Violation of the Stored Communications Act (SCA)

Based on this Court's above-conclusion and analysis that the Facebook Warrant was supported by sufficient probable cause under 18 U.S.C. § 2703(c), and thus, the FAC fails to state a plausible constitutional violation respecting that warrant, Chinook's Third Claim for Relief fails to state a plausible claim. *See Davis v. Gracey*, 111 F.3d 1472, 1484 (10th Cir. 1997) (where a valid warrant authorized seizure of computer equipment, officers were entitled to the good faith defense under 18 U.S.C. § 2707(e), as a matter of law, for their reliance on the warrant). The Plaintiffs cite no authority to suggest the SCA imposes requirements more demanding than the Fourth Amendment.[7] *See, e.g., id.* ("The plaintiffs have not persuaded us the statute imposes a requirement stricter than the Fourth Amendment[.]")

### E.     Sixth Claim for Injunctive Relief

Armendariz asserts this claim against the FBI.[8] Aside from incorporating previous allegations in the FAC by reference, the Sixth Claim reads, in its entirety:

---

[7] This is true even when considering the FAC's allegations that Chinook received no prior notice of the Facebook Warrant. The judge who issued the warrant did so under 18 U.S.C. § 2705(b), which allows the government to apply for, and the court to issue, an order delaying notification of the existence of a warrant. Dkt. 51-1; 18 U.S.C. § 2705(b); see also 18 U.S.C. 2703(b)(1)(B)(ii) ("except that delayed notice may be given pursuant to section 2705 of this title").

[8] In her Response to the City's Motion to Dismiss, Armendariz suggests Claim 6 is also brought against the City. Dkt. 61 at p.16 ("Plaintiffs acknowledge that the headings of their state constitutional and injunctive relief claims erroneously did not

215. On information and belief, Defendant Federal Bureau of Investigation retains copies of electronic files obtained from Ms. Armendariz's digital devices. The Federal Bureau of Investigation's failure to return or destroy the materials constitutes a continuing and ongoing seizure that violates the Fourth Amendment.

216. Ms. Armendariz is entitled to an award of injunctive relief under the Constitution of the United States and 5 U.S.C. § 702 ordering the return or destruction of Ms. Armendariz's digital data.

Dkt. 12. The FAC does not allege the FBI continues to possess Armendariz's electronic devices; rather, it alleges she seeks the return or destruction of the digital *copies* they made (and retain) from those devices. Dkt. 12 at ¶215.

The FBI argues, in relevant part, that its collection of this evidence was lawful under the Fourth Amendment, and even if it wasn't, its retention of electronic copies obtained in violation of the Fourth Amendment does not violate the constitution. Armendariz counters generally that the FBI's continued retention of these copies raises constitutional issues distinct from the lawfulness of the search and seizure, and in any event, other courts have recognized the Fourth Amendment is implicated by a delay in the return of property seized by the government for a criminal

---

identify the City. But the Amended Complaint makes clear throughout that Plaintiffs have stated a claim for injunctive relief against the City for the wrongful retention of Armendariz's files.") This argument is insincere. The FAC expressly indicates it is asserted *only* against the FBI. Dkt. 12 at p.50. To the extent Armendariz now claims it is also asserted against the City, the Court finds it fails to state a plausible claim against the City, and moreover, Plaintiff may not amend the FAC in this regard with her responsive pleading. *See Sudduth v. Citimortgage, Inc.*, 79 F. Supp. 3d 1193, 1201 n.2 (D. Colo. 2015) ("Plaintiffs cannot amend their complaint by adding factual allegations in response to [a] motion to dismiss.").

investigation.[9] Dkt. 28 at pp.27-28. The Court agrees with the FBI that the Fourth Amendment does not provide a remedy for its ongoing retention of these digital copies, but for reasons not discussed by either party.

What appears to distinguish this case from those cited by the parties is the fact that Armendariz pleaded guilty to a lesser offense—obstructing a peace officer—received a deferred judgment, and successfully completed her six-month unsupervised probation. Dkt. 12 at ¶119. The prior criminal proceedings against her have ended. And Armendariz does not seek monetary damages associated with the FBI's ongoing retention of the copies of her digital media. She instead only seeks injunctive relief in the form of an order for the return or destruction of those copies. *Id.* at ¶216.

Based on these allegations, the Sixth Claim for Relief does not plausibly plead a violation of the Fourth Amendment. The appropriate claim appears to be one for return of property under Fed. R. Crim. P. 41(g) (formerly Rule 41(e) until the rule was amended in 1989). "A cause of action under Rule 41(e) for return of property has been recognized as a valid cause of action in the Tenth Circuit and other federal courts[.]" *Lowrie v. United States*, 558 F. Supp. 1029, 1032 (D. Colo. 1983) (citing

---

[9] While the heading for the Sixth Claim for Relief titles the claim as seeking injunctive relief under the First and Fourth Amendments, the claim expressly alleges only a violation of the Fourth Amendment. Dkt. 12 at ¶215 (alleging "The [FBI]'s failure to return or destroy the materials constitutes a continuing and ongoing seizure that violates the Fourth Amendment.").

cases). "Where criminal proceedings against the movant have already been completed, a district court should treat a rule 41(e) motion as a civil complaint." *United States v. Clark*, 84 F.3d 378, 381 (10th Cir. 1996) (internal quotations and citations omitted); *see also Clymore v. United States*, 415 F.3d 1113, 1117 (10th Cir. 2005) ("Although Clymore's action is brought pursuant to Rule 41(e), a federal rule of *criminal* procedure, proceedings surrounding the motion for return of property seized in a criminal case are *civil in nature*[.]") (cleaned up; emphases in original); *Allen v. Grist Mill Cap. LLC*, 88 F.4th 383, 394 (2d Cir. 2023) ("[W]hile Rule 41(g) is a rule of criminal procedure, we have also long held that where, as here, a motion under that rule is filed after a criminal proceeding has ended, the district court should construe such a motion as initiating a civil action in equity.") (cleaned up); *U.S. v. Martinez*, 241 F.3d 1329, 1330-31 (11th Cir. 2001) (noting Second, Third, Sixth, Seventh, Eighth, and Ninth Circuits agree that motions for return of property under then Rule 41(e) made after criminal proceedings ended should be treated as civil proceedings for equitable relief).

Rule 41(g) provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). Prior to its amending in 1989, then Rule 41(e) "provided a method for enforcing the protection against unreasonable search and seizure guaranteed by the Fourth Amendment." 3A Fed. Prac. & Proc. Crim. § 690 (4th ed. 2023). But, as amended, Rule 41(g) now "provides that an aggrieved person

may seek return of property that has been unlawfully seized, and a person whose property has been lawfully seized may seek return of property when aggrieved by the government's continued possession of it." Fed. R. Crim. P. 41(g) notes to 1989 amendment.

Following the 1989 amendments, the Tenth Circuit has held that Rule 41(g) motions are now "solely for the return of property[,]" drawing a distinction between Fourth Amendment claims seeking redress for an alleged unlawful seizure and claims seeking the return of property (whether or not lawfully seized).[10] *Matter of Search of Kitty's E.*, 905 F.2d 1367, 1370 (10th Cir. 1990) ("Illegality of a search for purposes of Rule 41(e) and the scope of the exclusionary rule have been separated by the 1989 amendments."); *see also United States v. Anh Ngoc Dang*, 559 F. App'x 660, 662 (10th Cir. 2014) ("The issue of whether the deputy marshals violated the Fourth Amendment is distinct from the appropriate disposition of the cash seized."); *United*

---

[10] The partial concurrence in the *Lindell* case, which case Armendariz cites extensively, also draws this distinction. Concurring in part, Circuit Judge Colloton dissented from that portion of the majority opinion that purported to reverse the district court for not balancing the interests of the parties to determine whether the government could justify its continued possession of Lindell's cell phone that it lawfully seized. *Lindell v. United States*, 82 F.4th 614, 623 (8th Cir. 2023). Judge Colloton observed that the majority's "discussion concerns a ruling that was never made on a motion that was never filed. ... The majority exceeds the proper scope of appellate jurisdiction by purporting to rule on a different dispute concerning the retention of seized property[.]" *Id.* He explained: "If Lindell now wishes to secure a return of his old phone . . . then he may file a straightforward motion for return of property based on the length of retention. The parties may then address the matter in proper briefing and evidentiary presentations[.]" *Id.*

*States v. Giannukos*, No. 15-20016-01-DDC, 2020 WL 6680384, at \*2 (D. Kan. Nov. 12, 2020) (Rule 41(g) "governs requests for return of property seized in connection with a criminal investigation."); *Lintzeris v. City of Chicago*, 276 F. Supp. 3d 845, 849 (N.D. Ill. 2017) ("Complaints about the return of property, lawfully seized, do not implicate the Fourth Amendment.").

The Sixth Claim for Relief simply seeks the return or destruction of copies of property seized in connection with a completed criminal case. And in this Court's above-analysis, the Court has found the seizure to be lawful. For these reasons, the Sixth Claim for Relief fails to state a plausible claim for relief under the Fourth Amendment.[11] *See Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992) (holding the validity of a claim is determined by which constitutional right is alleged to have been infringed and then by the specific standard governing that right).

## F.    State Law Claims under Colo. Rev. Stat. § 13-21-131

### 1.    Claim 4 against the United States

During a hearing before the Honorable Magistrate Judge Maritza Dominguez Braswell on December 18, 2023, Judge Dominguez Braswell granted the United

---

[11] The Court considered whether it was appropriate to construe the Sixth Claim for Relief as alleging a claim for return of property under Rule 41(g). But first, Armendariz is represented by counsel, and therefore, the rule requiring the Court to liberally construe a *pro se* litigant's filings does not inure to her. Second, it is not clear to the Court that, even if so construed, it would be fair to then attempt to analyze the allegations as currently pleaded under a Rule 41(g) standard, particularly also where the parties have not briefed or argued the matter under a Rule 41(g) analysis.

States' motion brought under 28 U.S.C. § 2679(d)(1) to substitute itself for Summey on Claim 4. Dkt. 62; *see also* Dkt. 39. The United States generally enjoys sovereign immunity from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). But Congress has waived the United States' sovereign immunity through the Federal Tort Claims Act ("FTCA") for the wrongful act or omission of an employee of the federal government while acting within the scope of their employment, and if a private person would be liable to the claimant under the law of the state where the allegedly wrongful act occurred. *See* 28 U.S.C. § 1346(b)(1). It is the plaintiff's burden to establish subject matter jurisdiction under the FTCA. *Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005).

To benefit from the FTCA's waiver of sovereign immunity, claimants must first exhaust administrative processes with the appropriate federal agency before suing in federal court. *See* 28 U.S.C. § 2675(a). Under Section 2675(a), no action may be filed against the United States "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." This presentment requirement is jurisdictional, must be strictly construed, and cannot be waived. *Bradley v. United States ex rel. Veterans Admin.*, 951 F.2d 268, 270 (10th Cir. 1991).

The FAC does not plausibly allege compliance with 28 U.S.C. § 2675(a). True, as she argues, Armendariz had no reason to know Summey was acting as a federal employee. But Supreme Court and Tenth Circuit case law require strict compliance

38

with the administrative procedures mandated by the FTCA. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) (requiring "strict adherence to the procedural requirements" of § 2675(a)); *Bradley*, 951 F.2d at 270 (the FTCA's requirements must be strictly construed); *see also Smith v. United States*, 245 F.3d 790 (5th Cir. 2000) (unpublished table decision) (finding lack of subject-matter jurisdiction where plaintiffs failed FTCA exhaustion because they did not know the defendant was a federal employee); *Miller v. Mayers Mem'l Hosp.*, No. 209CV01687 MCE KJM, 2009 WL 3048690, at *2 (E.D. Cal. Sept. 18, 2009) ("[E]ven assuming that Plaintiff was indeed unaware of Watson's employment status, that lack of knowledge does not excuse compliance with § 2675(a)."); *Chin v. Wilhelm*, 291 F. Supp. 2d 400, 403-04 (D. Md. 2003) (dismissing claims under the FTCA for failure to present an administrative claim despite plaintiffs' lack of knowledge that the officer was a federal agent); *Bigg v. Selective Serv. Sys.*, No. CV-92-2610 (CPS), 1993 WL 547458, at *2 (E.D.N.Y. Nov. 26, 1993), *aff'd*, 28 F.3d 102 (2d Cir. 1994) (dismissing complaint where "plaintiff has not given any indication in his complaint or in his response papers of having met the requirements of section 2675(a). Indeed, plaintiff admits that he did not know that he could (or should) have filed an administrative claim with the Selective Service.").

The out-of-circuit cases Armendariz cites are either at odds with the required strict construction of the FTCA or they also involved issues related to the statute of limitations, which is not an issue here. Because the FAC fails to plausibly allege

Armendariz's compliance with 28 U.S.C. § 2675(a), Claim 4 is dismissed as against the United States.

### 2.      Claims 4 (against Ditzler) and 5 (against Steckler and Otero)

"Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990). Plaintiff's remaining claims (Claims 4 and 5) arise under a Colorado statute, Colo. Rev. Stat. § 13-21-131. There is no compelling reason to maintain jurisdiction over the state law claims considering this Court's findings pertaining to, and dismissal of, Plaintiff's federal law claims and state law claim against the United States. The Court thus declines to exercise jurisdiction over the state law claims and dismisses them on that basis.[12] 28 U.S.C. § 1367(c)(3).

\*      \*      \*

---

[12] Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, the Court need not address the merits of the arguments concerning those claims. Moreover, the parties have a dispute pending before Judge Dominguez Braswell regarding Plaintiffs' challenge to the United States' substitution for Summey. Even assuming Summey was the proper party to Claim 4, the claim would still be dismissed based on the Court's declination of supplemental jurisdiction.

For the reasons shared above, the Motions to Dismiss at Dkts. 49, 50, 51, and 52, are GRANTED as follows:[13]

1. The First Claim for Relief is DISMISSED without prejudice, against Summey, Ditzler, and the City;

2. The Second and Third Claims for Relief are DISMISSED without prejudice, against Steckler, Otero, and the City;

3. The Fourth and Fifth Claims for Relief are DISMISSED without prejudice;

4. The Sixth Claim for Relief is DISMISSED without prejudice; and

5. The Clerk of Court shall terminate this action.

DATED:      April 10, 2024

BY THE COURT:

S. Kato Crews
United States District Judge

---

[13] The Court does not reach the parties *Bivens'* or other arguments not addressed herein.

# ATTACHMENT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01951-SKC-MDB

JACQUELINE ARMENDARIZ and
CHINOOK CENTER,

      Plaintiffs,

v.

CITY OF COLORADO SPRINGS,
DANIEL SUMMEY, in his individual capacity,
B. K. STECKLER, in his individual capacity,
JASON S. OTERO, in his individual capacity,
ROY A. DITZLER, in his individual capacity,
FEDERAL BUREAU OF INVESTIGATION, and
UNITED STATES OF AMERICA,

      Defendants.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to the Order on Motions to Dismiss (Dkts. 49, 50, 51, 52) [ECF No. 103] of District Judge S. Kato Crews entered on April 10, 2024, it is

ORDERED that judgment is hereby entered in favor of the defendants and against the plaintiffs.   It is

FURTHER ORDERED that this case is terminated.

Dated at Denver, Colorado this 10th day of April, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

    s/C. Pearson, Deputy Clerk

# ATTACHMENT 3

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

CHRISTIAN ZIEGLER,
BRIDGET ZIEGLER,
      Plaintiff,

v.

                                CASE NO.  2024 CA 001409 NC
                                      DIVISION C CIRCUIT

OFFICE OF THE STATE ATTORNEY
FOR THE TWELFTH JUDICIAL
CIRCUIT,
SARASOTA POLICE DEPARTMENT,
      Defendant.

_____

## FINAL JUDGMENT
## IN FAVOR OF CHRISTIAN AND BRIDGET ZIEGLER

Law enforcement seized and searched the entire contents of Christian Ziegler's cell phone, Google Drive, and Instagram account through a series of three search warrants. As it turns out, these warrants were severely overbroad. And there was no seizure protocol to guide law enforcement's search of Mr. Ziegler's property. Law enforcement's handling of the three overbroad warrants were patently unreasonable and violated Mr. Ziegler's constitutional rights.

For example, law enforcement rifled through 250,000+ photographs and 30,000+ videos, seizing an indeterminant amount despite concluding they showed no evidence of a crime. They also seized more than 1,200 text communications between Mr. Ziegler and his wife, most of which transpired two years before the alleged criminal incident arose on October 2, 2023. Almost all of these communications had no connection to the crime being investigated. Law enforcement also seized other personal information about Mr. Ziegler with no apparent nexus to the crime investigated.

Cellphones today can contain a person's entire life story. Law enforcement agents euphemistically described the unlimited search and seizure of Mr. Ziegler's cellphone data to be "best practice." But 250 years ago, our forebears fought a Revolution against the tyrannical policies of King George III, including the allowance of general warrants that permitted unreasonable search and seizure. While today's seizure is not from the entirety of one's home—but 18 square inches of a cellphone and the content of electronic storage media—it is functionally the same. The Fourth Amendment prohibits general warrants like those advanced by law enforcement in this case.

Mr. Ziegler never was arrested, and all investigations into alleged criminal conduct are over. Joined by his wife, Mr. Ziegler wants the return of his personal property that law enforcement seized involuntarily from him based on the three warrants. To make the return meaningful, Mr. Ziegler wants to regain exclusive possession and control of his data, which he

says cannot occur if his property is publicly disseminated because of Florida's public records law.

The Intervenors say the Zieglers have no standing to make this request or even access the courts at all. Even if the Zieglers can go to court, say the Intervenors, they have no remedy or ability to prevent the release of the content of the items taken from Mr. Ziegler due to Florida's broad public record laws. Intervenors are mistaken.

This ruling is long. But the short answer is this: Mr. Ziegler has the constitutional right to recover exclusive control over his personal property seized involuntary through unconstitutional warrants. His property is not transformed into public record because it was not "made or received pursuant to law" and is outside the "official business" of law enforcement. Because Mr. Ziegler's personal property is not public record, there is no legal impediment to restoring exclusive possession of Mr. Ziegler's property to Mr. Ziegler.

Just because the Zieglers may be high profile figures in our community does not mean they have surrendered their constitutional rights. If the contents of an unconstitutional search and seizure allowed by a warrant became a public record simply by virtue of the government's possession of that material, the Fourth, Fifth, and Fourteenth Amendments' protections would be functionally nullified. And the entire contents of every cellphone searched and seized based on a warrant issued by a state judge in Florida would also be a public record.

The Court understands the particular interest in this case: the intersection of the Zieglers' public profile and the nature of the allegations virtually guarantees interest. Despite the intense public interest, the rule of law must apply equally to all. Instead of Mr. Ziegler, what if the cellphone belonged to the Executive Editor of a well-known media outlet and it contained the confidential identity of sources that had nothing to do with the crime being investigated? Should a search of the phone's contents via an overbroad warrant then convert the confidential identity of sources to a "public record"? If the Intervenor Defendants' position prevailed, the answer to this question would be "yes," and the Executive Editor would have no legal recourse to contest the public dissemination of that information. The Court vehemently disagrees.

The Court grants Mr. Ziegler the relief he requested as explained in this Judgment.

## 1.
## BACKGROUND AND PROCEDURAL HISTORY

The Sarasota Police Department ("SPD") investigated Mr. Ziegler for sexual battery based on his sexual activity with Jane Doe ("Ms. Doe") on October 2, 2023. After concluding there was no crime for sexual battery, SPD investigated Mr. Ziegler for video voyeurism based on a video Mr. Ziegler made of the October 2 encounter.

During its investigation, SPD obtained three separate warrants to search Mr. Ziegler's cellphone, Google Drive, and Instagram account. Ultimately, SPD referred only a charge of video voyeurism to the State Attorney's Office and provided that office with a limited set of documents from Mr. Ziegler's cellphone. (Trial Exhibit Q is the list containing the documents

physically provided by SPD to the State Attorney's Office.) The State Attorney's Office declined to prosecute Mr. Ziegler based on insufficient evidence.

The Zieglers are public officials, and there is substantial public and media interest in the contents contained within the seized items. There have been public record requests, including a request for the entirety of the contents of the seized items. Some items have been produced; others have not.

The Zieglers filed this action on March 15, 2024, seeking to regain exclusive possession of Mr. Ziegler's property and to prevent public disclosure of the contents of the seized items, including through public record requests. Their verified amended complaint [DIN 5] includes four counts, and they sued the City of Sarasota and the State Attorney's Office for the Twelfth Judicial Circuit. Both the City and State Attorney's Office have answered and raised affirmative defenses [DINs 45 and 50, respectively].

Counts 1 and 3 seek a declaratory judgment against the City and State Attorney's Office that the contents of the seized materials were obtained through unreasonable search and seizures and are not public records. Counts 2 and 4 seek to preclude the public dissemination of this material and to destroy this material in the hands of the City and State Attorney's Office. By doing this, the Zieglers say Mr. Ziegler would regain exclusive possession of his personal property.

The Court entered a temporary injunction enjoining the City and the State Attorney's Office from any further release of the documents or data seized from Mr. Ziegler's cellphone, Google Drive, or Instagram account that had not been previously publicly released [DIN 14, p. 5, ¶¶ 3, 4].

The Court on its own motion expedited all further proceedings [DIN 14, p. 5, ¶ 1].

Many intervenors who filed public record requests asked to participate [DINs 6, 11, 16, and 17]. The Court granted all of these requests, allowing Michael Barfield; the Florida Center for Government Accountability, Inc.; and a collection of six media outlets, Gannett Co., Inc., The McClatchy Company, LLC, Nextstar Media Group, Inc., Scripps Media, Inc., TEGNA Inc., and Times Publishing Company to intervene as Intervenor Defendants [DIN 24]. The Court authorized them to file pleadings, motions, and briefs, and to participate in all hearings and trial.

Intervenor Michael Barfield moved to dismiss the amended complaint [DIN 34], and the other Intervenor Defendants joined that motion. After hearing, the Court denied the motion to dismiss. The Court specifically concluded that the Zieglers had standing to bring this lawsuit [DIN 52]. The Court set the final hearing to occur on May 16, 2024 [DIN 38]. Mr. Barfield also sought to dissolve the temporary injunction [DIN 34], but he decided not to seek a hearing on that motion because the Court set the final hearing to occur the following month. That request to dissolve the temporary injunction is now abandoned with the entry of this Final Judgment.

The Intervenor Defendants answered the amended complaint and raised a number of defenses [DINs 44, 58, 60]. Each of the Intervenor Defendants attached a list of documents

provided by SPD to the State Attorney's Office, which list ultimately was introduced into evidence as Exhibit Q. Although they focused on obtaining the items referenced in Exhibit Q, at trial their request was broader and included, at a minimum, any item SPD detectives marked with the F7 key during SPD's review of Mr. Ziegler's property.

The Intervenor Defendants have also filed crossclaims seeking enforcement of Florida's Public Record Act [DINs 53, 61, 70]. By the time of trial, the crossclaims were not at issue and have not yet been tried. The day before the trial, the Court held a hearing, making clear that only the amended complaint would be heard at trial. The crossclaims, not being at issue, could not and would not be addressed during that trial. In essence, the Court severed the crossclaims from the amended complaint.

On May 16, 2024, the Court conducted the trial on the amended complaint. Five individuals testified live, and one individual testified by deposition. Plaintiffs introduced the three warrants as Exhibits 1-3. The Intervenor Defendants introduced 19 exhibits, identified as Exhibits A–S. The City and State Attorney's Office did not introduce any independent exhibits.

At the conclusion of the trial, the Court took the matter under advisement. During trial, the parties discussed, but did not resolve, whether the Court would need to conduct an *in camera* inspection of certain items reviewed by SPD and the State Attorney's Office. The Court deferred during trial. Later, after trial, the Court requested those documents for a potential *in camera* inspection of the materials identified in Paragraphs 15 and 16 of Exhibit Q [DIN 128].

Ultimately, the Court conducted an *in camera* inspection of some but not all of the items delivered. The Court reviewed *in camera* the communications between Mr. and Mrs. Ziegler—the items identified in Paragraph 15 of Exhibit Q. The Court did not conduct an *in camera* inspection of the Video—the item identified in Paragraph 16 of Exhibit Q—because, as explained later in this Final Judgment, the Court finds that Mr. Ziegler voluntarily provided the Video to law enforcement and there is no constitutional violation with SPD's acquiring the Video.

## 2.
## FINDINGS OF FACT

Based on the evidence from trial, the Court finds as fact—

1.        Plaintiffs Christian and Bridget Ziegler have been continuously married since 2013. Each is active in local and state politics. In October 2023, Mr. Ziegler was the Chairman of the Republican Party of Florida and previously was a member of the Sarasota County Commission. Mrs. Ziegler is a sitting member of the School Board of Sarasota County, and she is a sitting member of the Board of Supervisors for the Central Florida Tourism Oversight District.

2.        On October 4, 2023, a friend of the undisclosed "Jane Doe" reported to SPD that Ms. Doe had been sexually assaulted on October 2, 2023.  The friend requested SPD perform a welfare check on Ms. Doe. SPD found Ms. Doe under the influence of alcohol and extremely

distraught at her apartment. Ms. Doe was taken to the hospital for a sexual assault examination. She was initially reluctant to identify an alleged assailant.

3.      During a subsequent SPD interview with Ms. Doe, Ms. Doe alleged that Mr. Ziegler had contacted her on October 2, 2023, about getting together for sex. Ms. Doe agreed to potential sexual activity with Mr. and Mrs. Ziegler that day. When Mr. Ziegler later informed Ms. Doe that his wife would not be participating, Ms. Doe alleges she told him not to come. A short time after cancelling the liaison, Ms. Doe opened her door and found Mr. Ziegler standing there. Ms. Doe stated Mr. Ziegler entered her apartment, forced her over a bar stool, and sexually assaulted her.

4.      Ms. Doe showed SPD detectives text messages on her phone confirming that Mr. Ziegler told her it was, "Prob just me this time now," and her response, "Sorry I was mostly in for her."

5.      Detectives obtained the surveillance video from Ms. Doe's apartment complex for October 2, 2023, and observed Mr. Ziegler arriving in his vehicle at 2:29 p.m., walking into the building, and leaving at 3:07 p.m.

6.      During the subsequent investigation, detectives observed communication between Mr. Ziegler and Ms. Doe. SPD had Ms. Doe perform at least three controlled calls between she and Mr. Ziegler. None of these calls produced any incriminating admissions from Mr. Ziegler.

7.      On November 1, 2023, detectives interviewed Mrs. Ziegler. She cooperated with law enforcement and advised she did not know about the prearranged October 2d rendezvous. She told detectives she knew Ms. Doe and previously participated in sexual activities with Ms. Doe and Mr. Ziegler. Mrs. Ziegler cooperated with SPD. There is no evidence, though, that Mrs. Ziegler ever agreed to turn over her text communications with her husband.

8.      Also on November 1, 2023, SPD Detective Cox (lead detective) and Sergeant Riffe (investigative commander and Detective Cox's supervisor) began to interview Mr. Ziegler concerning the sexual battery allegation. Mr. Ziegler suspended the interview to hire an attorney. See Ex. E. Mr. Ziegler retained criminal defense attorney Derek Byrd.

9.      Mr. Ziegler met with Mr. Byrd around noon on November 1, 2023, and showed him a video of the sexual encounter ("the Video") with Ms. Doe which, in both Mr. Ziegler's and Mr. Byrd's opinions, exonerated Mr. Ziegler of the alleged sexual battery.

10.     Mr. Byrd, who knew Sergeant Riffe, called him at approximately 1:30 p.m. on November 1, 2023. This is the same day SPD began its interview with Mr. Ziegler. Mr. Byrd told Sergeant Riffe about the Video and that it exonerated Mr. Ziegler. During that call, Mr. Byrd and Sergeant Riffe agreed to meet at Mr. Byrd's office at 8:00 a.m. the next morning to show the Video to SPD and permit further interview of Mr. Ziegler.

11.     Detective Cox testified that she was aware of the planned November 2 meeting but did not recall being told of the Video. Sergeant Riffe testified that he told Detective Cox of

his call with Mr. Byrd and that the purpose of the meeting the next morning was to observe the Video.

12.      By 1:30 p.m. on November 1, 2023, SPD had actual knowledge of Mr. Ziegler's possession of the Video and the claim it exonerated Mr. Ziegler.

13.      At 9:49 p.m. on November 1, 2023, Detective Cox sent to the State Attorney's Office via email a proposed warrant for review that sought to search and seize Mr. Zeigler's cellphone. Detective Cox identified she was investigating an alleged violation of section 794.011(4)(b), sexual battery by a person 18 years of age or older upon a person 18 years of age or older under the circumstance that the victim was mentally defective. Although SPD knew at that time that Mr. Ziegler had the Video in his possession and that he contended it exonerated him, SPD did not inform the State Attorney's Office of that fact. The State Attorney's Office approved the warrant for submission at 10:30 p.m. that night. A judge of this Court signed the warrant before midnight that same day. See Exs. S and 1.

14.      Detective Cox's affidavit in support of the warrant did not reference Mr. Byrd's call to Sergeant Riffe regarding the forecasted exonerating Video. See Ex. 1. In fact, the affidavit did not contain any mention that SPD was meeting with Messrs. Ziegler and Byrd at 8:00 a.m. the next day.

15.      While the affidavit affirmed that, in Detective Cox's training and experience, evidence of a crime may be found in the phone's messaging programs, phone calls, historical cell tower and GPS data, it did not indicate that the phone's photo or video storage applications could also contain evidence. Id.

16.      The warrant ***broadly and without limitation*** authorized the search of Mr. Ziegler's phone and the seizure of ***all data*** contained on the phone, including all communication, contacts, photos, videos, audio files, web history, historical location data, data regarding documents, autofill data, user account data, passwords, PINs, financial transaction records, and credit card numbers. Id.

17.      On November 2, 2023, Sergeant Riffe, Detective Cox, Detective Llovio, Mr. Byrd, Mr. Ziegler, and another unidentified person met. See Ex. F. Mr. Ziegler showed SPD the Video. After SPD asked about when the Video was created, Mr. Byrd asked if they could provide the cellphone to SPD for the limited purpose of verifying the Video's date and time. See Ex. F at p. 21. SPD declined this offer and, instead, served the search warrant authorizing them to seize Mr. Ziegler's phone. Id. at p. 22.

18.      At the time SPD seized Mr. Ziegler's cellphone, SPD told Mr. Ziegler that the entire cellphone would be downloaded but assured him that they would use software to limit their search to "look at what you told us, the Video. We're going to try and tailor that down, as Mr. Byrd explained, to look to see when that video was created" and to attempt to find the message where Ms. Doe asked Mr. Ziegler if his wife enjoyed the video. Id. at p. 23.

19.     This explanation of the scope of SPD's search was all that was provided to Mr. Ziegler as his attorney then waived reading of the warrant. Id. at p. 30. Mr. Ziegler also explained that the Video did not reside on his cellphone but instead was in cloud storage. Id. at p. 29.

20.     SPD downloaded the entire contents of Mr. Ziegler's cellphone into a software program identified as Cellebrite. This program allows detectives to search the cellphone's contents for key words and to review text messages, documents, photos, and videos. When detectives reviewed the contents of Mr. Ziegler's cellphone and saw something they felt may require further review, the detectives would mark those files by hitting the F7 key on the keyboard.

21.     Mr. Ziegler's cellphone contained the most data of any cellphone extraction previously performed by SPD. It took approximately 5 days to download because SPD's software kept crashing given the enormous quantity of data taken. Detective Cox testified that Mr. Ziegler's cellphone contained more than a terabyte of data, including 30,000 videos and 250,000 photographs. There was also a substantial number of text messages.

22.     Detective Cox and another detective reviewed each of the videos and photographs, regardless of when they were created or the contents of them. In other words, law enforcement reviewed videos and photographs created years before the alleged sexual battery, even if they had nothing to do with Ms. Doe. Detective Cox used the F7 key to identify files which on her initial cursory review were of interest and potentially needed further review. Detective Cox testified these images and videos marked with the F7 key **did not depict Ms. Doe or any apparent criminal activity**. Instead, SPD uploaded them into Evidence.com regardless, for the off chance they might subsequently prove to contain evidence of prior bad acts relating to other crimes. This, of course, was not identified in the warrant.

23.     SPD detectives also sought to review any text, social, or other type of messages stored on Mr. Ziegler's cellphone either mentioning or involving Ms. Doe. Despite this announced self-limitation, the reviewed messages were not constrained to this scope. Again, the use of the F7 key flagged messages greatly exceeded what would be relevant—either inculpatory or exculpatory—for the alleged crime being investigated, as identified in the warrant.

24.     SPD was not able to locate the Video on Mr. Ziegler's cellphone. SPD detectives, therefore, prepared another warrant for the purpose of obtaining the Video. This November 13, 2023 warrant was directed to Google, LLC, for the entire contents of Mr. Ziegler's Google Drive **since the inception of his account**. The wide-scope of this request sought data including, but not limited to: all communication, account access information, all photos uploaded by Mr. Ziegler, all photos in *any* Google Drive where Mr. Ziegler was tagged, all phone back-ups, web bookmarks and browsing history, stored autofill data, all files stored in the account, all files shared with Mr. Ziegler via Google Drive, historical GPS data, Google Hangouts conversation content, and wallet information. SeeEx. 2. Like the original warrant, the crime identified was an alleged violation of section 794.011(4)(b), sexual battery by a person 18 years of age or older upon a person 18 years of age or older under the circumstance that the victim was mentally defective. The date of the alleged crime was October 2, 2023.

25.     Despite having viewed the Video in Mr. Byrd's office, Detective Cox's affidavit in support of the Google warrant did not mention this fact or the exculpatory nature of the Video. Instead, Detective Cox wrote:

> On 11/02/23, Detectives interviewed Christian Ziegler with his attorney present. Christian advised he had consensual sex with the victim, and that he took a video of the encounter on 10/02/23 of the victim. Christian said he initially deleted the video, but since the allegation, he uploaded the video to his Google Drive Which [sic] we have not been able to locate upon a digital extraction.

Ex. 2, pdf. P. 8, ¶8.

26.     The affidavit affirmed that Detective Cox believed a search warrant for the entire contents of Mr. Ziegler's Google Drive would "lead to locating evidence of the crime and will authenticate the date, time, and location when the video was created." Id. at ¶ 9. Besides this conclusory statement, there was no explanation in the affidavit how information from years prior could authenticate the Video allegedly made on October 2, 2023.

27.     Google responded to this warrant and provided SPD with all the requested information. Detective Cox testified that, in her opinion, the Google warrant did not produce any information relevant to SPD's investigation.

28.     Despite now having Mr. Ziegler's Google drive, SPD still was unable to locate a copy of the Video. SPD contacted Mr. Ziegler to ask for his help. Mr. Ziegler agreed to show SPD how to access the Video, as he had previously offered on November 2. That meeting took place in a Big Lots parking lot on December 1, 2023. Present were Mr. Ziegler (without his attorney), Detective Cox, Sergeant Riffe, and Brian Yang, SPD's Digital Forensic Specialist. See Ex. G.

29.     During that December 1, 2023, meeting, Mr. Ziegler voluntarily provided Specialist Yang access to the Video, and Specialist Yang downloaded the Video and associated data. Specialist Yang also took 14 photographs of Mr. Ziegler's cellphone and various images on Mr. Ziegler's cellphone. Mr. Ziegler consented to Specialist Yang taking these 14 photographs.

30.     Additionally, during the December 1, 2023 meeting, Mr. Ziegler voluntarily provided SPD with a DNA sample. There was also discussion concerning how Mr. Barfield knew about aspects of the on-going investigation and whether SPD was leaking information concerning the investigation to Mr. Barfield or the media. (Mr. Barfield is an intervenor in this lawsuit.)

31.     The Court specifically finds that its voluntariness finding with respect to the Video, the 14 photographs taken by Specialist Yang, and the DNA is made to the clear and convincing evidence standard. Despite the two preceding warrants being unconstitutional (as discussed later in this Final Judgment), given the passage of time and Mr. Ziegler's consent to

meet with SPD personnel on December 1, 2023, the Court finds there was an unequivocal break in the chain of illegal conduct sufficient to dissipate the taint of SPD's illegal actions to make the voluntariness finding.

32.     Using the Video's metadata, SPD confirmed that the Video's date and time was consistent with the incident reported by Ms. Doe. SPD ceased investigating Mr. Ziegler for sexual battery; instead, SPD refocused its investigation on an allegation of video voyeurism in violation of sections 810.145(2)(a) and (6)(b), Florida Statutes.

33.     While investigating this new alleged crime, on December 8, 2023, SPD prepared and obtained a third search warrant to serve upon Meta/Instagram. SPD sought to determine if Ms. Doe sent Mr. Ziegler a message in vanish mode **after** the October 2d encounter asking Mr. Ziegler if his wife enjoyed the video—evidence that would suggest Ms. Doe agreed to the videoing of their sexual encounter. Despite this date, the warrant sought all information associated with Mr. Ziegler's account and any other account operated by Mr. Ziegler **since its inception** including: messages, buddy lists, contact lists, calendars, transactional data, passwords, wall postings, photographs, videos, historical login information, and journal entries. SeeEx. 3.

34.     This third warrant affidavit informed the judge that they had observed the Video and Mr. Ziegler "claimed" it was consensual. The affiant, who was not Detective Cox, also stated that during the November 2, 2023, meeting, Mr. Byrd "made mention of a message (on Instagram vanish mode) between the victim and Mr. Ziegler where the victim asked him if he showed his wife the video." Id. at ¶13.

35.     SPD served the third warrant on Meta/Instagram, but Detective Cox testified that it did not produce any evidence relevant to their investigation.

36.     Mr. Ziegler voluntarily provided the Video to SPD. And Mr. Ziegler voluntarily allowed Specialist Yang to take the 14 photographs of Mr. Ziegler's cell phone. Mr. Ziegler, however, did not consent to providing SPD with the contents of his cellphone, Google Drive, or Meta/Instagram accounts. SPD obtained that data based on the three warrants. SPD's searches and seizures of Mr. Ziegler's property was involuntary from Mr. Ziegler's perspective.

37.     On January 19, 2024, SPD referred to the State Attorney's Office a charge of video voyeurism. On March 6, 2024, the State Attorney's Office declined to file a formal charge against Mr. Ziegler for video voyeurism due to insufficient evidence. See Ex. P. In its declination memorandum, the State Attorney's Office noted that Ms. Doe did not recall whether she consented for the Video being taken, and she explained that she possibly allowed Mr. Ziegler to film the October 2, 2023, sexual encounter.

38.     Trial Exhibit Q is an index of materials SPD provided the State Attorney's Office associated with SPD's referral of the video voyeurism charge. This list contains 16 separate paragraphs of records. Paragraphs 1-14 previously have been released publicly. The items in Paragraphs 15 and 16 have not been released publicly.

39.     Paragraph 15 of Exhibit Q contains 11 separate subparagraphs, lettered a through k. The items in Paragraph 15 were obtained from Mr. Ziegler's cellphone, which SPD seized from the first warrant while investigating the alleged October 2, 2023, sexual battery. Notably, SPD did not seek a separate warrant to investigate or seize evidence of a video voyeurism crime. And the first warrant did not reference an alleged crime of video voyeurism at all. The items in Paragraph 15 include:

i.      Approximately 1,270 text messages between Mr. and Mrs. Ziegler spanning approximately 408 pages (subparagraphs a-d);

ii.     Screenshot of text between Mr. Ziegler and Ms. Doe (subparagraph e);

iii.    Facebook messages between Mr. Ziegler and Ms. Doe (subparagraph f);

iv.     Call logs between Mr. Ziegler and Ms. Doe (subparagraph g)

v.      "Secret email CZ- Cellebrite extraction report" (subparagraph h);

vi.     "The List—a list of names/pseudonyms placed into various categories" (subparagraph i);

vii.    Mr. Ziegler's web browsing history 11/1/23 – 11/2/23 (subparagraph j); and,

viii.   A blank Snapchat message from 11/1/23 extraction showing evidence of message sent from Mr. Ziegler to Jane Doe (subparagraph k).

40.     Paragraph 16 of Exhibit Q is the Video. As noted above, Mr. Ziegler consented to producing the Video to SPD.

41.     In addition to the items in Paragraphs 15 and 16 of Exhibit Q, there are an indeterminate number of photographs, videos, and other material from Mr. Ziegler's cell phone that were seized by SPD—marked by hitting the F7 key—and uploaded into Evidence.com, which have not been publicly released. This information marked using the F7 key does not contain any evidence of criminal activity.

42.     Given the Zieglers' public profile, SPD's investigation has generated numerous requests for public access to SPD's investigative file. At least one of the many requests sought release of all contents of the records seized pursuant to the warrants, including all contents of Mr. Ziegler's cellphone, Google Drive, and Meta/Instagram account.

43.     Mr. Ziegler has never been charged with any crime, and there is no active investigation into his conduct. SPD concluded there was no crime of sexual battery, and the State

Attorney's Office declined to bring formal charges against him for video voyeurism. Mr. Ziegler never was arrested, and thus no criminal court case ever was opened.

44.     Mrs. Ziegler never was the subject of any criminal investigation, and she has never been accused of any criminal conduct. Mrs. Ziegler has never consented to the release of her private text messages between herself and her husband.

45.     There is no longer any need for law enforcement or the State Attorney's Office to retain the contents of Mr. Ziegler's cellphone, Google Drive, or Meta/Instagram accounts for purposes as evidence against Mr. Ziegler. These items remain in the possession of SPD, and to a lesser extent, the State Attorney's Office.

### 3.
### STANDING

The Intervenor Defendants hotly contest the Zieglers' standing in this action. The Court in its April 12, 2024 Order [DIN 52], concluded the Zieglers have standing. The Court now provides further analysis of the standing issue.

### A.
### Christian Ziegler

The thrust of Plaintiffs' lawsuit is not an action brought under chapter 119, Florida Statutes, to enforce the disclosure of public records. Instead, the main purpose is to adjudicate Mr. Ziegler's request for the return of his private property. Included in that request is Mr. Ziegler demand he regain exclusive control over his electronically stored information ("ESI") seized pursuant to unconstitutional warrants served on his cellphone, Google account, and Meta/Instagram account, where, as here, the government no longer has a legitimate investigative or prosecutorial purpose for their retention.

Putting that more directly, the issue is whether the government must return to Mr. Ziegler his property and not publicly disclose the contents of that property. Only after this issue has been determined will the Court be able to consider whether and to what extent the records are subject to public disclosure and analyze whether there are any applicable exemptions. See Hill v. Prudential Ins. Co. of Am., 701 So. 2d 1218, 1219 (Fla. 1st DCA 1997) ("In determining whether materials are subject to disclosure pursuant to the Florida public records law, the court must perform a two-step analysis. It must first determine whether the documents sought are, in fact, public records and whether the documents are exempt from public disclosure as a result of a constitutional or statutorily created exemption.").

Plaintiffs' Amended Complaint alleges that SPD seized Mr. Ziegler's private information pursuant to the three warrants. See Verified Amended Complaint for Declaratory and Injunctive Relief [DIN 5] at ¶¶ 9, 12, and 15. Plaintiffs further allege that Mr. Ziegler retains a protected privacy interest in those records. Id. at ¶¶ 27-28.

Intervenor Defendants contend that section 933.14, Florida Statutes, provides a procedure for the return of evidence seized pursuant to a search warrant. This remedy, however, is not exclusive, and the Court maintains inherent power to direct the return of seized property to its rightful owner. Moore v. State, 533 So. 2d 924, 925 (Fla. 2d DCA 1988), *citing* Garmire v. Red Lake, 265 So. 2d 2, 5 (Fla. 1972). Indeed, the Court would err if it failed to exercise its inherent power upon receipt of a facially sufficient motion, and an individual may seek mandamus relief if a court wrongfully denied that motion. Butler v. State, 613 So. 2d 1348, 1349 (Fla. 2d DCA 1993).

A facially sufficient motion for the return of property must allege that "the property at issue was his personal property, was not the fruit of criminal activity, and was not being held as evidence." Bolden v. State, 875 So. 2d 780, 782 (Fla. 2d DCA 2004), *quoting* Durain v. State, 765 So. 2d 880, 880 (Fla. 2d DCA 2000). The person seeking the return must specifically identify the "property at issue" but need not establish proof of ownership in order to allege a facially sufficient motion. Bolden, 875 So. 2d at 782. Where there is no criminal prosecution—as in this case—"the court to which the warrant and property are returned obtains jurisdiction to order its return." Sawyer v. Gable, 400 So. 2d 992, 994 (Fla. 3d DCA 1981). Interestingly, because there was no arrest—and no criminal court case file—there was no case number within which Mr. Ziegler could file his motion for return of his property.

Here, the Twelfth Judicial Circuit Court issued the warrant, and the Twelfth Judicial Circuit Court is the court with jurisdiction to address the return of Mr. Ziegler's seized property. This Court has jurisdiction over the seized items. And it is this Court that has jurisdiction to address the disposition of those seized items. The fact the undersigned judge currently sits in the civil division is not material; the undersigned is a judge of the Court that issued the warrant.

Mr. Ziegler more than adequately alleged a facially sufficient claim for the return of his property. As previously noted, Mr. Ziegler alleged ownership of seized ESI in the possession of SPD and the State Attorney's Office. See Verified Amended Complaint for Declaratory and Injunctive Relief [DIN 5] at ¶¶ 9, 12, 15 and 21. He also alleged that the criminal investigation has concluded with no arrest, charges, or criminal conviction, implying that the records at issue are neither the fruit of criminal activity nor evidence of a crime. Id. at ¶¶ 17, 20.

The Amended Complaint specifically requests an order requiring that the SAO and SPD permanently erase or destroy all ESI seized pursuant to the warrants that are not public records and "grant any other relief that this Court deems just and necessary." Essentially, the proposed order would once again return exclusive control over the records to Mr. Ziegler and result in the "return" of his property. Mr. Ziegler's claim is proper.

The Court finds Intervenor Defendants' "absolutist position" that Mr. Ziegler has no standing to assert his constitutionally protected privacy and property rights pursuant to the Fourth Amendment to be without merit. See Florida Freedom Newspapers, Inc. v. McCrary, 520 So. 2d 32, 34 (Fla. 1988) (rejecting media's absolutist position that a criminal defendant had no standing to enforce the constitutional right of a fair trial by seeking a prohibition of public dissemination of public records). Suggesting that a citizen may not even access the courts to enforce a constitutional right is a stunning proposition.

The public's right to public records "does not extinguish an individual's constitutional and statutory rights in private information." O'Boyle v. Town of Gulf Stream, 257 So. 3d 1036, 1042 (Fla. 4th DCA 2018). In fact, neither article I, section 24 nor the Public Record Act is "a zero-sum choice between personal liberty and governmental accountability." Id. The Florida Supreme Court previously has determined the location of a person's private information existing on a government's electronic system does not automatically transform that private information into a public record. State v. City of Clearwater, 863 So. 2d 149 (Fla. 2003) (city employee's use of government email for private message does not transfer that email into a public record). In other words, "[c]ommon sense . . . opposes a mere possession rule." Id. at 154 (quoting trial judge's order; alterations in original).

In Roberts v. News-Press Pub. Co., Inc., 409 So. 2d 1089, 1094 (Fla. 2d DCA 1982), the Second District posed the critical question: "If, then, there are federal constitutional rights of nondisclosure, . . . what is the process by which those rights . . . are to be exercised?" Id. at 1094. The Roberts court answered this question by ruling that when a statutory exemption or constitutional right of nondisclosure is a personal right, it may be protected only by the individual asserting the right "and not by the custodian of the file." Id.

Returning to this case, not only does Mr. Ziegler assert ownership of the ESI at issue, but he also alleges that the three warrants the government used to seize these records (i.e., the entire contents of his cellphone, information stored in his Google Drive account from its inception, and information contained in his Meta/Instagram accounts from its inception) were unconstitutionally overbroad. If true, the ESI may have been seized in violation of Mr. Ziegler's Fourth Amendment rights and further disclosure may also implicate Fourteenth Amendment protections against arbitrary or unjustifiable state deprivations of personal property. Ironically, had Mr. Ziegler been criminally charged, he would have had a well-established forum in the criminal case within which to seek suppression based on a violation of the Fourth Amendment. That Mr. Ziegler never was arrested nor criminally charged cannot preclude Mr. Ziegler from vindicating the violation of his constitutional rights.

For all of these reasons, and for the reasons stated in the Court's April 12, 2024 Order, the Court finds that Mr. Ziegler has standing to assert the claims he has made in this matter.

## B.
## Bridget Ziegler

Mrs. Ziegler's standing analysis is different than her husbands. In large part, this analysis is secondary given the Court's resolution of Mr. Ziegler's contention. It only applies if the Second District or a reviewing court ultimately disagrees with the Court's conclusions regarding Mr. Ziegler's claims.

Plaintiffs' Amended Complaint does not allege that Mrs. Ziegler owned the records seized from Mr. Ziegler. The only interest Mrs. Ziegler asserts is her section 90.504, Florida Statutes, statutory right to prevent disclosure of privileged spousal communications. The relevant part of that statute provides:

Page 13 of 46

> A spouse has a privilege during and after the marital relationship to refuse to disclose, *and to prevent another from disclosing*, communications which were intended to be made in confidence between the spouses while they were husband and wife.

§90.504(1), Fla. Stat. (italicized emphasis added).

The ultimate question for the Court is this: does this statute permit Mrs. Ziegler to prevent a government entity from disclosing as a public record her spousal communications that are covered by the statute? In reviewing the meaning of a statute, "our focus is the statutory text at issue." DeSantis v. Dream Defenders, 2024 WL 3058653, at *3 (Fla. June 20, 2024). "To determine its best reading, we exhaust all the textual and structural clues." Id. Justice Couriel, writing for the Florida Supreme Court, most recently warned not to ignore the whole-texts canon, "which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts. Id. at *8, n.12, *quoting* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012).

On the one hand, section 90.504 expressly provides that a spouse may "prevent another from disclosing" a spousal communication. There is no qualification on this statutory right, which suggests that a spouse like Mrs. Ziegler can do this.

On the other hand, this privilege is contained in Florida's Evidence Code, not chapter 119. But for public records, omission from chapter 119 does not mean much, though, as the Legislature creates exemptions throughout *Florida Statutes* and not simply in chapter 119. See Government-in-the-Sunshine Manual, Florida Office of the Attorney General, Volume 46 (2024 Ed.) (reviewing pages 225-234 and 240-306 for exemptions in *Florida Statutes* not contained within chapter 119). Perhaps more concerning to Mrs. Ziegler is the absence of an express statement in section 90.504 that it is intended to exempt information from being disclosed as a public record. This type of language exists in many other statutes. The absence of this language in section 90.504 suggest that it does not allow Mrs. Ziegler to prevent a governmental agency from producing her spousal communications.

The Court must also consider the applicability of article 1, section 24(d) that provides: "All laws that are in effect on July 1, 1993 that limit public access to records shall remain in force, and such laws apply to records of the legislative and judicial branches, until they are repealed." Without question, section 90.504 existed in its present-day form prior to that date.

Interestingly, the Florida Supreme Court adoption of Rule 1-14.1I, sheds light on this situation. On October 29, 1992—just days before the general election that included the vote on the constitutional amendment that would become article I, section 24, that court recognized there could be public record restrictions on the production of documents contained within the Evidence Code. The rule adopted provides as follows:

> Except as otherwise provided in these Rules Regulating The Florida Bar, *any restrictions to production of records contained in the Florida Evidence Code*

*(chapter 90, Florida Statutes, as amended)*, Florida Rules of Civil Procedure, or Florida Rules of Criminal Procedure *shall apply to requests for access to the records* of The Florida Bar.

In re Amendments to Florida Rules of Judicial Admin.-Pub. Access to Judicial Records, 608 So. 2d 472, 475 (Fla. 1992) (emphasis added).

This action by the Florida Supreme Court is powerful, contemporaneous evidence that chapter 90 contained restrictions on the production of records.

Because the statutory spousal privilege to "prevent another from disclosing" confidential spousal communications was adopted prior to the effective July 1, 1993 date—and it has not been repealed—the Court finds Mrs. Ziegler has standing to assert this exemption relating to privileged spousal communications.

Having determined both Mr. and Mrs. Ziegler have standing to bring this action, the Court turns its attention to the substance of the legal analysis.

## 4.
## WARRANTS AND THE FOURTH AMENDMENT

In this section, the Court discusses the Fourth Amendment, the need for particularity in search warrants, and the reasonableness requirement.

## A.
## Discussion of the Fourth Amendment

The Fourth Amendment demands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Amend. IV, U.S. Const. "Article 1, section 12, of the Florida Constitution provides virtually identical protections." State v. Peltier, 373 So. 3d 380, 384 (Fla. 2d DCA 2023).

"These words are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever be secure in their persons, houses, papers, and effects from intrusion and seizure by officers acting under the unbridled authority of a general warrant." Stanford v. State of Texas, 379 U.S. 476, 481 (1965) (holding the sweeping language of the warrant "constitutionally intolerable" that permitted the seizure of 2,000 books, pamphlets, and papers where warrant attempted to allow seizure of written instruments concerning the Communist Party of Texas).

In reversing a criminal defendant's conviction based on evidence obtained from a general warrant, the Second District quoted United States Supreme Court decisions from 1886 and 1927 discussing the historical importance of the Fourth Amendment:

In <u>Marron [v. United States</u>, 275 U.S. 192, 195 (1927)], the United States
Supreme Court explained why the prohibition against general searches
was so important as to be placed in the Constitution:

> The practice had obtained in the colonies of issuing writs of
> assistance to the revenue officers, empowering them, in
> their discretion, to search suspected places for smuggled
> goods, which James Otis announced "the worst instrument
> of arbitrary power, the most destructive of English liberty,
> and the fundamental principles of law, that ever was found
> in an English law book;" since they placed "the liberty of
> every man in the hands of every petty officer."

<u>Id</u>. (*quoting* <u>Boyd v. United States</u>, 116 U.S. 616 (1886)).

<u>Ingraham v. State</u>, 811 So. 2d 770, 773 (Fla. 2d DCA 2002) (only first bracketed alteration
added).

"The text of the Amendment thus expressly imposes two requirements. First, all searches
and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is
properly established, and the scope of the authorized search is set out with particularity."
<u>Kentucky v. King</u>, 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (internal citation
omitted). The particularity requirement "ensures that the search is confined in scope to
particularly described evidence relating to a specific crime for which there is probable cause."
<u>United States v. Oloyede</u>, 982 F.2d 133, 138 (4th Cir. 1993).

"[T]he particularity requirement stands as a bar to exploratory searches by officers armed
with a general warrant." <u>Carlton v. State</u>, 449 So. 2d 250, 252 (Fla. 1984) ("The requirement that
warrants shall particularly describe the things to be seized makes general searches under them
impossible and prevents the seizure of one thing under a warrant describing another. As to what
is to be taken, nothing is left to the discretion of the officer executing the warrant.")
(*quoting*<u>Marron v. United States</u>, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)). This
requirement also safeguards the "privacy and security of individuals against arbitrary invasions
by governmental officials." <u>Id</u>. (citations omitted).

A warrant must sufficiently describe what is to be searched and seized; using generic
terms such as "documents" is insufficient. The Fifth District has explained:

> Warrants attempting to authorize a search for, and seizure of, a class or
> group of objects, such as "documents" are too general and do not describe
> the thing or things to be seized with the particularity that the constitution
> requires. *If the original source of information upon which the search
> warrant affidavit relies cannot describe existing objects or things other
> than in terms of generic reference such as "papers", "documents", the
> information is too vague and indefinite upon which to authorize a search.*
> General searches are not permitted.

Filed 07/01/2024 07:46 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

Polakoff v. State, 586 So. 2d 385, 392 (Fla. 5th DCA).

In addressing the issue of particularity as applied to a subpoena duces tecum for documents, the Florida Supreme Court noted that "reasonable particularity" may be satisfied by the description of a category of documents being sought "along with a reasonable period of time covered by the documents and a statement of the subject matter to which the documents pertain." Vann v. State, 85 So. 2d 133, 136 (Fla. 1956); see also State v. Showcase Products, Inc., 501 So. 2d 11, 14 (Fla. 4th DCA 1986) ("It is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit."). In each case, however, the category of documents being sought must be particularly described, and their seizure must be supported by a nexus to the crime being investigated.

**B.**
**Particularity as Applied to Electronically Stored Information ("ESI")**

"The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions[.]" Riley v. California, 573 U.S. 373, 394 (2014). Ten years ago, the United States Supreme Court held that law enforcement must obtain a warrant to search the cellphone of an arrested individual. Id. In explaining the need for law enforcement to obtain a warrant to search and seize the contents of a cellphone, the United Statues Supreme Court observed:

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life." The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.

Id. at 403 (internal citation omitted).

That was 10 years ago. The use and storage capabilities of cellphones and social media accounts have grown exponentially since then. To say that cellphones and social media accounts are omnipresent today would be the understatement of the century. For many of us, a cellphone contains our life story.

On the stand, SPD detectives testified that it was "best practice" to make an identical copy of the complete contents of the cellphone and then search across the entire contents to ensure deleted or altered material would be discovered. In a civil case, the Third District recently rejected that very concept, noting the historical importance of the Fourth Amendment. Roque v. Swezy, 49 Fla. L. Weekly D921, 2024 WL 1895141, *3 (Fla. 3d DCA May 1, 2024) (rejecting view that a forensic search and seizure of a cellphone should occur because it is "quicker and

more efficient means of obtaining evidence"). As that court explained: "Such a contention is reminiscent of arguments advanced to justify warrantless searches otherwise prohibited under the Fourth Amendment." Id. This principle is of a constitutional dimension, recognized by the United States Supreme Court:

> [T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.

Mincey v. Arizona, 437 U.S. 385, 393 (1978) (internal citation omitted).

That takes us to the rules associated with searching for ESI. If law enforcement is not permitted to obtain a general warrant to rummage through a home, would law enforcement be able to execute a general warrant to search and seize all of an individual's ESI? And the answer is, law enforcement cannot.

In analyzing the sufficiency of the warrants authorizing the seizure of ESI, the particularity requirement assumes even greater importance. United States v. Galpin, 720 F.3d 436, 446 (2d Cir. 2013). That is because the seizure and subsequent retention of ESI "can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure." United States v. Ganias, 824 F.3d 199, 217 (2d Cir. 2016) (*en banc*). "The potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous"—a "threat [that] is compounded by the nature of digital storage." Galpin, 720 F.3d at 447.

The Court, of course, recognizes that in the search for specifically identified incriminating digital data, "it is almost inevitable that officers will have to review some data that is unrelated to the criminal activity alleged in the authorizing warrant." People v. Hughes, 506 Mich. 512, 547 (2020). "[O]n occasion in the course of a reasonable search [of digital data], investigating officers may examine, 'at least cursorily,' some 'innocuous documents ... in order to determine whether they are, in fact, among those papers authorized to be seized.'" United States v. Richards, 659 F.3d 527, 539 (6th Cir. 2011).  However,

> [a]lthough computer technology may in theory justify blanket seizures ..., the government must still demonstrate to the magistrate [judge] factually why such a broad search and seizure authority is reasonable in the case at hand.... Thus, there must be some threshold showing before the government may 'seize the haystack to look for the needle.'

United States v. Hill, 459 F.3d 966, 975 (9th Cir. 2006) (emphasis added).

Unfortunately, Florida law provides little guidance on how to apply the particularity requirement to searches of ESI. In the Fifth Amendment context concerning compelled production by a defendant of a cellphone passcode, the First District had occasion to comment on the scope and breadth of a search warrant for the defendant's cell phone. Pollard v. State, 287 So. 3d 649, 657 (Fla. 1st DCA 2019). In agreeing with the Fourth District's observation in G.A.Q.L. v. State, 257 So. 3d 1058, 287 So. 3d 249 (Fla. 4th DCA 2018), the Pollard court stated "unless the state can describe with reasonable particularity the information it seeks to access on a specific cellphone, an attempt to seek all communications, data and images amounts to a mere fishing expedition." 287 So. 3d at 657 (internal citation, quotation, and alteration omitted); seeG.A.Q.L. v. State, 257 So. 3d at 1064 ("It is not enough for the state to infer that evidence exists—it must identify what evidence lies beyond the passcode wall with reasonable particularity.").

Two years ago, a federal judge in Georgia found that a warrant that allowed the government unbridled authority to rummage through a defendant's Instagram account looking for evidence of possession of firearm by a felon to be unnecessarily overbroad and amounted to a general warrant in violation of the Fourth Amendment's particularity clause. United States v. Mercery, 591 F. Supp. 3d 1369, 1381 (M.D. Ga. 2022). The court explained:

> The Instagram Warrant authorizes the government to search and seize data that is not related to the probable cause established in Sergeant Frost's affidavit. It allows officers to search and seize virtually all of the information on Mercery's Instagram account, with no temporal limitations or limitations defined by the crime of possession of a firearm by a convicted felon. Such warrant is akin to a general warrant and therefore violates the Fourth Amendment's particularity clause.

Id. at 1382.

The Mercery court noted that, under the federal rules relating to ESI, normally there is a two-step investigatory process, "the 'search' wherein the warrant will compel the third party to produce a broad array of electronic information, and the 'seizure' wherein the warrant will authorize the seizure of a specified information." Id. The Court then found that the Instagram warrant in question described the broad production of data to be produced but failed to describe any subset of information subject to seizure. Id. In excluding the evidence, the court spoke directly to law enforcement and the types of limitations that must be followed relating to ESI:

> Finally, and most important, excluding the evidence obtained under the unconstitutional warrant will deter future violations. Social media networks like Instagram and Facebook are an ever-increasing form of communication and hubs of personal information for which law enforcement routinely seek and obtain search warrants. ***Officers need to know that a warrant must provide guidelines for determining what evidence may be searched and seized and must be tailored to the probable cause established in the supporting affidavit.*** Thus, the Court finds the good faith exception inapplicable under the circumstances here,

and Defendant's Motion to Suppress evidence seized pursuant to the
Instagram Warrant is GRANTED.

Id. at 1383 (emphasis added).

The Court also finds other state and federal courts' analyses of these principles as applied
to ESI searches to be instructive. These courts have consistently held that when a search warrant
uses "catchall" language which permits law enforcement to search all data on a cell phone or
other data storage accounts, this amounts to an invalid "general warrant."

- State v. Henderson, 289 Neb. 271, 854 N.W.2d 616, 625, 633 (Neb. 2014)
  (warrants to search cell phones violated particularity requirement where they
  authorized a search of "[a]ny and all information," as well as "any other
  information that can be gained from the internal components and/or memory
  Cards").

- State v. Allen, 288 Or. App. 244, 406 P.3d 89, 93 (Or. Ct. App. 2017) (holding
  that search warrant for cell phone failed the particularity requirement because it
  "placed no limitations on the types of files to be seized and examined").

- United States v. Otero, 563 F.3d 1127, 1133 (10th Cir. 2009) (government
  conceded and reviewing court agreed that warrant "authorizing a search of 'any
  and all information and/or data' stored on computer" was "the sort of wide-
  ranging search that fails to satisfy the particularity requirement").

- United States v. Clough, 246 F. Supp. 2d 84, 87 (D. Me. 2013) (warrant that
  authorized seizure of any and all text messages and digital images on computer
  was "clearly excessive" and was not sufficiently particularized).

- United States v. Fleet Mgmt. Ltd., 521 F. Supp. 2d 436, 439 (E.D. Pa. 2007)
  (warrant to search hard drives of three computers lacked particularity because it
  sought "[a]ny and all data in the computers or contained in the computer storage
  devices, including, but not limited to, software and all records including e-mail,
  photographs, and documents relating to the ship's operation, engineering,
  maintenance, pollution control equipment, navigational charts, and crew").

- United States v. Winn, 79 F. Supp. 3d 904, 919 (S.D. Ill. 2015) ("The major,
  overriding problem with the description of the object of the search – 'any or all
  files' – is that the police did not have probable cause to believe that everything on
  the phone was evidence of the crime of public indecency.")

Where there is a limitation built into the warrant, there is greater chance that it will be
constitutional. United States v. Lee, Crim. No. 14-227-TCB-2, 2015 WL 5667102, at *3 (N.D.
Ga. Sept. 25, 2015) ("[T]he weight of the authority supports the conclusion that a warrant that
requires disclosure of the entire contents of an [electronic source] and then describes a subset of
that information that will be subject to seizure is reasonable.").

The language of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701, et seq., and the corresponding Florida law contained in section 934.23(5), Florida Statutes, is also instructive, especially as applied to the Google and Meta warrants. Both statutes govern the warrant requirements for disclosure of ESI held by a third-party provider and use identical language requiring that the government's application for a search warrant provide:

> specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.

The Court finds that as applied to ESI, the warrant and supporting documents being reviewed must describe with particularity a specific record being sought or describe a specifically identified *type* of record (i.e. text, email, photo, etc.), which also contains case-specific facts demonstrating how this particular record is relevant and material to the ongoing investigation.

## C.
## Reasonableness of Search Methods

Even prior to the advent of the everyday use of ESI in the lives of virtually every citizen, the U.S. Supreme Court recognized,

> [T]here are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976).

As with searches for tangible evidence, determining whether an ESI search exceeded the scope of the authorizing warrant is an exercise in reasonableness assessed on a case-by-case basis. Dalia v. United States, 441 U.S. 238, 258 (1979) (holding that the manner of a search is subject to "later judicial review as to its reasonableness"). The general Fourth Amendment rule is that investigators executing a warrant can look anywhere where evidence described in the warrant might conceivably be located. United States v. Ross, 456 U.S. 798 (1982).

Page 21 of 46

This principle is equally applicable to warrants served upon ESI. In re Nextel Cellular Telephone, No 14-MJ-8005, 2014 WL 2898262, at 13 (D. Kan. June 26, 2014) (noting just as probable cause to believe "that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe drug trafficking communication may be found in [a] phone's . . . mail application will not support the search of the phone's Angry Birds application"). As previously noted, however, even when an electronic records warrant is narrowly tailored to search for specific items, the enormous amount of data and infinite places ESI evidence may be located inevitably results in the "seizure of the haystack looking for the needle." Hill, 459 F.3d at 975. Thus, it becomes critical for courts to also examine the reasonableness of the search method the government employed.

In In re Cellular Telephones, No. 14-MJ-8017-DJW, 2014 WL 7793690 (D. Kan. Dec. 30, 2014), a magistrate judge noted that in ESI searches, the "reasonableness of the manner of search is necessarily implicated because particularity and reasonableness are functionally related." Therefore, "[a]s the description of such places and things becomes more general, the method by which the search is executed becomes more important—the search method must be tailored to meet allowed ends." Id. (quoting United States v. Burgess, 576 F.3d 1078, 1094 (10th Cir. 2009)). For this reason, the magistrate required that the government must not only "provide the court with as specific a description of the place to be searched and the things to be seized as the circumstances reasonably allow," but they must also outline "a search protocol explaining how it will separate what is permitted to be seized from what is not."  Id. at *8. These limitations must "maintain the privacy of materials that are intermingled with seizable materials" and are necessary to "avoid turning a limited search for particular information into a general search of office file systems and computer databases." Id. at *9.

This is akin to what Mercery, 591 F. Supp. 3d 1369, 1381 (M.D. Ga. 2022), explained as the two-step process between a wide search but more narrow seizure. Other courts across the country have recognized the need for protocols to protect the cellphone owner's constitutional rights, as well as a subsequent warrant to seek evidence of a separate crime than identified in the original warrant.

- Matter of the Search of Apple iPhone IMEI 01388803738427, 31 F. Supp. 3d 159, 166 (D.D.C. 2014) ("a sufficient search protocol, i.e. an explanation of the scientific methodology the government will use to separate what is permitted to be seized from what is not, will explain to the Court how the government will decide where it is going to search—and it is thus squarely aimed at satisfying the particularity requirement of the Fourth Amendment.")

- United States v. Nasher-Alneam, 399 F. Supp. 3d 579, 593-94 (S.D. W. Va. 2019) ("Even when a seizure of electronic data is legal, any search of that data must be within the scope of the original warrant." Thus, if the government subsequently develops probable cause to believe the seized ESI contains evidence of a crime different from the subject of the original warrant, they are required to get a second warrant prior to the subsequent search.).

- United States v. Carey, 172 F.3d 1268, 1276 (10th Cir. 1999) (suppressing child pornography evidence where police, conducting search under warrant for drug offenses, continued to search for child pornography without obtaining warrant).

- United States v. Hulscher, 2017 WL 657436, *2 (D. S.D. Feb. 17, 2017) (suppressing evidence from second search of iPhone for evidence to support federal firearms charges where search warrant allowing seizure and search of phone was to investigate forgery, counterfeiting, and identify theft offenses because agent "should have applied for and obtained a second warrant [that] would have authorized him to search Mr. Hulscher's cell phone data for evidence of firearms offenses").

- United States v. Schlingloff, 901 F. Supp. 2d 1101, 1106 (C.D. Ill. 2012) (concluding scope of search warrant was exceeded and suppressing evidence of child pornography where law enforcement agent was searching computer for evidence of passport fraud and identify theft but, upon discovering evidence of child pornography, failed to seek a second warrant).

- United States v. Cawthorn, 682 F. Supp. 3d 449, 457 (D. Md. 2023) (noting that in exercising an ESI warrant "the government 'may not seize and retain items outside the scope of a warrant'").

The lesson from these cases demonstrates that, to the extent the warrants appropriately described with particularity the items being sought, the Court must also review the search methods employed by SPD to determine whether they reasonably restricted the search to exclude private, irrelevant information. It is within this framework that the Court now examines the three warrants at issue in this case.

## 5.
## THE CELL PHONE SEARCH WARRANT
## (NOVEMBER 1, 2023)

On November 1, 2023, SPD obtained a search warrant to seize and search Mr. Ziegler's iPhone. The affidavit in support of this warrant, signed by Detective Cox, stated facts in support of this warrant as outlined in paragraphs 2-6 of Section 2, "Findings of Fact."

As it pertains to evidence contained on Mr. Ziegler's cellphone, the warrant alleged the following:

> Based upon the above information, Affiant has reason to believe that evidence of a crime will be found within the cellular phone device belonging to Christian Ziegler telephone number XXX-XXX-XXXX.

See Ex. 1, at ¶ 10.

Page 23 of 46

Additionally, the attesting detective alleged that in her experience it is common for a suspect to use the phone's text messages, calls, emails, applications, and internet access to assist in the commission of a crime. Id. at ¶¶ 11, 12, and 13. She also alleged that the devices store cell tower data and GPS coordinates. Id. at ¶14, 15. All of this data "may contain evidence or fruits of the crime." Id. at ¶18. Finally,

> Based on the aforementioned facts, your Affiant believes that probable cause exists to show Christian Ziegler's cellular phone, an AT&T carrier # XXX-XXX-XXXX which is currently in Christian Ziegler's custody, contains valuable evidence relevant to the matter of this warrant.

The warrant then authorized the seizure of Mr. Ziegler's cell phone for the following "evidence":

1.    All data regarding target device identity information including the assigned phone number, serial number, make, model, IMEI, carrier, and owner information.

2.    All data regarding text communication including SMS, MMS, and 3rd party application communication whether incoming, outgoing, and drafts including any associated metadata.

3.    All data regarding contacts including any associated logs and metadata.

4.    All data regarding call log history, including incoming, outgoing, missed, and dialed and any associated metadata.

5.    All data regarding images, videos, and audio files, including any associated metadata.

6.    All data regarding web history, including web sites visited internet searches, web bookmarks, internet cookies, downloaded data, and associated metadata.

7.    All data regarding emails whether incoming, outgoing and drafts and associated metadata.

8.    All data regarding GPS locations, location information, longitude and latitude data, cell tower locations, Wi-Fi connections, Bluetooth connections, hot-spot connections, including any associated metadata.

9.    All data regarding documents, installed applications, autofill data, user accounts, passwords, PINs, notes pattern locks, financial transaction records, credit card numbers, including any associated metadata.

Id. at p. 2 (footnote omitted).

Upon serving the warrant, Detective Cox testified that over five days SPD imaged the phone's entire contents onto their computer. She and other detectives them utilized the Cellebrite program to identify potentially relevant information from the phone. This process was not spelled out in the warrant or otherwise controlled by the terms of the warrant.

In other words, SPD had unfettered access to, and unbridled discretion in, seizing anything SPD wanted from Mr. Ziegler's cellphone. During this process, Detective Cox marked numerous items using the F7 functionality to "seize" the records as evidence. Some of the F7 records include the items listed in paragraph 15 of Intervenors' Exhibit Q.

Recall the warrant sought evidence for an alleged crime of sexual battery occurring on October 2, 2023. And the affidavit identified that a digital extraction of Ms. Doe's cellphone revealed several messages from Mr. Ziegler to her "on 10/02/23 starting at 0729 hours." Given SPD's knowledge of the date of the alleged crime and when messages began there was absolutely no explanation why a time restriction or content restriction could not be used to guard against law enforcement's unfettered seizure of Mr. Ziegler's personal, private property.

During their subsequent review of 30,000+ videos and 250,000+ electronic photographs, SPD detectives seized an indeterminate number of these files, again using the F7 functionality. These were of a private nature. Incredibly, Detective Cox testified that ***none of them involved Ms. Doe, and none of them depicted any illegal activity, but they were seized anyway***.

Despite this, SPD detectives uploaded this media into Evidence.com to provide the State Attorney's Office with access to determine whether it *might* provide useful information of similar crimes pursuant to the rule established in <u>Williams v. State</u>, 110 So. 2d 654, 658 (Fla. 1959) (holding that evidence of other crimes is admissible and relevant if it tends to show a common scheme or plan). ***Again, even by the lead detective's own admission, none of the videos or images depicted any illegal activity.***

This practice of using the F7 key to seize videos and photographs with no apparent criminal activity displayed on the off chance that prosecutors in the future may use this as <u>Williams'</u> rule evidence is constitutionally intolerable. Certainly, these non-criminal items were not identified as evidence of the sexual battery allegation being investigated. And they were not identified in the warrant.

Presumably, had there been a criminal prosecution, the State's position would have been these videos and photos were in plain view of the SPD detectives during the search of the cellphone for evidence of a sexual battery occurring on October 2, 2023. Yet, the "plain view" doctrine allowing warrantless seizures only applies "where it is immediately apparent to the police" the item to be seized is of a criminal character; the doctrine "may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 466 (1971). More, law enforcement must have probable cause to seize an item in plain view where there is no warrant. <u>Arizona v. Hicks</u>,

480 U.S. 321, 327 (1987); Young v. State, 207 So. 3d 267, 269 (Fla. 2d DCA 2016) (holding that the incriminating nature of the evidence must immediately be apparent to seize items in plain view when performing a warranted search); see alsoDoane v. United States, 2009 WL 1619642 (S.D.N.Y. June 5, 2009) ("The fact that the prosecution ultimately recognizes the evidentiary value of the document is immaterial. The plain view doctrine requires that the objects evidentiary value be apparent at the time of the seizure.").

There is no scenario where the federal or state constitution would permit law enforcement outside of a warrant to knowingly seize property that, by law enforcement's own admission, is not contraband or criminally suspect on the off chance that some future prosecutor may divine a way to transform it into evidence of a crime.

Based upon these facts, the Court finds that the phone warrant's seizure of essentially the entire contents of Mr. Ziegler's cellphone as "evidence" wholly fails to sufficiently identify *specific* records which were reasonably related to the investigation. In other words, while the warrant accurately described the places which may be searched for evidence (i.e., the messages, photos, web-browsing history etc.) it failed to identify with *any reasonable specificity* the evidence which might be discovered at these locations. Even when construing the warrant application in its entirety, *at best*, it only particularly describes potentially relevant communication between Mr. Ziegler and Ms. Doe to be found on the cellphone. The search for this limited information did not permit SPD the legal authority to search the entirety of the phone's contents including images, videos, web browsing history, financial data, or passwords.

The request and warrant were absolutely overbroad and violated the particularity clause of the Fourth Amendment.

The Court further finds that, despite using Cellebrite to search the phone's contents, SPD failed to conduct the search in a manner designed to minimize unwarranted intrusion upon irrelevant private communications or other ESI. There was no established protocol governing how SPD would conduct its review of the contents to focus on seizing particularly identified items.

This unrestrained search led to the seizure of, among other things, more than *1,200 spousal communications* between the Zieglers *predating by more than two years* the alleged October 2, 2023, crime. And, making the seizure worse, only a handful of these communications even referenced Ms. Doe. (The Court knows this based on the *in camera* inspection of the marital communications referenced in paragraph 15 of Exhibit Q.) This seizure was entirely unreasonable and unconstitutional.

The Court is aware that search warrants have been upheld, in part, under the concept of severability. West v. State, 439 So. 2d 907, 914 (Fla. 2d DCA 1983), *decision quashed on other grounds*, 449 So. 2d 1286 (Fla. 1984); see alsoState v. Nuckolls, 617 So. 2d 724, 728 (Fla. 5th DCA 1993) (finding portions of the seized evidence was admissible because they were described with particularity).

But, where, as here, the violations are so fundamental and substantial, severance does not apply. Otherwise, law enforcement's unconstitutional practices could continue with no meaningful sanction. To be clear, the Court holds that the concept of severance does not apply to this unconstitutional warrant.

But if Second District or any reviewing court were to conclude the doctrine of severability applies to the facts of this case, the Court finds that no valid portion of the cellphone warrant was exercised as to the following items seized: the photos and videos marked by SPD detectives using the F7 key and uploaded into Evidence.com; the communications between Mr. and Mrs. Ziegler (Paragraph 15a-15d of Exhibit Q); the Cellebrite extraction report (Paragraph 15h of Exhibit Q); the "List" (Paragraph 15i of Exhibit Q); and web browsing history (Paragraph 15j of Exhibit Q). Thus—and even if severance were to apply here—these items were seized in violation of Mr. Ziegler's rights secured by the Fourth Amendment to the United States Constitution and article I, sections 12 and 23 of Florida's Constitution.

Although unnecessary for a finding of unconstitutionality, the Court also comments on yet another concerning factor of SPD's investigation. Despite knowledge, SPD in obtaining the cellphone warrant failed to include any information in the affidavit about the existence of the potentially exculpatory video or Mr. Ziegler's offer to show the Video to law enforcement. Law enforcement simply cannot withhold relevant, potentially exculpatory information from the judge reviewing a warrant. Because of the Court's prior conclusion of unconstitutionality, the Court need not further analyze this issue or perform a hearing contemplated by Franks v. Delaware, 438 U.S. 154 (1978).

But the Court remains troubled by this glaring omission.

## 6.
## THE GOOGLE WARRANT
## (NOVEMBER 15, 2023)

SPD obtained the Google warrant pursuant to 18 U.S.C. §§ 2701, et seq., and section 934.23(5), Florida Statutes. See Ex. 2, p. 1. The supporting documents for the warrant contained the same factual allegations to the November 1st cellphone warrant with one substantive addition:

> On 11/02/23, Detectives interviewed Christian Ziegler with his attorney present. Christian advised he had consensual sex with the victim, and that he took a video of the encounter on 10/2/23 of the victim. Christian said he initially deleted the video, but since the allegation, he uploaded the video to his Google Drive. Which we have not been able to locate upon a digital extraction.

Id. at ¶ 9.

Disconcertingly, this statement of fact failed to alert the reviewing judge that during the November 2nd interview, SPD officers watched the Video and that the sexual encounter

appeared consensual. The affidavit also failed to alert the reviewing judge of Detective Riffe's observation after watching the Video that the victim appeared to be "coherent." See Ex. F, Transcript of 11/2/23 interview of Christian Ziegler at p. 19 ("Just on the video and I don't know if [Mr. Byrd] heard it was well, I mean you could hear she's coherent, but she's slurring a little bit.").

After outlining these facts, Detective Cox's affidavit affirmed:

> Based on the above information, I believe a search warrant for the content stored on Google's servers for data relating to the Gmail address: redacted@gmail.com will lead to locating evidence of the crime, and will authenticate the date, time and location of when the video was created.

See Ex. 2 at ¶ 10. The warrant then stated that based upon Detective Cox's training and experience,

> searches and seizures of electronic communications evidence may require the seizure of most, or all communication currently stored to be processed later. Furthermore, your Affiant believes that there is no way to minimize or narrow the focus of the items being requested herein and this data can only be narrow [sic] after you [sic] Affiant has an opportunity to search all the data being stored within the aforementioned Google Drive account.

Id. at ¶ 15. The Google warrant then authorized them to "seize as evidence any of the following:"

1.    Stored electronic communications or files associated with the user accounts identified as Google User ID: Email: redacted@gmail.com and any related accounts concerning the same account subscribers or users, since creation of such account until the date of production, including but not limited to:

   a.    content and header information of email or other messages and any attachments;

   b.    user contact information, group contact information;

   c.    IP logs, and instant messages if any, whether drafted, sent, received, opened or unopened, read or unread, and/or forwarded; and

   d.    any buddy lists or contact lists, calendars, transactional data, account passwords or identifies, and/or any other files related to that account;

2.    Records concerning the identity of the user of the above-listed user accounts(s); consisting of name, postal code, country, e-mail

address, date of account creation, IP address at account sign-up, logs showing IP address and date stamps for account access;

3.      Any photoprints linked to or associated with the above-listed user account(s). The photoprints are to include a compilation of al photos and or videos uploaded by the user that have not been deleted, along with all photos and videos uploaded by any user that has the user tagged in them;

4.      Any additional video and/or images uploaded or downloaded to the account with any associated metadata, timestamps, and IP addresses associated with the upload or download, as well as any transactional logs that show user interaction with the video/images;

5.      Stored Android backups;

6.      Stored web bookmarks, web history, and autofill data that are stored under this account;

7.      Files stored in the Google Drive related to this account, to include shared folders that are accessible by this account;

8.      Files stored in the Google Photos related to this account, to include shared folders that are accessible by this account with any associated metadata (EXIF), timestamps, IP addresses associated with the upload or download, any transaction logs that show user interaction with the video/images;

9.      Google Hangouts conversation content and history associated to this account;

10.     Any additional Google Account or Google Play account to include account information, and account history;

11.     Any location history including global positioning coordinates;

12.     Google wallet/checkout service information; and

13.     Installed application, device make(s), model(s) and international mobile identification number (IMEI) or mobile equipment identifier number (MEID) for Google account.

Id. at pp. 2-3.

Notably, Detective Cox testified that no relevant evidence was seized during the search of the ESI produced pursuant to the Google warrant.

The Court finds that the Google warrant was overly broad in that it authorized the seizure of Mr. Ziegler's *entire Google account* as "evidence" despite investigating a crime allegedly occurring on October 2, 2023. Again, the warrant described the locations to be searched (i.e. web bookmarks, autofill data, wallet information, buddy lists, etc.) but it failed to identify the particular evidence being sought in those locations.

Further exacerbating this "over-seizing" mentality, there is no technological reason to obtain the entire contents of a Google or social media accounts because Google and other social media companies have the ability to produce only what is requested. This stands in stark contrast to the affidavit that affirmed there can be no narrowing or minimization until after searching the entire contents of the Google Drive.

Two cases—each more than six years old—demonstrate this point. These cases are examples like others across the country warning of the constitutional problems associated with seizing everything even though there is a technological means to seize a limited subset of data from Google. This ability to narrowly search an account is not a "new" technological invention, and the age of these cases fully support a generalized view that law enforcement (and courts) nationwide should understand this functionality.

In 2018, a federal judge quashed similar expansive search warrants seeking searches of the entirety of Google accounts:

> *That "accepted reality" [of needing to seize everything] has evolved.The Target asserts, and the government does not dispute, that Google is now willing and able to date-restrict the email content it discloses to the government.* [. . . S]*ee also* In re [Redacted]@gmail.com, 62 F. Supp.3d 1100, 1103 n.4 (N.D. Cal. 2014). In other words, Google is capable of producing to the government a much smaller haystack to search: only emails restricted to the probable cause time period of October 1, 2016, to April 14, 2017, rather than every email dating back to the creation of the email accounts. It is no longer a necessary evil to order Google to disclose to the government emails the government does not have probable cause to search. . . .

> *The Court finds that the search warrants challenged here, which require Google to disclose to the government the "contents of all emails associated with the Email Account[s,]" are overbroad because it is unreasonable to compel a provider to disclose every email in its client's account when the provider is able to disclose only those emails the government has probable cause to search.*SeeIn the Matter of the Search of Google Email Accts., 92 F. Supp. 3d 944, 946 (D. Alaska 2015) (denying two-step Google search warrant application as overbroad where although "the government promises to limit its search to the relevant date ranges, nothing in the proposed warrant precludes its agents from perusing other email content regardless how remote or how unrelated that content

may be to the current investigation"); In re [Redacted]@gmail.com, 62 F. Supp. 3d at 1104 (denying two-step Google search warrant application and stating that "[t]he court is nevertheless unpersuaded that the particular seize first, search second [warrant] proposed here is reasonable in the Fourth Amendment sense of the word"); U.S. v. Matter of Search of Info. Assoc. with Fifteen Email Addresses, 2017 WL 4322826, at *7, 10 (M.D. Ala. Sept. 28, 2017) (holding that "the Government's current request for all data related to all the [Google and other] email accounts is too broad" and ordering the government to include "a date restriction on the data to be turned over by the provider based on an individualized assessment of the accompanying probable cause evidence for each email account").

Matter of Search of Info. Associated With Four Redacted Gmail Accounts, 371 F. Supp. 3d 843, 845–46 (D. Or. 2018) (bolded, italicized emphasis added; first and second bracket set added; all other brackets in original; omitting internal citations, YouTube links, and parentheticals).

Similarly, in 2017, the Eleventh Circuit Court of Appeals explained that warrants directed to social media companies seeking "virtually every kind of data that could be found in a social media account" were overbroad. United States v. Blake, 868 F.3d 960, 974 (11th Cir. 2017). "And unnecessarily so." Id.

> Hard drive searches require time-consuming electronic forensic investigation with special equipment, and conducting that kind of search in the defendant's home would be impractical, if not impossible. By contrast, when it comes to Facebook account searches, the government need only send a request with the specific data sought and Facebook will respond with precisely that data. That procedure does not appear to be impractical for Facebook or for the government. Facebook produced data in response to over 9500 search warrants in the six-month period between July and December 2015.

Id. (internal citations and website omitted). The Court recognizes that the Eleventh Circuit did not determine if there was a Fourth Amendment violation in that case due to the application of the good-faith exception. But the overbroad analysis still applies here.

Even when construing the Google warrant application in this case in its entirety, the affidavit could only be construed to describe with particularity the Video and notes SPD was specifically seeking this Video "to authenticate the date, time, and location of when the video was created." See Ex. 2 at ¶ 10. However, the warrant application failed to explain how this Video could be related to Mr. Ziegler's wallet, web history, contacts, credit card numbers, PINs or any of the non-relevant information sought and seized. The Court finds that the warrant authorizing the broad seizure of ESI contained in Mr. Ziegler's Google Drive account was facially invalid and done in violation of his constitutional rights.

### 7.
### THE META/INSTAGRAM WARRANT

**(DECEMBER 8, 2023)**

As with the previous warrant, SPD obtained the Meta/Instagram warrant pursuant to 18 U.S.C. §§ 2701, et seq., and section 934.23(5), Florida Statutes. See Ex. 3 at p. 1. The affidavit in support of this warrant indicated SPD was investigating a charge of video voyeurism against Mr. Ziegler in violation of section 810.145(6)(b), Florida Statutes. The affidavit contained substantially the same facts as the phone and Google warrants. The Meta/Instagram warrant did reference the November 2nd meeting at Attorney Byrd's office:

> On 11/02/23, Detectives interviewed Christian Ziegler and his attorney Derek Byrd's office. Ziegler stated he took a video of the sexual encounter with the victim on 10/02/23, the date of the alleged sexual battery. Ziegler stated the sexual encounter was consensual. Ziegler showed detectives the 2.5-minute-long video of the sexual encounter. He stated that the sexual encounter was consensual. Byrd made mention of a message (on Instagram vanish mode) between the victim and Ziegler where the victim asked him if he showed his wife the video.

See Ex. 3 at ¶ 13. The affidavit then indicated that SPD had spoken to both Ms. Doe and Mrs. Ziegler and "the victim did not give Ziegler consent to take this video of them having sex." Id. at ¶ 14. It further stated that neither Mrs. Ziegler nor Ms. Doe had seen nor knew anything about the Video. Id.

The affiant then affirmed that she had reason to believe that evidence of the crime would be found within Mr. Ziegler's Instagram account and that Mr. Ziegler utilized the program to commit the crime of video voyeurism. Id. at ¶ 15. The affiant further asserted that "valuable evidence will be located within the suspect's account which will provide additional information about his criminal activity." Id. at ¶ 18.

Similar to the previous Google warrants, this warrant required Meta to "seize as evidence any of the following:"

> 1.  Any and all stored electronic communications or files associated with the user accounts identified as User Accounts Identified by User ID(s): [sic]
>
>     https://www.instagram.com/[redacted]/
>
>     Username: [redacted]
>
>     and any related accounts concerning the same account subscribers or users, since the creation of such account until the present time of this affidavit, including the content and header information of email messages and any attachments, user contact information, group contact information, IP logs, and instant messages (Instagram Messenger) to include vanish mode messages, whether drafted, sent, received, opened or unopened, read or unread, and/or forwarded, and any buddy lists or contact lists,

Page 32 of 46

calendars, transactional data, account passwords or identifiers, and/or any other files related to those accounts.

2.    Any Neoprints linked to or associated with the above Instagram user account. A Neoprint is an expanded view of a given user profile. It contains their current profile information, and all wall postings and messages to and from the user that have not been deleted by the user.

3.    Any Photoprints or videos linked to or associated with the above Instagram user account. A Photoprint is a compilation of all photos uploaded by the user that have not been deleted along with all photos uploaded by any user that has the user tagged in them.

4.    Records concerning the user of the above-listed user account(s); consisting of name, postal code, country, e-mail address, date of account creation IP address at account sign-up, logs showing IP address, and date stamps for account accesses.

5.    Journal entries, Neoprints, comments and the contents of private messages in the above-listed user's inbox, sent mail, and trash folders related to the above-listed user account(s)

6.    Any images, videos, or chats within the vanish mode setting of the above account.

Ex. 3, pp. 2-3, ¶¶ 1-6.

Again, Detective Cox testified at trial that, in her opinion, the Meta/Instagram warrant failed to produce any evidence relevant to SPD's investigation.

The Court finds that the Meta/Instagram warrant's "seizure" of Mr. Ziegler's entire account history since its inception to be used as "evidence" again fails to provide either the necessary particularity or establish a nexus between the entire contents of this account to the crime being investigated.  The only specific mention of Instagram linking this service to the crime is the affidavit's mention that Mr. Ziegler used it to communicate with Ms. Doe on and after October 2, 2023 (¶¶ 8, 10) and Mr. Byrd's comment that there was a vanishing message from Ms. Doe asking Mr. Ziegler if he showed the video to his wife. (¶ 13).

Even when construing the warrant application as a whole, the Court finds these references fail to provide the warrant with sufficient particularity to seize the entire contents of his account from its inception. Thus, even though no relevant evidence was located upon SPD's review of the seized information, the ESI seized by SPD was pursuant to a constitutionally invalid warrant and in violation of Mr. Ziegler's constitutionally protected rights.

**8.**
**REMEDIES**

Having concluded multiple and fundamental violations of Mr. Ziegler's Fourth Amendment right, the Court must address what can be done about it in the present context.

## A.
## The Constitutional Right of Return of a Person's Property

Implicit in the Fourth Amendment is the remedial obligation of courts to order the prompt return of illegally seized, non-contraband property. Weeks v. United States, 232 U.S. 383, 393 (1914), *overruled on other grounds by* Elkins v. United States, 364 U.S. 206 (1960); see also City of W. Covina v. Perkins, 525 U.S. 234, 240 (1999) (noting that when law enforcement seizes property pursuant to a warrant, the Fourteenth Amendment's due process clause applies to the return of the property to its rightful owner); Bolden v. State, 875 So. 2d 780, 782 (Fla. 2d DCA 2004) ("that the party from whom materials are seized in the course of a criminal investigation retains a protectible property interest in seized materials").

This is particularly important when the government determines that the investigation will not result in criminal charges which provide the individual a traditional criminal forum to challenge the seizure. Black Hills Inst. of Geological Research v. U.S. Dept. of Justice, 967 F.2d 1237, 1240 (8th Cir. 1992) ("Until criminal charges are brought, the property owner is to be considered an innocent bystander.").

The government may not retain access to seized property which has been determined to be outside the scope of the warrant. See United States v. Matias, 836 F.2d 744, 747 (2d Cir. 1988) ("when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items"); Doane v. United States, 2009 WL 1619642, at *10–11 (S.D.N.Y. June 5, 2009) (ordering the return of "the originals and all copies" of seized item).

Intervenor Defendants during oral argument suggested that even if there were a "return" of Mr. Ziegler's data, the government could keep a copy of it. The analogy used was if a stapler were seized, law enforcement could photograph and keep a picture of the stapler while returning the actual stapler. That contention, though, violates Mr. Ziegler's property rights because it destroys his ability to control that property and exclude others from it.

> Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. ***One of the main rights attaching to property is the right to exclude others*** . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.

Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978) (emphasis added; internal citation omitted).

For these reasons, the Court finds that Defendants' continued retention of the unlawfully seized ESI raises constitutional issues ***distinct*** from the lawfulness of the underlying warrants and their execution—not the least of which is Mr. Ziegler's right to regain exclusive control over

his private information and to be free from a *de facto* forfeiture without due process or compensation. E.g., <u>United States v. Premises Known as 608 Taylor Ave., Apartment 302, Pittsburgh, Pa.</u>, 584 F.2d 1297, 1302 (3d Cir. 1978) (noting that the government's failure to return property seized pursuant to a search warrant in a timely manner may result in a *de facto* forfeiture); <u>Lowther v. United States</u>, 480 F.2d 1031 (10th Cir. 1973) (holding that the continued retention of evidence would constitute a taking without just compensation).

Absent Florida's Public Record Law, there would be no credible argument to the main relief Mr. Ziegler seeks—the return of his property accomplished through the destruction of the electronic copies in the government's possession.

## B.
## Florida's Public Record Law

> Every person has the right to inspect or copy any public record made or received in connection with the official business of any public body, officer, or employee of the state, or persons acting on their behalf, except with respect to records exempted pursuant to this section or specifically made confidential by this Constitution. This section specifically includes the legislative, executive, and judicial branches of government and each agency or department created thereunder; counties, municipalities, and districts; and each constitutional officer, board, and commission, or entity created pursuant to law or this Constitution.

Art. I, §24(a), Fla. Const.

Even before this constitutional provision was added to Florida's Constitution in 1992, Florida maintained a robust statutory public records law. See ch. 119, Fla. Stat. That the people of Florida also added this right to our state's constitution underscores the importance of access to public records.

And the Court acknowledges the constitutional importance of public records in Florida.

"'Public records' means all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material, regardless of the physical form, characteristics, or means of transmission, ***made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency***." §119.011(12), Fla. Stat. (emphasis added).

It is well established that the public records laws be liberally construed in favor of the state's policy of open government. E.g., <u>Board of Trustees v. Lee</u>, 189 So. 3d 120, 125 (Fla. 2016).

## C.
## The intersection of the Fourth Amendment and the Public Record Act

**Filed 07/01/2024 07:46 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

Before proceeding further, the Court makes two observations derived from case law about Florida's public record law. *First*, physical presence on a governmental computer system does not automatically transform an individual's personal emails into a public record. State v. City of Clearwater, 863 So. 2d 149, 155 (Fla. 2003) (holding City of Clearwater employee's personal email on governmental server not public record). *Second*, an individual's private documents in the hands of a governmental entity received in the ordinary course of business are not automatically a public record. Kight v. Dugger, 574 So. 2d 1066, 1068 (Fla. 1990) (holding criminal defendant's file in the hands of the Office of Capital Collateral Representative are not governmental records subject to disclosure pursuant to chapter 119).

From these cases, the Court can conclude that a person's private property is not automatically transformed into a public record simply by being seized by the government and held in its file. That is not to say the seized items may not be public record—they may—but the simple fact of being seized and held by the government is not enough to qualify as a public record.

Otherwise, the return of every search warrant issued by a state court and returnable before a state judge in Florida would constitute a public record. And there would be nothing that the owner of the seized property could do to shield the contents of their property from public view. The ramifications of that holding would be sweeping—and outright scary.

Turning to the facts here, the Court has determined that the records at issue remain the private property of Mr. Ziegler. He has established ownership. And he has established that his property is not contraband, the fruit of criminal activity, or in need to be held as evidence for a future prosecution.

The question, then, is what, if anything, can be done by Mr. Ziegler (or Mrs. Ziegler, as it relates to marital communications) to shield his private property from public disclosure.

The Court is unaware of any published appellate court decision in Florida that directly addresses the public's right to disclosure of documents illegally seized by the government during an official investigation. The Court is aware, though, that despite Florida' public record law, the Palm Beach County Court ordered the destruction of a surveillance video obtained via a warrant but where the seizure occurred in violation of the defendant's Fourth Amendment rights. State of Florida v. Robert Kraft, 2019-MM-2346, 2019-MM-2348 (Fla. Palm Beach Cnty. Ct. order July 30, 2021).

The facts occurring before the trial court's destruction order were discussed in State v. Kraft, 301 So. 3d 981 (Fla. 4th DCA 2020). Law enforcement there was investigating massage parlors suspected of housing prostitution activity. Law enforcement sought, and obtained, a warrant to install a secret, non-audio video camera in places in the massage parlor where prostitution activities were believed to be occurring, including the massage room. There was no minimization in the warrant, and detectives were not given any instructions on how to minimize to avoid constitutional violation. Robert Kraft and many others were video recorded at the establishment, arrested, and prosecuted for soliciting prostitution. The trial court suppressed the

video surveillance based on the Fourth Amendment violation without any exception to the exclusionary rule applicable. The Fourth District affirmed.

There was a pretrial protective order in place preventing the video's release. After the evidence against him was suppressed, Mr. Kraft moved to modify the protective order seeking to prohibit the permanent release of the video. State v. Kraft, 2019-MM-2346, 2019-MM-2348 (Fla. Palm Beach Cnty. Ct. filing on May 13, 2021, pp. 2-4). A few months later, Mr. Kraft then moved to compel the destruction of the video, noting that it was unopposed by the State. Id. (Filing on July 29, 2021). (Previously, the State had opposed due to pending other litigation. Id. (Filing on Dec. 30, 2020). The trial court granted the motion and directed the State to "destroy the suppressed evidence forthwith and submit documentation to this Court outlining the steps it took to comply." Id. (order July 30, 2021). The Court found no appeal of that Order.

By separate Order entered today, the Court is taking judicial notice of the Kraft trial court filings. As noted in that order, because the Court is taking judicial notice, the Court is permitting the parties an opportunity to advise as to the propriety of the Court taking judicial notice.

The decision in Kraft establishes that a remedy can be the destruction of evidence obtained in violation of a person's Fourth Amendment rights. In Kraft the video never was Mr. Kraft's personal property; instead, it simply captured private moments in an area where he had an expectation of privacy. In this case, the facts are even more compelling because the government seized Mr. Ziegler's personal property.

Although not addressing the issue of improperly seized personal property, the Fourth District in Limbaugh v. State, 887 So. 2d 387 (Fla. 4th DCA 2004), did address medical records containing information of a criminal defendant, Rush Limbaugh. The main holding of that case was that Mr. Limbaugh's privacy rights to the content of his medical records was not implicated by the State's seizure and review of those medical records based on a valid warrant in an investigation of unlawful doctor shopping seeking to obtain controlled substances. The Fourth District though, explained its denial of certiorari was without prejudice to Mr. Limbaugh seeking "review by the issuing Judge to insure that all the records produced fall within the scope of the warrants, *and to seek other protective relief to prevent improper disclosures to third parties of records irrelevant to this prosecution.*" Id. at 398 (footnote citing to the statute allowing return of seized items omitted).

This last sentence suggests two things important here. *First*, there could be a remedy relating to documents seized in violation of the warrant. *Second*, Mr. Limbaugh retained a level of control to prevent disclosure to others of records not relevant to the prosecution. These suggestions would seem to apply here—especially the second—because almost all data SPD seized from Mr. Ziegler based on the three warrants is entirely irrelevant to the investigation.

Additionally, the Court notes there are Florida cases that have peripherally implied that, under facts like those here, an individual's constitutional rights prevail over the public's right to disclosure. These cases, though, are not directly relevant, are not as strong as Kraft, and to a lesser extent, Limbaugh, and could support either the Zieglers' or Intervenor's position.

- <u>Florida Freedom Newspapers, Inc.</u>, 520 So. 2d 32, 34 (Fla. 1988) (noting prior to trial that there may be instances where court records should remain sealed out of respect for an individual's constitutional rights).

- <u>Shevin v. Byron, Harless, Schaffer, Reid & Associates, Inc.</u>, 379 So. 2d 633, 638 (Fla. 1980) (holding that under the facts of that case, a violation of an individual's "disclosural privacy interest" *standing alone*, does not present a constitutionally protected interest sufficient to prevent public disclosure);

- <u>National Collegiate Athletic Association v. Associated Press</u>, 18 So. 3d 1201, 1214 (Fla. 1st DCA 2009) (holding that the application of the Florida public record law did not violate any constitutional right under the facts of that case and, therefore, the public records could be released);

- <u>Roberts v. News-Press Publishing Co., Inc.</u>, 409 So. 2d 1089, 1094 (Fla. 2d DCA 1982) (analyzing the post <u>Shevin</u> case law and noting that "it seems clear that there is a potential federal constitutional right of disclosural privacy for employees that may exist in addition to the limited statutory exemptions in regard to the contents of personnel files").

Having concluded that each of the three warrants violated Mr. Ziegler's constitutional rights, the Court concludes that Mr. Ziegler has the right to the return of his personal property. This right-of-return includes the right to exclusive possession of his property and the right to prevent disclosure to, or review by, others of his data. Failure to do so would result in further constitutional injury to Mr. Ziegler.

Mr. Ziegler's request to destroy the contents of the data seized from those three warrants is a permissible remedy he has regardless of the existence of Florida's broad public record provisions. And the Court will allow it.

There are two limitations to this ruling. *First*, the Court reminds that Mr. Ziegler voluntarily produced the Video to law enforcement and the 14 photographs taken by Specialist Yang, and therefore, those items were not seized unconstitutionally. *Second*, because Mr. Ziegler conceded that the data previously produced is already in the public domain, there is no need to destroy that data. Thus, those items will not be part of the Court's destruction order.

Before leaving this section, the Court notes several items touching on today's analysis. The data seized in violation of Mr. Ziegler's constitutional rights does not qualify as a public record. Recall the definition of public record requires it to be "made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency." §119.011(12), Fla. Stat. The seized ESI here cannot be made pursuant to a law or ordinance when it was seized *in violation* of Mr. Ziegler's constitutional rights. Further, as SPD's actions *exceeded* their lawful authority, the ESI was not received during the transaction of "official business." <u>Gentile v. Bauder</u>, 718 So. 2d 781, 784 (Fla. 1998) (holding that government officials act in an official capacity only to the extent their conduct does not violate a clearly established

statutory or constitutional right which a reasonable person should have known); <u>O'Boyle v. Town of Gulf Stream</u>, 257 So. 3d 1036, 1040–41 (Fla 4th DCA 2018) (for information to be considered a public record, an official or employee must be prepared, owned, used, or retained it within the scope of his or her employment or agency).

Additionally, the Court is aware that article I, section 23, of Florida's Constitution, textually provides that Florida's privacy right provision "shall not be construed to limit the public's right of access to public records and meetings as provided by law." That exclusion simply does not apply to an individual's right to be secure from unreasonable searches and seizures and against the "unreasonable interception of private communication" nor his right to due process. Indeed, these individual rights have been in existence long before the adoption of the Public Record Act and are basic to the foundations of freedom guaranteed by both the United States and Florida Constitution.

To rule otherwise would be to elevate Florida's public record law over the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The Supremacy Clause, <u>see</u> art. VI, U.S. Const., forecloses that construction.

### D.
### <u>Alternate Holding – Criminal Investigative Records</u>

The Court provides this analysis if an appellate or reviewing court ultimately disagrees with the Court's conclusions that Mr. Ziegler's data was seized unconstitutionally.

Assuming *arguendo* that the Mr. Ziegler's ESI were not seized in violation of his constitutional rights, the Court alternatively holds that all ESI deemed irrelevant to SPD's investigation was not received or held "'with the intent of perpetuating or formalizing knowledge' in connection with the transaction of official agency business" and is not subject to public disclosure. <u>State v. City of Clearwater</u>, 863 So. 2d 149, 154 (Fla. 2003).

As applied to this case, especially in the light of Detective Cox's testimony, this includes without limitation to: (1) the entirety of ESI seized pursuant to the Google and Meta/Instagram warrants as they contained no information relevant to SPD's investigation; (2) all 250,000+ photographs and 30,000+ videos from Mr. Ziegler's cell phone, specifically including those marked with the F7 as Detective Cox's testimony established none revealed any criminal conduct or implicated the sexual battery investigation; (3) the "List" as the testimony demonstrated it was not relevant to the potential criminal charge (Exhibit Q, paragraph 15i); and (4) all data not marked F7. This information plainly is not public record.

As it pertains to the information seized based on the cellphone warrant identified on Exhibit Q, the evidence established that Paragraphs 1-14 previously have been publicly produced and no longer addressed by this case. The Court found that Mr. Ziegler voluntarily produced the Video to law enforcement (Paragraph 16 of Exhibit Q).

That leaves the remainder of the items identified in Paragraph 15 of Exhibit Q as the only potential items that *may* qualify as public records: (1) those records between Mr. Ziegler and Ms.

Filed 07/01/2024 07:46 AM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

Doe (Exhibit Q, paragraph 15e, 15f, 15g and 15k); (2) Mr. Ziegler's web browsing history (Exhibit Q, paragraph 15j); (3) the Cellebrite extraction report (Exhibit Q, paragraph 15h); and (4) depending on the resolution of the spousal privilege issue, certain communications between Mr. and Mrs. Ziegler (Exhibit Q, paragraph 15a, 15b, 15,c, and 15d).

The Court hastens to note that it is **not** making an alternative finding that each of the items within these subparagraphs does or does not constitute a public record. The Court would need to adjudicate the Intervenor Defendants' crossclaims to make that determination, and it is not necessary to do so here. And the Court certainly is not adjudicating the existence or nonexistence of a statutory exemption from disclosure in this case. In other words, if the Court erred in its main analysis in this Final Judgment, the custodian will need to make the determination in the first instance if a record is a public record, and if so, whether it is confidential or subject to a statutory exemption.

The Court just noted "depending on the resolution of the spousal privilege issue," which the Court addresses below.

### E.
### Mrs. Ziegler's spousal privilege

The Court's conclusion that Mr. Ziegler is entitled to the return of all data seized by the cellphone warrant (except as specifically exempted) eliminates the need for the Court to address Mrs. Ziegler's spousal privilege claim as all spousal communications are included in the scope of the return/destroy order in Mr. Ziegler's favor.

If, however, an appellate or any reviewing court ultimately disagrees with the Court's conclusions concerning the constitutional violations, the Court provides additional analysis addressing the spousal communications, which are located at Exhibit Q, Paragraphs 15a-15d. The Court first provides its primary analysis and then, its alternative analysis.

*First*, the Court in Section 3-B of this Order concluded that Mrs. Ziegler had standing to raise spousal privilege. The Court held that Mrs. Ziegler has a statutory right to prevent disclosure of spousal communications that were intended to be made in confidence between spouses while married.

As it pertains to the more than 1,200 text messages between Mr. and Mrs. Ziegler (Exhibit Q, paragraphs 15a-15d) seized by SPD under authority of the cellphone warrant, the Court undertook an *in camera* inspection of these communications consistent with the procedure established in Times Publishing Co. v. City of Clearwater, 830 So. 2d  844 (Fla. 2d DCA 2002), *approved by* State v. City of Clearwater, 863 So. 2d 149 (Fla. 2003), where there is a contest whether a document constitutes a public record.

Based on that *in camera* inspection of those communications, the Court finds that each was made by one spouse to the other spouse during the existence of their continuous marriage, and there was no other recipient of those communications. Further, the Court finds that these

communications were intended to be made in confidence between spouses. There has been no waiver.

These communications qualify for protection under section 90.504. As such, both Mr. and Mrs. Ziegler have a protected spousal privilege to prevent another from disclosing these recorded spousal communications pursuant to section 90.504. Pagan v. State, 29 So. 3d 938, 958 (Fla. 2009) (holding that either spouse can invoke the privilege and prevent another from disclosing spousal communications). This includes agents of the government.

As previously noted, the statutory adoption of section 90.504 (spousal privilege) occurred *prior* to July 1, 1993. Thus, even assuming the search warrant permitted the seizure of the communication between Mr. and Mrs. Ziegler, and assuming some of them otherwise would qualify as a public record, the substance of those communications would be exempt from disclosure pursuant to article I, section 24(d), Florida Constitution, and section 90.504.

Putting that more directly, none of these 1,200+ communications between the Zieglers may be publicly released.

*Second*, assuming the Court's conclusion that Mrs. Ziegler may prevent disclosure pursuant to section 90.504 is erroneous, almost none of those communications qualify as a public record. Almost none of them have any nexus to the sexual battery charge being investigated by the cellphone warrant. And that is not surprising, as almost all of them were exchanged by the Zieglers more than two years before the alleged crime.

The only communications that may arguably have some tangential nexus that could conceivably be a criminal investigative record would be:

| All messages from beginning message to ending message, inclusive ||
| Beginning message | Ending message |
| --- | --- |
| 2/5/2021 at 12:40:54 p.m. | 2/5/2021 at 3:36:42 p.m. |
| 2/19/2021 at 2:18:12 p.m. | 2/19/2021 at 2:21:40 p.m. |
| 2/19/2021 at 8:48:20 p.m. | 2/19/2021 at 8:39:46 p.m. |
| 2/19/2021 at 11:00:33 p.m. | 2/19/2021 at 11:34:29 p.m. |
| 2/19/2021 at 11:37:16 p.m. | 2/19/2021 at 11:43:26 p.m. |
| 2/25/2021 at 10:13:49 p.m. | 2/25/2021 at 10:22:37 p.m. |
| 3/10/2021 at 11:22:56 p.m. | 3/10/2021 at 11:22:56 p.m. |
| 3/10/2021 at 11:32:27 p.m. | 3/10/2021 at 11:36:24 p.m. |
| 6/20/2021 at 5:49:15 p.m. | 6/20/2021 at 5:49:15 p.m. |

Again, this is not a finding that these qualify as a public record. It is only an alternative finding that this is the universe of spousal communications that may constitute public record. Other than those communications, though, none could qualify as a public record.

### 9.
### PUBLIC RECORD RETENTION AFFIRMATIVE DEFENSE

The State Attorney's Office has also raised the affirmative defense that they are required to retain felony files for one year in accordance with records retention requirements set by Rule 1B-24.003(1)(b), Fla. Admin. Code. However, the Court notes that this rule was adopted pursuant to section 119.021(2)(a)-(d), Fla. Stat. as it applies to "public records." To the extent that this ruling has found that the records at issue are the private records of Mr. Ziegler, the Court also finds that this provision does not apply.

**10.**
**CONCLUSION**

Each of the three warrants in this case violated Mr. Ziegler's Fourth Amendment rights. Those warrants were vastly overbroad. They did not describe with particularity the items to seize. There was no search protocol included.

Instead, these warrants were "general warrants" that allowed unreasonable searches and seizures. Since the inception of our country, the Fourth Amendment has guarded against general warrants like those in this case. Law enforcement's actions with respect to these three warrants were patently erroneous and constitutionally intolerable. Mr. Ziegler's property was searched and seized in violation of his constitutional rights.

Mr. Ziegler was not arrested, and all criminal investigations of him are complete. No criminal charges were brought or contemplated. There is no need for law enforcement or the State Attorney's Office to retain the contents of Mr. Ziegler's cellphone, Google Drive, or Meta/Instagram accounts for purposes as evidence against Mr. Ziegler or others for future prosecution. None of the data constitutes contraband or the fruit of criminal activity.

In these circumstances, Mr. Ziegler has the legal right to the return of his property. This right includes exclusive possession and control of his property. A corollary right is the ability to preclude others from reviewing his property. These rights derive from the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Article 1, section 24, Florida Constitution, gives every person the right to inspect and copy any public record unless it is confidential or exempt from disclosure. Mr. Ziegler's property was not converted to public record by law enforcement's search and seizure. Further, Mr. Ziegler's property cannot be considered public record because violating a person's constitutional rights forecloses a finding it was "made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency." Florida's public record law does not apply to this situation.

There is precedent in Florida for a court to order law enforcement to destroy illegally seized material in violation of a person's Fourth Amendment rights. And that is what Mr. Ziegler requests, and the Court grants that request.

IT IS ORDERED AND ADJUDGED:

1.     The Court grants judgment in favor of Christian Ziegler as to each of Counts 1, 2, 3, and 4 as discussed in this Order.

2.     Plaintiff Bridget Ziegler has standing to advance her spousal privilege claim. Based on the Court's resolution of Mr. Ziegler's claims, there is no need to award Mrs. Ziegler relief because her relief is accomplished by Mr. Ziegler's relief..

3.     Each of the three search warrants to seize Mr. Ziegler's cellphone, Google Drive, and Instagram accounts violated Mr. Ziegler's constitutional rights.

4.     Except as discussed in this decretal paragraph 4, the entirety of the data seized by the Sarasota Police Department based on the cellphone warrant belongs to Mr. Ziegler, and he is entitled to its return regardless of whether it is in the possession of the City of Sarasota/Sarasota Police Department or the State Attorney's Office for the Twelfth Judicial Circuit or both. The only exceptions are:

       a.     The Video Mr. Ziegler voluntarily provided to the Sarasota Police Department (also referenced at Exhibit Q, paragraph 16);

       b.     The 14 photographs Specialist Yang took on December 1, 2023, of Mr. Ziegler's cellphone and screens during the Video turnover; and

       c.     Any of Mr. Ziegler's data previously publicly produced by the Sarasota Police Department or State Attorney's Office.

5.     The entirety of the data seized by the Sarasota Police Department based on the Google warrant belongs to Mr. Ziegler, and he is entitled to its return regardless of whether it is in the possession of the City of Sarasota/Sarasota Police Department or the State Attorney's Office for the Twelfth Judicial Circuit or both.

6.     The entirety of the data seized by the Sarasota Police Department based on the Meta/Instagram warrant belongs to Mr. Ziegler, and he is entitled to its return regardless of whether it is in the possession of the City of Sarasota/Sarasota Police Department or the State Attorney's Office for the Twelfth Judicial Circuit or both.

7.     The entitlement to the return of Mr. Ziegler's property addressed in this Final Judgment specifically grants Mr. Ziegler the right to the exclusive possession and control of his property and the ability to exclude others from obtaining that property.

8.     Each of the City of Sarasota/Sarasota Police Department and the State Attorney's Office for the Twelfth Judicial Circuit is permanently enjoined from publicly disclosing the contents of Mr. Ziegler's property seized by any of the three warrants, except as specifically identified in decretal paragraph 4a-4c. The Court's temporary injunction merges into this Final Judgment.

9.      Each of the City of Sarasota/Sarasota Police Department and the State Attorney's Office for the Twelfth Judicial Circuit shall destroy the original and all copies of the data seized by any of the three warrants, except as specifically identified in decretal paragraph 4a-4c. The requirement to destroy shall not begin until the later of: (1) the expiration of the time to appeal this Final Judgment; or if there is an appeal (2) the issuance of the mandate. Once the requirement to destroy becomes effective, the City of Sarasota/Sarasota Police Department and the State Attorney's Office for the Twelfth Judicial Circuit will comply promptly and without delay.

10.     Within 10 days of executing the destruction requirement, each of City of Sarasota/Sarasota Police Department and the State Attorney's Office for the Twelfth Judicial Circuit will submit an affidavit that is filed in the Court file documenting the steps that it took the comply with the destruction of the data and affirming that it no longer possesses any data covered by this destruction requirement.

11.     The Zieglers are entitled to the return of the posted bond. The Clerk shall not return that bond to the Zieglers until further Order of the Court or, if no such Order, the later of: (1) the expiration of the time to appeal this Final Judgment; or if there is an appeal (2) the issuance of the mandate.

12.     Nothing in this Final Judgment impacts the status of any public record previously created that referenced or quoted information obtained from the data seized by the three warrants. This includes law enforcement's reports in this matter.

13.     The Court did not address the Intervenor Defendants' crossclaims, which were not at issue at the time of trial. Those are severed. Nothing about those pending crossclaims impacts the finality of this Final Judgment. All judicial labor is complete with respect to the Verified Amended Complaint except for collateral matters. This Final Judgment is final.

14.     The Court reserves jurisdiction to address enforcement matters as well as any timely filed motion for attorney fees or costs or both.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on July 01, 2024.

7/1/2024 7:46 AM 2024 CA
001409 NC
e-Signed 7/1/2024 7:46 AM 2024 CA 001409 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On July 01, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

JAMES BURGES LAKE
THOMAS & LOCICERO PL
400 NORTH ASHLEY DRIVE STE 1100
TAMPA, FL  33602

JOSEPH C MLADINICH
FOURNIER ,CONNOLLY,  WARREN & SHAMSEY PA
1 S SCHOOL AVENUE SUITE 700
SARASOTA, FL  34237

CRAIG JARETT SCHAEFFER
2071 RINGLING BLVD
SARASOTA, FL  34237

MORGAN R BENTLEY
783 S ORANGE AVE STE 300
SARASOTA, FL  34236

KAYLIN MARIE HUMERICKHOUSE
783 S ORANGE AVE STE 300
SARASOTA, FL  34236

JOSEPH C MLADINICH
FOURNIER ,CONNOLLY,  WARREN & SHAMSEY PA
1 S SCHOOL AVENUE SUITE 700
SARASOTA, FL  34237

MATTHEW SETH SARELSON
3801 PGA BLVD, SUITE 600
PALM BEACH GARDENS, FL  33410

MICHAEL BARFIELD
1668 OAK STREET #1
SARASOTA, FL  34236

| | |
|---|---|
| SARELSON, MATTHEW SETH | alfrancis@dhillonlaw.com |
| SCHAEFFER, CRAIG JARETT | CSCHAEFF@SAO12.ORG |
| SCHAEFFER, CRAIG JARETT | EBRODSKY@SAO12.ORG |
| BENTLEY, MORGAN R | ESERVE@BGK.LAW |
| SARELSON, MATTHEW SETH | haguillard@dhillonlaw.com |
| LAKE, JAMES BURGES | jlake@tlolawfirm.com |
| MLADINICH, JOSEPH C | JOE.MLADINICH@SARASOTAFL.GOV |
| MLADINICH, JOSEPH C | KATHERINE.CORDERO@SARASOTAFL.GOV |
| HUMERICKHOUSE, KAYLIN MARIE | KHUMERICKHOUSE@BGK.LAW |
| SCHAEFFER, CRAIG JARETT | LPARCELS@SAO12.ORG |
| BENTLEY, MORGAN R | MBENTLEY@BGK.LAW |
| BARFIELD, MICHAEL | MICHAEL@DENOVOLAWFL.COM |
| SARELSON, MATTHEW SETH | msarelson@dhillonlaw.com |
| HUMERICKHOUSE, KAYLIN MARIE | saorounds@sao12.org |
| SCHAEFFER, CRAIG JARETT | SSHIFFLET@SAO12.ORG |
| LAKE, JAMES BURGES | TGILLEY@TLOLAWFIRM.COM |
| Joseph Polzak | Joe.Polzak@sarasotafl.gov |
| Mark R. Caramanica | mcaramanica@tlolawfirm.com |
| Mark R. Caramanica | jvanderhorst@tlolawfirm.com |
| Zachary Stoner | zstoner@dhillonlaw.com |
| Michael Barfield | mbar62@gmail.com |
| Robert Fournier | robert.fournier@sarasotafl.gov |
| Joseph Mladinich | jmladinich@fournierconnolly.com |